## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLS BANK INTERNATIONAL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07-CV-00974-RMC |
| v. ) | |
| ) | |
| ALICE CORPORATION PTY. LTD., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ALICE CORPORATION PTY. LTD., ) | |
| ) | |
| Counterclaim-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CLS BANK INTERNATIONAL, ) | |
| ) | |
| Counterclaim-Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| CLS SERVICES LTD., ) | |
| ) | |
| Counterclaim-Defendant. ) | |

## MOTION OF CLS BANK INTERNATIONAL AND CLS SERVICES LTD. TO DISMISS THE COUNTERCLAIMS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

Plaintiff and Counterclaim-Defendant CLS Bank International and Counterclaim-

Defendant CLS Services Ltd. respectfully move the Court to dismiss the Counterclaims of

Defendant and Counterclaim-Plaintiff Alice Corporation Pty. Ltd., for failure to state a claim or,

alternatively, for summary judgment (the "Motion"). A memorandum of points and authorities

in support of the Motion, along with a proposed order, are submitted herewith.


Dated:  September 12, 2007                    Respectfully submitted,

                                              David O. Bickart (Bar # 355313)
                                              KAYE SCHOLER LLP
                                              901 Fifteenth Street, N.W.
                                              Washington, DC 20005-2327
                                              (202) 682-3503


Of Counsel:

William A. Tanenbaum (WT-9960)
Steven J. Glassman (SG-1616)
Stephen J. Elliott (SE-5437)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLS BANK INTERNATIONAL, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07-CV-00974-RMC |
| | ) |
| ALICE CORPORATION PTY. LTD., | ) |
| Defendant. | ) |
| ALICE CORPORATION PTY. LTD., | ) |
| Counterclaim-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CLS BANK INTERNATIONAL, | ) |
| Counterclaim-Defendant, | ) |
| and | ) |
| CLS SERVICES LTD., | ) |
| Counterclaim-Defendant. | ) |

## PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS THE COUNTERCLAIMS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 2

    A.    The Allegations of Alice's Counterclaims ................................................................ 2

    B.    Alice's Answer To The Allegations Of CLS Bank's Complaint .................................... 3

    C.    The Underlying Facts Concerning The Location Of The CLS System, And
        Performance Of The CLS Method, In The United Kingdom ......................................... 5

        1.    The CLS Service Is Effectuated By The CLS Core System, Located
               Entirely In The U.K. ......................................................................................... 5

        2.    CLS Bank's Limited Facilities In The U.S. Cannot Be Used To Settle
               Instructions .................................................................................................... 8

        3.    Alice's Patent Claims Cannot Cover The CLS System Located In The
               U.K. Or The CLS Process Performed In The U.K. .............................................. 9

ARGUMENT ....................................................................................................................... 11

ALICE'S COUNTERCLAIMS SHOULD BE DISMISSED, WITH PREJUDICE ................... 11

    A.    Alice's Counterclaims Fail To Plead Sufficient Facts To State A Claim .................... 11

    B.    Alice's Counterclaims Should Be Dismissed With Prejudice Or, Alternatively,
        By The Grant Of Summary Judgment ...................................................................... 14

        1.    The U.S. Patent Laws Only Reach Alleged Infringement Within The
               United States, And Do Not Have Extraterritorial Effect ..................................... 15

        2.    Alice's Answer To CLS Bank's Complaint Shows That It Cannot
               Plausibly Allege A Viable Claim For Patent Infringement .................................. 17

        3.    Alice Cannot, In Any Event, State A Viable Claim For Patent
               Infringement, Because The Relevant Components Of The CLS System
               And CLS Service Are Located In The U.K. ........................................................ 18

             a.    Alice Has No Claim For Infringement Of Its Method Patents ................. 18

             b.    Alice Has No Claim For Infringement Of Its Systems Patent ................. 19

    C.    The Counterclaims Should Be Dismissed Without Engaging In Lengthy And
        Expensive Discovery .............................................................................................. 21

CONCLUSION .................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aktieselskabet AF 21 v. Fame Jeans, Inc.*,
  No. 06-585, 2007 WL 1655877 (D.D.C. Jun. 7, 2007) ......................... 13

*Anticancer Inc. v. Xenogen Corp.*,
  No. 05-CV-0448-B, 2007 U.S. Dist. LEXIS 59811 (S.D. Cal. Aug. 13, 2007) .... 12, 13, 14

*Ass'n Gen. Contractors of Cal., Inc. v. Carpenters*,
  459 U.S. 519 (1983) ................................................. 21

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (May 21, 2007) ........................................ *passim*

*Brown v. Duchesne*,
  60 U.S. (19 How.) 183 (1857) ......................................... 16

*Chavous v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*,
  201 F.R.D. 1 (D.D.C. 2001) ........................................... 21

*Conley v. Gibson*,
  355 U.S. 41 (1957) ................................................... 12

*Deepsouth Packing Co. v. Laitram Corp.*,
  406 U.S. 518 (1972) ................................................. 1, 16, 21

*Ductmate Industrial, Inc. v. The Lockformer Co.*,
  No. 84-C-5152, 1985 WL 2179 (N.D. Ill. Feb. 12, 1985) .................... 23

*EEOC v. Concentra Health Servs., Inc.*,
  No. 06-3436, 2007 WL 2215764 (7th Cir. Aug. 3, 2007) .................... 13

*Foman v. Davis*,
  371 U.S. 178 (1962) .................................................. 15

*McCagg v. Marquis Jet Partners, Inc.*,
  No. 05-CV-10607, 2007 U.S. Dist. LEXIS 54516 (S.D.N.Y. Jul. 27, 2007) ........ 15

*Microsoft Corp. v. AT&T Corp.*,
  127 S. Ct. 1746 (Apr. 30, 2007) ....................................... 1, 16, 21

* *NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006) .................... 16, 18

*Page v. Lexington County Sch. Dist. One*,
  No. 3:06-249-CMC, 2007 WL 162178 (D.D.C. Jan. 17, 2007) ............... 23

*Pellegrini v. Analog Devices, Inc.*,
   375 F.3d 1113 (Fed. Cir. 2004)................................................................ 16

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
   36 F. Supp. 2d 810 (C.D. Ill. 1998),
   *aff'd*, 215 F.3d 1246 (Fed. Cir. 2000) ................................................... 23

*Singh v. S. Asian Soc'y of The George Washington Univ.*,
   No. 06-574, 2007 U.S. Dist. LEXIS 36620 (D.D.C. May 21, 2007)...................... 22-23

*U.S. v. $6,976,934.65 Plus Interest*,
   486 F. Supp. 2d 37 (D.D.C. 2007) ........................................................ 23

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999)............................................................ 22

*Weyrich v. The New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) .......................................................... 22

*Zoltek Corp v. U.S.*,
   442 F.3d 1345 (Fed. Cir. 2006)......................................................... 18

## STATUTES

\* 35 U.S.C. § 271 ............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6).................................................................................... *passim*

Plaintiff and Counterclaim-Defendant CLS Bank International ("CLS Bank") and Counterclaim-Defendant CLS Services Ltd. ("CLS Services U.K.") respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Counterclaims of Defendant and Counterclaim-Plaintiff Alice Corporation Pty. Ltd. ("Alice"), for failure to state a claim, or alternatively for summary judgment.

## PRELIMINARY STATEMENT

Alice's patent infringement counterclaims should be dismissed with prejudice, for failure to state a claim. The counterclaims fail to provide even the minimal factual allegations required to state a plausible claim of infringement in the United States, either by CLS Bank, or by Alice's newly-added counterclaim-defendant, CLS Services U.K. Moreover, Alice's Answer to CLS Bank's Complaint, which sought a declaratory judgment of non-infringement, further shows that Alice cannot plead facts to support a viable infringement counterclaim.

Infringement of a U.S. patent can only take place in the United States. 35 U.S.C. § 271(a); see, e.g., *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1758 (Apr. 30, 2007); *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527, 532 (1972).

Alice's counterclaims do not contain any factual allegations respecting infringement in the United States. This is no doubt for good reason: The computer system for settling instructions related to foreign exchange transactions which is the ultimate object of Alice's attempted infringement claims, while never even identified in Alice's pleadings, is in fact located in the United Kingdom, and the process for settling instructions related to foreign exchange transactions utilizing the foregoing system is performed in the United Kingdom. Accordingly, Alice cannot state a viable claim of infringement against either CLS Bank or CLS Services U.K.

There is no reason to extend this case or to waste the parties' or the court's resources in further protracted litigation proceedings. Under these circumstances, Alice's counterclaims for patent infringement should be dismissed with prejudice. Alternatively, CLS Bank and CLS Services U.K. should be granted summary judgment dismissing the counterclaims.

## STATEMENT OF FACTS

### A.    The Allegations of Alice's Counterclaims

Alice alleges that it owns three U.S. patents. Patent No. 5,970,479 ("the '479 patent") is entitled "Methods and Apparatus Relating to the Formulation and Trading of Risk Management Contracts." (*See* Countercl. ¶¶ 21, 42, Ex. A.) Patent No. 6,912,510 ("the '510 patent") is entitled "Methods of Exchanging an Obligation." (*See* Countercl. ¶¶ 28, 49, Ex. B.) Patent No. 7,149,720 ("the '720 patent") is entitled "Systems for Exchanging an Obligation." (*See* Countercl. ¶¶ 35, 56, Ex. C.)

Alice's counterclaims omit any allegations whatsoever as to what, if any, product, system or process of CLS Bank or CLS Services U.K. supposedly infringes any of Alice's patents, let alone any allegations as to what, if any, alleged infringing activity occurs in the United States.

To the contrary, all that Alice's counterclaims contain are wholly conclusory allegations which paraphrase the language of the patent statute. Thus, Counts I-III of Alice's counterclaims against CLS Bank, and Counts IV-VI of Alice's counterclaims against CLS Services U.K., each contain only the following conclusory language:

> Upon information and belief, [CLS Bank or CLS Services U.K.] has directly infringed, has induced others to infringe, and/or has committed acts of contributory infringement of one or more claims of the ['479, '510, or '720] patent in violation of

> 35 U.S.C. § 271, *et seq.* [CLS Bank or CLS
> Services U.K.] has committed acts of infringement
> by making, using, selling, and/or offering to sell
> products or services within the United States, or by
> importing products into the United States.

(*See* Countercl. ¶¶ 23, 30, 37, 44, 51, 58.)

Alice's counterclaims are silent as to what CLS Bank or CLS Services U.K.

product or system is found in the United States, or what CLS Bank or CLS Services U.K. method

is performed in the United States. Indeed, the only factual allegations in the counterclaims

respecting the United States are that some of the parties met in New York to discuss a licensing

offer from Alice. (*See* Countercl. ¶¶ 9, 13.) Alice also alleges that "[u]pon information and

belief, CLS Bank and CLS Services U.K. are parties to a Master Services Agreement by which

CLS Bank and CLS Services U.K. engage in infringing activities" (Countercl. ¶ 18), but the

Counterclaims contain no allegation whatsoever as to what, if any, product, system or method

relating to such Agreement infringes, let alone what, if any, infringing activity relating to such

Agreement occurs in the United States.

**B.    Alice's Answer To The Allegations Of CLS Bank's Complaint**

In CLS Bank's Complaint, unlike Alice's conclusory pleading, CLS Bank made a

number of specific allegations respecting the location of its system for settling foreign exchange

transactions being *outside of the United States*, and the performance of its service respecting

settlement of foreign exchange transactions *outside of the United States*. In correspondence

between the parties before the institution of this litigation, that system and method for settling

foreign exchange transactions was the object of Alice's purported infringement claims. (*See*

Compl. ¶¶ 13-16.)

Alice's Answer to the Complaint, inconsistent with the affirmative allegations of infringement in Alice's counterclaims, merely denied knowledge or information sufficient to form a belief as to the truth of CLS Bank's extraterritorial allegations.

CLS Bank's Complaint thus alleged as follows:

> 11. CLS Bank, through a contractual arrangement with CLS Services Ltd., a private limited company organized under the laws of England and Wales and located in the United Kingdom, provides a "continuous linked settlement service" to settle foreign exchange transactions for other banks (the "CLS Service").

> 12. The CLS Service offered by CLS Bank utilizes various computer hardware and software to settle foreign exchange transactions (the "CLS System"). The relevant components of the CLS System are located in the United Kingdom.

> 19. The components of the CLS System relevant to Alice's allegations of infringement of its systems claims are located outside of the United States.

> 20. One or more elements of the CLS Service relevant to Alice's allegations of infringement of its method claims are performed outside of the United States.

Rather than a straightforward denial of these allegations, as would be expected of a party asserting counterclaims of infringement in the U.S., Alice's Answer only stated that: "Alice lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in ¶[¶ 11, 12, 19, and 20] of the Complaint, and on that basis denies them." (Answer ¶¶ 11, 12, 19, 20.)

**C.    The Underlying Facts Concerning The Location Of The CLS System, And Performance Of The CLS Method, In The United Kingdom**

As more fully described in the accompanying Declaration of James Hughes,[1] CLS Bank is an "Edge Act Corporation," organized under Section 25A of the Federal Reserve Act, as amended, and is authorized by statute to engage in international banking activities. (Hughes Decl. ¶ 3.) It is a subsidiary of CLS U.K. Intermediate Holdings Ltd. ("CLS U.K. Holdings"), a private limited company incorporated under the laws of England and Wales, which is in turn a wholly-owned subsidiary of CLS Group Holdings AG ("CLS Group Holdings"), a company incorporated under the laws of Switzerland, with its registered office in Zurich. (*Id.* at ¶ 6.)

CLS Services U.K., which is another subsidiary of CLS U.K. Holdings, is a private limited company organized under the laws of the United Kingdom ("U.K.") and Wales, with offices in the U.K. (*Id.* at ¶ 7.) CLS Bank has a master services agreement with CLS Services U.K., pursuant to which CLS Services U.K. provides CLS Bank with far-ranging system and operational support, including data processing systems and services, and administrative support. (*Id.* at ¶ 8.)

1.    The CLS Service Is Effectuated By The CLS Core System, Located Entirely In The U.K.

CLS Bank provides, in conjunction with CLS Services U.K., a "continuous linked settlement" service (the "CLS Service") for the settlement of payment instructions ("Instructions") related to underlying foreign exchange ("FX") transactions. (Hughes Decl. ¶ 9.) CLS Bank provides the CLS Service to banks known as CLS Bank Settlement Members

---

[1]    Mr. Hughes is the Director of Business Risk Analysis for CLS Services U.K. (Hughes Decl. ¶ 1.) He has worked on the development and management of foreign exchange transaction settlement systems for nearly 15 years. (*Id.* at ¶ 2.) Mr. Hughes helped to develop the functional specifications for the CLS Service, is currently responsible for overseeing the settlement operations of CLS Bank and CLS Services from a risk management perspective, and is familiar with those operations. (*Id.* at ¶ 3.)

("Members"), who maintain multicurrency accounts with CLS Bank ("Member Accounts"), and

through the Members, the CLS Service is provided to other third parties (including banks)

worldwide. (*Id.* at ¶¶ 10, 11.)

The CLS Service is implemented in computer hardware and software (the "CLS

core system") located entirely in the U.K. (*Id.* at ¶ 12.) The CLS core system maintains Member

Accounts, processes payments by Members into their Member Accounts, receives and processes

Instructions, carries out the steps in the settlement process, and issues instructions to effect

payouts to Members of balances in their Member Accounts. (*Id.* at ¶¶ 12, 24.)

The CLS Service allows CLS Bank (through its arrangement with CLS Services

U.K.) to settle the two payments relating to an FX transaction by having the CLS core system in

the U.K. simultaneously credit and debit the corresponding Member Accounts.  By debiting and

crediting the Member Accounts simultaneously on the CLS core system, the CLS Service

eliminates the risk that one payment could be made and the corresponding payment not

received.[2] (*Id.* at ¶ 13.)

Members of CLS Bank electronically submit, to CLS Services U.K., Instructions

for settlement on a particular date (the "settlement date"). (*Id.* at ¶ 15.) Instructions relating to

the same FX transaction are received, authenticated and matched by the CLS core system.  The

---

[2]    For example, suppose Bank A has agreed with Bank B (both CLS Members) to exchange
       $100 million for £50 million.  Each Bank has a multicurrency Member Account with
       CLS Bank that is maintained on the CLS core system in the U.K.  By settling this
       transaction using the CLS Service, Bank A's Member Account is debited $100 million
       and credited £50 million, while, simultaneously, Bank B's Account is credited $100
       million and debited £50 million.  By using the CLS Service, Bank B can ensure its does
       not pay out $100 million without receiving the corresponding payment from Bank A for
       £50 million, and vice versa. (*Id.* at ¶ 14.)

matched ("paired") Instructions are then stored on the CLS core system until the settlement date. (*Id.* at ¶ 17.)

On the settlement date, each Member makes pay-ins to its Member Account to cover the settlement of all Instructions it submitted for that settlement date, based on a pay-in schedule prepared and transmitted by the CLS core system. (*Id.* at ¶ 18.)[3] Concurrently, each paired Instruction to be settled is placed in a "settlement queue" that is maintained on the CLS core system. (*Id.* at ¶ 19.) The paired Instructions in the settlement queue are then tested by the CLS core system, to determine if settlement would cause the balance of either of the corresponding Member Accounts to fall below certain predetermined values, or to exceed certain limits (the "risk management tests"). (*Id.* at ¶¶ 19-20.) If it passes the risk management tests, the paired Instruction is settled when the CLS core system simultaneously debits and credits the Member Accounts of two Members. (*Id.* at ¶ 21.) Periodically throughout the settlement day, CLS Bank pays out to each Member any positive balance which remains in that Member's multicurrency Member Account. To do so, the CLS core system issues an instruction, on behalf of CLS Bank, to the relevant Central Bank to make a payment to the Member (or its designated agent) by debiting the CLS Central Bank Account held by that Central Bank. (*Id.* at ¶ 22.)

The CLS core system is comprised of IBM pSeries computers, coupled to Enterprise Storage Server Model 800 storage devices, which are physically located in two "IBM Data Centers" in the U.K. (*Id.* at ¶ 23.) The two IBM Data Centers, which are maintained by

---

[3]    CLS Bank itself maintains an account with the Central Bank responsible for each of the currencies for which CLS Bank provides settlement services (*e.g.*, the Federal Reserve, the Bank of England, etc.) (each a "CLS Central Bank Account"). Members make periodic pay-ins to the CLS Central Bank Account corresponding to a particular currency; the pay-ins are then reflected in the balance of the Member Account maintained by CLS Bank. (*Id.* at ¶ 11.)

IBM U.K. Ltd. ("IBM"), contain identical redundant systems, each of which can process the full volume of CLS FX transaction traffic. (*Id.*)

        2.     CLS Bank's Limited Facilities In The U.S.
                Cannot Be Used To Settle Instructions

CLS Bank uses several facilities in the U.S. that are maintained by CLS Bank, IBM, or AT&T. However, none of these facilities contain CLS core system computers or coupled data storage devices, and none can be used to settle Instructions. In addition, none of these facilities can serve as a backup for the CLS core system. (Hughes Decl. ¶ 25.)

- An IBM Command Center is located in the U.S. This facility, maintained by IBM, contains IBM computers that are used to review (remotely) performance metrics relating to the CLS core system computers and data storage devices located in the IBM Data Centers in the U.K. The IBM Command Center in the U.S. can diagnose problems with the CLS core system, and start and stop the CLS core system if necessary. It cannot be used to settle Instructions, or serve as a backup for the CLS core system or the IBM Data Centers. (*Id.* at ¶ 26(a).)

- An Operations Center is located in the U.S. This facility, maintained by CLS Bank, allows administrative oversight of the CLS Service by permitting operators to review (remotely) information relating to the Instructions processed by the CLS core system in the U.K. The Operations Center in the U.S. cannot be used to settle Instructions, and cannot serve as a backup for the CLS core system or the IBM Data Centers. (*Id.* at ¶ 26(b).)

- Two "RTGS Crossover sites" are located in the U.S. These facilities, maintained by AT&T, contain routing and encryption/decryption devices used to connect (1) the AT&T network that links the CLS core system and other CLS facilities with

(2) the "Fedwire" network (operated by Sprint and the United States Federal Reserve) that is used by banks and other institutions to communicate with Federal Reserve Banks. The RTGS crossover sites cannot be used to settle Instructions, and cannot serve as backups for the CLS core system or the IBM Data Centers. (*Id.* at ¶ 26(c).)

- A Business Continuity Office is located in the U.S. This facility, maintained by CLS Bank, contains computers and other equipment used to provide email and business services, such as accounting services, to the CLS Group. The Business Continuity Office in the U.S. cannot be used to settle Instructions, and cannot serve as a backup for the CLS core system or the IBM Data Centers. (*Id.* at ¶ 26(d).)

      3.    Alice's Patent Claims Cannot Cover The CLS System Located In The U.K. Or The CLS Process Performed In The U.K.

As noted earlier, Alice alleges that it owns three U.S. patents, entitled "Methods and Apparatus Relating to the Formulation of Risk Management Contracts" (the '479 patent), "Methods of Exchanging an Obligation" (the '510 patent), and "Systems for Exchanging an Obligation" (the '720 patent). The '479 and '510 patents contain certain "method" claims while the '720 patent contains certain "system" claims directed to similar subject matter. (*See* Hughes Decl. ¶¶ 27-30; Countercl. Exs. A-C.)

While the Alice patents have various detailed claim limitations which narrow their scope (Hughes Decl. ¶¶ 28-30; Countercl. Ex. A (the '479 patent) at col. 65, Ex. B (the '510 patent) at cols. 64-68, Ex. C (the '720 patent) at cols. 65-70), we assume, *arguendo*, solely for purposes of this Motion, that the claims of the '479 patent and '510 patent may be interpreted to broadly encompass a method comprising, (1) maintaining accounts for two parties to a

transaction, (2) adjusting the parties' accounts in accordance with the terms of the transaction, after testing the transaction to ensure that the parties have adequate value in their accounts, and (3) providing instructions to another institution (*e.g.*, a bank) to adjust accounts maintained at that institution.[4]  (*See* Hughes Decl. ¶ 31; Countercl. Ex. A at col. 65; *id.* at Ex. B at cols. 64-68.)

The only process used by or on behalf of CLS Bank or CLS Services U.K. that involves (1) maintaining accounts for two parties to a transaction, (2) adjusting the accounts to reflect the transaction, after testing the transaction to ensure that the account balances are adequate, and (3) providing instructions to another bank, is performed entirely in the U.K., utilizing the CLS core system computers and coupled data storage units at the IBM Data Centers located in the U.K., as discussed above.  (Hughes Decl. ¶ 32.)

Likewise, and also solely for purposes of this Motion, one can assume, *arguendo*, that the claims of the '720 patent may be interpreted broadly to encompass a computer system and coupled storage devices configured to (1) maintain accounts for two parties to a transaction, (2) adjust the parties' accounts in accordance with the terms of the transaction, after testing the transaction to ensure that the parties have adequate value in their accounts, and (3) provide instructions to another institution to adjust accounts maintained at that institution.  (*See* Hughes Decl. ¶ 33; Countercl. Ex. C at cols. 65-70)[5]

The only computer system (including coupled storage devices) operated by or on behalf of CLS Bank and/or CLS Services U.K. that is configured to (1) maintain accounts for two parties to a transaction, (2) adjust the accounts to reflect the transaction, after testing the

---

[4]    If this case were to proceed beyond a decision on the CLS Motion, CLS Bank and CLS Services U.K. would contend, among other things, that Alice's patent claims should be more narrowly construed, and that they are invalid and unenforceable.

[5]    See *supra* at note 4.

transaction to ensure that the account balances are adequate, and (3) provide instructions to another bank, is located entirely in the U.K., utilizing the CLS core system computers and coupled data storage units at the IBM Data Centers located in the U.K., as discussed above. (Hughes Decl. ¶ 34.)

## ARGUMENT

## ALICE'S COUNTERCLAIMS SHOULD BE DISMISSED, WITH PREJUDICE

Alice's Counterclaims for patent infringement should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, in light of Alice's failure to provide even the minimal factual allegations required to state a plausible claim of infringement. Moreover, the dismissal in this case should be with prejudice, because Alice cannot state a viable claim of infringement in the United States against CLS Bank or CLS Services U.K.

The futility of any attempted repleading by Alice is demonstrated both by Alice's denial of knowledge or information sufficient to form a belief as to the truth of the allegations regarding the U.K. location of the CLS system and method for settling instructions related to foreign exchange transactions – which suggests that Alice did not have any facts to support the filing of its counterclaims – and by the underlying facts respecting the United Kingdom location of the CLS system and method at issue. Alternatively, summary judgment should be granted dismissing Alice's counterclaims.

### A.    Alice's Counterclaims Fail To Plead Sufficient Facts To State A Claim

Alice's patent infringement counterclaims against CLS Bank and CLS Services U.K. are so minimal and bare-boned, doing nothing more than paraphrasing the patent infringement statute, that they fail to satisfy even the minimal threshold for an adequate pleading of such a claim.

Under the pleading standard announced in May of this year by the U.S. Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (May 21, 2007), a complaint or counterclaim must do more than raise a suspicion that the claim may be legally cognizable:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . , a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.

*Id.* at 1964-65.

In *Bell Atlantic*, the Court set out a new standard for determining whether the factual basis for a claim has adequately been alleged. A party cannot avoid dismissal pursuant to Rule 12(b)(6) for failure to state a claim unless it has alleged sufficient facts "to render [its] entitlement to relief plausible," and not merely conceivable. *Id.* at 1965, 1973 n.14, 1974. In announcing this standard, the Court characterized as "best forgotten" the formulation of the standard set out in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that a plaintiff can avoid dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic*, 127 S. Ct. at 1969, 1978-79. Applying its new standard, the Court dismissed the plaintiff's antitrust claims because he failed to allege sufficient facts to render "plausible" his claims of a conspiratorial agreement involving Bell Atlantic and other telephone companies.

In *Anticancer Inc. v. Xenogen Corp.*, No. 05-CV-0448-B, 2007 U.S. Dist. LEXIS 59811, at *6-10 (S.D. Cal. Aug. 13, 2007), the court explicitly held that the *Bell Atlantic* standard applies to patent infringement actions. ("The Court finds that the new *Bell Atlantic* pleading standard applies to pleadings in patent infringement actions . . . and holds that pleadings must allege enough facts so as to demonstrate a plausible entitlement to relief.") Indeed, *Bell*

*Atlantic* has now been widely applied to dismiss numerous other complaints, alleging various causes of action, for failure to satisfy the heightened pleading standards set forth by the U.S. Supreme Court. *See, e.g., EEOC v. Concentra Health Servs., Inc.,* __ F.3d __, 2007 WL 2215764, at *2-9 (7th Cir. Aug. 3, 2007) (Title VII retaliation); *Aktieselskabet AF 21 v. Fame Jeans, Inc.,* No. 06-585, 2007 WL 1655877, at *12-15 (D.D.C. Jun. 7, 2007) (misrepresentation of intention to use trademark in PTO trademark application), and other cases collected in *Anticancer,* 2007 U.S. Dist LEXIS 59811, at *8-9. Applying the same standard, dismissal is appropriate here.

In its six counterclaims, Alice provides nothing more than a "formulaic recitation" of a patent infringement cause of action, and a conclusory allegation that unspecified "acts" of CLS Bank and CLS Services U.K. infringe Alice's patents. (*See* Countercl. ¶¶ 23, 30, 37, 44, 51, 58, quoted *supra* at 2-3.) In each of the foregoing paragraphs of its counterclaims, Alice thus alleges that "[u]pon information and belief, [CLS Bank or CLS Services U.K.] has directly infringed, has induced others to infringe, and/or has committed acts of contributory infringement of one or more claims of the ['479, '510, or '720] patent in violation of 35 U.S.C. § 271 *et seq.*" But this does no more than paraphrase the different types of infringement provided for in 35 U.S.C. § 271(a)-(c) (recognizing direct infringement, infringement by "inducement," and "contributory" infringement). In each of these paragraphs, Alice further alleges that CLS Bank or CLS Services U.K. "has committed acts of infringement by making, using, selling, and/or offering to sell products or services within the United States or by importing products into the United States." But this is nothing more than a paraphrase of patent infringement elements set out in 35 U.S.C. § 271(a) ("whoever . . . makes, uses, offers to sell, or sells any patented

invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent").

Apart from these bare bones, conclusory allegations, Alice's pleading offers nothing to support even a minimally plausible claim for relief. Alice's counterclaims contain not a single allegation as to what, if any, product, system or process of CLS Bank or CLS Services U.K. supposedly infringes any of Alice's patents, let alone any allegations as to what, if any, alleged infringing acts occur in the United States.

Indeed, it is revealing that the only factual allegations in the counterclaims respecting any activity in the United States do not relate to infringement, but rather merely recite that some of the parties met in New York to discuss a licensing offer from Alice. (*See* Countercl. ¶¶ 9, 13.)

Under these circumstances, similar to those in *Anticancer*, 2007 U.S. Dist LEXIS 59811, at *6-11, Alice has plainly failed to meet the requirements of *Bell Atlantic*, and its counterclaims should therefore be dismissed.

**B.    Alice's Counterclaims Should Be Dismissed With Prejudice Or, Alternatively, By The Grant Of Summary Judgment**

Alice's counterclaims should be dismissed with prejudice, because Alice cannot state a viable claim of infringement under the U.S. patent laws. Alice did not have information to allow it to adequately plead infringement by CLS Bank or CLS Services U.K. Moreover, the facts concerning the location *in the United Kingdom* of the CLS core system computers and coupled storage devices for settling payment instructions relating to foreign exchange transactions, and the performance of the CLS Service *in the United Kingdom* using those computers *in the United Kingdom*, establish that any attempt by Alice to replead its counterclaims would be futile. Alternatively, based on consideration of these facts concerning

the extraterritorial nature of CLS Bank's and CLS Services U.K.'s relevant systems and process, summary judgment should be granted dismissing the counterclaims.

"Futility" is one of the recognized grounds for denying a party leave to replead inadequately pled claims. *Foman v. Davis*, 371 U.S. 178, 182 (1962). As the U.S. Supreme Court recently stated in *Bell Atlantic*, in dismissing an antitrust claim, "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management'." *Bell Atlantic*, 127 S. Ct. at 1967. Relying on *Foman* and *Bell Atlantic*, the court in *McCagg v. Marquis Jet Partners, Inc.*, No. 05-CV-10607, 2007 U.S. Dist. LEXIS 54516, at *2, *8-11 (S.D.N.Y. Jul. 27, 2007) recently dismissed an antitrust action and denied leave to replead, on futility grounds, in the face of conclusory allegations and proposed amendments that were "not plausible." *Id.* at *8, 11.

Alice cannot have a viable claim for patent infringement because neither CLS Bank nor CLS Services U.K. performs any act in the United States that could conceivably infringe Alice's patents. Accordingly, repleading by Alice would be futile, and its patent infringement counterclaims should be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6). Alternatively, summary judgment should be granted dismissing the counterclaims.[6]

1.    The U.S. Patent Laws Only Reach Alleged Infringement Within
        The United States, And Do Not Have Extraterritorial Effect

It is a fundamental tenet of U.S. patent law that infringement can only take place within the United States. 35 U.S.C. § 271(a) thus provides that "whoever without authority makes, uses, offers to sell or sells any patented invention, *within the United States* . . . , infringes the patent." (Emphasis added.)

---

[6]    CLS Bank also has claims for a declaration of non-infringement, invalidity and unenforceability of Alice's patents. However, if the present motion to dismiss is granted, the remaining claims in the litigation will be moot.

The territorial limitation of the U.S. patent laws has been repeatedly reiterated by the U.S. Supreme Court. In *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527, 531 (1972), the Supreme Court thus stated that "[t]he statute makes it clear that it is not an infringement to make or use a patented product outside of the United States. . . . Our patent system makes no claim to extraterritorial effect." *See also id.* at 531 ("'[T]hese acts of Congress do not, and were not intended to, operate beyond the limits of the United States,' and we correspondingly reject the claims of others to such control over our markets.") (citing *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1857)).

Most recently, in *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746 (Apr. 30, 2007), the U.S. Supreme Court emphatically stated: "The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." *Id.* at 1758 (citing *Deepsouth* and *Brown*). *Accord*, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006) ("The territorial reach of section 271 is limited. Section 271(a) is only actionable against patent infringement that occurs within the United States.")

In addition, Alice cannot base a claim for infringement on the mere fact that CLS Bank is located here. As the Federal Circuit made clear in *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1116-17 (Fed. Cir. 2004), a party's incorporation in the United States and U.S. executive responsibilities (including, design, marketing, development and production decisions), use, subcontracting and payment of others in the U.S., budgetary pricing, receipt of payment and the like, do not constitute the supply of products "in or from the United States" for purposes of infringement. Moreover, "[t]here is no dispute that [such products] are not made, used, sold or offered for sale in the United States." *Id.* at 1117. Similarly here, CLS Bank's incorporation in

the U.S., and its management responsibilities and related tasks performed in the U.S., do not constitute acts of patent infringement.

2.    Alice's Answer To CLS Bank's Complaint Shows That It Cannot Plausibly Allege A Viable Claim For Patent Infringement

As noted earlier, Alice's Answer to CLS Bank's Complaint seeking a declaratory judgment of non-infringement strongly suggests that Alice did not have a valid basis for alleging *infringement in the United States* by either CLS Bank or CLS Services U.K.  Thus, CLS Bank's Complaint specifically alleged that the components of the CLS system for settling foreign exchange transactions are located *outside of the United States*, and that the performance of the CLS service respecting settlement of foreign exchange transactions occurs *outside of the United States*.  But rather than simply denying CLS Bank's extraterritorial allegations, Alice was only able to deny knowledge or information sufficient to form a belief as to the truth of these allegations.  This is hardly compatible with the affirmative assertion by Alice of sustainable patent infringement counterclaims.

CLS Bank's Complaint thus specifically alleged that, through a contractual arrangement with CLS Services U.K. in the United Kingdom, it provides a continuous linked settlement service to settle foreign exchange transactions for other banks; that this service utilizes computer hardware and software whose relevant components are located in the United Kingdom; and that one or more elements of the CLS service relevant to Alice's infringement allegations of its method claims are performed outside of the United States.  (*See* Compl. ¶¶ 11, 12, 19 and 20, quoted *supra* at 4.)

Alice's statement, in its Answer, that it "lacks knowledge or information sufficient to form a belief as to a truth of the allegations contained in ¶[¶ 11, 12, 19, and 20] of the Complaint", together with its limited pleading only of meetings between the parties in New

York to discuss a licensing offer from Alice (plainly not infringing acts), belies any ability to plausibly allege facts now to support a bona fide repleading of infringement in the United States.

3.    Alice Cannot, In Any Event, State A Viable Claim For Patent Infringement, Because The Relevant Components Of The CLS System And CLS Service Are Located In The U.K.

As discussed below, given that the CLS core system computers are not located in the United States, and that the CLS process utilizing those computers is not performed in the United States, neither Alice's system patent, nor its method patents, are infringed by CLS Bank or CLS Services U.K.

a.    Alice Has No Claim For Infringement Of Its Method Patents

Alice has no claim for infringement of its method patents because neither CLS Bank nor CLS Services U.K. performs the steps of the claimed methods in the United States. As the Federal Circuit has held, "a process [method] cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *NTP*, 418 F.3d at 1318. *Accord, Zoltek Corp v. U.S.*, 442 F.3d 1345, 1350 (Fed. Cir. 2006) (same). Applying that standard in *NTP*, the Court concluded that a finding of direct infringement based on the method claims was "precluded by the location of RIM's Relay" — one element of the method claimed in NTP's patent — "in Canada." *NTP*, 418 F.3d at 1318.

Here, Alice cannot possibly establish that "each of the steps" of any method encompassed by its method patent claims is performed by CLS Bank or CLS Services U.K. within the United States, as would be required for infringement of those patents. Indeed here, all of the steps in the settlement process used by CLS Bank and CLS Services U.K. are performed outside the United States.

The "method" claims of Alice's '479 and '510 patents call for a method of exchanging obligations between parties comprising various specified steps. (See, e.g., Hughes

Decl. ¶¶ 28, 29.) CLS Bank and CLS Services U.K. assume, solely for purposes of this motion,

that the claims of Alice's '479 and '510 patents may be broadly characterized as encompassing a

method comprising the steps of (1) maintaining accounts for two parties to a transaction, (2)

adjusting the parties' accounts in accordance with the terms of the transaction, after testing the

transaction to ensure that the parties have adequate value in their accounts, and (3) providing

instructions to another institution (*e.g.*, a bank) to adjust accounts maintained at that institution.

(*See* Hughes Decl. ¶ 31.)[7]

As established by the Declaration of James Hughes, the only method used by or

on behalf of CLS Bank or CLS Services U.K. that might be characterized as involving these

types of steps is performed entirely in the United Kingdom, utilizing the CLS core system

computers and coupled data storage units at IBM data centers located in the United Kingdom.

(*See, e.g.*, Hughes Decl. ¶¶ 12, 24, 32.) The CLS computers and coupled data storage units in

the United Kingdom maintain the CLS Member Accounts, electronically adjust the parties'

accounts to reflect payments relating to FX transactions after performing certain tests, and

provide instructions to central banks. (*Id.* at ¶¶ 15-24.) The facilities that CLS Bank uses in the

United States do not perform *any* of these steps. (*Id.* at ¶¶ 25-26.) *A fortiori*, Alice cannot

establish that "each of the steps" of its patented methods is performed within the United States.

The CLS method of settling instructions related to FX transactions cannot infringe the Alice

method patent claims.

   b. Alice Has No Claim For Infringement Of Its Systems Patent

Alice also does not have a viable claim for infringement of its "system" patent,

because neither CLS Bank nor CLS Services U.K. maintains or uses any system located in the

---

[7] If the litigation were to proceed, CLS Bank and CLS Services U.K. would contend that
the patent claims are much narrower in scope.

United States that might conceivably infringe that patent. The CLS core system used for settlement is located entirely outside of the United States.

The "system" claims of Alice's '720 patent call for a data processing system with the combination of a particular type of "data storage unit" having account information about two parties to a transaction, and a computer which is "coupled" to the data storage unit and is configured to perform specified functions. (*See, e.g.*, Hughes Decl. ¶ 30.) Solely for purposes of this motion, CLS Bank and CLS Services U.K. assume that the claims of the '720 patent may be broadly characterized as encompassing a computer system and coupled storage devices configured to (1) maintain accounts for two parties to a transaction, (2) adjust the parties' accounts in accordance with the terms of the transaction, after testing the transaction to ensure that the parties have adequate value in their accounts, and (3) provide instructions to another institution to adjust accounts maintained at that institution. (*Id.* at ¶ 33.)[8]

As established by the accompanying Declaration of James Hughes, the only computer system (including coupled data storage devices) operated by or on behalf of CLS Bank or CLS Services U.K. that might be characterized as having such a configuration is located entirely in the United Kingdom. (*See, e.g.*, Hughes Decl. ¶¶ 12, 24, 34.) The CLS computers and coupled data storage devices that have account information, receive a transaction, in any way test the transaction and adjust the parties' accounts, and provide instructions to another bank, are located at IBM Data Centers in the United Kingdom. (*Id.* at ¶¶ 15-24, 34.) Accordingly, the CLS data processing system cannot infringe the Alice system patent claims.[9]

---

[8]    *See supra* at note 7.

[9]    The CLS data processing system and the associated method using that system do not, in any event, come within the scope of Alice's patent claims. However, a full comparison of the details of the CLS system components and method steps with the elements of Alice's patent claims, to establish these points, is unnecessary here in view of the CLS

There is no basis for expansively construing the infringement statute to reach a different result. In *Microsoft v. AT&T*, interpreting the provisions of § 271(f) of the patent statute concerning the supply of an invention's components from the U.S., the Supreme Court held that "*[a]ny doubt*" that the accused activities fall outside the statute's reach "*would be resolved by the presumption against extraterritoriality.*" 127 S. Ct. at 1758 (emphasis added). And as the Supreme Court pointed out in *Deepsouth*, 406 U.S. at 530, "we must consider petitioner's claim in light of this Nation's historical antipathy to monopoly and of repeated congressional efforts to preserve and foster competition."

The motion of CLS Bank and CLS Services U.K. to dismiss Alice's patent infringement counterclaims pursuant to Rule 12(b)(6), or alternatively for summary judgment, should accordingly be granted.

### C.    The Counterclaims Should Be Dismissed Without Engaging In Lengthy And Expensive Discovery

In view of Alice's lack of facts sufficient to state a viable claim for infringement in the United States, dismissal with prejudice under Rule 12(b)(6), or alternatively the grant of summary judgment, is appropriate without further delay or the need for further costly and wasteful discovery. As the Supreme Court recently held in *Bell Atlantic*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." 127 S. Ct. at 1967 (quoting with approval, *Ass'n Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). Given the expense of discovery, as noted above "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case

---

system's extraterritorial location in the United Kingdom and the method's performance in the United Kingdom.

management' . . . ." *Bell Atlantic*, 127 S. Ct. at 1967.  While *Bell Atlantic* involved potentially

expensive antitrust discovery, the same conclusion should be reached in a patent case as here, in

which the discovery process can be expected to be quite lengthy and expensive as well.  See also,

*Chavous v. Dist. of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2

(D.D.C. 2001) ("A stay of discovery pending the determination of a dispositive motion 'is an

eminently logical means to prevent wasting the time and effort of all concerned, and to make the

most efficient use of judicial resources'.") (citation omitted).

> Of course, if the Court were nevertheless to conclude that discovery relating to the

motion is necessary, it should be narrowly limited to the extraterritoriality issues raised by this

motion.  "A district court has broad powers of case management, including the power to limit

discovery to relevant subject matter and to adjust discovery as appropriate to each phase of the

litigation." *Vivid Techs., Inc. v. Am. Sci. & Eng'r., Inc.*, 200 F.3d 795, 803-04 (Fed. Cir. 1999).

Using this discretion, courts often have entered orders limiting discovery initially to potentially

dispositive issues.  Prior to the Supreme Court's pronouncements in *Bell Atlantic* regarding the

avoidance of expensive discovery and dismissal at the pleading stage, both the Federal Circuit

and D.C. Circuit have endorsed the initial limitation of discovery in patent cases.  *See Vivid

Techs.*, 200 F.3d at 804 ("When a particular issue may be dispositive, the court may stay

discovery concerning other issues until the critical issue is resolved."); *Weyrich v. The New

Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001) (district court discretion includes the power to

"limit discovery to [a] threshold issue . . . thereby delaying and possibly eliminating . . . more

burdensome discovery").  Similarly, this Court has regularly used its broad case management

discretion to limit discovery to dispositive threshold issues.  *See Singh v. S. Asian Soc'y of The

George Washington Univ.*, No. 06-574, 2007 U.S. Dist. LEXIS 36620, at *19-20 (D.D.C.

May 21, 2007) (Collyer, J.) (limiting discovery to threshold jurisdictional issue); *U.S. v. $6,976,934.65 Plus Interest*, 486 F. Supp. 2d 37, 40 (D.D.C. 2007) (ordering limiting discovery to the threshold issue of whether a corporation's claim should be barred by the fugitive disentitlement statute); *Page v. Lexington County Sch. Dist. One*, No. 3:06-249-CMC, 2007 WL 162178, at *66 (D.D.C. Jan. 17, 2007) (limiting "discovery to address the threshold issue of whether a forum [subject to First Amendment protections] was created").

Prior to *Bell Atlantic*, this same limited discovery approach has also been directly applied to the very issue raised here — whether a party could establish acts of patent infringement in the United States. In *Rotec Indus., Inc. v. Mitsubishi Corp.*, 36 F. Supp. 2d 810 (C.D. Ill. 1998), *aff'd*, 215 F.3d 1246 (Fed. Cir. 2000), the court limited discovery to the issue of whether an act of infringement was committed in the United States. *Id.* at 813. Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the plaintiff could not allege that the defendants committed the alleged act of infringement within the United States. *Id.* at 812, 813. The court limited discovery solely to the dispositive "issue of whether an act of patent infringement was committed in the United States." *Id.* at 813. Following this limited discovery, the court granted summary judgment dismissing the case. *Id.* at 817-18. *Accord, Ductmate Indus., Inc. v. The Lockformer Co.*, No. 84-C-5152, 1985 WL 2179, at *4 (N.D. Ill. Feb. 12, 1985) (limited discovery permitted to determine whether there were "any possible infringements . . . in the United States").

Given the utter failure of Alice's counterclaims to pass the minimum specificity test for a "plausible" patent infringement claim, dismissal of the counterclaims is appropriate here, under *Bell Atlantic*, without the need for discovery. Alternatively, the court should permit only narrowly circumscribed discovery limited to the issue of whether there are any infringing

acts in the United States by CLS Bank or CLS Services U.K., and then dismiss the

counterclaims.

## CONCLUSION

In accordance with all of the foregoing points and authorities, the motion of CLS

Bank and CLS Services U.K. to dismiss Alice's counterclaims, or in the alternative for summary

judgment, should be granted.

Dated:  September 12, 2007

Respectfully submitted,

David O. Bickart (Bar # 355313)
KAYE SCHOLER LLP
901 Fifteenth Street, N.W.
Washington, DC  20005-2327
(202) 682-3503

Of Counsel:

William A. Tanenbaum (WT-9960)
Steven J. Glassman (SG-1616)
Stephen J. Elliott (SE-5437)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022-3598
(212) 836-8000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLS BANK INTERNATIONAL, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 07-CV-00974-RMC |
| ALICE CORPORATION PTY. LTD., | ) |
| Defendant. | ) |
| ALICE CORPORATION PTY. LTD., | ) |
| Counterclaim-Plaintiff, | ) |
| v. | ) |
| CLS BANK INTERNATIONAL, | ) |
| Counterclaim-Defendant, | ) |
| and | ) |
| CLS SERVICES LTD., | ) |
| Counterclaim-Defendant. | ) |

## DECLARATION OF JAMES HUGHES
### IN SUPPORT OF PLAINTIFF AND COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

I, James Hughes, declare as follows based on my personal knowledge:

1.      I am the Director of Business Risk Analysis for counterclaim-defendant CLS Services Ltd. ("CLS Services U.K."), which contracts with plaintiff/counterclaim-defendant CLS Bank International ("CLS Bank") to provide certain services as described below.  My business address is 1 Harbour Exchange Square, London E14 9GE, United Kingdom.

2.      I joined CLS Services U.K. in 1997. I have worked on the development and management of foreign exchange transaction settlement systems since 1993, and on transaction settlement systems in general since 1983. I have an M.B.A. (Accounting) from the University of Wisconsin at Madison, and a B.A (Economics/Political Science) from the same institution.

3.      In my current position, I oversee the daily activities of CLS Bank and CLS Services U.K. from a risk management perspective, and develop risk management policies in connection with those activities. In the past I helped to develop functional specifications for the settlement operations of CLS Bank and CLS Services U.K., and I am familiar with those operations.

4.      I make this declaration in support of CLS Bank's and CLS Services U.K.'s Motion to Dismiss or, Alternatively, for Summary Judgment (the "CLS Motion").

**CLS Bank International**

5.      CLS Bank, with its principal office in New York, New York, is an "Edge Act Corporation," organized under Section 25A of the Federal Reserve Act, as amended. CLS Bank is authorized by statute to engage in international banking activities.

6.      CLS Bank is a subsidiary of CLS U.K. Intermediate Holdings Ltd. ("CLS U.K. Holdings"), a private limited company incorporated under the laws of England and Wales, which is in turn a wholly-owned subsidiary of CLS Group Holdings AG ("CLS Group Holdings"), a company incorporated under the laws of Switzerland, with its registered office in Zurich.

7.      CLS Services U.K., a private limited company organized under the laws of England and Wales with offices in the U.K., is a subsidiary of CLS U.K. Holdings.

8.      CLS Bank has a master services agreement with CLS Services U.K., pursuant to which CLS Services U.K. provides CLS Bank with far-ranging system and operational support, including data processing systems and services, and administrative support.

2

**Overview of the CLS Service and the CLS Core System**

      9.     CLS Bank provides, in conjunction with CLS Services U.K., a "continuous linked settlement" service (the "CLS Service") for the settlement of payment instructions ("Instructions") related to underlying foreign exchange ("FX") transactions. The CLS Service protects against certain risks associated with FX transactions by providing for the continuous and simultaneous settlement of payments from different parties in fifteen different currencies (*e.g.*, U.S. dollar, British pound, Euro, Swiss franc, etc.).

      10.    CLS Bank provides the CLS Service to banks known as CLS Bank Settlement Members ("Members"). Through the CLS Bank Members, the CLS Service is provided to other third parties (including banks) worldwide.

      11.    Members maintain multicurrency accounts with CLS Bank ("Member Accounts"). CLS Bank itself maintains an account with the Central Bank responsible for each of the currencies for which CLS Bank provides settlement services (*e.g.*, the Federal Reserve, the Bank of England, etc.) (each a "CLS Central Bank Account"). Members make periodic pay-ins to the CLS Central Bank Account corresponding to a particular currency; the pay-ins are then reflected in the balance of the Member Account maintained by CLS Bank.

      12.    The CLS Service is implemented in computer hardware and software (the "CLS core system") located in the United Kingdom ("U.K."). The CLS core system maintains Member Accounts, processes payments by Members into their Member Accounts, receives and processes Instructions, carries out the steps in the settlement process, and issues instructions to effect pay-outs to Members of balances in their Member Accounts.

      13.    The CLS Service allows CLS Bank (through its arrangement with CLS Services U.K.) to settle the two payments relating to an FX transaction by having the CLS core system in the U.K. simultaneously credit and debit the corresponding Member Accounts. By debiting and

crediting the Member Accounts simultaneously on the CLS core system, the CLS Service eliminates the risk that one payment could be made and the corresponding payment not received.

14.    For example, suppose Bank A has agreed with Bank B (both CLS Members) to exchange $100 million for £50 million. Each Bank has a multicurrency Member Account with CLS Bank that is maintained on the CLS core system in the U.K. By settling this transaction using the CLS Service, Bank A's Member Account is debited $100 million and credited £50 million, while, simultaneously, Bank B's Account is credited $100 million and debited £50 million. Using the CLS Service, Bank B can ensure its does not pay out $100 million without receiving the corresponding payment from Bank A for £50 million, and vice versa.

**The CLS Service Is Effectuated By The CLS Core System**

15.    Members of CLS Bank electronically submit, to CLS Services U.K., Instructions for settlement on a particular date (the "settlement date"). Instructions may be submitted by a Member, relating to its own underlying FX transactions, or on behalf of the Member's third party customers who use the Member to settle Instructions relating to the customer's underlying FX transactions.

16.    Members submit Instructions for settlement processing by using specific electronic messages. Each Instruction must identify: (i) the Member submitting the Instruction and the other Member that is expected to submit an Instruction with respect to the same FX transaction; (ii) the exchange rate and amounts and identities of currencies to be delivered and received pursuant to the Instructions; (iii) the date on which the Instruction is scheduled for settlement in CLS Bank; and (iv) the two parties to the underlying FX transaction.

4

17. Instructions relating to the same FX transaction are received, authenticated and matched by the CLS core system. The matched ("paired") Instructions are then stored on the CLS core system until the settlement date.

18. On the settlement date, each Member makes one or more pay-ins to its Member Account, in a total amount sufficient to cover the settlement of all Instructions submitted by the Member for that settlement date. Members make pay-ins based on a pay-in schedule prepared by, and transmitted to the Member by, the CLS core system.

19. On the settlement date, each paired Instruction to be settled is placed in a "settlement queue" that is maintained on the CLS core system. The CLS core system then tests each paired Instruction in the settlement queue to determine if settlement would cause the balance of either of the corresponding Member Accounts to fall below certain predetermined values, or to exceed certain limits (the "risk management tests").

20. If it fails the risk management tests, the paired Instruction remains on the settlement queue for later reevaluation.

21. If it passes the risk management tests, the paired Instruction is settled when the CLS core system simultaneously debits and credits the Member Accounts of two Members in accordance with the paired Instruction.

22. Periodically throughout the settlement day, CLS Bank pays out to each Member any positive balance in that Member's multicurrency Member Account. To do so, the CLS core system issues an instruction, on behalf of CLS Bank, to the relevant Central Bank to make a payment to the Member (or its designated agent) by debiting the CLS Central Bank Account held by that Central Bank.

**The CLS Core System is Located in the U.K.**

23.    The CLS core system is comprised of IBM pSeries computers, coupled to Enterprise Storage Server Model 800 storage devices. These computers and data storage devices are physically located in two "IBM Data Centers" in the U.K. The two IBM Data Centers contain identical redundant systems, each of which can process the full volume of CLS FX transaction traffic. The IBM Data centers are maintained by IBM U.K. Ltd. ("IBM") pursuant to an agreement with CLS Bank.

24.    The CLS core system computers and coupled data storage devices located in the IBM Data Centers in the U.K. carry out each of the tasks described above, including: receiving and processing pay-ins from Members; storing and adjusting Member Accounts; receiving and storing electronic Instructions from Members; authenticating, validating, processing, filtering and matching Instructions; building a settlement processing queue; testing Instructions to determine if the risk management tests are met before settlement; settling paired Instructions that pass the risk management tests by simultaneously debiting and crediting the relevant Member Accounts to reflect the Instructions; and issuing pay-out instructions to Central Banks.

**CLS's Limited Facilities In The United States**

25.    CLS Bank uses several facilities in the United States that are maintained by CLS Bank, IBM, or AT&T. However, none of these facilities contain CLS core system computers or coupled data storage devices, and none can be used to settle Instructions. In addition, none of these facilities can serve as a backup for the CLS core system.

26.    The following facilities are located in the United States:

    (a)    A facility maintained by IBM, known as an "IBM Command Center."
           This facility contains IBM computers that are used to review (remotely)

6

performance metrics relating to the CLS core system computers and data

storage devices located in the IBM Data Centers in the U.K. The IBM

Command Center in the U.S. can diagnose problems with the CLS core

system, and start and stop the CLS core system if necessary. It cannot be

used to settle Instructions, or serve as a backup for the CLS core system or

the IBM Data Centers.[1]

(b)     A facility maintained by CLS Bank, known as an "Operations Center."

This facility allows administrative oversight of the CLS Service by

permitting operators to review (remotely) information relating to the

Instructions processed by the CLS core system in the U.K. The

Operations Center in the U.S. cannot be used to settle Instructions, and

cannot serve as a backup for the CLS core system or the IBM Data

Centers.[2]

(c)     Two facilities maintained by AT&T, known as "RTGS Crossover sites."

These facilities contain routing and encryption/decryption devices used to

connect (1) the AT&T network that links the CLS core system and other

CLS facilities with (2) the "Fedwire" network (operated by Sprint and the

United States Federal Reserve) that is used by banks and other institutions

to communicate with Federal Reserve Banks. The RTGS Crossover sites

---

[1]     There is also an IBM Command Center in the U.K.

[2]     There are also two Operations Centers in the U.K., one of which also serves as a Business
Continuity Office (*see* ¶ 26(d)).

cannot be used to settle Instructions, and cannot serve as backups for the CLS core system or the IBM Data Centers.

(d)    A facility maintained by CLS Bank, known as a "Business Continuity Office." This facility contains computers and other equipment used to provide email and business services, such as accounting services, to the CLS Group. The Business Continuity Office in the U.S. cannot be used to settle Instructions, and cannot serve as a backup for the CLS core system or the IBM Data Centers.

**The Allegedly Infringing Service Is Not Carried Out in the United States, and No Part of the Allegedly Infringing System Is Located in the United States**

27.    I understand that the Alice Corporation Pty. Ltd. alleges in this lawsuit that CLS Bank infringes U.S. Patent No. 5,970,479 (the "'479 patent") which contains certain "method" claims; U.S. Patent No. 6,912,510 (the "'510 patent") also containing certain "method" claims; and U.S. Patent No. 7,149,720 (the "'720 patent") containing certain "system" claims. I understand that the following are, facially, the broadest claims of each of these patents:

28.    Claim 33 of the '479 patent:

33. A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:

(a)    creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;

8

(b)     obtaining from each exchange institution a start-of-day balance for each

shadow credit record and shadow debit record;

(c)     for every transaction resulting in an exchange obligation, the supervisory

institution adjusting each respective party's shadow credit record or

shadow debit record, allowing only these transactions that do not result in

the value of the shadow debit record being less than the value of the

shadow credit record at any time, each said adjustment taking place in

chronological order; and

(d)     at the end-of-day, the supervisory institution instructing ones of the

exchange institutions to exchange credits or debits to the credit record and

debit record of the respective parties in accordance with the adjustments of

the said permitted transactions, the credits and debits being irrevocable,

time invariant obligations placed on the exchange institutions.

29.     Claim 68 of the '510 patent:

68. A method of exchanging an obligation between parties, wherein an

exchange obligation is administered by a supervisory institution, the

method performed by the supervisory institution, comprising:

maintaining a first account for a first party, independent from a

second account maintained by a first exchange institution;

maintaining a third account for a second party, independent from a

fourth account maintained by a second exchange institution;

electronically adjusting said first account and said third account in

order to effect the exchange obligation between said first party

and said second party after ensuring that said first party and

said second party have adequate value in said first account and

said third account, respectively; and

providing an instruction to said first exchange institution and said

second exchange institution to adjust said second account and

said fourth account in accordance with the adjustment of said

first account and said third account, wherein said instruction

being an irrevocable, time invariant obligation placed on said

first exchange institution and said second exchange institution.

30.     Claim 68 of the '720 patent:

68. A data processing system to enable the exchange of an obligation

between parties, the system comprising:

a data storage unit having stored therein (a) information about a

first account for a first party, independent from a second

account maintained by a first exchange institution, (b)

information about a third account for a second party,

independent from a fourth account maintained by a second

exchange institution; and

a computer, coupled to said data storage unit, that is configured to

(a) receive a transaction; (b) electronically adjust said first

account and said third account in order to effect an exchange

obligation arising from said transaction between said first party

and said second party after ensuring that said first party and/or

said second party have adequate value in said first account

and/or said third account, respectively; and (c) generate an

instruction to said first exchange institution and/or said second

exchange institution to adjust said second account and/or said

fourth account in accordance with the adjustment of said first

account and/or said third account, wherein said instruction

being an irrevocable, time invariant obligation placed on said

first exchange institution and/or said second exchange

institution.

31.    Without in any way opining on or conceding the breadth or scope of the claims of

the '479 patent or '510 patent, I will assume, solely for purposes of the CLS Motion, that the

claims of these patents may be interpreted to encompass a method comprising (1) maintaining

accounts for two parties to a transaction, (2) adjusting the parties' accounts in accordance with

the terms of the transaction, after testing the transaction to ensure that the parties have adequate

value in their accounts, and (3) providing instructions to another institution (*e.g.*, a bank) to

adjust accounts maintained at that institution.[3]

32.    The only process used by or on behalf of CLS Bank or CLS Services U.K. that

involves (1) maintaining accounts for two parties to a transaction, (2) adjusting the accounts to

reflect the transaction, after testing the transaction to ensure that the account balances are

adequate, and (3) providing instructions to another bank, is performed entirely in the U.K.,

---

[3]    I understand that if this case were to proceed beyond a decision on the CLS Motion, CLS
Bank and CLS Services U.K. would contend, among other things, that Alice's claims
must be more narrowly construed.

11

utilizing the CLS core system computers and coupled data storage units at the IBM Data Centers located in the U.K., as discussed above.

33.    Without, in any way, opining on or conceding the breadth or scope of the claims of the '720 patent, I will assume, solely for purposes of the CLS Motion, that the claims of this patent may be interpreted to encompass a computer system and coupled storage devices configured to (1) maintain accounts for two parties to a transaction, (2) adjust the parties' accounts in accordance with the terms of the transaction, after testing the transaction to ensure that the parties have adequate value in their accounts, and (3) provide instructions to another institution to adjust accounts maintained at that institution.[4]

34.    The only computer system (including coupled storage devices) operated by or on behalf of CLS Bank and/or CLS Services U.K. that is configured to (1) maintain accounts for two parties to a transaction, (2) adjust the accounts to reflect the transaction, after testing the transaction to ensure that the account balances are adequate, and (3) provide instructions to another bank, is located entirely in the U.K., utilizing the CLS core system computers and coupled data storage units at the IBM Data Centers located in the U.K., as discussed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 12, 2007.

_James A. Hughes_
James Hughes

---

[4]    *See* note 3.

12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLS BANK INTERNATIONAL,<br><br>      Plaintiff,<br><br>v.<br><br>ALICE CORPORATION PTY. LTD.,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)  Case No. 07-CV-00974-RMC<br>)<br>)<br>)<br>)<br>) |
| ALICE CORPORATION PTY. LTD.,<br><br>      Counterclaim-Plaintiff,<br><br>v.<br><br>CLS BANK INTERNATIONAL,<br><br>      Counterclaim-Defendant,<br><br>and<br><br>CLS SERVICES LTD.,<br><br>      Counterclaim-Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] ORDER DISMISSING COUNTERCLAIMS OF DEFENDANT AND COUNTERCLAIM-PLAINTIFF ALICE CORPORATION PTY. LTD.

Upon consideration of Plaintiff and Counterclaim-Defendant CLS Bank International ("CLS Bank") and Counterclaim-Defendant CLS Services Ltd.'s ("CLS Services U.K.") motion to dismiss the counterclaims of Defendant and Counterclaim-Plaintiff Alice Corporation Pty. Ltd. ("Alice") or, alternatively, for summary judgment, and all papers filed in support and opposition thereto, and for good cause shown, it is hereby

**ORDERED** that Plaintiff and Counterclaim-Defendants' [motion to dismiss the Counterclaims, with prejudice,] [alternative motion for summary judgment dismissing the Counterclaims,] is **GRANTED**; and it is

**FURTHER ORDERED** that CLS Bank's claims for declaratory judgments of non-infringement, invalidity and unenforceability of U.S. Patent Nos. 5,970,479, 6,912,510 and 7,149,720 are dismissed without prejudice as moot.  Accordingly, this case is closed.  This is a final appealable order.  *See* Fed. R. App. P. 4(a).

**SO ORDERED.**


Dated:  _____            _____

                                           Judge Rosemary M. Collyer



Copies to:

Paul M. Wolff, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Mark F. Evens, Esq.
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC 20005

David O. Bickart, Esq.
KAYE SCHOLER LLP
901 Fifteenth Street, N.W.
Washington, DC 20005-2327