# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## ALICE CORPORATION PTY. LTD.'S OPPOSITION TO THE MOTION TO DISMISS THE COUNTERCLAIMS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 3

    A.   An Overview of Alice's Patents. ...................................................................... 4

    B.   An Overview of CLS and the CLS System. ..................................................... 5

    C.   CLS Settles Foreign Currency Trades in New York and has a
           Substantial Presence in the United States. ...................................................... 6

ARGUMENT ................................................................................................................... 10

I.     Alice's Counterclaims are Sufficiently Pled. .................................................... 10

II.    Alice Has a Good-Faith Basis for Asserting its Counterclaims for Patent Infringement...... 14

III.   If Necessary, Alice Should be Entitled to Replead with More Specificity. ........................... 16

IV.  Alice is Entitled to Discovery. .......................................................................... 17

V.   Genuine Issues of Material Fact Preclude Summary Judgment in Favor of CLS................. 20

    A.   Prior Public Statements Contradict the Hughes Declaration. ........................... 21

    B.   The Hughes Declaration Fails to Negate Prior Infringement. .......................... 23

    C.   The Hughes Declaration Fails to Address the Ownership, Control
           and Beneficial Use of the CLS System. .......................................................... 23

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

Atchinson v. District of Columbia, 73 F.3d 418 (D.C. Cir. 1996) ................................10

Azhar Ali Khan v. Parsons Global Services, Ltd., 428 F.3d 1079 (D.C. Cir. 2005) ....................17

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (U.S. 2007)............................................1, 10, 12

Burka v. United States HHS, 87 F.3d 508 (D.C. Cir. 1996)..........................................................18

*Decca Ltd. v. United States, 544 F.2d 1070 (Ct. Cl. 1976) ........................................................24

Doe v. United States Department of Justice, 753 F.2d 1092 (D.C. Cir. 1985)..............................11

Ductmate Industrial, Inc. v. The Lockformer Co., Inc., No. 84-C-5152,
    1985 WL 2179 (N.D. Ill. Feb. 12, 1985) .................................................................18, 19

EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621 (D.C. Cir. 1997) .........................10, 13

Ferguson Beauregard/Logic Controls v. Mega System, 350 F.3d 1327 (Fed. Cir. 2003) .............10

Foman v. Davis, 371 U.S. 178 (1962) ..........................................................................................16

Glater v. Eli Lilly & Co., 712 F.2d 735 (1st Cir. 1983)................................................................15

Markman v. Westview Instruments, 517 U.S. 370 (1996) ..............................................................3

Martin v. Malhoyt, 830 F.2d 237 (D.C. Cir. 1987)......................................................................17

*McZeal v. Sprint Nextel Corp., No. 2006-1548, 2007 U.S. App. LEXIS 22025 (Fed.
    Cir. Sept. 14, 2007)...............................................................................................11, 12, 16

*NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282 (Fed. Cir. 2005).........................15, 19, 24

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).................................................................3

Polymer Industrial Products v. Bridgestone/Firestone, Inc., 347 F.3d 935 (Fed. Cir. 2003) ........13

Riggiladez v. Harvey, No. 06-1337, 2007 U.S. Dist. LEXIS 70078 (D.D.C. Sept. 21,
    2007) .....................................................................................................................................10

Rotec Industrial, Inc. v. Mitsubishi Corp., 36 F. Supp. 2d 810 (C.D. Ill. 1998) ....................18, 19

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) .........................................13

## FEDERAL STATUTES

35 U.S.C. §§ 271(a)-(c)................................................................................24

## FEDERAL RULES

Fed. R. Civ. P. 8(b) ....................................................................................15

Fed. R. Civ. P. 12(b)(6)...............................................................................10

Fed. R. Civ. P. 26(c) ...................................................................................18

Fed. R. Civ. P. 56(c) ...................................................................................20

Fed. R. Civ. P. 84.............................................................................10, 11, 12

Fed. R. Civ. P. App. Form 16 ...............................................................1, 10, 11, 13

## INTRODUCTION

The Motion of CLS Bank International ("CLS Bank") and CLS Services Ltd. ("CLS Services") (collectively, "CLS"), to dismiss Alice's counterclaims or, in the alternative, for summary judgment, is a naked attempt to limit this Court's ability to assess CLS Bank's claims and Alice's counterclaims. CLS portrays itself as an unwilling and unwitting defendant who should not be put unjustly to the expense of discovery. But it was CLS Bank that initiated this litigation by filing suit against Alice. Alice had no choice but to counterclaim for patent infringement when faced with CLS Bank's declaratory judgment action. Having hauled Alice into court, CLS now disingenuously argues that "further protracted litigation proceedings" would be a waste of the parties' and the Court's time. Pl. & Countercl. Defs. Mem. of P. & A. in Supp. of their Mot. to Dismiss the Countercls. or Alternatively for Summ. J. ("CLS Mot.") at 2. The Court should not indulge CLS's gamesmanship. Alice's counterclaims are well pled.

CLS's motion to dismiss must be denied. The motion rests on the mistaken belief that *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), changed the basic principle of notice pleading and on a mischaracterization of Alice's Answer to CLS Bank's Complaint. First, Alice's counterclaims give CLS notice sufficient to answer, which is all that Federal Rule of Civil Procedure 8(a) requires. Indeed, the counterclaims track the presumptively sufficient allegations of patent infringement laid out in Form 16 of the Appendix to the Federal Rules of Civil Procedure. The Federal Circuit, even after *Bell Atlantic*, has confirmed that such allegations are sufficient to state a claim for patent infringement. Second, Alice's denial of certain paragraphs of CLS Bank's Complaint based on a lack of knowledge or information does not support the dismissal of Alice's counterclaims. CLS's attempt to transform Alice's denial in

its Answer into an admission regarding infringement in the United States for purposes of CLS's motion is contrary to law and unsupported by the allegations of CLS Bank's Complaint.

CLS's motion for summary judgment is both premature and meritless. First, the motion is clearly premature and should be stayed until Alice has an opportunity to take discovery. It is based entirely on the Declaration of James Hughes who, after proffering one interpretation of the invention claimed in Alice's patents, proceeds to state in conclusory fashion that "the CLS core system," which settles foreign currency trades, is located in the United Kingdom and thus does not infringe. This Declaration, the entire basis for CLS's summary judgment motion, is not supported by a single piece of corroborating evidence. Further, the Declaration has yet to withstand the crucible of cross-examination, where the details of the Declaration, many of which are noticeably absent, will be explored. To consider this unsupported and untested Declaration without providing Alice the opportunity to conduct discovery offends basic notions of fairness and violates the tenets of Rule 56(f). In the attached Rule 56(f) affidavit, counsel for Alice identifies essential areas of discovery that must be had before any summary judgment motion should even be considered.

Second, even without the benefit of discovery (to which Alice is entitled), it is clear that the motion and corresponding Declaration is contradicted by the prior public statements of CLS and other knowledgeable parties during the last four years concerning the location, operation, and control of the continuous linked settlement service, implemented by CLS through the CLS System and related processes (the "CLS System"). These statements raise a genuine issue of material fact as to whether CLS infringes Alice's patents in the United States. Not only is the Hughes Declaration contradicted, but even if the Court were to take everything in

2

the declaration as true, it fails to establish facts that would, as a matter of law, entitle CLS to summary judgment.

At the end of its motion, CLS essentially concedes that Alice is entitled to discovery, but complains that discovery is too costly and, in effect, seeks a protective order limiting discovery to a topic of its choosing. CLS's suggestion imposes so many limits on the scope of discovery as to make it meaningless. CLS's attempt to limit discovery in this case should be rejected. Instead, Alice should be permitted to conduct discovery concerning the design, function, processes, control, ownership, beneficial use and location of the CLS System and all of its components. Any issues concerning the scope or burden of discovery should be addressed as they arise in the normal course of this litigation and not in the abstract at the outset of the case. For these reasons, Alice respectfully urges the Court to deny CLS's motion in its entirety.

## STATEMENT OF FACTS

CLS unilaterally interprets the claims of Alice's patents[1] and then asserts that the system and all of the steps of the method, as defined by CLS, are carried out by the "CLS core system" located in the United Kingdom. CLS's prior public statements, upon which Alice, in part, based its counterclaim, are contrary to this simplistic—and untested—view of CLS's operations.

---

[1] The claims are the part of the patent that define the invention and serve as the boundaries of the property right belonging to Alice. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006). In almost every patent suit filed in the United States today, the claims are interpreted or "construed" by the Court in what is called a *Markman* hearing. *See Markman v. Westview Instruments*, 517 U.S. 370 (1996). This typically occurs after the completion of fact and expert discovery, prior to the court entertaining dispositive motions. It is thus highly irregular for a court even to entertain a motion for summary judgment prior to fact and expert discovery and a *Markman* hearing, because such a motion requires making a decision without a full understanding of the boundaries of the claimed invention.

A.     **An Overview of Alice's Patents.**

Alice holds three patents that address the exchange of an obligation between third parties: U.S. Patent No. 5,970,479, issued October 19, 1999 (the '479 Patent); U.S. Patent No. 6,912,510, issued June 28, 2005 (the '510 Patent); and U.S. Patent No. 7,149,720, issued December 12, 2006 (the '720 Patent). Alice's patents describe a number of different types of exchange systems, including the types of foreign exchange settlement system used by CLS and at issue here. The three patents in suit, which include 198 claims, all claim priority through a series of continuation applications to two patent applications filed in Australia in 1992. Each of the patents underwent substantial examination by the U.S. Patent & Trademark Office, which evaluated the merits of the patent claims in light of literally hundreds of prior art references prior to issuing the patents. Alice's patents enjoy a presumption of validity.

The claims of the three patents in suit include both "method" claims, *i.e.*, claims to a series of steps that constitute a process by which obligations are exchanged between parties, and "system" claims, *i.e.*, claims to a data processing system that enables the exchange of an obligation between parties. The claims set out the details of the inventive means by which parties can exchange an obligation. Two examples of Alice's claims follow.

Claim 68 of the '510 Patent recites a method of exchanging an obligation between parties. A supervisory institution maintains a "first account" for a first party (*e.g.*, a U.S. bank) independent of a "second account" for a first exchange institution (the Federal Reserve Bank of New York) and a "third account" for a second party (*e.g.*, a U.K. bank) independent from a "fourth account" for a second exchange institution (the Bank of England). The first and third accounts at the supervisory institution are electronically adjusted in order to effect the exchange of an obligation between the U.S. and U.K. banks after ensuring that there is adequate value in these accounts. Once the first and third accounts are adjusted, the exchange institutions are

4

instructed to adjust the second and fourth accounts, each instruction being an irrevocable, time invariant obligation placed on the exchange institution.

Claim 68 of the '720 Patent recites a data processing system to enable the exchange of an obligation between parties. The system comprises a data storage unit that stores the account information regarding the supervisory accounts (the first and third accounts) and two exchange institution accounts, and a computer coupled to the data storage unit that is configured to adjust the supervisory accounts and generate an instruction to the exchange institutions to adjust the exchange institution accounts.

**B.** **An Overview of CLS and the CLS System.**

CLS exists to eliminate settlement risk in foreign exchange transactions. A foreign exchange transaction involves two separate payments by the parties to the transaction. To take a simplistic example, a U.K. bank in London and U.S. bank in New York wish to exchange £500 for $1000. Traditionally, the U.K. bank would pay the £500 to an agent of the U.S. bank in London and the U.K. bank would then wait for a corresponding payment of $1000 to its agent in New York. As the two payments could not be made simultaneously, there remained a risk that the U.S. bank would become insolvent after it had received the £500 and be unable to make the corresponding $1000 payment to the U.K. bank. The U.K. bank would then have to recover the £500 from the U.S. bank, typically through a U.S. bankruptcy proceeding. This risk—that one party to a foreign exchange transaction would not perform after receiving payment—is known as "settlement" or "Herstatt" risk. When the daily volume and value of foreign exchange transactions are considered, settlement risk presents a serious potential liability for financial institutions.

CLS attempts to eliminate settlement risk by irrevocably and simultaneously crediting the payments made by each party to a foreign exchange transaction in fifteen different

currencies through the CLS System.  The CLS System can be accessed by banks who are "Settlement Members," as well as certain other categories of users sponsored by Settlement Members.  CLS's Settlement Members, who represent sixty-nine of the world's largest financial groups, are shareholders of CLS Group Holdings AG ("CLS Group") and have multi-currency accounts with CLS Bank.  Settlement members also have accounts with the central banks of the various currencies in which they trade.  Taking the example above, a U.S. bank and a U.K. bank who are Settlement Members of CLS would separately submit instructions to CLS indicating the exchange of £500 for $1000 on a given date.  CLS would then match the separate instructions as a pair and place the trade in line for settlement.  After ensuring that the U.S. and U.K. banks have adequate value in their CLS accounts and the trade passed risk management tests, CLS Bank would then simultaneously and irrevocably:  (1) credit the U.S. bank's CLS account £500 and debit it $1000, and (2) credit the U.K. bank's CLS account $1000 and debit it £500.  At the end of the day, CLS would credit the central bank accounts of the U.S. and U.K. banks, taking into account all trades submitted by both institutions.  On September 19, 2007, CLS Bank settled 905,478 such payment instructions, with a gross value of $8.4 trillion, and for the month of September was settling an average daily volume of 430,000 instructions, with a gross value of $4 trillion.  R. 56(f) Aff. of M. Jesse Carlson ("Carlson Aff."), Ex. 1.

> **C.    CLS Settles Foreign Currency Trades in New York and Has a Substantial Presence in the United States.**

CLS Bank purchased the CLS System from CLS Services in late 2001, and the CLS System has been in operation since September 2002.  Since that time, CLS has made numerous public statements that indicate a presence in the United States sufficient to state a claim for patent infringement.  For example, on April 17, 2003, CLS Group wrote to the United Kingdom's Treasury on behalf of CLS Bank and CLS Services regarding potential operational

disruptions in the financial system. Explaining CLS's operations, CLS Group stated that "CLS Bank has entered into a Master Services Agreement with CLS Services pursuant to which CLS Services provides a number of services to CLS Bank, including bank office operations." Carlson Aff., Ex. 2 at 2. Concerned that proposed British laws would apply to "'actions that took place in the UK,'" CLS stated that "[t]he case of CLS Bank is potentially ambiguous on its face, since operations occur in London but *settlement occurs across the books of CLS Bank in New York City*." *Id.* at 4 (emphasis added). Indeed, CLS repeatedly noted that the settlement of foreign currency trades entered into the CLS System occurred in New York, not London. *Id.* at 2 (noting "finality of instructions settled across the books of CLS Bank"); *see also id.* at 3 ("One of the significant aspects of the CLS settlement system is that while settlement of payment instructions is done on a gross basis across the books of CLS Bank in New York City, the funding [of the trades] is done on a net basis."); *Id.* Ex. 3 at 7 ("'Settlement' means the *settlement* of [eligible payment instructions] . . . *across the books and records of CLS Bank* by the simultaneous making of debits and credits to the Accounts of the respective Settlement Members specified in the applicable . . . [payment instructions]." (emphasis added) (alterations in original)); *Id.* Ex. 4 ("CLS makes settlement when both party's payment instructions are *matched by CLS Bank* and meet its settlement criteria. By a system of payment versus payment, *CLS Bank will then* simultaneously credit *each party's account at CLS Bank* with the funds owing eliminating the risk that one side may not receive payment." (emphasis added)).

    Later that year, Joseph De Feo, the President and CEO of CLS Bank, further indicated that CLS Bank would be expanding its operations in New York. He stated, "There are two operation sites, in the greater London area. What we're planning to do is to migrate one of those to New York, or possibly elsewhere, so we achieve a greater geographic separation."

Carlson Aff., Ex. 5 at 26. He went on to confirm that the second operational site for CLS would

be in New York, stating:

> Where do we at CLS Bank see ourselves in terms of our resilient posture in
> several years? Well as I suggested, we will have geographically dispersed key
> operational sites. Our current thinking is one will be in New York, one will be in
> the United Kingdom (our back office for CLS Bank is in London). We will have
> two sets of information technologies supporting the server environments required
> to underpin those operational facilities and they will all be networked, they'll be
> interconnected. So that, for example, the London operational site could run off the
> IT configuration in New York, the New York site could run off the IT
> configuration in London.

*Id.* at 27. Thus, it is apparent that CLS planned an integrated system that would allow CLS to

control and actually settle trades in New York.

CLS Group's Annual Report for 2003 confirmed the plans outlined by Mr. De

Feo. The report noted that operation changes to enhance resilience of the CLS System were

planned and that CLS "intend[ed] to establish out of region operations capability that will take

responsibility for the service in the event of a disruption in London." Carlson Aff., Ex. 6 at 6.

Further, the report indicated that "[o]n 30 January 2004, CLS Bank entered into a ten year

agreement with the IBM Corporation for a managed secure data centre facility in the USA as part

of the Group plans in 2004 to improve the operational resilience of the CLS service." *Id.* at 36.

CLS's plans to establish an operation presence in the United States were then

implemented in 2004. CLS Group's annual report for 2004 states, "An out of region Operations

capability was established in New York that is working side by side with the London-based

Operations team, both being individually capable of running the full service." *Id.* Ex. 7 at 6.

The "2004 Scorecard Summary" goes on to note that "CLS has significantly enhanced its

operational resilience with the completion of the out of region operations and CLS IT capability

as cover against major problems in the UK." *Id.* at 11.

CLS's operations in New York have, more recently, been detailed by other knowledgeable parties. In a review of payment systems, the Danmarks Nationalbank noted that "[i]nitially CLS [was] established with primary and secondary operating and data centres in the south of England," but that "CLS has established a parallel operating and data centre in New York." Carlson Aff., Ex. 8 § 8.7 at 171. The Danmarks Nationalbank would be familiar with CLS Bank's operations, because the Danish Krone is one of the currencies that can be settled by the CLS System and the Federal Reserve Bank of New York engages in oversight of CLS in cooperation with the central banks, like Danmarks Nationalbank, whose currencies are settled by the CLS System. *Id.* at 171 n.1.

The following year, Jonathan Butterfield, CLS's Executive Vice President of Marketing and Communications, stated that CLS has multiple data centers, triple network connections and runs hardware and software of both sides of the Atlantic. *See Id.* Ex. 9.

Most recently, the Danmarks Nationalbank stated: "As a provision against system failures, parallel operation of the CLS system has been established in London and New York, and a complete 'out of region' back-up solution is underway. When this solution has been fully implemented as planned in 2007, CLS will comply with the US authorities' enhanced requirements after the attacks on the World Trade Center in New York on 11 September 2001." Carlson Aff., Ex. 10 at 77.

CLS has thus publicly indicated that it settles foreign currency trades in New York City and, further, that it has planned and implemented the operation of the CLS System in New York.

## ARGUMENT

**I.    Alice's Counterclaims are Sufficiently Pled.**

Contrary to CLS's contention, *Bell Atlantic Corp. v. Twombly* did not alter the basic principle of notice pleading. *See* 127 S. Ct. 1955, 1969 (2007). Alice's counterclaims are indistinguishable from Form 16 of the Federal Rules of Civil Procedure, which under Federal Rule of Civil Procedure 84 and recent Federal Circuit precedent is sufficient to state a claim for patent infringement. Moreover, CLS Bank initiated this action, hauling Alice into court; it cannot now argue that it has no notice of Alice's claims. Finally, Alice's counterclaims incorporate by reference correspondence between the parties that amply provides the detail that CLS claims is missing from Alice's counterclaims. Under these circumstances, Alice has sufficiently pled its counterclaims under Federal Rule of Civil Procedure 8.[2]

"A motion to dismiss for failure to state a claim will not be granted unless the complaint does not contain 'enough facts to state a claim to relief that is plausible on its face' and there is no 'reasonably founded hope' that the plaintiff can make a case." *Riggiladez v. Harvey*, No. 06-1337, 2007 U.S. Dist. LEXIS 70078, at *5 (D.D.C. Sept. 21, 2007) (quoting *Bell Atl.*, 127 S. Ct. at 1969, 1974). The party moving for dismissal of claims pursuant to Federal Rule of Civil Procedure 12(b)(6) carries the burden of proving that no sustainable legal claim has been stated. *See Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996). The Court must construe the counterclaims in a light most favorable to Alice and accept all factual allegations as true. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir.

---

[2]    By contrast, CLS Bank's allegation in Count III of its Complaint that Alice engaged in inequitable conduct is governed by the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See, e.g., Ferguson Beauregard/Logic Controls v. Mega Sys.*, 350 F.3d 1327, 1344 (Fed. Cir. 2003). *See generally* Def. Alice Corp. Pty. Ltd.'s Mot. to Dismiss Count III.

1997).  Because of this high burden, courts have generally viewed a motion to dismiss for failure to state a claim with disfavor, and such motions are rarely granted.  *See Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985).

Alice's counterclaims are sufficient to state a claim for direct infringement of its patents.  The language in the counterclaims tracks Federal Rule of Civil Procedure Appendix Form 16, which sets out a sample patent infringement complaint.  *Compare* Fed. R. Civ. P. App. Form 16[3] *with* Alice's Counterclaims.  Rule 84 provides that the "forms contained in the Appendix of forms are sufficient under the rules" to sustain a claim for relief.  Fed. R. Civ. P. 84. Despite CLS's statement that the Supreme Court's *Bell Atlantic* decision "set out a new [pleading] standard," *see* CLS Mot. at 12, the Supreme Court has not overruled *Conley v. Gibson*, 355 U.S. 41 (1957) or invalidated the Federal Rules.  Indeed, the Federal Circuit just recently reaffirmed the notice pleading standard and clarified the scope of *Bell Atlantic* as it pertains to patent infringement claims.  *McZeal v. Sprint Nextel Corp.*, No. 2006-1548, 2007 U.S. App. LEXIS 22025, at *7 (Fed. Cir. Sept. 14, 2007).

In *McZeal*, the Federal Circuit held that to defeat a motion to dismiss, a patentee alleging infringement "need only plead facts sufficient to place the alleged infringer on notice as

---

[3]     Form 16 provides the following example of a sufficient pleading:

1.     Allegation of jurisdiction.
2.     On May 16, 1934, United States Letters Patent No. ___ were duly and legally issued to plaintiff for an invention in an electric motor; and since that date plaintiff has been and still is the owner of those Letters Patent.
3.     Defendant has for a long time past been and still is infringing those Letters Patent by making, selling, and using electric motors embodying the patented invention, and will continue to do so unless enjoined by this court.
4.     Plaintiff has placed the required statutory notice on all electric motors manufactured and sold by him under said Letters Patent, and has given written notice to defendant of his said infringement.

to what he must defend." *Id.* The plaintiff in that case, McZeal, alleged that part of Sprint

Nextel's telephone service fell within the scope of one or more claims of a patent he owned. *Id.*

at *8. Though his Complaint merely pled jurisdiction, ownership of a specific patent, and that

the defendants infringed—McZeal cited the infringement statute rather than quoting from it—the

Court held that it "contain[ed] enough detail to allow the defendants to answer and thus m[et] the

notice pleading required to survive a Rule 12(b)(6) motion." *Id.* at *8-9. The Court went on

specifically to address the Supreme Court's holding in *Bell Atlantic*:

> [I]n its *Bell Atlantic* opinion, the [Supreme] Court . . . . noted that the language
> "no set of facts" contained in *Conley* could be read "as saying that any statement
> revealing the theory of the claim will suffice unless its factual impossibility may
> be shown from the face of the pleadings." *Bell Atlantic*, 127 S.Ct. at 1968. The
> Court concluded that "[t]he phrase is best forgotten as an incomplete, negative
> gloss on an accepted pleading standard: once a claim has been stated adequately,
> it may be supported by showing any set of facts consistent with the allegations in
> the complaint." *Id.* at 1969. This does not suggest that *Bell Atlantic* changed the
> pleading requirement of Federal Rule of Civil Procedure 8 as articulated in
> *Conley*. In fact, as illustrated above, *Bell Atlantic* favorably quoted *Conley*.

*Id.* at *6 n.4 (alteration in original).[4] Thus, *Bell Atlantic* did not invalidate Federal Rule of Civil

Procedure 84 and does not stand for the proposition that patentees must set forth every claim

from each of their patents and match them specifically to acts perpetrated by alleged infringers

prior to any discovery. On the contrary, patentees merely must provide enough information to

permit a defendant to answer. *Id.* at *9.

---

[4]    Though McZeal was a *pro se* litigant, his status did not play a role in the Court's analysis
of *Bell Atlantic* or the pleading standard applicable to a claim for patent infringement, as even
the dissent noted. *See McZeal*, 2007 U.S. App. LEXIS 22025, at *6 n.4 (reaffirming *Conley*'s
notice pleading standard in light of *Bell Atlantic*); *id.* at *18, *20 (Dyk, J. dissenting) ("I agree
that under Rule 84 of the Federal Rules of Civil Procedure, we would be required to find that a
bare allegation of literal infringement in accordance with Form 16 would be sufficient under
Rule 8 to state a claim" but dissenting on the ground that Form 16 should not apply to McZeal's
"complex doctrine of equivalents claim.").

Here, CLS does not even attempt to argue that it has no notice of Alice's claims or that it does not have enough information to file an Answer.  *See* CLS Mot. at 11–14 (arguing that Alice fails to meet the pleading standard of *Bell Atlantic*, but misconstruing that standard to require more than sufficient notice to answer plaintiff's claims).  Indeed, CLS Bank had enough information to file a Complaint in this case for declaratory relief, a development which effectively forced Alice to counterclaim for infringement.  *See Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.*, 347 F.3d 935, 938 (Fed. Cir. 2003) ("[A] claim for a declaration of noninfringement makes a counterclaim for patent infringement compulsory.").  CLS thus knows enough about the merits of Alice's claims to have sought a judgment from this Court that CLS does not infringe Alice's patents; any suggestion otherwise in its Motion to Dismiss is disingenuous.

Putting aside both the fact that CLS Bank initiated this lawsuit and the fact that the simple allegations from Federal Rule of Civil Procedure Form 16 would be sufficient to state a claim, CLS's argument that Alice failed to identify the CLS product or system at issue is incorrect as a factual matter.  Alice's counterclaims referred to correspondence exchanged between the parties concerning the patents at issue, including a draft license agreement the parties were negotiating.  Countercls. ¶ 12.  The content of documents incorporated by reference are considered when addressing a motion to dismiss for failure to state a claim.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25 ("In determining whether a complaint fails to state a claim, we may

13

consider . . . any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."). The license agreement provided to CLS and referenced in Paragraph 12 of Alice's counterclaim specifically states the "Licensed Service" is "the service performed by CLS Bank of administering the exchange of foreign exchange transaction settlement obligations between CLS Settlement Members." *See* Countercls. ¶ 12; Carlson Aff., Ex. 11.[5] The allegations of Alice's counterclaims are more than sufficient to put CLS on notice as to Alice's claims, and CLS's motion to dismiss must be denied.

## II.   Alice Has a Good-Faith Basis for Asserting Its Counterclaims for Patent Infringement.

CLS contends that Alice has no basis for asserting a counterclaim for infringement because it admitted in its Answer that it "lacks knowledge or information sufficient to form a belief as to the truth of the allegations" in two paragraphs. *See* Answer ¶¶ 11–12; CLS Mot. at 17–18. CLS misreads its allegations in those two paragraphs (and the corresponding denials), as well as the law.

First, CLS misstates the allegations from its own Complaint, asserting in its Motion that its Complaint had alleged "that the components of the CLS system for settling foreign exchange transactions are located *outside of the United States*, and that the performance of the CLS service respecting settlement of foreign exchange transactions occurs *outside of the United States*." *See* CLS Mot. at 17. In fact, Paragraph 11 of its Complaint actually states that "CLS Bank, *through a contractual arrangement with CLS Services Ltd.*, a private limited company organized under the laws of England and Wales and located in the United Kingdom, provides a 'continuous linked settlement service' to settle foreign exchange transactions for other banks." Compl. ¶ 11 (emphasis added). This allegation has nothing to do with where the

---

[5]      Alice has redacted certain confidential information from the license agreement.

"components of the CLS system" are located or where "performance" occurs, and Alice

responded, accurately, that it lacked knowledge or information sufficient to form a belief as to

the specifics of the contractual arrangement between CLS Bank and CLS Services Ltd.

       Similarly, Paragraph 12 of the Complaint alleged that "[t]he CLS Service offered

by CLS Bank utilizes various computer hardware and software to settle foreign exchange

transactions (the 'CLS System').  The relevant components of the CLS System are located in the

United Kingdom."  Compl. ¶ 12.  While Paragraph 12 thus contains an assertion about the

location of CLS System "components," it also narrows this assertion to the "relevant

components," a conclusory limitation that CLS has not clarified and that Alice therefore lacks

knowledge or information to confirm.  *Id.*

       In addition, the effect of Alice's answer to Paragraphs 11 and 12 is to *deny* these

allegations in its Answer.  A defendant's good faith answer that it lacks knowledge or

information sufficient to form a belief as to the truth of an averment constitutes a denial.  *See*

Fed. R. Civ. P. 8(b) ("If a party is without knowledge or information sufficient to form a belief as

to the truth of an averment, the party shall so state and this has the effect of a denial.");  *see, e.g.,*

*Glater v. Eli Lilly & Co.*, 712 F.2d 735, 737 (1st Cir. 1983).  Indeed, whether CLS performs acts

that constitute patent infringement in the United States under the patent statute is a *legal*

determination—though based on facts not yet discovered—and therefore any attempt to assert a

lack of infringement is premature and should be rejected on that basis.  *See NTP, Inc. v.*

*Research in Motion, Ltd.*, 418 F.3d 1282, 1313–18 (Fed. Cir. 2005) (analyzing section 271(a)

under the facts presented *after* discovery to determine whether "infringing activity occurs within

the United States"), *cert denied*, 546 U.S. 1157 (2006).

Finally, Alice is not required (much less expected) at this stage to understand every aspect of how the CLS System works and where it takes place. In the Federal Circuit's recent case confirming the vitality of the notice pleading standard in patent actions following *Bell Atlantic*, the plaintiff conceded during oral argument that he "didn't know what device, what mechanism or what means [defendant] uses to transmit and connect its telephone customers to the rest of the world." *McZeal*, 2007 U.S. App. LEXIS 22025, at *10. The Court noted that at this early stage of litigation, all a plaintiff has access to is "public statements and advertisements. . . . [T]he specifics of how [a defendant's] purportedly infringing device works is something to be determined through discovery." *Id.* That is exactly the situation here. Alice is entitled to discovery on the specifics of the CLS System, including the design, function, processes, ownership, control and beneficial use of the CLS System, in addition to the location of all of the components CLS uses to settle foreign exchange transactions before the Court reaches the merits of this case. CLS seeks to secure a judicial determination that it does not infringe without any inquiry by the Court or Alice into whether its assertions are accurate. That is fundamentally unfair, and the Court should reject CLS's motion to dismiss.

## III.    If Necessary, Alice Should Be Entitled To Replead with More Specificity.

Alice has a clear basis for alleging patent infringement in the United States, and CLS's suggestion that its counterclaims should be dismissed with prejudice is unfounded. As noted above, publicly available information demonstrates that CLS controls the settlement of and/or settles foreign currency transactions in the United States and has a backup system that operates parallel to the system in England. While Alice is not required to add any more detail to its counterclaims, it could, if necessary, replead them to specifically allege that CLS is infringing Alice's patents in the United States. Contrary to CLS's assertion, Alice's responses to two Paragraphs from CLS Bank's Complaint are not sufficient to "belie[] any ability" by Alice to

16

replead. *See* CLS Mot. at 18; *Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that leave to amend should be "'freely given'" except in cases of "undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [or] futility of amendment").

## IV.    Alice Iis Entitled to Discovery.

CLS grudgingly concedes that Alice may be entitled to discovery, but asks the Court to limit discovery to the "extraterritoriality issues raised by this motion." *See* CLS Mot. at 22. This request is both premature at this stage and inappropriate coming from CLS Bank, the party who invoked the jurisdiction of this Court and who has yet to see a single discovery request.

First, contrary to CLS's representations, summary judgment would be premature given that Alice has not had the opportunity to conduct any discovery or otherwise test the assertions in the Hughes Declaration. Any deficiency in the evidence Alice offers at this stage is due solely to the fact that it has not been allowed to take discovery in this case and must instead rest its allegations on publicly available statements by CLS. As established by the accompanying Rule 56(f) Affidavit, to the extent that the publicly available information cited above and relied on by Alice is insufficient to create a genuine issue of material fact, Alice cannot fairly controvert the Hughes Declaration unless it is first given the opportunity to conduct discovery regarding the design, function, processes, ownership, control, beneficial use and location of the CLS System and all of its components. *See* Carlson Aff. ¶¶ 5–9. Alice therefore formally requests discovery pursuant to Federal Rule of Civil Procedure 56(f) so that it may have a "reasonable opportunity" to respond to the summary judgment motion. *Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987) (noting that "insufficient time or opportunity to engage in discovery" is cause to defer decision on summary judgment motion); *see also Azhar Ali Khan v.*

17

*Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087–88 (D.C. Cir. 2005) (remanding where summary judgment "motion was filed in lieu of an answer, before a scheduling order, discovery, or initial disclosures, and the motion relied upon information in [defendant's] sole control").

Moreover, there is no need for the Court to rule on the proper scope of discovery in deciding this Motion. Any concerns about overbroad discovery may be addressed by the Court at the scheduling conference in this case. Alice attempted during the initial Rule 26(f) conference in this case to engage CLS in a discussion about the scope of discovery, but CLS refused to engage in any substantive discussion on this point until the Court decides the pending motions. CLS's argument effectively amounts to a request for a protective order, but CLS has not seen Alice's discovery requests and therefore cannot legitimately argue that it needs protection from any such request. *See Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 516, n.6 (D.C. Cir. 1996) (noting that under Fed. R. Civ. P. 26(c), protective orders are available to protect parties from "annoyance, embarrassment, oppression, or undue burden or expense").

While limitations on discovery have occurred in certain cases involving inquiries of personal jurisdiction or other instances in which a court seeks to protect a defendant from burdensome discovery, here, CLS Bank invoked the jurisdiction of the Court and asked for a determination on a wide range of issues, including validity, anticipation, obviousness, and indefiniteness. *See, e.g.,* Compl. ¶ 27. It cannot now argue, after dragging Alice into court to defend its patentee status, that CLS fears burdensome and overbroad discovery. The cases cited by CLS are not to the contrary. *See, e.g., Rotec Indus., Inc. v. Mitsubishi Corp.*, 36 F. Supp. 2d 810, 813 (C.D. Ill. 1998) (limiting *plaintiff's* discovery on issue of whether act of patent

infringement occurred in the United States); *Ductmate Indus., Inc. v. The Lockformer Co.*, No. 84-C-5152, 1985 WL 2179, at *4 (N.D. Ill. Feb. 12, 1985) (same).

Those cases are easily distinguishable on another ground, as well. While discovery was limited to (as CLS puts it) the "extraterritoriality" issue in those cases, as a factual matter that issue involved simpler discovery because the products were discrete physical items and the defendants' acts in the United States were easily defined. *See, e.g.*, *Rotec Indus.*, 36 F. Supp. 2d at 815 (noting that "the only real issue is whether an 'offer to sell' [the infringing product, a conveyer-belt system,] was made in the United States" and that only issue of disputed fact was whether Defendants attended negotiations in the United States); *Ductmate Indus.*, 1985 WL 2179, at *2 (noting that the only evidence of manufacture in the United States of the allegedly infringing product was a sample on display at a trade show). Here, by contrast, whether CLS commits acts of infringement in the United States using the CLS System—a electronic system implemented through multiple locations run by a company with a principal office in the United States—depends on complex legal and factual issues including, but not limited to, the design, function, ownership and structure of the CLS System, who "controls" the system, and who has "beneficial use" of the system, among other issues. *See e.g., NTP, Inc.*, 418 F.3d at 1313–18.

CLS's request to limit discovery to the location of its servers (what CLS unilaterally calls the components of Alice's claimed invention based on its unilateral construction of the patents) is nothing more than an attempt to get a quick judicial determination that it does not infringe Alice's patents without any inquiry necessary to make that determination. *See* CLS Mot. at 15 n.6 (acknowledging that CLS's goal is to "moot" its own claims and obtain judgment before any discovery can take place). The Court, however, cannot

determine the truth of CLS Bank's allegations and self-serving Declaration concerning the specifics of the CLS System any better than Alice at this early stage. Alice has no interest in wasting its resources or the Court's during the litigation of this case. But before the question of infringement can be resolved, it is imperative that Alice be given an opportunity to conduct discovery. CLS's fear of overbroad and unduly burdensome discovery are unfounded, and any questions concerning scope can and should be dealt with in the normal course of this litigation. Accordingly, the Court should make no determination regarding the scope of discovery in deciding this Motion.

## V.     Genuine Issues of Material Fact Preclude Summary Judgment in Favor of CLS.

Were the Court to consider the merits of CLS's summary judgment motion at this time, the motion should be denied.

Summary judgment is appropriate only if the Hughes Declaration shows that there is no genuine issue of material fact such that CLS is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor." *Litton Sys. v. Honeywell Inc.*, 238 F.3d 1376, 1379 (Fed. Cir. 2001). As an initial matter, CLS has failed to comply with Local Rules 7(h) and 56.1 which require a party to file a "statement of material facts as to which the moving party contends there is no genuine issue." *See* Local Rules 7(h), 56.1. The District of Columbia Circuit Court of Appeals "[r]equire[s] strict compliance with the local rule" because it "isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980) (reversing summary judgment because of failure to comply with prior Local Rule 1-9(h), which is identical to current Local

Rule 56.1). Since CLS failed to comply with the local rules, this Court has discretion to deny summary judgment on this basis alone. *See id.*

Even without the aid of discovery, the Hughes Declaration is deficient in three respects: (1) it does not explain or reconcile prior public statements by CLS and others that contradict the assertions in the Hughes Declaration; (2) by speaking only in the present tense, it fails to negate prior infringement by CLS; and (3) by focusing solely on the location of the CLS core system, it fails to address overall control and beneficial use of the system. CLS's motion for summary judgment must therefore be denied.

**A.     Prior Public Statements Contradict the Hughes Declaration.**

First, without the aid of discovery, public statements by CLS and others reveal genuine issues of material fact (and thus preclude summary judgment in favor of CLS). CLS's public statements contradict the characterization of CLS Bank's "limited" facilities in the United States and indicate that the infringing method and system by which CLS settles foreign exchange transactions are located in New York. The information publicly available to Alice shows that CLS has planned and implemented a complete backup system in the United States in order to comply with a directive from its primary regulator, the Federal Reserve Bank of New York. Contrary to the "limited facilities" described by Mr. Hughes, CLS's prior statements (outside the context of litigation) support an inference that CLS's facilities in New York are capable of settling trades and apparently serve as a backup to the CLS core system. For example:

- CLS was "planning . . . to migrate one of [its operation sites] to New York, or possibly elsewhere, [to] achieve a greater geographic separation" as early as 2003. Carlson Aff., Ex. 5 at 26.

- CLS planned "two sets of information technologies supporting the server environments required to underpin [the] operational facilities and they will all be networked, they'll be interconnected. So that, for example, the London operational site could run off the IT configuration in New York, the New York site could run off the IT configuration in London." *Id.* at 27.

- "On 30 January 2004, CLS Bank entered into a ten year agreement with the IBM Corporation for a managed secure *data centre facility* in the USA as part of the Group plans in 2004 to improve the operational resilience of the CLS service." *Id.* Ex. 6 at 36 (emphasis added).

- CLS stated in its 2004 Annual Report that "[a]n out of region Operations capability was established in New York that is working side by side with the London-based Operations team, *both being individually capable of running the full service*." *Id.* Ex. 7 at 6 (emphasis added). *Compare* Hughes Decl. ¶ 25 ("[N]one of [CLS Bank's facilities in the United States] . . . can be used to settle instructions. In addition, none of these facilities can serve as a backup for the CLS core system.").

- That a parallel operations and data center exists in New York was confirmed in 2005: "Initially CLS [was] established with primary and secondary operating and data centres in the south of England," but "CLS has established a parallel operating and data centre in New York." Carlson Aff., Ex. 8 at 171.

- "As a provision against system failures, parallel operation of the CLS system has been established in London and New York, and a complete 'out of region' back-up solution is underway. When this solution has been fully implemented as

planned in 2007, CLS will comply with the US authorities' enhanced requirements after the attacks on the World Trade Center in New York on 11 September 2001." *Id.* Ex. 10 at 77.

The core assertion of the Hughes Declaration—that CLS does not operate facilities in the United States capable of infringing Alice's patents—is belied by its own public statements. Taking all inferences in favor of Alice, it appears that CLS is operating a complete backup system capable not only of settling trades, but of running the CLS Service in the United States. Even without discovery, Alice has produced evidence sufficient to defeat CLS's motion. Because there is a genuine issue of material fact as to whether CLS's operations in the United States infringe Alice's patents, CLS's motion for summary judgment must be denied.

**B.     The Hughes Declaration Fails to Negate Prior Infringement.**

Second, one cannot help but notice that, when describing the CLS System, the Hughes Declaration speaks only in the present tense. *See, e.g.,* Hughes Decl. ¶ 25 ("[N]one of [CLS Bank's U.S.] facilities *contain* CLS core system computers, and none *can* be used to settle instructions. In addition, none of these facilities *can* serve as a backup for the CLS core system." (emphases added)). Hughes easily could have stated that CLS's facilities in the United States "have not, do not and never could" be used to settle foreign currency transactions. He did not. Having failed even to assert, much less controvert, that there was no past infringement, summary judgment should be denied.

**C.     The Hughes Declaration Fails to Address the Ownership, Control and Beneficial Use of the CLS System.**

Finally, the Hughes Declaration only addresses the location of the CLS core system servers and computers, explaining that they are not located in the United States. CLS Mot. at 18–19  CLS thus concludes that Alice's patents cannot be infringed by CLS Bank or CLS

23

Services. *Id.* However, this argument ignores the fact that Alice's '720 patent includes system claims.[6] These claims recite a data processing system to enable the exchange of an obligation between parties including, *inter alia*, a data storage unit and a computer. The Federal Circuit's decision in *NTP, Inc. v. Research in Motion, Ltd.* made clear that the place where control of the system is exercised, and beneficial use of the system obtained, determines whether infringement of a system occurs in the United States. 418 F.3d 1282 (Fed. Cir. 2005); *see also Decca Ltd. v. United States*, 544 F.2d 1070, 1083 (Ct. Cl. 1976).

   *NTP, Inc.* is instructive. There, the court reaffirmed the holding of *Decca* that a system is "used" for purposes of the patent laws "where control of the system is exercised and beneficial use of the system obtained." 418 F.3d at 1317. RIM attempted to distinguish *Decca* by arguing that a component of its system, which controlled the system and was necessary for the other components of the system to function properly, was not located in the United States. *Id.* The Federal Circuit disagreed, noting,

> While this distinction recognizes technical differences between the two systems, it fails to appreciate the way in which the claimed NTP system is actually used by RIM's customers. When RIM's United States customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as a whole occurs in the United States. This satisfactorily establishes that the situs of the "use" of the RIM's system by

---

[6]   Alice in no way concedes that CLS does not infringe the '479 Patent and the '510 Patent —which both include method claims—within the United States. CLS Bank's CEO, Joseph De Feo, stated in December 2005 that CLS Bank is "the only bank in the world that has been given the ability to have central bank accounts and access central bank real-time gross settlement services by way of one legal entity and one central location." Carlson Aff., Ex. 12. This statement, in combination with the fact that settlement "occurs across the books of CLS Bank in New York City" fully supports Alice's contention that CLS infringes Alice's method patents. *Id.* Ex. 2. Similarly, CLS only discusses 35 U.S.C. §§ 271(a)–(c) in their Motion. However, Alice also has viable infringement claims under other sections of the patent infringement statute that will be briefed at the appropriate time after Alice is given an opportunity to conduct discovery.

> RIM's United States customers for purposes of § 271(a) is the
> United States.

*Id.* Thus, when it comes to evaluating Alice's systems claim, the location of the components is

irrelevant if CLS Bank exercises control of and/or derives beneficial use from the system in the

United States.

Apart from the physical location of CLS's servers, the Hughes Declaration

describes how the various steps necessary to carry out a foreign currency trade are performed by

the "CLS core system." Hughes Decl. ¶¶ 17–22. The Declaration fails to identify the entity that

is controlling this process, perhaps with good reason, given that publicly available information

indicates that CLS Bank controls and settles the trades in New York. For example, CLS has

stated that "settlement occurs across the books of CLS Bank in New York City." Carlson Aff.,

Ex. 2 at 4. This non-litigation statement stands in sharp contrast to the assertion by Mr. Hughes

that "the paired Instruction is settled when the CLS core system simultaneously debits and

credits" the member's accounts. Hughes Decl. ¶ 21. Likewise, similar public statements by CLS

support an inference that CLS Bank in New York is exercising control of and deriving beneficial

use of the CLS System. *See also, e.g.*, Carlson Aff., Ex. 3 at 7, ("'Settlement' means the

*settlement* of [eligible payment instructions] . . . *across the books and records of CLS Bank* by

the simultaneous making of debits and credits to the Accounts of the respective Settlement

Members specified in the applicable . . . [payment instructions]." (alteration in original)

(emphasis added)); *Id.* Ex. 4 ("CLS makes settlement when both party's payment instructions are

*matched by CLS Bank* and meet its settlement criteria. By a system of payment versus payment,

*CLS Bank will then* simultaneously credit *each party's account at CLS Bank* with the funds

owing eliminating the risk that one side may not receive payment." (emphases added)).

Moreover, CLS Bank in New York purchased the CLS System/Service from CLS Services on December 31, 2001, and it is CLS Bank that entered into the contractual arrangements with IBM to maintain the computer systems that allow the CLS System to function. *Id.* Ex. 6 at 36. In addition, the Hughes Declaration itself acknowledges that "the CLS core system issues an instruction, *on behalf of CLS Bank*, to the relevant Central Banks to make a payment to the Member (or its designated agent) by debiting the CLS Central Bank Account held by that Central Bank." Hughes Decl. ¶ 22 (emphasis added). It is a fair inference that CLS Bank is exercising control over and obtaining beneficial use of the CLS System in the United States.

## CONCLUSION

For the foregoing reasons, Alice respectfully requests that the Court Deny the Motion of CLS Bank and CLS Services to Dismiss the Counterclaims, or, Alternatively, for Summary Judgment.

Dated:  October 4, 2007                Respectfully submitted,

                                       ALICE CORPORATION PTY. LTD.,

                                       By its attorneys,

                                       _____
                                       Paul Martin Wolff (D.C. Bar No. 90217)
                                       Bruce R. Genderson (D.C. Bar No. 961367)
                                       Ryan T. Scarborough (D.C. Bar No. 466956)
                                       M. Jesse Carlson (D.C. Bar No. 490196)
                                       WILLIAMS & CONNOLLY LLP
                                       725 Twelfth Street, N.W.
                                       Washington, DC 20005
                                       Telephone: (202) 434-5000
                                       Facsimile: (202) 434-5029


                                       _____
                                       Mark F. Evens (D.C. Bar No. 343723)
                                       STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
                                       1100 New York Avenue, N.W.
                                       Washington, DC 20005
                                       Telephone: (202) 371-2600
                                       Facsimile: (202) 371-2540

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of October, 2007, a copy of ALICE CORPORATION

PTY. LTD.'S  OPPOSITION TO THE MOTION TO DISMISS THE COUNTERCLAIMS OR,

ALTERNATIVELY, FOR SUMMARY JUDGMENT was served upon the following by

electronic means through ECF:

      David O. Bickart, Esq.
      KAYE SCHOLER LLP
      901 15th Street, N.W.
      Suite 1100
      Washington, DC 20005-2329
      Fax: (202) 414-0310

                                 _____
                                       M. Jesse Carlson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| _____ | ) | |

## RULE 56(f) AFFIDAVIT IN SUPPORT OF ALICE CORPORATION PTY. LTD.'S OPPOSITION TO THE MOTION TO DISMISS THE COUNTERCLAIMS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT

I, M. Jesse Carlson, hereby state as follows:

1.    I am an associate with the law firm of Williams & Connolly LLP.  I am one of the

attorneys representing Alice Corporation Pty. Ltd. ("Alice") in this action.  I am submitting this

affidavit in support of Alice's Opposition to the Motion of CLS Bank International ("CLS

Bank") and CLS Services Ltd. ("CLS Services") (collectively, "CLS") to Dismiss the Counterclaims, or, Alternatively, for Summary Judgment.

2.    I believe that CLS's public statements are sufficient to create a genuine issue of material fact that precludes summary judgment in favor of CLS. CLS, in an attempt to limit discovery in this matter after bringing suit against Alice, highlights the physical location of certain components of the system by which it settles foreign currency trades as the sole issue in this dispute. CLS's public statements, which are admissible against CLS, create a genuine issue of material fact as to the location of CLS's operations and preclude summary judgment in favor of CLS.

3.    I have reviewed CLS's motion and, should the Court determine the documents attached hereto are insufficient to create a genuine issue of material fact, I have concluded that discovery must take place before Alice can oppose summary judgment. Any infirmity in Alice's opposition to CLS's motion is due solely to the fact that Alice is limited to CLS's public statements in responding to its motion. In responding to CLS's motion, Alice has been deprived of the opportunity to engage in discovery and must be afforded a reasonable opportunity to do so. No discovery has taken place in this matter. Specifically, no documents have been produced, no witnesses deposed, CLS's operational centers have not been inspected, and no interrogatories or requests for admission have been answered.

4.    CLS's motion and the accompanying Declaration of James Hughes (the "Hughes Declaration"), upon which it is based, rely upon information that is within the sole possession and control of CLS. Any information, besides CLS's public statements, that could confirm or deny Mr. Hughes's representations is also in CLS's sole possession and control. Discovery is likely to yield information regarding the design, function, processes, ownership, control,

beneficial use and location of the components used by CLS to settle foreign currency trades that contradicts the assertions in the Hughes Declaration.

5.      More specifically, while the Hughes Declaration's statement of the corporate organization of CLS (¶¶ 5-8) is generally consistent with publicly available documents, it contains no detail as to the relationship among the various corporate entities affiliated with CLS, or between CLS and the shareholders of CLS Group Holdings AG ("CLS Group") who actually use the "continuous linked settlement" system ("the CLS System"), or between CLS and its outside vendors who maintain components of the CLS System, or between CLS and the central banks that are integral to the CLS System.  To take one example, without the master services agreement and other documents relating to the formation, incorporation, and relationship between CLS Bank, CLS Services, and CLS Group, it is impossible for Alice to contradict the assertion that CLS Services "provides CLS Bank with far-ranging system and operational support, including data processing systems and services, and administrative support."  Hughes Decl. ¶ 8.  Discovery is likely to reveal these details, which bear on matters directly relevant to CLS's motion for summary judgment.

6.      Similarly, the assertion that "the CLS Service is Effectuated by the CLS Core System," (¶¶ 15-22), minimally describes how the exchange of obligations using the CLS system is accomplished.  Numerous details are lacking.  By way of illustration, the Declaration fails to identify who controls the CLS System.  Hughes Decl. ¶¶ 17-22.  The relationship between CLS Bank and its affiliated entities, outside vendors, settlement members, other users of the CLS System, and the central banks to which it issues payment instructions will shed light on CLS's infringing activities.  Indeed, more detail as to the design and function of the CLS System is

likely to reveal that CLS operates and controls the CLS System from the United States and that CLS obtains beneficial use of the system in the United States.

7.      Mr. Hughes is an employee of Counterclaim-Defendant CLS Services in the United Kingdom who does not purport to have first-hand knowledge of the day-to-day operations in CLS Bank's United States locations.  Accordingly, the discovery necessary to rebut his assertions is not limited to his deposition; rather, it must include discovery from officers, directors, employees, and outside vendors of Plaintiff/Counterclaim-Defendant CLS Bank, which is located in the United States.

8.      CLS has provided no overview of the design or function of its computer hardware and software.  Rather, the Hughes Declaration describes only certain components of CLS's computer hardware and software systems, and it does so in general terms.  *See* Hughes Decl. ¶¶ 23-25.  Only CLS knows the design of the computer hardware and software used by the CLS System, and the publicly available documents indicate that there is a data center and full backup system in the United States.  Discovery will reveal how the system is designed and operated— including details of how the exchange of obligations is effected, how CLS members interact with the CLS System, what information is provided in the United States and available to the United States settlement members or users, and whether and how transactions occur between United States-based banks—how and by whom the CLS System is controlled, who obtains beneficial use of the CLS System, and the location of *all* of CLS's computer hardware and software.  Alice has not been given the chance to subpoena or depose the IBM Corporation or its affiliates, who, according to the Hughes Declaration, maintain the data and command centers that allow the CLS System to function.  Nor has Alice been given a chance to inspect the various facilities that CLS references in the Declaration to determine whether the functionality described by the Declaration

is accurate. Based on CLS's public statements, I believe in good faith that this discovery will reveal that CLS engages in acts that constitute infringement of Alice's patents in the United States.

9.     The Hughes Declaration repeatedly asserts that the CLS System is implemented by computer hardware and software in the United Kingdom. Hughes Decl. ¶¶ 12, 24–25, 32, 34. However, the declaration provides no documents in support of this contention, despite the fact that CLS is in possession of documents that could support or refute these claims. I believe in good faith that the production of documents regarding the CLS System's design, function, processes, ownership, control, beneficial use and location will likely allow Alice to contest this assertion and reveal that the CLS System infringes Alice's patents.

10.     Attached hereto are true copies of the following exhibits, which are submitted in support of Alice's opposition to CLS's motion.

| Exhibit Number | Description |
| --- | --- |
| 1 | CLS Bank Press Release |
| 2 | Letter from CLS Group to the British Treasury |
| 3 | CLS Bank FX Protocol, Frequently Asked Questions |
| 4 | Excerpt from CLS Group Website |
| 5 | Excerpt from Public Statements at Sibos SWIFT Plenary Conference, Singapore, October 2003 |
| 6 | Except from 2003 CLS Group Annual Report |
| 7 | Excerpt from 2004 CLS Group Annual Report |
| 8 | Excerpt from Danmarks Nationalbank, *Payment Systems in Denmark* (2005) |
| 9 | Reuters, *Bank of England, London FX, CLS Bank Plan Financial Outage Terror Drill Sept. 26* (Jul. 27, 2006) |

| | |
|---|---|
| 10 | Lone Natorp & Tina Skotte Sorensen, *Settlement of Foreign-Exchange Transactions*, Danmarks Nationalbank Monetary Review (4th Q. 2006) |
| 11 | Email from counsel for Alice to Counsel for CLS Bank with attached License Agreement |
| 12 | Peter Hoflich, *Getting Legislation Changed*, The Asian Banker (Dec. 31, 2005) |

11.    Exhibits 1 through 10 and 12 are or were publicly available and I obtained them either from Alice or the internet.

12.    I swear under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

_____
M. Jesse Carlson

DISTRICT OF COLUMBIA          ss:
Subscribed and sworn to before me this
4th day of October, 2007
Moira E. Ricketts
Notary Public

Moira E. Ricketts
Notary Public, District of Columbia
My Commission Expires 03-14-2008

# EXHIBIT 1

About CLS    CLS Bank    Press Office    Who's Who    Events    CLS Services    Careers

**CLS**

Home    Contact

## Press **Office.**

Home > Press Office > CLS News

# CLS News

**Press Office**

* CLS News
* CLS Media Coverage
* CLS Shareholder News
* Media Resources
* FAQ's

**Search**

◉ Press Office Only
◯ The Whole Site

**Advanced Search**

19 September 2007
**CLS Bank settles new record volume and value**

Today, CLS Bank International (CLS Bank) set a new record for both the volume and value of payment instructions settled in one day. CLS Bank settled **905,478** payment instructions (previous record 877,312) with a gross value of **US$8.4 trillion** (previous record $7.28 trillion). This is the first time that the volume and value of payment instructions settled in one day has exceeded the milestones of 900,000 and US$ 8 trillion respectively.

These new records come after the month of August, when CLS Bank settled a record average daily volume of nearly 480,000 instructions a day during the month. To date in September CLS Bank is settling an average daily volume of 430,000 instructions with a gross value of $4 trillion. There are currently 1,903 banks, brokers, fund accounts and corporates using the CLS Bank service. September marks the fifth anniversary of the launch of CLS Bank, during which time it has settled over 220 million payment instructions with a value of over $2.4 quadrillion.

Rob Close, Chief Executive Officer of CLS Group and President and CEO of CLS Bank said: "This the third time in the last month that we have broken the volume record. September sees the fifth anniversary of the launch of CLS Bank, and we have made great progress since then, now settling over half of all FX transactions globally. Nevertheless the events affecting the markets over the last few weeks have demonstrated more than ever the importance of CLS Bank's role in eliminating FX settlement risk, and that more needs to be done to encourage the remainder of the market to address this issue."

Author: CLS Corporate Communication



# EXHIBIT 2



**CLS Group**
c/o Interhold AG
Othmarstrasse 8
P.O. Box 432
CH-8024 Zurich
Switzerland

Tel: +41 1 268 6907
Fax: +41 1 268 8099

17 April 2003

The Financial System and
  Major Operational Disruption FSM Team
Room 4/16
HM Treasury
1 Horse Guards Road
London
SW1A 2HQ

Ladies and Gentlemen:

We are writing on behalf of the CLS Group, and on behalf of its two subsidiaries CLS Services Ltd. ("CLS Services"), a company organized in the United Kingdom, and CLS Bank International, an Edge corporation organized under the laws of the United States ("CLS Bank"). The CLS Group welcomes the opportunity to respond to and comment upon the paper entitled "The financial system and major operational disruption" dated February 2003 issued by HM Treasury (Cm5751) (the "Treasury Paper").

The CLS Group is acutely aware of the importance of having good arrangements in place to maintain the resilience of the global financial system during major operational disruption. The CLS Group agrees with the position set forth in the Treasury Paper that the main responsibility for responding to a major operational disruption's effect on the financial system can only realistically rest with the private sector. The CLS Group has implemented very robust contingency plans to ensure business continuity in the event of natural or manmade disasters. CLS Bank, as a critical market infrastructure, has been

working very closely with the Federal Reserve Bank of New York to address issues raised by the Federal Reserve in it's White Paper. CLS Services is an active member of the Foreign Exchange Joint Standing Committee's operations sub-group focusing on technical operational issues within the foreign exchange and international money markets, including contingency planning.

## Background on the CLS Group

CLS Bank is a special purpose bank organized under Section 25A of the US Federal Reserve Act, as amended (the "Edge Act"), and, as such, received its charter from the Board of Governors of the Federal Reserve System. The CLS Group is owned by 67 of the world's largest financial institutions and was organized to provide a continuous linked settlement service for the settlement of payment instructions relating to foreign exchange transactions. The service that CLS Bank provides to its Members eliminates the temporal risk (or so-called "Herstatt" risk) associated with the settlement of foreign exchange transactions. CLS Bank has received robust legal opinions from counsel in each jurisdiction in which a Settlement Member is organized or has its headquarters confirming the finality of instructions settled across the books of CLS Bank. Each Settlement Member of CLS Bank agrees, pursuant to a Settlement Member Agreement governed by New York law, to be bound by the CLS Bank Rules and Member Handbook, which are governed by the laws of England and Wales.

CLS Bank has its office in New York City and, as mentioned, is regulated by the Board of Governors of the Federal Reserve System through the Federal Reserve Bank of New York. CLS Bank has entered into a Master Services Agreement with CLS Services pursuant to which CLS Services provides a number of services to CLS Bank, including back office operations. CLS Services is organized under the laws of England and Wales and has its offices in London. The CLS settlement system has been designated by the Bank of England under the Regulations implementing the EU Settlement Finality Directive (SFD). It has also been designated by the Bank of Canada, the Australian Ministry of Finance and the Monetary Authority of Singapore under appropriate local legislation.

For each of the currencies eligible for settlement through CLS Bank, CLS Bank maintains an account at the corresponding Central Banks. All payments related to settlements that are received by or paid out of CLS Bank go through the applicable Central Banks accounts and Real Time Gross Settlement (RTGS) systems. Accordingly, CLS Bank is a part of a robust, global payment network that has already incorporated important contingency protections covering both concentrated regional disruptions and catastrophic events.

To put the significance of CLS Bank in context, CLS Bank currently settles an average of 80,000 payment instructions a day, comprising a US dollar equivalent in excess of US$800 billion. Since it began offering its settlement service on 9 September 2002, CLS Bank has settled 6 million instructions, representing a US dollar equivalent of US$70 trillion.

One of the significant aspects of the CLS settlement system is that while settlement of payment instructions is done on a gross basis across the books of CLS Bank in New York City, the funding of the resulting payment obligations is done on a net basis. Experience has shown that because of netting, a relatively small amount of value paid into the system (in the order of US$20 billion equivalent) can settle an enormous amount of payment instructions (so far upwards of the equivalent of US$1 trillion on CLS Bank's highest value days). The liquidity and operational benefits of such netting would be of great value in the event of any operational disruption. It is an important feature of the CLS settlement service that, in connection with settlement, CLS Bank only receives and disburses Central Banks funds. Accordingly, it is clear that timely access to those Central Bank funds and related payment systems is critical.

## General Response to the Treasury Paper

The CLS Group welcomes the publication of the Treasury Paper, as it highlights the importance of contingency planning, outlines the legislative tools currently available, and recognises the fundamental importance of leaving it to the private sector to respond in recovery scenarios.

The core question posed by the Treasury Paper is whether, in principle, it would be useful to have new legislation to help promote order in the financial system in the face of major operational disruption. CLS Bank believes that the CLS settlement service which it offers and the legal framework supporting that service – in and of itself – makes a significant positive contribution to the ability of the foreign exchange community to respond quickly and effectively in the case of a major operational disruption. Pursuant to the CLS Documents, many of the most important participants in the global foreign exchange community have bound themselves to a single set of rules for the settlement of payment instructions relating to the settlement of foreign exchange transactions. CLS Bank believes that the CLS Documents are robust and notes that they are supported by legal opinions in all 18 jurisdictions wherein a Settlement Member of CLS Bank is organized or headquartered. The CLS Documents already contain provisions relating to the obligations of the parties in the event of *force majeure* or settlement disruption.

The CLS Documents also contain explicit provisions governing the failure of one or more of its Settlement Members to perform under the terms of the CLS Documents, whether due to *force majeure* or otherwise, including provisions on the interest rates and compensation to be paid for delays in making payments. CLS User Groups have already agreed a best practice for the applicable interest rates and compensation to be paid for delays in settling. Similarly, the agreements that CLS Bank has with its Liquidity Providers include provisions governing the inability of a party to perform due to *force majeure*. The contractual arrangements that CLS Bank has with the applicable Central Banks also contain provisions related to extending the opening hours for payment systems and the adjustment of the settlement period. CLS Bank already has in place robust contingency procedures with each of its Central Banks.

- 4 –

The Treasury Paper correctly notes that the financial system is highly dependent on information and that in a crisis the normal mechanisms through which information flows could be unavailable. This is an area in which the CLS settlement system makes a unique and important contribution. CLS Bank provides an infrastructure for the collection of information and the prompt communication of information among CLS management and operations, CLS Bank Settlement Members and Central Banks. This infrastructure constitutes an important vehicle for market co-operation to resolve difficulties on both a bilateral and multilateral basis.[1] Accordingly, it is vital that in the event of a major market disruption, CLS Bank and CLS Services have access to the best methods of communication available and prompt access to contingency sites. It is also critical that all sites from which CLS Bank and CLS Services operate be secure in times of crisis. CLS Bank and CLS Services would welcome any assistance that the authorities could provide to ensure such access at a time when communications and transportation may be severely restricted.

The Treasury Paper notes that the limitations of any new legislation should acknowledge the international nature of the financial system. This limitation is critically important to CLS Bank. Since CLS Bank is organized and regulated in the United States but has delegated many operational functions to CLS Services in London, it is vitally important that any legislation enacted in the United Kingdom provide absolute certainty as to whether it would apply to CLS Services. The issue is raised in paragraph 5.19 of the Treasury Paper, where it states that the laws being considered would apply to "actions that took place in the UK". The case of CLS Bank is potentially ambiguous on its face, since operations occur in London but settlement occurs across in the books of CLS Bank in New York City. The preferable approach would be to make clear that such legislation does not apply to CLS Services leaving it to U.S. legislation and the Federal Reserve to make any necessary legislative provisions applicable to CLS Bank. Clearly any action proposed by the authorities in London should be taken in consultation with the Federal Reserve Bank of New York and perhaps the wider Central Banks community. If anything, the Treasury Paper does not go far enough in recognizing the international impact of any proposed suspensive or directional powers.

Legal certainty is a critical component to the effectiveness of the CLS settlement system. Accordingly, it is crucial that CLS Bank and CLS Services be given as much advance notice as possible of any action to be taken under existing legislation (e.g., the declaration of a bank holiday under the Banking and Financial Dealings Act 1971) or any proposed legislation.

---

[1] On 25th March, CLS Bank and CLS Services experienced their first major service disruption. While the event itself was regrettable, it did provide first hand experience for co-ordinating a disruption involving 52 Settlement Members located in 18 jurisdictions and involving seven currencies and their respective Central Banks. The disruption was successfully managed under the existing CLS Bank Documents and an industry "best practice" that had been implemented relating to compensation, which is now being reviewed.

**Specific Responses to the "Key Broad Questions" set forth in the Treasury Paper**

The CLS Group would like to respond as follows to the "key broad questions" addressed in the Treasury Paper:

**3b    Is there more that could usefully be done by the private sector to strengthen the contingency provisions in contracts and other legal instruments?  Is there a role for the authorities in assisting with this?**

CLS Bank has included within its legal documentation with its Settlement Members and in its legal documentation and operating guidelines with the Central Banks with whom it maintains accounts contingency protections that it believes are adequate to deal with major disruptions.  The CLS Group does not believe that there is a role for the authorities in assisting with this to the extent that such provisions would directly affect CLS Bank's contracts and other legal instruments.

The CLS Group defers to each of CLS Bank's Settlement Members to determine in light of its own circumstances whether there is a role for the authorities that will assist the Member meeting their obligations under its legal arrangements with CLS Bank.  However, CLS Bank points out that the CLS settlement system has been carefully designed to provide the CLS services to its Settlement Members under the legal regime in each applicable jurisdiction.  Any changes in the applicable legal regimes might adversely affect the operation of the current CLS Bank Rules or adversely affect finality and would have to be reviewed carefully with local counsel.  In particular, any change in the bankruptcy law governing a CLS Bank Settlement Member that had the effect of introducing a clawback or other similar provision or any uncertainty as to the applicability of any such provision, would require close scrutiny.

One of the lynchpins in the CLS settlement system is the certainty provided by the CLS Bank Documents that if each of CLS Bank's Settlement Members performs, settlement will be completed with finality. Any change in law, however well intentioned, that adds uncertainty as to a Settlement Member's obligation to perform under the CLS Documents in accordance with their respective terms calls into question the certainty and finality that those documents now provide.

**3c    Is there more that could usefully be done by the private sector to strengthen market co-operation?   Is there a role for the authorities in assisting with this?**

The CLS Bank settlement service provides a classic example of the private sector being called upon to address a systemic industry risk.  The ability of CLS Bank to offer its unique settlement service to its Membership has only been made possible through the support and encouragement of the CPSS

Subgroup on Foreign Exchange Settlement Risk of the Bank for International Settlements and the Central Banks representing the seven currencies that are currently eligible for settlement in CLS Bank.[2]  Such support will continue to be vitally important to the continued success of CLS Bank.  By the same token, it underscores the importance of any action taken by regulators in one jurisdiction being coordinated with actions being taken by regulators in the other jurisdictions.

The CLS Group supports and encourages market co-operation and CLS Bank itself provides a significant example of and vehicle for such cooperation. As the shareholders of the CLS Group represent a significant share of the foreign exchange market, the CLS Group constitutes an important forum where ideas can be exchanged and actions taken to mitigate the consequences of a serious market disruption.  The CLS Group does not believe that, from its perspective, there is a role for the authorities in assisting in strengthening such market cooperation; however, the CLS Group would also be supportive of initiatives that CLS Bank's Settlement Members thought might be useful to strengthen market co-operation.

### 4a    In principle, would it be useful to have new legislation to help promote order in the financial system in the face of major operational disruption?

The CLS Group defers to CLS Bank's Settlement Members to propose what, if any, new legislation might be helpful in promoting order in the financial system in the face of major operational disruption, with the caveat that any legislation proposed would have to be carefully reviewed by the industry prior to its enactment to make sure that it did not adversely impact on the performance of CLS Bank's Settlement Members under the CLS Bank Documents.  It is, for instance, vitally important to CLS Bank that the relevant Central Banks are always in a position to credit CLS Bank's settlement account and that they be able to communicate that information to CLS Bank promptly.  It is also critical that once such information is communicated to CLS Bank that the credit be irrevocable and final.

### 4b    Have you any comments on: how new legislation might address risks; the possible disadvantages and limitations of new legislation; and the general constraints on the use of new legislation?

The CLS Group again defers to CLS Bank's Settlement Members to comment on how new legislation might address risks.  We do, however, note again that any new legislation would have to be carefully scrutinized to make sure that it did not adversely affect the operation of the CLS settlement system. There would be a clear disadvantage to the foreign exchange community if the result of new legislation were to compromise the legal obligation of CLS Bank Settlement Members to perform in accordance with the terms of the CLS Bank

---

[2] The Australian dollar, Canadian dollar, euro, Japanese yen, Swiss franc, UK pound sterling, and US dollar.

- 7 –

Documents or if the new legislation were to introduce uncertainty in that regard. The CLS Group endorses the limitations and constraints set forth in paragraph 6.28 of the Treasury Paper; namely, that any new powers should never be used in a purely financial crisis; should only be used in extreme circumstances; only with the support of the markets; and only if the overall benefits of doing so outweighed the costs. Any action taken would also have to be consistent with any action taken by the Federal Reserve and any other applicable Central Banks. It is critical that any legislation not add additional uncertainty to the uncertainty already implicit in a disaster scenario. It is vitally important that any powers exercised not have unanticipated consequences on the existing and highly complex legal arrangements represented by the CLS Bank Documents and the agreements CLS Bank has with the Central Banks. It is critical that the finality of settlement under the CLS Bank Rules not be impaired or threatened in any way.

**4c    If new legislation were to be sought, are the suspension and direction powers the right choices?  Are there any other types of legislation that might be useful to help promote order in the financial system?**

Since the CLS Group is not proposing any specific category of legislation at this time, it does not offer a specific response to this question.

**6l    Do you support the idea of a suspension power, subject to the constraints of paragraph 6.28?**

The CLS Group does not support any power to suspend financial obligations that would affect the ability or obligation of a CLS Bank Settlement Member to comply with its obligations to CLS Bank under the CLS Bank Documents. Any such suspension might have an adverse affect on the global settlement of foreign exchange transactions involving multiple currencies. Where CLS Bank can foresee the possibility of such an adverse affect, it might require action under the CLS Bank Rules to suspend the affected Settlement Members or currencies as a prophylactic measure. Such measures would be taken in consultation with the relevant Central Banks. Accordingly, any measure enacted that would suspend obligations would have to be reviewed very carefully to see what, if any, affects such suspension might have in practice on the operation of the CLS settlement system.

**7f    Do you support the idea of a direction power, subject to the constraints of paragraph 7.29?**

The CLS Group does not support any power to direct financial infrastructure that would affect the ability or obligation of a CLS Bank Settlement Member affected thereby to comply with its obligations to CLS Bank under the CLS Bank Documents or that would affect the ability or obligation of CLS Bank to comply with its obligations to its Settlement Members. Any such direction might have an adverse affect on the global settlement of foreign exchange transactions.  Where CLS Bank can foresee the possibility of such an adverse affect, it might require action under the CLS Bank Rules to suspend the affected

- 8 –

Settlement Members or currencies as a prophylactic measure.  Accordingly, any measure enacted that would suspend obligations would have to be reviewed carefully to see what, if any, affects such suspension would have on the operation of the CLS settlement system.  To the extent that CLS Services is, itself, part of the financial infrastructure, the CLS Group does not see a useful role for the authorities to directly intervene in the operations of CLS Services or CLS Bank.

*   *   *

In conclusion, there are three items that are important to the CLS Group.  First, that the Central Banks are always in a position to credit CLS Bank's settlement account promptly and with finality; second, that communication links between CLS Bank, CLS Services, CLS Bank's Settlement Members and the Central Banks not be adversely affected by a disaster; and third, that CLS Services in the UK receive the utmost logistical support and security for its infrastructure and communications links to enable it to continue its activities even in the event of a major disaster.

The CLS Group believes that the consultation called for in the Treasury Paper constitutes a very constructive exercise that should contribute significantly to any legislative proposals.  The continuing leading position of London in the International Financial Markets generally, and the Foreign Exchange Markets particularly (a strong element in the rationale for CLS Services to be domiciled in London), place significant stresses on the legal and regulatory structure in the United Kingdom.  We look forward to an opportunity to comment on any proposed legislation prior to its enactment.

Yours sincerely,

Joseph De Feo
Chief Executive Officer, CLS Group
President & Chief Executive Officer
　CLS Bank International

Robert Close
Deputy Chief Executive Officer, CLS Group
Chief Executive Officer, CLS Services, Ltd.

# EXHIBIT 3

®

---

# CLS Bank FX Protocol
# FREQUENTLY ASKED QUESTIONS (FAQs)

---

CLS Bank has prepared this brief summary of FAQs to assist in your consideration of the CLS Bank FX Protocol. **Please note that these FAQs may be updated over time, and was last updated on June 1, 2007.**

THESE FAQS DO NOT PURPORT AND SHOULD NOT BE CONSIDERED AS A GUIDE TO OR AN EXPLANATION OF ALL RELEVANT ISSUES OR CONSIDERATIONS IN CONNECTION WITH THE FX PROTOCOL.   PARTIES SHOULD THEREFORE CONSULT WITH THEIR LEGAL ADVISERS AND ANY OTHER ADVISER THEY DEEM APPROPRIATE PRIOR TO USING THE FX PROTOCOL.  CLS BANK AND ITS AFFILIATES ASSUME NO RESPONSIBILITY FOR ANY USE TO WHICH ANY OF ITS DOCUMENTATION OR ANY DEFINITION OR PROVISION CONTAINED THEREIN MAY BE PUT.

---

This FAQ is divided into six sections:

- I.    Introduction and Overview of the FX Protocol
  - o  Purpose
    - ▪ *Confirmation of Economic Terms Matched in the CLS System*
    - ▪ *Optional Adoption of Best Practice of Not Requiring Separate Confirmations*
  - o  How Does the FX Protocol Work
- II.   How Does the Best Practice Work and What Does It Mean For My Institution?
- III.  CLS Bank Rules and CLS Bank Member Handbook
  - o  Defined Terms
  - o  Matching
- IV.  Process for Adhering to the FX Protocol and Optional Adoption of Best Practice
- V.   Role of CLS Bank
- VI.  Miscellaneous

---

*With the permission of the International Swaps and Derivatives Association, the CLS FX Protocol is based on and incorporates portions of the 2002 ISDA Master Agreement Protocol. ISDA is not responsible for any modifications to the ISDA Master Agreement Protocol or related procedures made solely by CLS Bank International in creating the CLS FX Protocol or its related procedures.*

## I.    INTRODUCTION AND OVERVIEW OF FX PROTOCOL

**What is the purpose of the FX Protocol?**

CLS Bank has published the FX Protocol on June 1, 2007.  The purpose of the FX Protocol is to offer market participants an efficient way to address legal and operational issues that arise in connection with FX Transactions whose related FX Instructions are submitted to the CLS System for Settlement services in CLS Bank.  Specifically:

- Confirmation of Economic Terms (Legal) – to enable parties with FX Instructions related to their underlying FX Transaction submitted to the CLS System for Settlement in CLS Bank to treat FX Instructions that have been matched in the CLS System as a confirmation of each economic term of the underlying FX Transaction so matched.

- Adoption of Stated Industry Best Practice (Operational) – to enable parties to notify other parties of their respective current positions, as an operational matter, on the stated industry best practice of not requiring the receipt of a separate confirmation of an FX Transaction if the related FX Instructions have been matched in the CLS System (the "*Best Practice*").  Unlike the confirmation of economic terms described above, **this is an optional, not mandatory, provision in the FX Protocol.**

**How does the FX Protocol work?**

The FX Protocol reflects a procedure which allows for certain agreements to be made on a multilateral basis.  It builds on the principle that parties may agree with one or more other parties that certain terms and provisions will apply to their respective relationships now and in the past and future (unless they specifically agree otherwise).   Specifically, the FX Protocol provides a mechanism which enables multiple parties to agree that, in respect of any FX Instructions that have been or will be matched in the CLS System, certain standardized terms and provisions will apply to their underlying FX Transactions.

Market participants ("*Adhering Parties*") indicate their participation in the FX Protocol arrangement by sending a letter (an "*Adherence Letter*") by email to CLS Bank; *provided, however,* that market participants that are CLS Bank Members are not required to submit such Adherence Letters because their participation in the FX Protocol is automatic.  CLS Bank Members agree in the CLS Bank International Member Handbook (to which each CLS Bank Member is bound through its *Member Agreement* with CLS Bank) to be bound by the FX Protocol.  By adhering to the FX Protocol, an Adhering Party agrees that, with respect to each other Adhering Party with whom it has executed FX Transactions where the related FX Instructions have been matched in the CLS System, the match of such FX Instructions shall be a confirmation of each term so matched.

In addition, each Adhering Party **may, but is not required to,** indicate its current position regarding the adoption of the Best Practice by sending a letter (an "*Adoption of Best Practice Letter*") by email to CLS Bank.  This Letter will identify which of the Adhering Party's Identification Codes (e.g., SWIFT BICs and BEI Codes) operationally do not require the receipt of separate confirmations of its FX Transactions where the FX Instructions have been matched in the CLS System.  An Adhering Party may also identify *additional* Identification Codes that have adopted, or will be adopting, the Best Practice by sending a letter (an "*Adoption of Best Practice Supplemental Letter*") by email to CLS Bank.

The process surrounding adherence to the FX Protocol and adoption of the Best Practice is set out in the FX Protocol itself, which is published on CLS Bank's website (www.cls-group.com/CLSBankProtocols), along with the forms of Adherence Letter, Adoption of Best Practice Letter and Adoption of Best Practice Supplemental Letter (collectively, the "*Letters*").

**Why should my institution consider participating in the FX Protocol?**

The FX Protocol's multilateral procedure saves time and expense that would otherwise be spent on bilateral negotiations with individual counterparties.  It is expected that the FX Protocol will become the standard process used by market participants to efficiently and effectively:

> (i)    obtain certainty surrounding the confirmation process (a legal matter); and
>
> (ii)   communicate their respective current positions regarding the adoption of the Best Practice (an operational matter).

With respect to (i), the confirmation of economic terms addressed by the FX Protocol is valuable to each market participant **even if it is not adopting the Best Practice**.  This is because the FX Protocol, at a minimum, provides legal certainty to each Adhering Party that the basic economic terms of any FX Transaction has been confirmed in the CLS System even if some other form of confirmation was required but for some reason not received.  Evidence of some form a confirmation may be legally necessary to satisfy contractual obligations between parties or a legal requirement that there be a writing evidencing the FX Transaction.

With respect to (ii), information on the market participants' respective positions regarding the adoption of the Best Practice does not currently appear to be publicly available in a centralized or comprehensive manner.  Through the FX Protocol, Adhering Parties **may, but are not required to,** indicate that they have, as an operational matter, adopted and therefore agree to be bound by the Best Practice.  In addition, because the FX Protocol provides legal certainty regarding confirmation of the economic terms as described above, there is no risk that an Adhering Party has agreed to be bound by the Best Practice through the FX Protocol in the absence of such legal certainty.

**For whom is the FX Protocol designed?**

The FX Protocol is designed for all types of market participants whose FX Transactions are eligible for Settlement in CLS Bank.

**Does my institution need to be a CLS Bank Member to participate in the FX Protocol?**

No.  The FX Protocol is open to non-Members of CLS Bank.  As indicated above, all CLS Bank Members are automatically bound to the FX Protocol.

**Can an Adhering Party, including a CLS Bank Member, opt-out or otherwise subsequently revoke its participation in the Protocol (or agreement to the Best Practice)?**

Once an Adherence Letter has been accepted by CLS Bank, the Adhering Party is bound by the terms of the FX Protocol with each other party that has already adhered to the FX Protocol and that may adhere to the FX Protocol thereafter.  As indicated above, CLS Bank Members are automatically bound to the FX Protocol.  An Adhering Party can, however, negotiate and agree to any changes **bilaterally** with any other Adhering Party outside the scope of the FX Protocol.  For

example, any Adhering Party, including a Member, may separately agree on a bilateral basis with another Adhering Party that the FX Protocol shall not apply to any of its FX Transactions with such other Adhering Party.

The above is true with respect to an Adhering Party's agreement to be bound by the Best Practice. As indicated above, not all Adhering Parties have adopted or agreed to be bound by the Best Practice. However, once an Adoption of Best Practice Letter or Adoption of Best Practice Supplemental Letter has been accepted by CLS Bank, the Adhering Party may not revoke its agreement through the FX Protocol that the Identification Codes specified in any such Letter will abide by the Best Practice. An Adhering Party can, however, negotiate and agree to any changes **bilaterally** with any other Adhering Party outside the scope of the FX Protocol.

**What alternatives, if any, are there to participating in the FX Protocol?**

The alternative to participating in the FX Protocol is to address the various issues covered in the FX Protocol on a bilateral basis with each of your institution's counterparties. These issues could be addressed by way of individually negotiated provisions, or by incorporating certain provisions of the FX Protocol by reference into the bilateral agreements, with each of your institution's counterparties.

**If my institution signs up to the FX Protocol, will it cover all my FX Transactions whose related FX Instructions have been, or will be, matched in the CLS System?**

Yes, unless your institution has bilaterally agreed otherwise with another Adhering Party. In addition, it is important to note that adherence to the Protocol is only effective between your institution and **another Adhering Party** on the later of the Effective Adherence Date specified in the Adherence Letters of your institution and such other Adhering Party. Any FX Transactions that you may have with a counterparty that is not an Adhering Party is not covered by the FX Protocol.

**Does the FX Protocol apply to any of my FX Transactions whose related FX Instructions are not submitted to or matched by the CLS System? What about FX Transactions that do not involve currencies that are not eligible for Settlement in CLS Bank?**

The FX Protocol does not apply to any of these FX Transactions.

**II.     HOW DOES THE BEST PRACTICE WORK AND WHAT DOES IT MEAN FOR MY INSTITUTION?**

**What does it mean for a party to have adopted the Best Practice?**

As indicated above, a party that has adopted the Best Practice no longer requires the **receipt** of separate confirmations from its counterparties for any of its FX Transactions where the related FX Instructions have been matched in the CLS System. It is important to understand that the focus of the Best Practice is on an individual institution's requirement that it "receive" (or rather that it no longer requires the receipt of) separate confirmations, and on any obligations it may have to "send" separate confirmations to its counterparties.

4

**Why should my institution consider adopting the Best Practice?**

The Best Practice was proposed originally by a CLS industry working group and subsequently endorsed by the Foreign Exchange Committee (FXC) of the Federal Reserve Bank of New York (FRBNY) in September 2004 (www.newyorkfed.org/**fxc**/2004/**fxc**040928.pdf) as a means of:

      (i)      reducing operational risk by allowing for the early identification and resolution of discrepancies through the real time matching process of the CLS System; and

      (ii)      eliminating the need to send duplicate confirmation messages, which in turn reduces the potential for confusion and/or error while also lowering transaction costs.

**Can I assume that another Adhering Party has adopted the Best Practice since it participates in the FX Protocol?**

No. Another Adhering Party's adherence to the FX Protocol (*i.e.*, its agreement that Matched Instructions in the CLS System constitute a confirmation of the terms matched by the CLS System alone does not provide any indication of whether it has adopted, or will be adopting, the Best Practice. Whether you are required to **send** separate confirmations to another Adhering Party that has **not** agreed to be bound by the Best Practice through the FX Protocol will depend on the arrangements and agreements which are specific to you and the other Adhering Party (whether currently in place or as amended bilaterally between you and the other Adhering Party) and separate from this FX Protocol.

**If my institution has adopted, or is adopting, the Best Practice and submits an Adoption of Best Practice Letter, can my institution stop sending separate confirmations (e.g., MT300s) to the other Adhering Parties?**

Maybe. Your institution's adoption of the Best Practice in no way affects any existing obligation it may have to send a separate confirmation to any of its counterparties, including any other Adhering Party. This is because in adopting the Best Practice, your institution no longer requires the **receipt** of separate confirmations outside of the CLS System. By submitting an Adoption of Best Practice Letter, your institution is simply notifying all the other Adhering Parties that your institution no longer requires the receipt of separate confirmations (i.e., such other Adhering Parties no longer have to send separate confirmations to your institution).

In order to determine whether your institution needs to continue to send separate confirmations to a particular counterparty, your institution will need to determine whether (i) such counterparty is an Adhering Party, (ii) whether such Adhering Party has submitted an Adoption of Best Practice Letter and (iii) review the contents of (i.e., the identification Codes listed in) such Adhering Party's Adoption of Best Practice Letter (and, if any, Adoption of Best Practice Supplemental Letter(s)).

If your institution's counterparty is not an Adhering Party or is an Adhering Party that has not submitted an Adoption of Best Practice Letter, your institution may wish to contact that counterparty directly to determine whether it has nonetheless adopted the Best Practice (and to the extent it has, encourage it to participate in the FX Protocol).

**What if my institution is not able to stop sending separate confirmations to another Adhering Party that has submitted an Adoption of Best Practice Letter?**

As indicated above, in adopting the Best Practice, an Adhering Party no longer requires the receipt of separate confirmations outside of the CLS System. The FX Protocol does not obligate the other Adhering Parties to stop sending separate confirmations to that Adhering Party, but rather permits them to stop sending separate confirmations to that Adhering Party if they wish.

---

## III.  CLS BANK RULES AND CLS BANK MEMBER HANDBOOK

**Since the FX Protocol uses terms that are defined in the CLS Bank Rules and Member Handbook, how can my institution obtain copies of these documents?**

CLS Bank Members have direct access to these documents which are confidential to CLS Bank. An institution that is not a CLS Bank Member may request copies from a Member that provides third party services to such institution.

For convenience, however, a brief description of the terms used in the FX Protocol (and defined in the CLS Bank Rules or Member Handbook) is provided below.

- **"Affiliate"** means, in relation to any person, any entity (i) controlled, directly or indirectly, by the person, (ii) that controls, directly or indirectly, the person or (ii) directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting shares of the entity or person or actual control over the business and affairs of such person.

- **"CLS System"** means the hardware and software system used … to deliver the [CLS Bank Settlement] service…

- **"FX Instruction"** means a [payment instruction submitted to the CLS System] relating to an underlying FX Transaction.

- **"FX Transaction"** means *a single deliverable foreign exchange spot or forward transaction, a single leg of a deliverable foreign exchange swap transaction, a single exercised deliverable foreign exchange option and any similar single deliverable foreign exchange transaction or any type of deliverable foreign exchange transaction specified in …. the Member Handbook; provided* that an FX Transaction may not be result of an agreement to novate or other agreement to combine the legal obligations associated with two or more FX Transactions into a single FX Transaction.

- **"Identification Code"** means a BIC or BEI Code of an entity or such other identifier indicated in … the Member Handbook as a valid code for the identification of an entity.

  (A "BIC" means a Bank identifier Code, and "BEI Code" means a Business Entity Identifier, in each case identified with such entity in the BIC Directory most recently issued by SWIFT. To date, the Member Handbook also lists **"Fund Identifiers"** as valid codes, i.e., a code assigned to a fund by the custodian, fund manager or similar entity

that manages the fund and is used by the CLS Bank Member to identify the fund as the Transaction Counterparty to the underlying FX Transaction of an FX Instruction.)

- "**Matched Instructions**" means two [payment instructions submitted to the CLS System whose information] ... is matched in accordance with the parameters specified in the CLS Bank Rules.

- "**Member**" means a Settlement Member or User Member [of CLS Bank].

- "**Settlement**" means the settlement of [eligible payment instructions] . . . across the books and records of CLS Bank by the simultaneous making of debits and credits to the Accounts of the respective Settlement Members specified in the applicable . . . [payment [instructions].

- "**Transaction Counterparty**" means, with respect to a [payment instruction submitted to the CLS System], the original counterparty to the [FX] Transaction referenced in such [i]nstruction.

**What economic terms of an FX Transaction specified in an FX Instruction are matched by the CLS System?**

The CLS Bank Rules provide that the CLS System shall attempt to match two FX Instructions as a pair on the basis of the following information specified therein and, if successful, the two FX Instructions will be classified as "Matched Instructions":

- the Identification Codes of the Transaction Counteparties;

- the Settlement Date;

- the amounts and identities of the buy and sell Eligible Currencies (within certain permitted matching tolerances specified in the Member Handbook); and

- the Identification Codes of the CLS Bank Members that have submitted the FX Instructions to the CLS System.

---

**IV.    PROCESS FOR ADHERING TO FX PROTOCOL AND OPTIONAL ADOPTION OF BEST PRACTICE**

**How can my institution participate in the FX Protocol?**

Your institution can participate in the FX Protocol by downloading all necessary information from CLS Bank's website and then submitting a signed Adherence Letter in the proper form by email to CLS Bank in New York.  In addition, your institution **may, but is not required to,** agree to the Best Practice by submitting a signed Adoption of Best Practice Letter (and, if applicable, signed Adoption of Best Practice Supplemental Letter(s)) in the same manner.

7

**How does my institution send in its Letters?**

Each Adherence Letter must be delivered by email to protocols@cls-bank.com.  The Adherence Letter(s) should be on your institution's letterhead.  In the email, **your institution must submit <u>both</u> your conformed and executed copies of the Adherence Letter as separate PDF attachments**.  A signed copy and a conformed copy of the Adherence Letter must be received by CLS Bank in order for CLS Bank to list your institution on the website as having adhered to the FX Protocol.

Nothing in the form of Adherence Letter available on CLS Bank's website may be changed with the exception of completing the details of your institution's name, signature block and the Effective Adherence Date.

No other documents (including an original signed copy of Adherence Letters) are required of, nor will be accepted from, a party wishing to participate in the FX Protocol.

The above also applies to any Adoption of Best Practice or Adoption of Best Practice Supplemental Letter that an Adhering Party **may, but is not required to**, submit to CLS Bank under the FX Protocol.  In the case of such Letters, however, nothing in the form of these Letters available on CLS Bank's website may be changed with the exception of completing the details of your institution's name, signature block, the Effective Adoption Date and the list of Identification Codes.

**Who is an authorized signatory?**

An authorized signatory for an Adhering Party is an individual who has the legal authority to bind the adhering institution.

**What is a conformed copy?**

A conformed copy of a Letter means that the name of the authorized signatory (e.g., John Doe) is typed rather than having John Doe's actual signature on the letter.  CLS Bank only publishes on its website the conformed copy of the Letters.

Your institution must also submit an executed, or signed, copy of the Adherence Letter in addition to the conformed copy of the Adherence Letter.  CLS Bank keeps the executed copy of the Adherence Letter for its files and does not share the executed copy with anyone else.

**Are parties required to provide evidence of signing authority to CLS Bank?**

No.  Each Adhering Party makes certain representations in the FX Protocol itself regarding the execution and delivery of each Letter.  No supporting documents are required of, nor will be accepted from, a party wishing to participate in the FX Protocol.

**How can my institution check the signing authority of other Adhering Parties?**

For security reasons, Adherence Letters on CLS Bank's website will have signatures conformed into type and signing authority information will not be displayed.  Should parties wish to take steps to ascertain signing authority, each published Adherence Letter will include a contact name and contact details for the relevant Adhering Party.  This will also be required of any Adoption of Best Practice Letter and Adoption of Best Practice Supplemental Letters.

8

In the case of CLS Bank Members, no Adherence Letters are available because the adherence by each Member to Protocol is evidenced in the provisions in the CLS Bank International Member Handbook to which each Member is bound through its Member Agreement with CLS Bank.  In addition to publishing the current list of CLS Bank Members on its website, CLS Bank will publish an extract of this provision in the Member Handbook.

**Can my institution obtain copies of supporting documents for, or hard copies of, the Letters?**

Yes.  If your institution wishes to obtain supporting documents for, or hard copies of, any Letter, each Letter posted on CLS Bank's website will include a contact name and contact details for the person at the Adhering Party who can send your institution such materials.  CLS Bank can also provide certified copies of the conformed Letters.

**Which party in a corporate group must adhere to the FX Protocol?**

Each legal entity with FX Transactions whose related FX Instructions have been, or will be, submitted to the CLS System may adhere separately in its own capacity if it wishes to adhere to the FX Protocol.  The Protocol also  contemplates adherence by a group of separate legal entities.

**Can an institution use one Letter for some or all its affiliates or funds that it manages?**

Yes.  An institution may submit a single Letter adhering it and one or more of its affiliates to the FX Protocol (or agreeing to the Best Practice).  The same is true of an investment or asset manager acting on behalf of one or more funds it manages.  In both cases, the institution represents to each other Adhering Party that it is authorized to act on behalf of any affiliates or funds, as the case may be, that may be identified by the institution in the Letter.

**Are the affiliates of CLS Bank Members automatically bound to the FX Protocol?**

No.  An  affiliate of a CLS Bank Member that wishes to adhere to the FX Protocol (or agree to the Best Practice) must either submit its own Letter, or arrange for its affiliated CLS Bank Member, acting on behalf of the affiliate, to adhere the affiliate to the FX Protocol (or agree to the Best Practice).  This is because the provisions of the CLS Bank Member Handbook only apply to CLS Bank Members and does no apply to its affiliates.

**Is an investment or asset manager required to list the legal name or other identifier of funds it manages in the Letters?**

No.  An investment or asset manager may identify the funds it is acting on behalf of by listing the funds in the Letter by their respective legal names or fund identifiers and/or by reference to the master agreement between the investment or asset manager and another Adhering Party.  If the funds are identified by reference to the master agreement, the investment or asset manager may have the Letter apply to funds included in the master agreement (i) as of the Effective Adherence Date (or Effective Adoption Date) or (ii) as of and after the Effective Adherence Date (or Effective Adoption Date).

**Do Adhering Parties have to accept all of the FX Protocol provisions?**

As indicated above, all Adhering Parties have agreed that if FX Instructions relating to their FX Transactions have been matched in the CLS System, the match of such FX Instructions shall

constitute a confirmation of each term so matched. However, each Adhering Party **may, but is not required to**, agree to the Best Practice; evidence of any such agreement to the Best Practice will be provided by the execution and delivery of an Adoption of Best Practice Letter by email to CLS Bank.

**Can I modify the wording of the FX Protocol or any of the forms of Letters attached thereto?**

No. Any changes to the standardized wording set out in the FX Protocol or to the standard form Letters will be considered invalid and unenforceable.

Counterparties can, of course, negotiate and agree to any changes bilaterally outside the scope of the FX Protocol. The FX Protocol in no way inhibits freedom of contract whether the parties have adhered to the FX Protocol or not.

**Is there a deadline for participating in the FX Protocol?**

No.

**What does my institution need to do after sending in its Letters?**

It will be the responsibility of each Adhering Party to check that its Adherence Letter is being displayed properly on CLS Bank's website. Each Adhering Party should monitor other institutions' adherence to the FX Protocol and, if applicable, their current positions regarding the Best Practice.

**How will my institution know (i) who has adhered to the FX Protocol and (ii) which Adhering Parties have adopted the Best Practice?**

A current list of Adhering Parties is displayed on CLS Bank's website. Similarly, the website will indicate whether the Adhering Party has submitted an Adoption of Best Practice Letter. The website also offers access to PDF copies of each Letter from an Adhering Party. For security reasons, only the conformed copies of Letters are displayed. Adhering Parties therefore simply need to monitor the website to determine which other market participants have adhered to the FX Protocol, as well as which of such Adhering Parties have adopted the Best Practice (and, more specifically, which of their Identification Codes).

---

## V.    CLS BANK'S ROLE

**What is CLS Bank's role in the FX Protocol?**

CLS Bank acts, for certain purposes, as an agent for each party participating in the FX Protocol. As expressly stated in each Letter, CLS Bank has been appointed as the Adhering Party's agent for the limited purposes of the FX Protocol and such Adhering Party waives, and releases CLS Bank and its affiliates from, any rights, claims, actions or causes of actions whatsoever arising out of or in any way relating to the Letters or actions contemplated as being required by CLS Bank under the FX Protocol.

CLS Bank receives Letters, updates its website from time to time and posts PDF conformed copies of the Letters. CLS Bank takes a minimal role in reviewing each Letter when submitted (e.g., to

check that no pages are missing and the Letter is signed).  It will be the responsibility of each Adhering Party to check that its Letters are displayed properly on the website and, if desired, verify the information in the Letters of another Adhering Party or whether such Letters were duly executed by the Adhering Party

CLS Bank also publishes the FX Protocol and provides information about it to interested parties.

---

## VI.    MISCELLANEOUS

**How much does participation in the FX Protocol cost?**

There is no charge for participation in the FX Protocol.

**How can I encourage a counterparty to participate in the FX Protocol?**

CLS Bank has prepared a standard form letter (which is available on its website) to assist Adhering Parties that wish to encourage others to participate in the FX Protocol.

**How can my institution obtain a copy of the FX Protocol and other relevant information?**

Copies of the FX Protocol, the form of Letters, the form of counterparty letter and information about CLS Bank's role and other aspects of the FX Protocol (including the Procedures) are available on CLS Bank's web site (www.cls-group.com/CLSBankProtocols).

# EXHIBIT 4





**Press Office**
* CLS News
* CLS Media Coverage
* CLS Shareholder News
* Media Resources
* FAQ's

**Search**

◉ FAQ's Only
○ The Whole Site



Home > Press Office > FAQ's

# FAQ's

**Introduction to CLS**

**How does CLS Bank execute trades?**

CLS is not a trading system. It is the first global settlement utility.

Under the old system of settlement, after a trade is done payments have to be sent to each counterparty to settle the trade. It is the potential delay of receipt of that payment across multiple time zones and legal jurisdictions that creates settlement risk.

CLS makes settlement when both party's payment instructions are matched by CLS Bank and meet its settlement criteria. By a system of payment versus payment, CLS Bank will then simultaneously credit each party's account at CLS Bank with the funds owing eliminating the risk that one side may not receive payment.

# EXHIBIT 5

## > SWIFT plenary - Financial industry resilience and continuity



**Donald R. Monks**, Senior Executive Vice-president, The Bank of New York

Thank you, Lenny, and thank you for asking me to be here today. The events of September 11, 2001, or 9/11 as we've come to call it, had a unique impact on the financial services industry, certainly in New York, but also around the world. It has really set the tone for discussions about business continuity planning, the adequacy of business continuity planning, and the thinking that we all have had in the past about the nature of disasters and our responses to disasters.

As Lenny said, the Bank of New York had a unique position in the 9/11 tragedy. Especially in terms of our proximity to the buildings that collapsed and the many more difficulties we faced in the next days. We did have a major data center and over 8,000 people within a kilometre of Ground Zero.

So I'd like to talk about some of the framework from a private sector, commercial bank perspective of how we're now thinking of business continuity planning. In the opinion of IBM, who did some consulting work for us right after 9/11, The Bank of New

York went through the most extensive and largest (and successful) financial company disaster recovery. We successfully accomplished a very difficult recovery, something I know that our staff and management team is quite proud of.

What I'd like to relate today is the framework in which the bank is thinking about disaster recovery. Then I'd like to relate some of the issues that I think we as financial service industry participants face and possibly give you a framework for some of the things that institutions in your markets may be able to take back home and implement.

*"Increasing diversity of data centers, operational sites, and so forth is extremely critical to our current planning process"*

I realize that competitive issues are important and many of you, when considering business continuity, are focused on the cost. It is certainly less costly to be less resilient, at least in the short run, and that's a problem that I think the industry is facing; how will people know whether Bank A and Bank B, (or financial service industry participant A) is as resilient as B. If they have a cost structure lower than a competitor, does that mean they're skimping on resiliency?

Lastly, some points to ponder. I'm going to give you a list of some examples of the spending that we've gone through at our bank to give you a concept of what it costs to improve resiliency. One of the surprising things I found is that

some of the most important things we have done are not necessarily the most expensive items on the list. I think that is an important point to look at because people will want to spend their money in a variety of ways on the issue of business continuity planning and resiliency. However, it is most important to focus on things that matter.

So first of all, let's talk about framework. The first item that we are thinking about is the possibility of a regional disaster creating the potential for a multi-site simultaneous outage. Geographic diversity is a very important part of our thinking. Increasing diversity of data centers, operational sites, and so forth is extremely critical to our current planning process. And this is really contrary to where many banks, including The Bank of New York, have gone over the last 20 years, where centralization was king and bringing things together to maximize efficiency was important.

But I can say that moving to a diversified framework is now a common discussion point in our company, and has created a situation where I now have more people coming to me asking me to make changes that will diversify their operations. This was not the case two years ago, when people would routinely say, 'I need to bring more people together, and things would work better if we were closer together and if we were contiguous in our operations'.

A favorite topic of mine is telecommunications. We're going to hear a little bit about that from others today, but I think

the telecommunications structure and framework is something that we should be worried about, and we need to be worried about it, because we can't control it.

How "available" is the architecture in the data center? This is clearly very important in the typical bank mainframe data centers, but in the world of servers and departmental computers, trying to recover systems that are widely spread all over the physical map of the corporation can be a challenge and a problem. Therefore, which high availability architectures or techniques should we use that allow the reliability and availability of systems to be improved, including the operating systems and applications of diverse operating departments that don't use central computing.

*"Where does business continuity report in your organization?"*

Then, lastly, a little bit about governance. Where does business continuity report in your organization? Very importantly, you cannot recover an institution without having technology in place. But it's also very evident that you can't recover an institution if you've only recovered technology. Business recovery requires operating staff, facilities, and so forth, and so the governance model in many organizations is a resiliency plan for technology and a resiliency plan for physical facilities and the business units, but where do those come together? Do they come together at a senior enough level in the organization?

Once you've defined your approach, the next major issue is really priority of operations and recovery. What recovery do we want for various operations in the company? It's clear that if establish a company objective that everything has to be recovered within four hours; we'd be out of business well before any disaster. A four hour recovery objective for the entire bank, for example, would be far too expensive. So in establishing our recovery framework, we're establishing the target recovery times. And we look at these in three priorities.

Operations that require split operation are priority one, and here I mean what you might call a "pilot/co-pilot" operating model. Basically, this where both sites have full functionality, and either can "fly the plane", and complete the day's work without the other site being available and operational. This is also called the "active-active" model in the Interagency White Paper that the U.S. regulators have published (I might add that BNY was one of the few banks that openly and publicly supported that white paper and its imperatives). Only the most critical operations in terms of the continuity of financial market operations would be in this first category.

Priority two. Our next most important operations that require some operational diversity and capability, these we would consider to be very important banking functions – basically major businesses of the bank. They're not actually pilot/co-pilot, in terms of full functionality, but these activities are separated by a significant distance , in most cases, many, many miles. The

operating staff in these multiple locations fully understand how to do the work of people at the other location and within 24 hours could continue the essential work of the operating facility that might have been damaged or evacuated.

And then, priority three is what I would call the routine model, the model which says you have an operating facility and some miles away, but within commuting distance, you have a backup facility that can be brought up in a matter of hours, days, or a week or so, depending upon the urgency of the function being supported. That's more of what I would call the traditional model.

Accomplishing some of this operational diversity has challenged us, but I would say that we haven't accomplished diversity by simply moving people from one part of the country to the other in the U.S. We've taken advantage of the sites we already had and have begun to transport jobs without transferring people. This requires a little bit of training and a different way of thinking, but the truth of the matter is, there are not that many activities that require the fully "active-active" kind of capability.

In our case, we're using sites in places like Orlando, Florida; Syracuse, New York; Brussels; London; and Singapore, to provide functionality and capability in certain operating functions where the main function, or half of the function, may be in another part of the globe. For example, our US dollar funds transfer operation, which is critical to the U.S. payment system because we are one of

the major providers of that service in the U.S., has the more focused, active-active kind of approach where we now have two operations separated by over 15 kilometres. In another six months, we'll have a third "active-active" site over a thousand miles away.

It is important to understand that these functions really can't operate fully with only a single site available. You can have full capability, but you don't have your full staff, you can't actually do all the work. The important thing is that you get all of the critical transactions – which means closing the day out, and that's critical in payment operations, for example. It's about coming to a close and settling the balance sheet of the company.

*"We don't control telecommunications, and yet, it's our lifeblood"*

Also in the U.S., we're a major participant, along with J.P. Morgan, as clearance banks in the U.S. government securities clearance market. That would be our most clear and vital operation to the U.S. payment system, and here we're taking a triangular approach where we have operations in New Jersey, New York, and in Florida, where each of those can operate the full capability of that function and responsibility.

Now, this brings us to the traditional model and the simple fact that we'll need recovery seats to go to in an emergency. Certainly, with 9,000 people in New York, we've got a lot of people to worry about, and we've taken the

philosophy that about 50% of those people need a place to go in a relatively short period of time. And the reason I use that 50% number is that many people will try to push that to a higher number, and it obviously becomes very expensive to have 100% of all seats standing by vacant somewhere, ready for occupancy. It simply isn't possible financially, and so we've arrived at this target of space and seating for about 50%, and about half of that 50% or one-quarter of our total staff, really has a hot PC installed, wired, ready and waiting to go if a business unit has to move to its contingency site. The next 25% can be wired-up at the contingency site, usually with a day or two of a disaster.

So for the most critical operations, we have that framework of active-active, then for important operations, we have split operations where people are able to do the same work in two different geographies, and then, lastly, for more routine operations, we have the traditional backup and recovery seats.

I'd like to now turn to some of the issues and challenges and possible approaches that the industry has to wrestle with.

I think there are three major issues. The first is going back to the issue of data centers. How do you really develop a posture which allows data centers to operate and support each other with no loss of data if a data center goes down suddenly? And this gets into the issue of synchronous or simultaneous copying of data between data centers and the

difficulty of doing that over a long distance. We'll talk a little bit about that.

The second is the issue of liquidity. And this is where our central banks are also involved. I gave a speech such as this to the CPSS group of central bankers that invited many private sector institutions to a special conference in Frankfurt earlier this year, where liquidity was one of the major topics. I'd like to talk just a little bit about that and some of the things we're doing in the United States as part of a group of major banks interested in payment risks, working with the Federal Reserve.

And then, lastly, we need to talk more about the telecommunications conundrum. What are we going to do about it? We don't control telecommunications, and yet, it's our lifeblood. It is an issue around which I think we really need to have some structured thinking, which is important, because putting a structure around this issue gets people on a level playing field in terms of what they're talking about.

So now back to the issues around data center separation. I notice that when we talk with some of our clients and our competitors, we'll get a wave of the hand and they say, 'we have data centers all over the world. We don't have any continuity problems'. And, of course, my question would be, "Can that variety of data centers, that variety of operations all over the world, really do anything to back up the other locations, or is this just a geographic description of your locations?"

So that's the first tough question. What can these sites do for each other in a disaster? If they can't take on the work of a site that has been evacuated or impaired, then all that geographic diversity really does not help.

Today, typically, out of region means out of sync. Let's discuss synchronous mirroring, starting with a definition of what it is. It's the copying of transactions at a recovery data center simultaneously to their completion at the primary center, and the data in both locations is confirmed, complete, and identical. This requires the "mirror" to involve instantaneous copying of data in two locations at once, and the problem that we have in this area today is that that can't happen over long distance.

*"Distance is a problem where perfectly synchronous communications is important"*

In the U.S., we are seeing synchronous mirroring between data centers at 100 kilometres, with our bank now doing it at 125 kilometres. We're planning to do it at a 150 kilometres. But that is basically stretching today's technology as far as it will go.

The point I want to make is that when people say they're doing this kind of mirroring trans-Atlantic; no technical person I've ever met would confirm that. It's not being done at much over a hundred kilometres. But over what distance can it be done? People often talk in terms of a hundred kilometres, 50 kilometres, 25 miles, 50 miles, but really, the whole discussion has to do with the

length of fiber. For most telecommunications, the logical, physical distance of a hundred kilometres of fiber will get you 50 kilometres of distance, because fiber doesn't go in a straight line. So that's where sometimes you hear – "I've heard it's 50. I've heard it's 100. What is it?" It really is about the physical length of the fiber, let's say 100 kilometers , and geographically, on the ground between the sites, half that distance, or 50 kilometers.

Why is this important? Well, we'll talk a little bit about data loss. And of course, why does it seem less important to some people? Well, it's not important to some companies like, for instance, SWIFT – it's not that important because SWIFT is a messaging system environment and their tolerance for lost data is fairly large because they can replay it, whereas complex financial institutions, such as ourselves and other global players cannot simply hit "replay". It's more difficult for us because we have multiple transactions – payments received, securities moved, collateral taken. And our records have to agree with those of our customers and the clearing and settlement utilities. That all has to be relayed exactly simultaneously, and it's not as simple as replaying messages. So distance is a problem where perfectly synchronous communications is important.

At The Bank of New York today we have a data center design that includes three data centers anywhere from 15 to 66 kilometers from the backup site, and we use the backup facilities of a third party provider on a contract basis. This worked

extremely well on 9/11. The recovery data center came up just fine. In our current environment, we're moving further out. Today, we're building our own recovery data center, so we will begin to move away from reliance on a third party for this kind of activity, and that sets the stage for improved testing, more control over that resource, and also not having to wait in line if someone else declares a disaster ahead of you. So that's our phase one approach.

We also have a future state design which we will use a technique that will allow us to operate a backup data center over 500 miles from our primary data center. We would place a primary data center over 500 miles away from New York City, with a backup in the New York City area. For those of you that are thinking that this contradicts what I've just said about the limitations of synchronous mirroring, we will create an additional data mirroring site, or data bunker. This data bunker site is within synchronous distance of our primary data center, and receives data synchronously. It organizes that data, and then transmits it with perhaps a 15 minute delay to the primary data center. The issue here is that there will be sufficient distance between the primary site and the data bunker that it would be unlikely that both of them would be hit by the same disaster at the same moment in time. This gives us 15 minutes for that cycle to complete without a loss of data.

Another issue I'd like to talk about is liquidity in the next major disaster, and where that might come from. During the

9/11 crisis, the Federal Reserve injected massive amounts of liquidity into the system, and the result was that the Fed actions were instrumental in restoring market liquidity and confidence. The markets reacted positively, although there were liquidity dislocations. The challenge for the future is that no Central Bank is going to guarantee us commercial bankers prior to an event that we should not be worried about liquidity. Central banks can't say, 'We'll be there with liquidity if you have problems.' It's not realistic to believe that we would have that kind of commitment, and so, one of the things we're doing as the Payment Risk Committee in the United States is working on a framework for asking the central banks to think about these issues in advance, without commitment, but in advance.

Now, there are many issues involved here, but, basically, the proposal which will be presented at another session of this conference today is that the private sector needs to develop a number of services between themselves and other market participants that enhance their ability to achieve liquidity and to get liquidity, cross-border. Some of these are the same issues that we have with getting liquidity into the right payment system at the right time. Both the European market and the U.S. market will also need to deal with issues around what collateral is good in what market.

You know, in CLS when we thought about this, we arrived at the in-and-out swap, and so this effort is trying to get to the next level of thinking about what kind of liquidity is needed and what kind of

instruments the private sector can develop to provide a capability to get this liquidity moving more efficiently across borders.

And, of course, you can't really talk about cross-border liquidity without talking about the Central Banks, and, of course, the Central Banks are already giving this some thought as well. This topic was also presented in Frankfurt at the CPSS meeting, and there are now a number of groups, including Central Bankers, looking at the issues involved in establishing a cross-border liquidity pool. I think that's a healthy discussion, although I'm not in a position to predict any results. But the paper prepared by the U.S. Payment Risk Committee does at least establish a framework for discussion.

*"The private sector needs to develop a number of services between themselves and other market participants that enhance their ability to achieve liquidity and to get liquidity, cross-border"*

Now, my favorite issue ... the telecommunications problem. As banks we are a supervised industry who rely on a regulated utility. Our telecommunications suppliers will say, 'We're regulated, too.' What they don't understand is what the whole supervision regime is for all of us in banking. We know supervision means auditors. It means examiners. It means supervisory involvement with senior management. It means a regulator/supervisor who sits and advises the board on the capability and operational readiness of the firm. That's well beyond just regulation. So we are supervised, they are only regulated.

We are dependent on an under-supervised utility called telecommunications. And, again, this is an issue that is keenly felt by us, because we feel that the financial services industry problem on and after 9/11 was a telecommunications problem. The U.S. Payment Risk Committee has established a working group on this topic. The Bank of New York chairs that working group.

There are really three objectives to that working group. First, to establish a set of best practices for individual financial institutions on how they should go about developing a review of their telecommunications reliability and diversity.

We at BNY have done our own internal telecommunications review. We have established the diversity of our data telecommunications framework, and, more importantly, we have hired a vice president in our telecommunications group whose sole responsibility is to negotiate with the telecommunications carriers in order that we retain that diversity as time goes on. This is probably the single most important thing we have done in the post 9/11 era to significantly improve resiliency and at a reasonable cost.

Central Banks and the financial regulators need to put some pressure on the telecommunications industry. Of course, this is difficult to do, because they are typically not charged with supervising the telecommunications industry and therefore, everything has to happen among the many agencies at a national government level. The difficulty is that we've had this discussed

by bureaucrats for two years since 9/11, and the main problem is not necessarily out in the broad infrastructure but in that last mile from your front door to the local central office of the telecom carrier.

Secondly, we want to establish a set of best practices for the payment and settlement system infrastructure utilities – CHIPS, Fedwire, DTC, and SWIFT to name a few. These organizations are members of our working group. Our approach here is to talk about how they can look holistically at their utility's telecommunications infrastructure, not the silos of each individual bank member or participant, but how does the utility itself work and how is their network able to really provide diversity. When you look at each individual bank, they may have achieved diversity and still be layered right on top of a single point of failure when it comes to major participants in the utility. That could be anything from trans-Atlantic traffic flow to connections within the last mile within a city center. I think that we have a lot to do there. I will say that there are no telecommunications service providers on that working group. Not allowed. We want to concentrate on what we can do for ourselves.

The third is to think 'outside the box' about how banks can help each other in an emergency. This is an interesting area because there may be opportunities for banks to provide redundancy for each other if common standards and protocols can be established which would insure data security, but allow network sharing in an emergency.

There are some issues to ponder where I think it is a little difficult to develop answers. These are issues for which I have no solutions, but I think that they are worthy of consideration.

What if out of region means out of country? That's not such a major problem from an American standpoint, but for smaller nations having an out of region backup might require that the backup be in another nation. What are the legal implications?

Who can close a particular market? It's very clear that the European Central Bank can close Target, for example. Central Banks in general could decide to close payment systems, but what about securities markets? For example, in the United States, the commercial paper market, which is a very influential and important money market, takes place in a kind of space where there is no clear regulatory approach or "system" operator. How do you close that market if you have a problem on a given day? And who makes that decision? The Payment Risk Committee has established a framework to consider who should be at the table when a market close is being considered, so that we identify all parties that have a role to play. With that group supplying information about market conditions, participant capabilities and potential impacts of a decision to close, the appropriate regulatory or governmental agencies will at least have all the input they need to make decisions.

And then, of course, what about speed of recovery? Is it important to get back quickly or is it more important to get all of the participants back in place? The equity

securities market, the New York Stock Exchange, was out six days after 9/11, but came back in a very orderly way. The US bond market was out a number of hours, but the recovery was quite disorderly. Some might say that the bond market was brought back too quickly, because it came back before enough major players were ready to participate and be able to move the market forward. There are certainly no clearcut or easy answers but the point is some sense of critical mass of participants is part of the decision process.

So finally, let's talk about cost, because everything that I am talking about costs a lot of money. Let me give some examples of what we have spent in different areas over the past two years. Data centers are the most expensive. We've spent twenty-eight million dollars on making sure that we have total mirroring of mainframe, midrange and computing systems that are used for critical functions in the company. That's an expensive proposition.

Examples of more moderate expenses are USD 5 million to create active-active sites for critical operations, and another USD 6 million to upgrade some core activities to a more resilient structure. And of course on the low side, the USD 1 million I mentioned to establish a telecommunications diversity program.

An important final point. We, who participate in the critical financial markets, do so by choice. This choice carries responsibilities as we all know. Adequate business recovery planning is simply one element of the investment that is required of institutions that want to participate at that level and sit at the table. ▪▪▪▪

## > SWIFT plenary - Financial industry resilience and continuity (cont.)



**Joseph De Feo**, Chief Executive Officer, CLS Group Holdings, President and CEO, CLS Bank International

I'm going to give a different flavour to my presentation because I'm giving it from the perspective of an industry infrastructure utility. Keeping in mind that CLS Bank International (CLS Bank) is unique in that it is truly the first global infrastructure that the industry has ever put together to deliver an actual settlement service, SWIFT provides the telecommunication facilities, CLS Bank provides a settlement service.

Why should you be concerned about this? When we started with the G20 (the group of Banks that decided to try to construct a global FX settlement infrastructure), we had some quite significant ambitions for this entity, and we needed to convince everyone to work cooperatively, to create this coalition of bankers and central bankers to attack this problem [settlement risk] and I think we have now reached the point where we've exceeded those expectations by a significant margin. We are fortunate to have our Chairman Fritz Klein and Rob Close, my deputy CEO in the audience here, who were both involved in this the design of the service dating back to the time of the G20. We had a milestone reached in the last two weeks where after a bank holiday in the United States, we settled 191,000 payment instructions to a value of USD 1.63 trillion.

When we started the work to develop the CLS infrastructure we knew that we were going to require a highly resilient environment because there would be this global dependency, and we are providing, as I indicated, a truly global service. We span all the time zones. We had to design the concepts of resilience into the architecture for the service from day one.

We also recognized that in addition to this resilience, we had to acknowledge the dependencies to deliver that service on other entities. For example, it is non-helpful for us to be up and have that service available from the core CLS system in 40 minutes, which is what we're able to do, if the Central Bank Real Time Gross Settlement (RTGS) systems are not available. In addition, if the real-time settlement systems of the essential Settlement Member banks are not up in the same timeframe, we cannot actually deliver the service.

As a result we have these extraordinary dependencies and I'd like to spend a couple of minutes talking about the issue of dependency because it addresses a concern that I think we have in the global environment that our industry operates in and where these dependencies are not always obvious on a day-to-day basis. An example of this is the interdependency between the commercial paper market, the bond market and so on and the management of liquidity that emerged in the aftermath of the 11 September disaster.

We have to accept that these global dependencies exist. One of the things that the Inter-Agency White Paper (the so-called "Fed White Paper") in my view does not address adequately are these global dependencies. SWIFT, of course, by its very nature has had to deal with global dependencies. A third core concept I'd like to talk about is "protection". A number of the extensions of the major mandates



for increased resiliency as a result of the Inter-Agency White Paper are really all about protecting ourselves from "near-perfect storm" scenarios. Yes, we do have to think the unthinkable, but at what price?

Are we going to make ourselves so expensive that no one will buy the service? We need to get the balance put in perspective. What does this imply? I've got a definition here – we like to think of resilience in terms of satisfying the business need for recoverability. The speed of recoverability, the range of service that we have to bring back on-line should be determined by the business requirements. And again for CLS Bank, in a situation like we're in, we have a very large and demanding constituency of clients that we have to deliver to in multiple geographic locations, across time zones and that makes it particularly challenging for us.

We believe that our architecture for the delivery of the CLS Bank service to you, our customers, is resilient. We already have in place a full redundancy of our operation facilities and our data centres and the data centres do incorporate technologies that provide for the full synchronous mirroring capability that Don Monks was talking about. It was designed from day one to work that way. With this capability we do not say that we've completed the update of a data record in the databases that are attached to the core application service until we know, with certainty, that the data update has taken place in both data centres.

This is a part of the enablement for us to recover in the timeframes that we can. We have already had occasions where we needed to recover from a data centre failure and we've done it in under 40 minutes. We know with certainty that the databases that are in the backup data centre are up to date and they are not going to require any reconciliations or any feedback to our customers in order to determine that our records are accurate. And since we are constrained by the dateline and by the time zones, we have to recover within 40 minutes.

*"We like to think of resilience in terms of satisfying the business need for recoverability"*

We have two sites for operations; we have determined that these sites are too close together and we were going to address that over the course of the next several years. The Inter-Agency White Paper has accelerated considerations for a wide geographic dispersion of those two sites. There are two operation sites, in the greater London area. What we're planning to do is to migrate one of those to New York, or possibly elsewhere, so we achieve a greater geographic separation.

In addition, we will be adopting the active/active model that Don also referenced. That is, there will be two teams of operational staff one in each of the sites who will be concurrently managing the service and where one could take over from the other and continue to complete the day's business if one of the sites should be disabled. The data centre situation is much, much more difficult as Don pointed out.

Now I also want to emphasize again dependency. At CLS Bank we refer to this as an "ecosystem". To deliver the CLS Bank service to you and the markets, we have to ensure that the entire ecosystem is available. I wish that Rob Close, my deputy CEO and I could lay claim to the development of the term 'ecosystem' because its being widely used, but we can't. It was "coined" by Larry Sweet of the Federal Reserve Bank of New York, who's also the Chairman of the CPSS Sub-Group on FX Settlement Risk.

It was an acknowledgement by Larry and his colleagues on the CPSS Sub-Group that we actually could not recover the CLS service without the various other dependent elements being available. And those dependent elements are essentially the Central Banks that I already referenced, the availability of the RTGS systems, and critical settlement members (all Settlement Members have agreed to aggressive standards for availability), Nostro Banks (these are the providers of the payment inputs to CLS Bank) and SWIFT. We've been working very, very closely with SWIFT from day one because they knew, and we knew, that they had to be available if we were going to deliver this service.

A very complex web and we're just one service! I would suggest to you that as the industry becomes more and more global, as we become more real-time, not multi-domestic, but truly global in the services we are delivering to the marketplace, we've got to extend this knowledge of our dependencies beyond

those that are around the core business in our home location. Don referenced that in his discussion.

Beyond these more obvious dependent organizations, we are also dependent on core utilities. At present some of this is hidden from us because we're a very larger user of SWIFT and, as a result, we've outsourced a lot of our telecommunications requirements to SWIFT. However, we at CLS Bank have a dependency on direct telecommunications providers as well as knowing that SWIFT are dependent on these telecommunication providers also. I must say that I feel very strongly, as I think Don does, that the industry needs to do something to ensure that we're actually getting the telecommunication services we need in order to deliver the resilience that is being demanded by our customers and by the regulators.

We've got to look at the availability of all the services, we've got to look at factors that constrain that availability. We've got to look at how we test the structure we have set up. One of the things that I haven't heard yet (and I didn't even hear from Don) is the suggestion in the Inter-Agency White Paper that we test various contingency scenarios. This is not about just your own internal facilities, but how the dependencies are going to be tested, your interrelationships with other critical members of the community and the service providers in the event of an outage. We have to be able to demonstrate that we can recover from a number of a different combinations of events.

Where do we at CLS Bank see ourselves in terms of our resilient posture in several years? Well as I suggested, we will have geographically dispersed key operational sites. Our current thinking is one will be in New York, one will be in the United Kingdom (our back office for CLS Bank is in London). We will have two sets of information technologies supporting the server environments required to underpin those operational facilities and they will all be networked, they'll be interconnected. So that, for example, the London operational site could run off the IT configuration in New York, the New York site could run off the IT configuration in London, etc.

*"As the industry becomes more and more global, as we become more real-time, ... we've got to extend this knowledge of our dependencies beyond those that are around the core business in our home location"*

We also see ourselves introducing a third data centre configuration very similar to the approach that Don was suggesting. However in our case, in order to meet our business requirements, we will almost immediately be forced into demonstrating how we're going to re-establish the synchronous connections between the primary data centre and its backup. And that is made problematic by the distance requirement, the geographic separation, imposed by the Inter-Agency White Paper.

As Don suggested in his talk, we really don't see the technology progressing to the point where we can overcome the

speed of light issue, to actually extend synchronous data mirroring beyond the 100-150 kilometres that is inadequate to meeting the "out of region" requirement. So one of the issues that we're going to be dealing with is how to do we rapidly restore the synchronous data centre backup configuration that is required by a business to meet the recoverability and the assurance of the availability of the service.

What we are currently looking to do is to provide the capacity to quickly restore in a fourth data centre the synchronous linkages and then use one of the data centres in the primary location as the third level backup. This is going to get very, very expensive and technologically challenging. We are also working with IBM to find ways to mitigate some of those costs and to make it operationally feasible.

Protection - a lot of what we're talking about here is protecting ourselves from the relative perfect storm or near-perfect storm scenarios. We had some discussions with some of the officials involved with us trying to understand what set of triggering event would cause us to have to execute an "out of region" data centre recovery where our data centres now are nearly 100 miles from London and the two data centres are geographically separated. We're talking through this, we're pondering this, and you say, well are you suggesting that we think about a multi-megaton nuclear weapon going off in London?

And they sit there and they look at you and they don't say no. So this is the sort

of thing that we've got to be able to respond to. We've got to be able to understand the depth of feeling of this audience and how much they were impacted by what happened on the 11th of September. Now ordinarily, if it were you and I and in most circumstances, we could look at our personal lives when we consider protection we go out and buy insurance. We wouldn't set up an alternative house in another geography in case our house was impacted by a hurricane. However, this is what we're being asked to do. We must figure out a way of getting the balance of cost and service in synch.

Otherwise, as I said, I think we're going to price ourselves out of existence. I think that what Don said is very legitimate. What happens if the situation arises that there are competitors out there that are not subject to the same level of scrutiny by their regulatory bodies, are not being asked to meet such demanding standards and are competing with you in the marketplace thereby delivering the service at a much lower cost. How do we deal with that keeping in mind that this is a global situation, not a solely domestic one, not confined just to the US.

I have one other remark before I close. I really do believe that Don hit the nail on the head about the "fog" (a reference to the so-called network "cloud" the telecommunications companies often use). I think we've got to figure out a way to solve this problem. Our offices in New York are very nearly as close to "Ground Zero" as Don's are and it scared the hell out of our staff.

However, the biggest problem for our recovery was the lack of telecommunications. I don't believe that individual institutions can deal with this problem. This is a problem very similar to when we started the G20 and we tried to address the issues that led to the creation of CLS Bank.

*"I do believe that we ought to organize ourselves to approach the telecommunication industry in a coordinated way"*

I think what we've got to do is recognize that there's a call for action here on the part of the industry to work collaboratively. While we have demonstrated the ability to do that, we created SWIFT, we created CLS Bank, we can act collectively to solve these sorts of problems and it probably will take that sort of action. Perhaps we ought to use Leonard's initiative in the resiliency council, I don't know, but I do believe that we ought to organize ourselves to approach the telecommunication industry in a coordinated way that doesn't eliminate the need to do it on an individual institution basis, but in a coordinated way so that we get an understanding, an assurance and a capability delivered from the telecommunications providers on a worldwide basis which is actually going to penetrate that fog and deliver the diversity that they purport to have. I agree with Don, they're not delivering it now.

We're going to spend a ton of money here with backup data centres, "active-active" operation sites and what's going to let us down are the telcos.

# > SWIFT plenary - Financial industry resilience and continuity (cont.)



**Leonard H. Schrank**, CEO, SWIFT

## Financial industry resilience and continuity

Well we've heard from a global bank, we've heard from a market infrastructure, now let's quickly talk about what SWIFT's been doing.

After 9/11, everybody worked individually to improve their business continuity. Also, at regional levels – on the East Coast of the U.S., Britain, on the continent, in Asia - there were lots of organisational activities. SWIFT was invited to participate in all of that. We're also leading the way internationally. I think there's been tremendous progress to date - especially in our industry, and not only at SWIFT.

I chaired a panel on "Managing Catastrophic Risk" at the World Economic Forum earlier this year and I was quite impressed by our industry when you compare what other industries are doing versus ours. We have a natural advantage because we have a natural regulatory hierarchy starting with the central banks. We were organised hierarchically for Y2K. So we're quite well organised already,

and we're taking advantage of that. There has been a lot of progress to date, but we still have a way to go, as you're hearing.

### Four Pillars II at SWIFT

After 9/11, SWIFT established its Four Pillars II program to raise its resilience. It means that we're very substantially increasing our physical and cyber security. We had been already been doing that anyhow, but after 9/11 we took it a lot more intensively. In terms of personnel, we looked at how we hire personnel. We now do more serious background checking than we've ever done before. Then once you have people working for you, you look at the processes that you want to follow to prevent someone accidentally - or on purpose - causing damage to your system. In the financial industry we've done this for a century. Every financial institution has segregation of duties to avoid fraud and problems in our financial systems.

*"We feel that we at SWIFT had post 9/11 resilience before 9/11... we're taking that resilience to even higher levels"*

But what about in your operational and IT systems? We use what we call the two-four-six eyeball approach. One person writes the code, another person checks the code, a third person installs it. There are other approaches that even nuclear launch installations use. It's a lot easier said than done and SWIFT is implementing these types of procedures in our IT and operational areas.

After physical and cyber security and personnel, the third pillar covered is service continuity. Let me say right at the beginning that although we've taken the approach of asking 'what happens if SWIFT is out', let me assure you that we have no plans to be out. We feel that we at SWIFT had post 9/11 resilience before 9/11. As you know we've got multiple operation centres on different continents, so we're way beyond the single site issues that were mentioned in that White Paper when they referred to 300 miles or 500 kilometres.

SWIFT had extraordinary resilience for years, but after 9/11 we're taking that resilience to even higher levels. The Board has approved substantial investments that are being made right now to take our service continuity to an even higher level.

And our final pillar is crisis management – our communications command control centre. We've had a lot of experience preparing for or operating during a crisis. Fortunately we haven't had too many. For example, preparing for the Euro and Y2K and living through 9/11 have given us plenty of experience.

I think that our network people knew more about the network map at Ground Zero than some of the network operators. This was based on 1993, when there was a terrorist bomb at the World Trade Centre. Since there were so many acquisitions and changes of the telcos in New York between then and 9/11, we probably knew more about what was going on under the ground than they did. So crisis management is

something we take very seriously and know quite a lot about.

Let me give you some examples though of how we look at it even now. Here is a sample of a threat matrix that we use. Side graphic: threat matrix slide (no. 1) The columns are labelled "normal conditions", "increased threat", and "imminent attack". That sounds like terrorists, but it applies to any emergency. You could just as well change the phrase "imminent attack" to "imminent hurricane". It doesn't only have to be the Tom Clancy stuff. What other the disaster is that's coming after you – what do you do differently? On the rows, you list the different actions that you take – these are just some examples. Your organisation will have different actions depending on your own operations and physical considerations.

I think we have to get a lot more granular about what it means these days when the threat levels go up. SWIFT has been working quite intensively with local officials, as well as at the national and even the international level to respond as the threat levels go up. As a vital infrastructure, we get a lot of attention and we take it very seriously. It's an important responsibility for our organisation.

So here, in terms of the best practice, is the type of threat matrix that you should adopt appropriately for your own organisation. And then you have to practice it. It's not good enough to have a PowerPoint – you've got to practice.

**Resilience Advisory Council**

To help us look at crisis management and service continuity, we formed the Resilience Advisory Council last year. You know that SWIFT always taps its membership – it's the best consultancy in the world. Just as we set up working groups for standards and expert bodies for trade issues, we reached out to tap into the best and brightest of our community to help us work our way through the next levels of resilience, looking at what SWIFT should do and how we can get the balance right.

*"It's not good enough to have a PowerPoint – you've got to practice"*

We could have had 80 or 90 volunteers to fill slots for this Council, but we wanted to keep the group small so that we could be as efficient and effective as possible. We have thirteen experts from a cross section of our members. This included our largest banks, key market infrastructures and central bank operators - not the overseeing parts, but the ones that run the systems. We had our first meeting of the group in a year ago at Sibos in Geneva. They have met practically every other month since then and they met yesterday. We'll have another meeting later this week.

Let me show you what this wonderful group has done. One of my former chairmen once told me working groups don't work. Well this one works. Every single meeting we have near 100% attendance. That's the level of intensity here. When they go back to their regions they have sub-committee meetings on their own. And they consult their communities as well. It's been just tremendous. I've really been grateful for their time and effort and insight they've given SWIFT.

Let me show you what they face. You've heard the phrase, "think the unthinkable". They were asked, "what if SWIFT is out?" Of course, the first thing a number of them said that you can't be out because we use SWIFT. But this was the exercise. Imagine SWIFT is out. Let's go through the exercise. What would we do? And they broke up the task into three areas – emergency procedures, service continuity and crisis management.

Emergency procedures. If SWIFT weren't available should we have a primitive fallback messaging mechanism? In other words would you use a telex, fax, unstructured e-mail; do we use secure mail, or do we use structured email. What messages would we send? What takes precedence, what is the triage?

It took practically a year of debate before they decided that we're not going to have a global standardised fallback. They don't want to invest in a weaker system, with all the control issues that go with that solution. They'd rather we spend our time getting SWIFT back up. So that turned out to be a dead end. A lot of our members have ad-hoc bilateral mechanisms they can fallback on anyway – the Council agreed that the main thing to get SWIFT back up.

Service continuity. The Resilience Advisory Council was very, very helpful

to us here. Of course we could have spent hundreds of millions of extra dollars and built all sorts of extra data centres – but that's not practical. So they helped us with some of the parameters that are driving the proposals. These have been approved by the SWIFT Board - this is what we're doing to increase our resilience.

Crisis Management. This is still work in progress. SWIFT already does crisis management. SWIFT's command and control centre will spring into operation if a crisis occurs. But that's not the issue. The question is, what do we do at a higher level, like we did with Y2K. There is a need for crisis co-ordination and communication between our global banks, between national infrastructures, between central banks. What's going on out there? We are now wrestling – and I think we are in the final stages of this - with how we co-ordinate, or facilitate, or act as a clearinghouse for what's happening in the US, what's happening in Britain, what's happening in Europe, Asia. We would be looking at incoming information and then distilling it. Maybe broadcasting guidelines to the community that we have received from local communities through our command centre.

What should we call this? Perhaps it would be the 'IC3', the International Crisis Co-ordination Communication group, or it could be the 'SC3'- the SWIFT Crisis Co-ordination Communication. Note we are not using the word 'control'. Who are the members? It's work in progress now.

SWIFT board's talking about it, the RAC is talking about it, the CPSS is talking about it. If this were the December we'd probably tell you what we're going to do. But it's an important co-ordination group – sort of like the Heathrow group that met during the Euro cutover. It could be conference call – that type of a thing – but would be beyond SWIFT's own crisis centre. So stay tuned – we have to do more here.

### SWIFT2006 "making financial messaging safer and less costly"

I'm going to say a little bit about *SWIFT2006*. The summary of *SWIFT2006* is to make financial messaging safer and less costly. We've been talking this morning about making financial messaging and making financial systems safer. Let's move to how we make it less costly.

*"We've been talking about making financial messaging safer... Let's move to how we make it less costly"*

We've heard a lot about the migration – Jaap spoke about it yesterday, I mentioned it yesterday. It's mandatory – we have to do it. The X.25 platform is obsolete. We're moving over to IP. It's complicated – but the good news is that it is just a one-time move. You've got hardware, the VPN box which handles the IP security, the routers, the firewalls and the telecommunications links that are purchased separately. These all have to be configured at the right location and someone has to be there to install it. Things sometimes go wrong. Very

often addresses are given out incorrectly. So there are small irritating problems that happen – that delay you a few day - but as I said, you only have to do it once. And we're getting better every single day.

We are committed to getting this done with you by the end of 2004. I'm going to tell you about the benefits for you once you migrate in a second. But let me emphasise: we really need the discipline of our community. We know how to migrate. The country windows and the backup country windows – we're working very hard with our larger accounts - the complex ones - to move forward and we've done a lot to help you. As I've mentioned before, we're also working intensively with our network partners - AT&T, Colt, Equant and Infonet. We also have 35 service partners in 26 countries, for those of you that need technical assistance with the routers and the firewalls and working with the network providers. And of course let's not forget SWIFT's own banking division, securities division and our customer support people. We've hired extra staff over the last two years to help you through the migration.

*What are the benefits of migrating to SWIFTNet?* Here are three important ones: powerful new standards, the value of SWIFTNet and the competitive pricing which we announced yesterday.

### Powerful new standards

On the standards front, 20 years ago when we established standards, it was basically what should the message type be -- what are the records and fields - and it's worked very well. They are simple but good rules and we all follow them.

With SWIFTNet we have a much more sophisticated way of approaching business problems. We now have a patented standards workstation using a universal modelling language. How do we approach a problem? We take a problem like a cash reporting or trade. We say 'what are the business processes – what are the flows – who are the counter parties that are involved'? We bring in a working group – an expert group that has been in the business for years - to really help us model what is going on. We look at the boundary conditions. Out of this model falls an XML schema. This becomes the standard and then we can apply to it the different messaging services store and forward, interactive, file transfer, browse. Everybody is connected now. Every financial institution can connect to their counterparties. And now even the corporates can connect, through member-administered closed user groups.

So we have a very rich and robust platform. We've got the tools today to build the new SWIFTNet business solutions for tomorrow. And although we will focus on migrating during the coming year or so, these and other business solutions – a half a dozen of

them coming off the assembly line - are going to be the way we do our standards of the future. It's going to be quite extraordinary. The new standards and our legacy FIN standards will co-exist but over time – the next three, four, five, ten years. *SWIFT2010* will talk about standards and you will see this as a basis for how our industry works together.

*"We've got the tools today to build the new SWIFTNet business solutions for tomorrow"*

### Value

We have spent the last year working with several dozen of our members trying to quantify in real, business case terms the financial benefit of using SWIFTNet. We look at this in terms of reusability – using SWIFT to connect to many market infrastructures or multiple service providers. We've looked at the benefits you get from reach--. Many of our members access thousands of counterparties through SWIFT. We've quantified the benefits of SWIFTNet for increasing your straight through processing. We've actually gone in and done case studies and calculated that the return on investment of migrating to SWIFTNet. The pay back is in many cases six months. Seven figure values - and that comes back to you year after year after year. Of course if you don't migrate to SWIFTNet, you don't get these benefits.

In addition there is our resilience, which is hard to quantify but tremendously important. Joseph De Feo made the

point that we need to look at what we do with the competitors that are not overseen, that don't have the resilience. Before 9/11 our community took our security and reliability for granted. Now nobody does. We know there's a price for that and I think our community is going to support the systems that we have in place. But we still have to keep the price reasonable otherwise you can't afford it. In other words, we need to be both operationally and financially resilient.

### Pricing

I'll just show you my favourite chart. Those prices have come down 70% since 1992 and we're going to hit that SWIFT challenge with another 50% between 2002 and 2006. the sweeping price reductions we announced yesterday certainly helped us down that path. André Roelants from our board also talked about the rebate today on CNBC – it was very kind of him.

We've announced an 8% rebate for this year – and we are locking in with lower prices. For SWIFTNet there is a 10% reduction on average, but you have to migrate to get there. For InterAct and FileAct, there is a 50% or more reduction for domestic or branch to branch messaging. We are unbundling the value-added features so that if you don't want to use them you don't get charged for them. And then, very important, as Jaap Kamp was talking about yesterday, we are extending our reach to the smaller financial institutions And as Brett Goodin was saying yesterday, the fund



The SWIFT challenge

managers and corporates who want to connect will benefit. The introductory packages will make it 50, 60 or 70% less expensive for them to join in the first year and will simplify how we deal with them – if they have limited counterparties.

All of this coming together creates the real value of SWIFTNet.

**The SWIFT Community**

So, just to close. What is SWIFT in our community? The essence of SWIFT is really in three areas.

First of all, we're a community. It's who we are - 8,000 financial institutions getting together. It's a franchise that it is really priceless, the way we work together.

It's standards. It's easy to set a standard, but it's hard to get consensus. We

struggle with the issues, and it can take a while, but our community sets the standards for banking and securities. Not only technically, but also in how we work together.

And then the third piece that pulls it together and what this morning was all about is the quality of the systems: the security, the reliability and our resilience. You put all of that together and you have the unbeatable combination that makes us more than just a bank-owned network. We are a network of banks and financial institutions that have come together, to agree on how we're going to interoperate in mission-critical areas. And our vision, as stated in *SWIFT2006*, is to be the global financial community's foremost messaging infrastructure that is lowest risk and highest resilience.

**We're building on this vision today**

I very much want to thank Don Monks and Joseph De Feo for their contributions this morning.

I hope you now have a better view of the New Realities of what resilience is. It's not all black and white. There are a lot of trade-offs and we're talking about it. And we are doing things as we're talking. We're beyond the talking phase.

I hope you've taken some lessons in terms of what's best practice and what's appropriate for your organisation. Give us feedback about what you think we should be doing at the SWIFT level and at the market infrastructure level. And I hope you have a sense of how much is enough. We've got to get the balance right here. My gut feeling is that we should do a little bit more, rather than a little bit less.

I want to thank you very much for being here this morning. Enjoy the rest of Sibos.

# EXHIBIT 6

# Chief Executive Officer's Report

The Group has continued to deliver a world-class service to our Stakeholders and we can be satisfied that the efforts of the Group's Management Team and staff have delivered such a success story.

The CLS Group's primary focus is to deliver value to our stakeholders. 2003 has seen the company make significant progress on all fronts and we have delivered against our objectives. The first full year of live operation is widely seen to have been a success, and our impact on the industry has been met with almost unanimous positive feedback from everyone including the media and our Stakeholders and regulators (in particular the Central Banks).

The Group has continued to deliver a world-class service to our Stakeholders and we can be satisfied that the efforts of the Group's Management Team and staff have delivered such a success story. We processed volumes in a single day in excess of 200,000 instructions and US$1.7 trillion in value.

Fifty-six Members were live on the service, with over 100 more 'Third Parties' (customers of our Members) settling through CLS Bank. 2003 has seen the successful implementation of four new CLS Bank eligible currencies – the Danish Krone, Norwegian Krone, Singapore Dollar and Swedish Krona – as well as the addition of a further two Shareholders to our growing Shareholder Group.

In October we launched the 'Enhanced Fund FX' solution, enabling fund managers to settle FX related payment instructions through CLS Bank for the first time. This is an important change as it enables a significant proportion of FX transactions that are securities-related to be settled through CLS Bank. This followed on from the July launch of the 'Settlements Directory for CLS' providing a comprehensive capability for CLS participants to store and access Standard Settlement Instructions (SSIs).

After achieving average billable instruction volumes well in excess of 90,000 sides a day, the Group announced another milestone in its development when it declared 'Steady State' in December. This is a major achievement for the Group and its Shareholders. We now expect CLS Bank to process sufficient volume each month such that the company can cover, with the benefit of the IBM financing secured in 2002, its operating expenses from its volumes processed. This means that the Group no longer requires the additional support that Ramp Up 'prepayments' provided.

The CLS Group has now moved to its next stage of development and next year will see the Group focus on the following activities:

* building participant volume;
* attracting new shareholders;
* promoting the use of the Enhanced Fund FX solution;
* extending the service to four new currencies – Hong Kong Dollar, Korean Won, New Zealand Dollar and the South African Rand, subject to successful trials and regulatory approval;
* beginning rolling out new value added products, such as a new portfolio of information services; and
* substantially upgrading of the CLS core technology for improved efficiency and volume capacity.

We have come a long way in 2003, and this would not have been possible without the immense contribution from the Board of Directors, the Management Team (in particular Rob Close) and the staff of CLS Group. Anne Nethercott retired at year-end as Director of Operations. Her hard work and dedication have enabled the exceptional operational capability, reflecting one that is vastly more mature, that we have in place today. I would like to thank them all for their efforts. 2004 promises more change and further development, but I am confident we are up to the challenge. I would like to particularly note the outstanding contribution of Suzanne Labarge who stepped down as Chairman of the Group and Bank Boards at the end of April. Suzanne has been involved with the program of building and delivering CLS Bank from its inception as a Director of the founding 'G20' group of banks that sponsored the original research and structural work. During the years since then her steadfast support and engagement, faith in the concept of CLS Bank and leadership as Chairman have been one of the core underpinnings of the Group's success. The Board and the Management Team will be forever grateful.



We are, however, very fortunate to have had Fritz ('Itzi') Klein assume the Chairmanship upon Suzanne's retirement from the Board. Also long engaged with the CLS Bank development as a member of the Operational Feasibility Working Group (OFWG) he brings a wealth of detailed knowledge of the Bank's design and operation and has already had a very positive impact at the Board and with the Management Team.

**CLS Balanced Scorecard Highlights**
**as at 31 December 2003**

**To deliver the CLS Core Service to the highest standards of resilience and operational performance and achieve the volume and unit cost targets as planned.**

- The average daily volume of billable instructions per day for Q4 2003 was 90,000, 6,000 up from the previous quarter but lower than budget due to seasonality.
- The primary business objectives (of settling all eligible instructions and paying-out all funds) were met on 257 out of 258 business days during the year.
- The CLS system was available over 98% of business days during Q4, with all outages having been effectively managed.

**To extend the coverage of the CLS core service (through additional currencies and customers) so as to achieve planned volume growth.**

- Four new CLS Bank eligible currencies live in September 2003.
- Two Korean Banks invested to become Shareholders of CLS Group in October 2003.

**To develop and launch new products/services that (a) add value to the core service and (b) exploit the functionality/scalability of the core service.**

- The Settlements Directory for CLS was launched in July 2003.
- Four new CLS Bank eligible currencies September 2003: Danish Krone, Norwegian Krone, Singapore Dollar and Swedish Krona.
- Enhance Fund FX solution live in October 2003.
- Work on enhancements required for the four new currencies in 2004 progressing to plan.

**To establish and maintain the CLS brand.**

- The Group continues to have excellent coverage in the media. 260 pieces of CLS-focused press coverage during 2003, which included coverage in the Financial Times (5 articles), FX Week (20 articles), Financial News (9 articles), Reuters news service (4 articles), Euromoney and Dow Jones.

**To establish a funding profile that (a) mitigates against volatility of prices, (b) achieves a downward progression of unit prices, and (c) ensures adequate flow and timing of investment funds.**

- The Group cash position is £17.1 million ahead of Plan. Of this total approximately £13.4 million relates to real cost savings (rather than expense realisation timing differences) and demonstrates the continued focus of the Management on effective cost control and the realisation of savings opportunities.

**To attract, retain and develop appropriately skilled staff to support the Company's strategic objectives as efficiently and cost effectively as possible.**

- Staff turnover has improved in 2003 (8.29%) from 2002 (11.79%).

*Joseph De Feo*

Joseph De Feo
23 March 2004



CLS Group Holdings AG

# Deputy Chief Executive Officer's Report

Over 20 million sides were settled in 2003, with an aggregate value of over US$221 trillion.

The first full year of live operation of the service has been a success. We have proved we can deliver and handle considerable volume growth whilst implementing a major change programme. Challenges have had to be faced, but feedback from Stakeholders is that the issues have been resolved to their satisfaction.

Over 20 million sides were settled in 2003, with an aggregate value of over US$221 trillion. On 18 February 2003, CLS Bank settled payment instructions with a gross value of over US$1 trillion in one day for the first time. The record day for the year was achieved on 28 November, when CLS Bank settled over 200,000 payment instructions for the first time with a gross value of US$1.78 trillion. Towards the year-end CLS Bank was settling on average over 100,000 sides a day with an aggregate value of over US$1 trillion. A further five shareholders qualified to become Settlement Members, and one qualified to become a User Member and one as an Affiliated User Member, bringing the total number of Members to 56. Participant (or third party) volume continued to rise, with over 100 live at the end of the year.

100% settlement was achieved on 257 out of 259 business days. The one major exception was the service disruption of 25 March. Contingency arrangements were successfully invoked, and we worked closely with Settlement Members to manage the situation. Settlement Members resubmitted the unsettled instructions and settlement of the remaining instructions took place the following day. The cause of the disruption was rectified on the day with a temporary solution, and a permanent solution was put in place the following weekend. Following a thorough review, various changes were implemented to ensure that, as much as possible, we avoid a repeat in the future. The second day on which full settlement was not achieved was 12 December. In this case, one normal trade and 34 trades relating to In/Out Swaps were not included in the revised Pay In Schedule. Members had to take actions to manage their changed liquidity position.

A very demanding change programme had to be implemented throughout 2003. During April, CLS successfully implemented

a major systems upgrade, and then in May activated the new currency functionality to permit the trialing of the four new currencies which took place successfully in June. The four new currencies went live on the service in September. Release 1.16 was implemented in two phases, with infrastructure changes taking place in July and application changes in October. The latter included the successful launch of the Enhanced Fund FX solution in October. All this change was implemented without disrupting the service.

2004 will see further enhancements to the service, including a major CLS technology upgrade and the changes required for the implementation of the four new currencies expected at the end of the year. We will also be making operational changes in response to the Federal Reserve White Paper on resilience. Most notably we intend to establish out of region Operations capability that will take responsibility for the service in the event of disruption in London.

The last year has seen good progress made, and I am pleased with how we have performed. I would like to thank all Members, the Central Banks, RTGS systems and CLS Group's own service providers as well as CLS staff for working together to make 2003 such a successful year for the company.

Rob Close
23 March 2004



# Chief Financial Officer's Report

The long-term financial viability of the Group will be achieved by sustaining the very successful financial performance of the last two and a half years.

Financial management of the CLS Group's resources was exceptional in 2003. Costs were effectively managed, resulting in a year-end cash balance that was £17.1 million higher than that envisaged in the 2002 financing plan that was approved by the Board Executive Committee at the end of 2002. The 2002 plan took account of the new IBM Services and financing agreements.

Group cash and current asset investments increased by £2.5 million during 2003 as a consequence of:

- total cash receipts of £40 million, comprising £5.9 million from new shareholders and £34.1 million cash received from Members in payment of their CLS invoices;
- total cash payments of £37.5 million, comprising £29.3 million to defray Group operating expenses and new product and infrastructure investments, and £8.2 million net was paid to IBM.

The Group reported a loss for the financial period of £35.1 million for the year ending 31 December 2003. A loss of £57.8 million was reported for the previous 18-month period ended 31 December 2002. The loss attributable to the 12 months ending 31 December 2002 was £36.6 million, so on a directly comparable basis, the 2003 trading loss was a £1.5 million improvement on the prior year.

The year on year improvement in performance was primarily due to the fact that the £27.4 million increase in income in 2003 exceeded a commensurate but lower £25.9 million increase in operating costs. The increase in income and costs was expected and budgeted, and was a direct consequence of 2003 being the first full year of the live operation of the service. Over the medium to long term, revenue is planned to grow faster than the largely fixed costs, as the volume of transactions processed increases, thus enabling the servicing and eventual repayment of the IBM debt.

The £35.1 million loss for 2003 was £15.9 million better than budget, primarily due to the positive impact on the profit and loss account of a lower depreciation charge on the CLS

System (useful life extended from 3 to 5 years). This was combined with actual operating costs incurred being lower than that budgeted, and managing to spend less than budget on new products and projects. The net assets of the Group have declined by £28.1 million over the course of 2003 to £44.1 million as at 31 December 2003. The reduction in net assets was primarily due to 2003 being the first full year of CLS System depreciation and the increase, as planned, in IBM vendor financing debt. The reduction in the reported net assets is consistent with the CLS Five Year Strategic Plan, and the trend will continue until the volume of transactions processed exceeds that level required to reach the single 'parity price', estimated to be approximately when an average of 180,000 sides a day are transacted.

The declaration of 'Steady State', effective from September 2003, means that CLS customers now pay only for the transactions processed by CLS. Growth in CLS volume will automatically result in unit price reductions, with CLS revenue remaining constant until every customer is paying the same price per transaction, known as the 'parity price'.

The CLS pricing policy gives rise to an ongoing requirement to retain a strong focus on ensuring that the Group's financial resources are effectively managed. There is a planned expectation that the Group will report trading losses and a reducing level of net assets over the next two to three years, as the CLS system is written down. There will be an ongoing dependency on attracting new shareholder funds, and achieving the volume growth targets. The long-term financial viability of the Group will be achieved by sustaining the very successful financial performance of the last two and a half years. Actual performance will continue to be closely monitored to ensure that the Group will be well placed to invoke any contingency measures, should such action be necessary.

Sean Spence
23 March 2004

# CLS Management Team



**Back, left to right**
**Richard Harris-Smith,** General Counsel, UK
**Sean Daly,** Programme and Service Delivery Director
**Rob Close,** Deputy Chief Executive Officer, CLS Group Holdings;
Chief Executive Officer, CLS Services
**John Paine,** Financial Controller
**Joseph De Feo,** Chief Executive Officer, CLS Group Holdings;
President and CEO, CLS Bank International
**John Hagon,** Director of Operations
**Sean Spence,** Chief Financial Officer, CLS Group Holdings

**Front, left to right**
**Kiyoshi Morofushi,** General Manager, Asia Pacific
**David Skoblow,** General Counsel, CLS Bank International
**Claire Wilkinson,** Director, Human Resources
**Phil Kenworthy,** Director, Group Audit
**Nan Noonan,** Executive Vice President, Risk Management
and Regulatory Affairs
**Tom Newman,** Director, Relationship Management
**Jonathan Butterfield,** Executive Vice President, Marketing
and Communication, CLS Bank International



# Stakeholder Listing

## Shareholders

ABN AMRO Bank N.V.
American International Group, Inc.
Australia and New Zealand Banking
Group Limited
Banco Bilbao Vizcaya Argentaria, S.A.
Banco Popular Espanol S.A.
Banco Santander Central Hispano
Bank of Montreal
The Bank of Nova Scotia
Bank of Tokyo-Mitsubishi, Ltd.
BankAmerica International
Financial Corporation
Bank One Corporation
Barclays Bank PLC
Bayerische Landesbank Girozentrale
Bayerische Hypo-und Vereinsbank AG
Bear, Stearns Securities Corporation
BNY International Financing Corporation
BNP Paribas
BT Foreign Investment Corporation
Credit Agricole S.A.
CIBC World Markets Plc
Citibank N.A.
Commerzbank AG
Commonwealth Bank of Australia
Coöperatieve Centrale Raiffeisen
Boerenleenbank B.A.
(Rabobank Nederland)

Credit Lyonnais
Credit Suisse
Danske Bank Aktieselskab
DnB NOR Bank ASA
Deutsche Bank AG
DBS Bank Ltd.
Dexia Banque Internationale
a Luxembourg
DZ Bank AG Deutsche Zentral-
Genossenschaftsbank Frankfurt am Main
Dresdner Bank AG
Fortis Bank N.V.
The Goldman Sachs Group, Inc.
HSBC Bank plc
Mizuho Corporate Bank Limited
ING Bank N.V.
Banco Intesa S.p.A.
KBC Bank N. V.
Korea Exchange Bank
Kookmin Bank
Lehman Brothers Holdings Inc.
Mellon Overseas Investment Corporation
Merrill Lynch Capital Markets
Bank Limited
JP Morgan International Inc
Morgan Stanley & Co.
International Limited

National Australia Bank Limited
The Norinchukin Bank
Northern Trust Corporation
Oversea-Chinese Banking
Corporation Limited
Royal Bank of Canada
Royal Bank of Scotland Plc
Skandinaviska Enskilda Banken AB
(PUBL)
Société Générale
Standard Chartered Bank
State Street Bank and Trust Co.
Sumitomo Mitsui Banking Corporation
The Sumitomo Trust & Banking Co., Ltd.
Svenska Handelsbanken
The Toronto-Dominion Bank
UBS AG
UFJ Bank Limited
Nordea Bank Danmark A/S
Unicredito Italiano
United Overseas Bank Limited
Westdeutsche Landesbank Girozentrale
Westpac Banking Corporation
Zürcher Kantonalbank

## Registered Vendors

AFA – Systems
Aleri
CityNetworks
Clearing & Payment Systems Pte Ltd
DIAMIS
Enigma Business Consulting B.V.
Fundtech (UK) Ltd.

Getronics Japan Ltd
Gresham Computing Plc
IBM
IntraNet
LogicaCMG
Misys Plc
RCC

SmartStream
Sungard eProcess Intelligence
Sungard Trading and Risk Systems
Wall Street Systems
Xansa



'As an active participant in the foreign exchange market, removing risk from our business was a priority and so joining CLS was an easy choice for Biverbanca. After using the CLS service for over four months we can say that it has met our expectations, and we look forward to more of our counterparties making the same decision. As a result of joining CLS, over the coming months we will be reviewing our credit system in order to reduce the number of credit limits, and we expect to see a change in the bank's trading practices leading to more trading opportunities with a wider range of banks than was possible before.'
Biverbanca SpA

'CLS reduces settlement risk, allowing us to increase volume transactions with our trading partners and customers. We became the first broker dealer to become a third party participant and aggressively petitioned the FX community in an effort to settle our transactions in the CLS environment. The reduction of settlement risk has allowed trading partners to reconsider and calculate credit worthiness differently today than prior to the coming of CLS.'
Bear Stearns

'The main rationale behind our decision to participate is a desire to reduce settlement risk. Moreover we have been of the opinion that CLS would become the overall settlement standard and based on our significant foreign exchange turnover we found it desirable as well as necessary to adhere to this standard. Following a successful and relatively uncomplicated start we find the CLS system to be an efficient and secure way to settle foreign exchange transactions. Sydbank has been able to reduce its settlement risks significantly and to conclude CLS settlement agreements very quickly with a high number of trading counterparties. Moreover CLS settlement has led to simplification of liquidity management and cash flow.'
Sydbank

'The main reason for joining CLS was our goal to reduce settlement and operational risks. Operational and business expectations have been met as internal credit limits are used less and cash transfers have been reduced due to netted payments. CLS marks the future in FX settlement and any bank which wants to stay competitive needs to join in.'
Landesbank Rheinland-Pfalz



ĽÝĆĭ   ³   ¿@ļ- ¬ » º«¬«® ·² ÚÈ -»¬´»³ »²¬¿² ¼¿² § ¾¿² µ
©¸ ·½ ©¿² ¬ ¬± -¬¿ -¬§½ ½ ½½- »® ° ¿½½¬ ²¿´ ¬¬ ¬± -¬¿ -¬§§ - ¿½ ¬¬ ® ¬ ¾¿² ¬²¸ ¿¾²¸ ½ ³ ¬¾¸¿² ²´¿¬ ¬¾¸¿² ¬ ½ ¾¼ ² ¬ ¬

'BBH has received significant reduction in FX settlement risk from CLS. We have been able to reallocate our credit lines, which has translated into increased business with existing counterparties and the ability to develop trading relationships with new counterparties. CLS has also reduced our operating expenses, both directly via reductions in clearing fees and Swift charges, and indirectly through cleaner reconciliations and fewer fails.'
Brown Brothers Harriman



'Our decision to participate in CLS was based on a wish to optimise our treasury management whilst looking to reduce our FX settlement risk. From a business perspective we are already seeing benefits with regards to the reduced exposure to those counterparts clearing via CLS and its introduction has opened doors to those participants who we might not normally have traded with but now can due to the elimination of settlement risk.'
Bank Julius Baer & Co Ltd

'About 80% of our FX trades are now settled through CLS Bank and that is well above our expectations. We believe that CLS participation may lead to increasing instances of less favourable FX pricing or even on the availability of price quotations at all to non-CLS participant counterparties.'
Joh. Berenberg, Gossler & Co. KG





CLS Bank settles US$1 trillion in one day

CLS Bank settled over 117,000 payment instructions with a gross value of over US$1 trillion in one day for the first time.

Benefits of CLS participation unveiled in TowerGroup survey

First independent survey of CLS Bank Membership reveals benefits of CLS participation already being felt after just six months of operation.

Fritz T. Klein appointed new Chairman of CLS Group

Suzanne Labarge steps down as Chairman at the end of her term of office, which encompassed the most important phase in CLS Group's history.

Korean Won endorsed as potential CLS currency

CLS Bank announced that the Board of Directors of CLS Bank had endorsed, in principle, the inclusion of the Korean Won as a CLS Bank eligible currency once all the requirements in CLS Bank's rules have been satisfied and the necessary regulatory approvals have been obtained.

CLS Bank adds four new currencies

CLS Bank settled payment instructions in the Danish Krone, Norwegian Krone, Singapore Dollar and Swedish Krona for the first time, bringing to eleven the number of currencies eligible to settle through CLS Bank.

CLS Group and SSISearch launch The Settlements Directory for CLS

New product for CLS Bank Members developed to improve STP and reduce operational risk.





Third Party Participant Growth

Ñ½±¾®

Two new shareholders for CLS Group

Korea Exchange Bank and Kookmin Bank became shareholders of CLS Group, bringing the total number of banking and financial institutions as shareholders to 69.

Ô±ª»ª ¾®

Enhanced Fund FX goes live

Unique solution becomes available on the CLS Bank service that enables fund managers to settle foreign exchange transactions through CLS Bank via their CLS service provider.

100 third party participants live on CLS

The number of Settlement Member customers ('third party participants') using the CLS Bank service reaches 100.

Ûª½ª ¾®

CLS declares 'Steady State'

After achieving average billable instruction volumes well in excess of 90,000 sides a day in the three previous months, the Group declared 'Steady State' in December. This means that the Group no longer requires the additional support that Ramp Up 'prepayments' provided.





# Ü·®»½¬±®- ®»°±®¬

The Directors present their report and consolidated accounts for CLS Group Holdings AG together with its subsidiaries (the 'Group') for the twelve months to 31 December 2003. Comparisons are with the previous eighteen months to 31 December 2002.

**Î»-«´¬- ¿²¼ ¼·ª·¼»²¼**

The consolidated loss for the period amounted to £35,069,000 (2002 - £57,798,000). No dividend is recommended for the year. (2002 - £nil).

**Ð®·²½·°¿´ ¿½¬·ª·¬·»- ¿²¼ ¾«-·²»-- ®»ª·»©**

CLS (Continuous Linked Settlement) allows banks to eliminate foreign exchange settlement risk.

The principal activity of the Group during the period was the provision of the CLS service by CLS Bank International to its Members in the first full year of the service since go-live in September 2002, and in achieving the critical mass of submitted instructions from Members to sustain the future income requirements of the Group in 2004 and beyond.

Further information on the business activities of the Group and planned developments in 2004 are given in the Chief Executive Officer's report on pages 4 and 5.

Details of significant events since the balance sheet date are contained in Note 21 to the financial statements.

**Ú«¬«®» ¼»ª»´±°³»²¬-**

The Directors look forward to continued growth in the use of the CLS System by the Members of CLS Bank International and their banking customers. We are confident of meeting our turnover and business volume targets established for 2004 and developing further facilities in the market for settlement risk reduction services.

**Ü·®»½¬±®- ¿²¼ ¬¸»·® ·²¬»®»-¬-**

The Directors who served during the period are listed on page 2. There were no Directors with an interest in the share capital of CLS Group Holdings AG. During the period, the Group has maintained Directors' and Officers' insurance relating to any liabilities that may arise in relation to Group companies.

**ß«¼·¬±®-**

On 25 November 2003, Ernst & Young AG Zurich and Ernst & Young LLP London submitted their resignation as Auditors of the Company and Group respectively. A resolution to appoint Deloitte & Touche AG Zurich as Company Auditors and Deloitte & Touche LLP London as Group Auditors was approved by the Shareholders at an extraordinary general meeting held on the same date.

By order of the Board.

Joseph De Feo
Director

23 March 2004

# Ý±® ±® ⟶ Ù±ᵃ »® ¿² ½ Í ⁊ ⟶³ »² ¬

The CLS Group has adopted a robust governance structure which, at the same time as meeting applicable financial and legal constraints, provides the right level of governance flexibility together with high standards of business transparency, accountability and independence. To date, although the CLS Group is not legally obliged to follow any governance requirements, the CLS Group has followed, as 'good practice', and where applicable to CLS' business interests the tenets of the UK Combined Code. The Nominating and Governance Committee is currently reviewing recent changes to the UK Combined Code and other applicable governance reports for subsequent CLS Group Holdings Board approval.

The current governance structure of the CLS Group is (by way of summary) designed to enable:

i. effective and consistent shareholder influence over the CLS Group and, in particular, CLS Bank and CLS Group Holdings;
ii. the retention of flexible governance arrangements (which includes the overlap of CLS Group Holdings and CLS Bank's Board of Directors;
iii. the divisions of functions best suited to servicing the needs of the CLS Group of companies and its shareholders, members and customers;
iv. the ongoing segregation of the management and control of CLS Bank in the US and CLS Services in the UK;
iv. the most appropriate and highest standards of corporate governance to be adopted, within applicable legal and financial constraints and in the context of the CLS Group's business interests.

The CLS Group has a well developed corporate governance infrastructure that ensures full engagement of shareholders through directorships of the CLS Group Holdings and its subsidiary boards, through membership of a number of Board and subsidiary board committees and working groups and through active participation at regional shareholder group level. In addition, the CLS Group Holdings Board has adopted a

Directors Governance Handbook which describes the governance arrangements of the CLS Group in detail. This CLS Board and Committee infrastructure is summarised below.

The Board acknowledges its responsibility for the CLS Group's system of internal control and appropriate policies have been established. The Directors have obtained reassurance (through the activities of the CLS Internal Audit Programme) that the system of internal control is functioning effectively, identifying and managing risks appropriately.

The Audit Committee provides reassurance to the Board that there is a sufficient, systematic and embedded risk based review of the CLS Group's internal control arrangements. The Audit Committee ensures that any identified weaknesses in internal controls (including the corporate governance structure) are corrected by management.

ÝÓ Ù®«ᵖ Ø±½²¹¹ · ßÙ ±ÝÓ Ù®«ᵖ Ø±½²¹¹ -H is the CLS Group holding company. CLS Group Holdings is incorporated in Switzerland and is regulated by the Federal Reserve in the United States as a bank holding company.

The ÝÓ Ù®«ᵖ Ø±½²¹¹· · Ð±¿Ø®½comprises a maximum of 26 directors of which a maximum of three directors are CLS Group Holdings senior executives and one director is the Swiss based Company Secretary. The remaining 22 directors are shareholder representatives. selected according to defined eligibility criteria including the individual quality of candidates, the shareholder financial and volume contribution to the CLS Group and the type and region of the applicable shareholder institution. The Chairperson of the Board is also selected according to defined eligibility criteria.

ÝÓ Í »@·½⁃ Ó·½and ÝÓ Ð¿²µ ø ⟶@ ¿⁊±² ¿· have their own Boards of Directors, similarly represented with a majority of non-executive directors from shareholder institutions that fulfil applicable eligibility criteria.

# Ý±® ±®¿ Ù±±ª» ¿² ½» Í ¬¿ »²¬(continued)

ÝÝ EÖ «¬»¨ »¼¿ »½»¼ Ø± 7½² ¹ - Ó½ is a shell company (from a governance perspective) and is therefore composed of two executive directors only.

The Û »¼¿»¨» Ý±¨ ¨ »²»» of the CLS Group Holdings Board consists of up to nine members, seven being non-executive directors of the CLS Group Holdings Board including the Chairperson and vice-Chairperson of the Board and the CEO and Deputy CEO of CLS Group Holdings. The committee is a subset of the CLS Group Holdings Board that provides a vehicle for rapid response to matters that require Board level endorsement and/or approval (between scheduled Board meetings).

The Ò±¨ ¼¿¼½¿²¼½» ½ Ù±¨»¨®Ø¿² ½» Ý±²¨²²¼¨»» of the CLS Group Holdings Board consists of up to eight members, seven being non-executive directors of the CLS Group Holdings Board and the CEO of CLS Group Holdings. The committee provides support to the Board as required to assure the proper governance of the CLS Group and, in particular, CLS Group compliance (where applicable) with the tenets of the UK Combined Code.

The Bı½¼¨Ý±¨ ¨ »²¨²» of the CLS Group Holdings Board consists of up to eight members who are all non-executive directors of CLS Group Holdings. The committee ensures that the system of internal controls of the CLS Group are appropriate to the requirements of applicable company law and regulatory frameworks (including substantial compliance with the UK Combined Code and other codes relevant to the business of the CLS Group). The Head of CLS Internal Audit and the external audit partner responsible for the CLS Group's audit are also invited to attend the meetings of the committee.

The Ì »µ Ò¿²¿¹»¨ »²¨ ²²¬²¨Ý±¨ ¨ »²²», a committee of the CLS Bank Board, consists of up to eleven members, with up to nine non-executive members and the Executive Vice President of CLS Bank. The committee is responsible for overseeing and directing the risk management policies and practices of CLS Bank. It also monitors performance of these policies and practises in CLS Bank's operations.

The Ñ° »®@¬²¿²¹ - ½²½¼¿² ®¿¬²¨¨²¬ Ý±¨ ¨ »²», a committee of the CLS Services' Board, consists of up to eighteen members, including up to thirteen non-executive members. The objectives of the committee are to provide advice and support to the CLS Services' Board (and to the management, where applicable) in matters relating to CLS service operation, systems implementation and the planning for customer services and support. The future of this committee (and whether its responsibilities should be amalgamated with the CLS Services Board) is currently under review.

## Ù±²¨ ²²¼¨²¹

The Directors have formed a judgement, at the time of approving the financial statements, that there is a reasonable expectation that the Group has adequate resources to continue in operational existence for the foreseeable future. For this reason, the Directors continue to adopt the going concern basis in preparing the financial statements.

The Directors estimate, based on their assessment of progress to date on service uptake and having reviewed cash flow forecasts for the 2004 budget year and the 5-year business plan 2004-2008, that sufficient funds will be available in the business for the next 18 months.

This will be reviewed again by the Directors in June 2004 and as necessary actions taken at that time if the projected funding outlook for the Group has deteriorated.

Such actions may include a combination of the need to raise additional capital from existing Shareholders (as has been undertaken successfully in the past), modifications to the pricing policies of CLS Bank International in order to raise additional revenues (as facilitated by the annual review process contained in the pricing policy) and reappraisal of the investment and baseline operating expenditure plans of the Group so as to reduce or otherwise defer planned costs.

March 2004

16



The Directors have prepared financial statements under United Kingdom Generally Accepted Accounting Principles for each financial year which give a true and fair view of the state of affairs and of the profit or loss of the Group for that period. In preparing those accounts, the Directors have:

- selected suitable accounting policies and then applied them consistently;
- made judgements and estimates that are reasonable and prudent;
- stated whether applicable accounting standards have been followed.

The Directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the Group. They are also responsible for the system of internal controls, for safeguarding the assets of the Group and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.







We have audited the financial statements of CLS Group Holdings AG for the year ended 31 December 2003 which comprise the profit and loss account, the balance sheet, the cash flow statement, the statement of total recognised gains and losses and the related notes 1 to 22. These financial statements have been prepared under the accounting policies set out therein. As explained in Note 1, these financial statements have been prepared solely for the purpose of assisting the Directors to satisfy themselves as to their stewardship of the Group's assets and are solely for the use of the directors. They have not been prepared for the purposes of section 227 of the Companies Act 1985 and are therefore not statutory accounts.

This report is made solely to the Directors of the Company, in accordance with our engagement letter dated 12 November 2003. Our audit work has been undertaken under the terms of that engagement letter so that we might state to the Company's Directors those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company for our audit work, for this report, or for the opinions we have formed.

As described in the statement of directors' responsibilities, the company's directors are responsible for the preparation of the financial statements in accordance with United Kingdom accounting standards and the law that would have been applicable had they been statutory accounts, with the exclusion of the company balance sheet. Our responsibility is to audit the financial statements in accordance with relevant United Kingdom legal and regulatory requirements and auditing standards.



We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the provisions of the Companies Act 1985 which would have applied had they been statutory accounts, with the exclusion of the company balance sheet. We also report if, in our opinion, the directors' report is not consistent with the financial statements, if the company has not kept proper accounting records, or if we have not received all the information and explanations we require for our audit.

We read the directors' report for the above year and consider the implications for our report if we become aware of any apparent misstatements. Our responsibilities do not extend to any other information.

### Բ՚֊~ ±ª ¿⌐½¬±˚˙·ª ±ª

We conducted our audit in accordance with United Kingdom auditing standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion, we also evaluated the overall adequacy of the presentation of information in the financial statements.

### Ñ՚·ª·±ª

In our opinion the financial statements give a true and fair view of the state of the Group's affairs as at 31 December 2003 and of its loss for the year then ended and have been properly prepared in accordance with the provisions of the Companies Act 1985 which would have applied had they been statutory accounts (except for the exclusion of reporting a company balance sheet in this annual report).

*Deloitte & Touche LLP*

Deloitte & Touche LLP
*Chartered Accountants and Registered Auditors*
London, England
23 March 2004

# Ȯ±⊸»‐  ㄱ±  ㄱ » ß½/½±«² ㄱ
## At 31 December 2003

## ↑ȯȯŸ±² ㄱ²¹ »² ㄱ˙¿¾˙ㄱ»‐

### ℊ+Ȗ»ᵇ»₢₿½Ÿ±²‐·½₢₢ㄱ±²
On 17 December 1997. CLS UK Intermediate Holdings Ltd. (formerly CLS Services Ltd.) acquired Exchange Clearing House Limited ('ECHO'), incorporated in England and Multinet International Bank ('MIB'), incorporated in the USA, from their respective Shareholders under the terms of a Sale and Purchase Agreement.

The Sale and Purchase Agreement provides for deferred consideration payable to former ECHO and MIB owners. The company's liability to pay deferred consideration spans a ten-year period which commenced on 1 January 2003. The maximum amount payable under these arrangements is US$107,390,861.

Payment is dependent on a pre-determined adjusted cumulative Group net operating profit level and is calculated as a percentage of an adjusted net operating cash flow formula.

No liability to pay deferred consideration arises in the year ended 31 December 2003, nor is expected to arise in the near future, due to the adjusted cumulative net operating profit of the Group being less than the pre-determined level.

Due to the degree of uncertainty regarding future levels of operating profits and cash flows, the Directors consider that a reliable estimate of any potential liability under this Agreement cannot be made.

### ∂⁄÷ÊȮ ᴇᴀ̣̣̣̣ⵏ
In 2002, CLS UK Intermediate Holdings Ltd, together with its tax advisors, were in discussion with HM Customs and Excise (Customs) in respect of the VAT status of CLS Bank International, a US resident 100% subsidiary of the Company, and provided Customs with various documentation. Pending a response from Customs, the Directors are of the opinion that the Company can robustly defend any assessment raised.

### ∂⁄÷Ȯ»¹¿˙Ÿ±²ㄱ²¹»²½»‐
CLS Bank International has received correspondence alleging breach of a US registered patent. The Group's professional advisors are confident that CLS Bank can defend a formal claim but the actual success and the financial impact on the CLS Group of such a claim (including applicable defence costs) cannot currently be assessed.

## ↑↑ọ̇ⵏ «¾»⁻«»²ㄱ»ª»²ㄱ

On 30 January 2004, CLS Bank International entered into a ten year agreement with the IBM Corporation for a managed secure data centre facility in the USA as part of the Group plans in 2004 to improve the operational resilience of the CLS service. The monthly recurring cost of the facility is US$44,000 per month and the agreement can be terminated for convenience by CLS after three years.

## ↑↑ȯŸ±²‐₢˙̃ʹˑ²¹ °¿®§

The Company accounts of CLS Group Holdings AG (a company incorporated in Switzerland) are available at its registered office c/o Interhold AG, Othmarstrasse 8, P.O. Box 432, CH-8024 Zurich, Switzerland.

36



2003 has seen the first full year of the CLS service. During this time the CLS Group has made significant progress on many fronts. Our service is delivering value to the industry on a daily basis, and the last year has seen many first hand accounts of the benefits of CLS participation from a growing number of Members and their 'third party' customers. In addition, the range of perceived benefits is growing, and, as well as the elimination of settlement risk, our Members and participants report operational efficiencies, reduced liquidity requirements, and increased trading lines, building into an ever-stronger value proposition.

The number of CLS Bank settlement eligible currencies has risen to 11, more Shareholders have qualified as Members, and the number of their customers using the service is growing steadily.

The Group reported a loss for the year of £35.1 million compared with a loss of £57.8 million in the previous 18 month period. The loss in 2003 was less than anticipated in reflecting the first full year of live service operating charges and CLS system depreciation.

The last year has seen several changes in the Group. Firstly, I would like to thank Suzanne Labarge, our former Chairman, whose term of office ended during the year. Suzanne provided the Group with invaluable leadership during the most important phase in its history. She also provided the vision, drive and diplomatic skills necessary for the Group to be in the sound position that it finds itself today.

Our Board of Directors plays a central role in the success of the Group, and we are grateful for their contribution in both the governance of such a rigorously regulated organisation, and in the development of the Group's future strategic direction. I would like to thank all our Directors for their contribution during the year, and in particular I would also like to thank all of our retiring Directors for their contribution: Alan Jebson (in his role as Vice Chairman of the Group), Robert Boursault, Vincenzo Gallo, Jeffrey Pitt and Willy Scheerlinck.

During 2003 the Board has worked with the Group's Management Team to develop a strategy that reflects our commitment to enhancing the CLS service, looking at areas of new investment and ensuring the long-term financial strength of the company.

In summary the Group aims to:

- provide services to the foreign exchange market that reduce settlement risk, are operationally resilient and which reduce Members' costs;
- pursue those new investments that raise capital, increase volume and provide more value to Members; and
- focus over the next 1-2 years on achieving improved financial viability by growing volume, adding new Members and managing costs within the agreed pricing policy.

In respect of potential new investments, the Board is working with CLS Bank Members to investigate and develop possible enhancements to the service. CLS Board sponsored groups of Members have been created to investigate what additional benefits are available to the market by leveraging the current CLS infrastructure. The main items being addressed are additional liquidity tools (including investigation into the possible benefits of additional settlement sessions that would enable same day foreign exchange settlement). Initiatives to facilitate straight through processing (including E-trading connectivity) are also being discussed in detail. CLS Members are analysing if there are services to deliver valuable information to market participants given CLS's unique position in the industry as well.

The involvement of Members in setting the Group's strategy is a reminder that CLS is not just a company in the traditional sense, but in reality it is more an 'ecosystem' consisting of the CLS Group itself, its Shareholders, participants, regulators (in particular the Central Banks), suppliers and vendors. We all have an important part to play, and I would like to thank all our Stakeholders for their contribution to the success of 2003.

Fritz T. Klein
23 March 2004

# EXHIBIT 7

# CLS GROUP HOLDINGS AG

## Annual Report and Consolidated Accounts
## 31 December 2004

## CLS GROUP HOLDINGS AG

**2004 RESULTS SUMMARY**

| The CLS Group – At a Glance | | 31 December 2004 | 31 December 2003 |
|---|---|---|---|
| Turnover for the year | GB£m | 49.7 | 34.8 |
| Operating loss for the year | GB£m | (18.2) | (34.7) |
| Total loss for the year | GB£m | (19.4) | (35.1) |
| Total assets at year end | GB£m | 96.0 | 96.1 |
| Net Shareholders' funds at year end | GB£m | 30.0 | 44.1 |
| | | | |
| Average monthly number of employees in year | No. | 154 | 141 |
| Number of Shareholders at year end | No. | 71 | 69 |
| Number of Members at year end | No. | 58 | 56 |
| Number of Third Parties at year end | No. | 254 | 109 |
| | | | |
| Daily average settlement volume in the year | Number of sides | 133,187 | 79,471 |
| Daily average settlement value in the year | US$ trillion | 1.456 | 0.854 |
| Peak daily volume in the year | Number of sides | 356,108 | 191,338 |
| Peak daily value in the year | US$ trillion | 3.684 | 1.780 |
| | | | |
| Cumulative volume settled since Go Live (September 2002) | Number of sides | 57,193,030 | 22,431,232 |
| Cumulative value settled since Go Live | US$ trillion | 625.632 | 245.704 |

## CLS GROUP HOLDINGS AG

### CHAIRMAN'S REPORT

During 2004 CLS Group built on the progress made in the first year of operation to achieve a number of significant milestones. Volume continues to grow significantly, participation has almost doubled and we have again added four new eligible currencies to the CLS Bank service. As a result the perceived and demonstrable benefits are growing and we have succeeded in establishing CLS as a global market standard.

The Group reported a loss for the year of £19.4 million compared with a loss of £35.1 million in 2003. This reduction in loss reflects the planned growth in revenue expected and achieved when we declared Steady State effective September 2003, together with continued careful management of expenditures in the period.

Over 120 third party participants began using the service during the year, which is a very pleasing result. However, one of the key priorities for the Group going forward is not only to grow participation, but to broaden it as well. A significant proportion of the future growth of CLS Bank volume will come from outside CLS Bank's core Group of Members – Member customers ("third parties"). The majority of these third parties using the CLS Bank service today are correspondent bank customers of our Members. It is our objective to increase participation beyond this group and to significantly increase the numbers of non-bank financial institutions (in particular the Fund Management industry) and corporations using the service. Over the coming year we will be working with our Members and other stakeholders in the industry to communicate what CLS Bank has to offer and ultimately bring them on Board.

Whilst growing the core service remains the main priority for the Group, during 2004 the Board in conjunction with the Group's Management Team agreed to research possible development of the CLS Bank service in three areas:

- "Multiple Settlement Sessions" to offer secure CLS Bank settlement for the growing value of same day settlement needs, especially in the field of liquidity management.
- Accommodation of other financial instruments related to the Foreign Exchange business (labeled "FX+" for working purposes). This includes services for currencies not currently eligible for CLS settlement plus other product sets such as Forex Options and Non-Deliverable Forwards (NDFs).
- Delivering further straight through processing ("STP") initiatives through CLS Bank to increase the efficiency of end-to-end processing.

The research is being conducted by CLS Board-sponsored groups of Members with the Group's staff and further demonstrates the value that the involvement of our Members in the governance and development of the Group brings us.

Our Board of Directors represents a wide cross section of the industry, and has made a significant contribution in both the governance of the Group and defining the future direction of CLS. I would like to thank all the Directors for their contribution to the Board and its Committees throughout the year, and express my appreciation to the Directors that retired during 2004 for the part they have played in the achievements of the Group: Louis Bazire, Cian McHugh, Philip Newcomb, and Otello Sturino.

By its very nature CLS is extremely reliant on the contribution of all our Stakeholders who work closely with us to deliver the CLS Bank service. I would like to thank all our Shareholders, regulators (Central Banks), third party participants, suppliers and vendors for the valuable part they have played in making 2004 another successful year for the Group.

Fritz T. Klein
March 2005

# CLS GROUP HOLDINGS AG

## CHIEF EXECUTIVE OFFICER'S REPORT

The second full year of live operation has seen the CLS Group add further value to the service that we provide to our Members and third parties. At the centre of our focus is the objective to maximise the use of the CLS Bank service throughout the industry, and in 2004 we have witnessed a further step change in participation. During the year volume has increased by 68%, and the number of banks, brokers, funds and corporates using the service as third parties was rapidly approaching 250 by the end of the year with a strong pipeline of additional participants.

New records for both volume and value have been set during the year, with the daily record for volume and value breaking through the 300,000 and US$3 trillion thresholds respectively. Financial performance continues to be strong and working capital (i.e., cash) is well ahead of budget. We will continue to work to ensure that the financial structure of the Group can comfortably accommodate the requirements in the period ahead.

2004 also saw the expansion of CLS into new markets. Early in the year we welcomed two new shareholders from South Africa, bringing the CLS Bank service to the African market. December also saw the addition of four new CLS Bank settlement-eligible currencies: the Hong Kong Dollar, the New Zealand Dollar, the Korean Won and the South African Rand. We were very pleased to welcome these currencies into CLS Bank as they represent an important enhancement to the service that the Bank provides to the market. It is also important to acknowledge that this was only possible as a result of an extraordinarily high degree of co-operation between CLS Bank, the respective Central Banks and the other stakeholders.

The addition of four new currencies is part of our ongoing strategy to continue to grow CLS Bank's value proposition. It also demonstrates the strength of support for CLS Bank within the global banking community.

In his Report the Chairman made reference to our objective of broadening the participation of non-bank third parties. The beginning of the year brought the first fund-related instructions to be settled by the Bank, and since then the number of funds using the CLS Bank service has risen above the 50 mark. We have set some aggressive volume targets for 2005 and we expect all sectors of third party volume to rise significantly during the year. Critical to achieving this is the success of the "Strategic Initiatives" as outlined in the Chairman's remarks. Improving the scope of the CLS Bank service not only creates new value for our existing Members and their customers but enables an enhanced proposition for Members in marketing their service going forward, bringing additional customers and volume into the Bank that in turn creates the foundation for lower prices and potential for even more service enhancement. It also may motivate greater interest for new currency/country participation and/or consideration by institutions in existing countries concerning their direct participation. This goal of creating a "virtuous circle" of investment – value creation – increased commercial viability is the cornerstone of our Group strategy.

One of the major factors driving CLS Bank participation is the value and benefit Members and their customers derive from the CLS Bank service. The second annual research conducted with TowerGroup amongst users of the service found evidence of growing benefits and significant value delivered - it was also most encouraging to note the particularly positive feedback from the third party community and evidence of the increasing impact of the CLS Bank service on the "front office".

Later in the year the company conducted its first customer satisfaction survey. The results were extremely strong and showed that the company was delivering above-industry average service. We will not be resting on our laurels however and we have already put in place an action plan to further improve the results in future.

The progress of the last year could not have been achieved without the strong contribution of the Group's Management Team and CLS Group staff. There is still much to do in the year ahead but I am confident that the solid foundation that we have put in place will ensure that we continue to meet the challenging objectives that we have set ourselves and deliver increasing value to our Shareholders.

Joseph De Feo
March 2005

# CLS GROUP HOLDINGS AG

## DEPUTY CHIEF EXECUTIVE OFFICER'S REPORT

The CLS Bank service has enjoyed a successful year, with volumes continuing to rise over the period, reaching a daily average of over 150,000 instructions with a value of just over $1.9 trillion at the end of the year. Year on year there was a 68% rise in volume. We have again successfully implemented a challenging change programme whilst delivering a robust and resilient service to our Members and their customers.

I am pleased to report that the service achieved 100% settlement and 100% pay outs on all 261 business days during 2004. Over 34 million sides were settled in 2004, with an aggregate value of over $379 trillion. On 12 November 2004, CLS Bank settled a record number of payment instructions - 356,108. This was followed on 15 December by a new record for gross value settled in one day – $3.684 trillion. These records further demonstrate the capacity of the service to cope with large peak volumes, as well as showing that the service will be able to meet the demand of higher volume over the coming years that our business plan requires.

At the end of the year the number of CLS Bank Members stood at 58. Additionally 238 banks, brokers, funds and corporates settled, with a further 16 registered to settle, through CLS Bank as third party participants.

In December four additional currencies were successfully added to the CLS Bank service bringing the number of eligible currencies to 15. This was the last in a series of successful changes implemented as part of a demanding programme in 2004.

Another major change was the implementation of the New Service Platform. This was implemented earlier than expected and, despite the complexity, was opaque to our users. This is a major step forward in ensuring service reliability and in handling planned volume growth. In addition, we also successfully managed the roll-out of the latest version of the core system, Release 1.17. This enhanced reliability and capacity has already been demonstrated in the months since the implementation.

Our initial response to the operational changes required by the "Inter-Agency White Paper on Operational Resilience" (so-called "Fed White Paper") were completed in the middle of the year. An out of region Operations capability was established in New York that is working side by side with the London-based Operations team, both being individually capable of running the full service. We also established an out of region second site to run our internal applications including the In/Out swap service.

The Facilities Management (FM) service provided by IBM has been good during 2004, and we are pleased at how the relationship is continuing to develop. We had a number of service issues to manage during one week in May demonstrating the need to move to the New Service Platform. However settlement and "pay-out" were not materially affected. All issues from that week are well understood and the more problematic ones cannot reoccur due to the introduction of the New Service Platform.

2004 has been a very successful year both in terms of service delivery and the volume of change management achieved to plan, and I believe that this has provided us with an excellent foundation to progress further in future years. I would like to thank all our Members, the Central Banks, RTGS systems and CLS Group's own service providers as well as the Group's staff for the part they have played in the successes of 2004.

Rob Close
March 2005

## CLS GROUP HOLDINGS AG

### CHIEF FINANCIAL OFFICER'S REPORT

The financial performance of the CLS Group, in the second full year of live operation, continues to improve year on year and by comparison with the approved 2004 budget. Turnover is up 42%, costs are marginally down resulting in a loss of £19 million, just over half of the £35 million loss posted in 2003 and a £14 million improvement upon budget.

The continuing trend of increasing average daily billable volumes being submitted to CLS are producing unit price reductions to our Members, with the average unit price charged in 2004 of £1.39 per side compared to £1.65 per side in 2003. At the end of 2004, 15 Members had achieved the parity price of £1.13 per side.

Group cash and current asset investments of approximately £36 million were sustained in 2004. The gross cash flows may be summarized as follows:-

* total cash receipts of £54.5 million, comprising £5.4 million from new shareholders, £48.0 million cash received from Members in payment for their CLS services and £1.1 million interest income;
* total cash payments of £54.3 million, comprising £37.6 million to defray Group operating expenses and new product and infrastructure investments, and £16.7 million net was paid to IBM. IBM loan repayments in 2004 were £14.2 million compared with £11.4 million in 2003.

Operating expenses declined from £69.5 million in 2003 to £67.9 million in 2004, mainly due to the impact of a lower CLS System depreciation charge resulting from a management decision to reset the estimated useful economic life of the System to five years, effective 1st January 2004. The ongoing level of investment in the CLS infrastructure, for example the successful implementation during 2004 of the new IBM service platform and technology refresh, is one of the key reasons for the policy change. The impact of this decision was to reduce the 2004 depreciation charge by £3.5 million.

Underlying operating expenses in 2004 were £1.9 million higher than in 2003, due mainly to the new investment during 2004 in the CLS IT/Operations operational resilience programme (totaling £3.9 million of which £1.6 million was charged to the P&L account in 2004) to implement out of region support capability for CLS' internal systems and operations infrastructure in accordance with regulatory requirements and our own objective to improve service resilience.

The loss for the year of £19.4 million compared with a budgeted loss of £33.7million, an improvement of £14.3 million of which the depreciation change accounts for £3.5 million, £2.8 million is accounted for by capitalising expenditure as fixed assets that was budgeted as P&L expenditure for operational resilience and other investment projects and the balance of £8.0 million is primarily due to cost savings achieved in our business as usual operating cost base during 2004 together with lower new product investment and internal infrastructure project costs.

The overall net assets of the Group declined by £14.0 million during 2004. The equity shareholder's funds amounted to £30.0 million at the year end. The debt owed to IBM on our balance sheet increased (as planned) by £12.0 million during the year. The level of this debt will peak during 2005 at £44.6 million, from the 2004 year-end balance of £40.7 million. The net repayment of the loan will commence in 2006.

We had budgeted for a reduction in overall net assets to £23.0 million by the end of 2004, so the actual outturn of £30.0 million is an improvement of £7.0 million and results primarily from operating and investment expenditures savings achieved against budget in 2004, with the benefit of the depreciation change and capitalising more project expenditures as fixed assets during the year more than offsetting lower new shareholder funding against that budgeted.

The Board endorsed CLS Group Plan financial outlook continues to have a high dependency upon the Members delivering growth in volume of CLS settlement instructions, up to and beyond achieving pricing parity. Only when an average daily volume of 213,000 sides is reached will the Group 'break even' and (with increased volume) achieve modest revenue reserves with which to repay the IBM debt and afford the regulatory imposition of the second phase of our operational resilience programme (to implement 'out of region' IBM technical and command centre support for the CLS System).

## CLS GROUP HOLDINGS AG

### CHIEF FINANCIAL OFFICER'S REPORT (continued)

On the 26th January 2005 the Board of Governors of the Federal Reserve issued a set of guiding principles that will determine the liquidity and capital levels applicable to CLS Bank International. We believe that CLS Bank (and hence the Group) currently comply with the guidance. The full implications will be worked through and an examination carried out by the end of June 2005.

The excellent financial performance of the Group since Go Live demonstrates the impressive capability of the organisation, together with the support of our Shareholders and other stakeholders, to manage its finances in a way that minimizes the unit cost of CLS settlement to Members, whilst ensuring we have funds for continued investment to grow the business and accommodate the impact of externally imposed changes on the infrastructure.

We will continue to focus our efforts on managing the finances of the Group to ensure that future expectations are met and even exceeded.

Sean Spence
Chief Financial Officer
March 2005

# CLS GROUP HOLDINGS AG

## CLS GROUP MANAGEMENT TEAM

Joseph De Feo,
Chief Executive Officer

Rob Close,
Deputy Chief Executive Officer

Jonathan Butterfield,
Executive Vice President, Marketing and Communication

Sean Daly,
Programme and Service Delivery Director

John Hagon,
Director of Operations

Richard Harris-Smith,
General Counsel, UK

Phil Kenworthy,
Director, Group Audit

Kiyoshi Morofushi,
General Manager, Asia Pacific

Tom Newman,
Director, Relationship Management

Nan Noonan,
Executive Vice President, Risk Management and Regulatory Affairs

John Paine,
Financial Controller

David Skoblow,
General Counsel, US

Sean Spence,
Chief Financial Officer

Claire Wilkinson,
Director, Human Resources

Diane Zuaro
Assistant Vice President, Administration

# CLS GROUP HOLDINGS AG

## STAKEHOLDER LISTIN

### Shareholders

ABN AMRO Bank N.V.

ABSA Bank Limited

American International Group, Inc.

Australia and New Zealand Banking Group Limited

Banco Bilbao Vizcaya Argentaria, S.A

Banco Popular Espanol S.A.

Banco Santander Central Hispano

Bank of Montreal

The Bank of Nova Scotia

Bank of Tokyo-Mitsubishi, Ltd.

BankAmerica International Financial Corporation

Barclays Bank PLC

Bayerische Landesbank Girozentrale

Bayerische Hypo-und Vereinsbank AG

Bear, Stearns Securities Corporation

BNY International Financing Corporation

BNP Paribas

BT Foreign Investment Corporation

CIBC World Markets Plc

Citibank N.A.

Commerzbank AG

Commonwealth Bank of Australia

Coöperatieve Centrale Raiffeisen Boerenleenbank B.A. (Rabobank Nederland)

Credit Agricole S.A.

Credit Lyonnais

Credit Suisse

Danske Bank Aktieselskab

DnB NOR Bank ASA

Deutsche Bank AG

DBS Bank Ltd.

Dexia Banque Internationale a Luxembourg

DZ Bank AG Deutsche Zentral-Genossenschaftsbank Frankfurt am Main

Dresdner Bank AG

Fortis Bank N.V./S.A.

The Goldman Sachs Group, Inc.

HSBC Bank plc

Mizuho Corporate Bank Limited

ING Bank N.V.

Banca Intesa S.p.A.

KBC Bank N. V.

Korea Exchange Bank

Kookmin Bank

Lehman Brothers Holdings Inc.

Mellon Overseas Investment Corporation

Merrill Lynch Capital Markets Bank Limited

J.P. Morgan International Inc.

JP Morgan Chase & Co.

Morgan Stanley & Co. International Limited

National Australia Bank Limited

The Norinchukin Bank

Northern Trust Corporation

Oversea-Chinese Banking Corporation Limited

Royal Bank of Canada

Royal Bank of Scotland Plc

Skandinaviska Enskilda Banken AB (PUBL)

Société Générale

Standard Bank of South Africa Limited

Standard Chartered Bank

State Street Bank and Trust Co.

Sumitomo Mitsui Banking Corporation

The Sumitomo Trust & Banking Co., Ltd.

Svenska Handelsbanken

The Toronto-Dominion Bank

UBS AG

UFJ Bank Limited

Nordea Bank Danmark A/S

Unicredito Italiano

United Overseas Bank Limited

WestLB AG

Westpac Banking Corporation

Zürcher Kantonalbank

### Vendors registered with CLS

Aleri

CityNetworks

Clearing & Payment Systems Pte

Enigma Business Consulting B.V.

Fundtech (UK) Ltd.

Getronics Japan Ltd

IBM

IntraNet

LogicaCMG

Misys Plc

Stercl

Wall Street Systems

Xansa

## CLS GROUP HOLDINGS AG

### 2004 SCORECARD SUMMARY

**Financial**

The cash and funding profile of the Group continues to be very strong compared to budget, as we continue to manage the expenses of both our Business as Usual (BAU) operating cost base and the new investment programmes.

Unit costs for the full year are well below the target. This was achieved by reduced operating costs in the year.

The funding outlook for the Group is challenging because the prospects for attracting new Shareholder funds has diminished compared to the 2003 plan. Action has been taken to eliminate this dependency on new Shareholder capital as presented in the 2004 Strategic Plan.

**Customer**

Fifteen Members achieved pricing parity of GB£1.13 per side in November 2004 (peak month of 2004). Overall, in 2004 the average unit price for all Members was GB£1.39 per side, against a target average of GB£1.45.

Full year average daily billable volumes were 1% above budget, at 128,035 sides per day against the target for the year of 127,000.

100% settlement and 100% payout of all funds on every day was achieved during the year and system stability and availability remained high.

The customer satisfaction scores from the survey of CLS undertaken by Boxbreaker were extremely strong. This provides a challenging target for the future. The key findings from the survey have been translated into an action plan to improve our scores which will be part of an annual programme.

**Internal processes**

All key infrastructure initiatives for 2004 have been achieved. CLS has significantly enhanced its operational resilience with the completion of the out of region operations and CLS IT capability as cover against major problems in the UK.

Managing the financial risks in the plan has been addressed. The 2004 Strategic Plan has been endorsed by the Board. which successfully eliminates the dependency on new share capital.

Twenty nine Audit reports published in 2004, none of which were unsatisfactory.

**Staff and business development**

The 2004 new currencies product launch was successfully completed on 9th December with the Go Live of the Hong Kong Dollar, the New Zealand Dollar, the Korean Won and the South African Rand.

Good progress has been made on the concept papers required for the Strategic Product Initiatives by the Board working groups.

Staff turnover and absence rates remain favourable and well within target. Training levels are improving but remain 30% below target.

Media coverage of the CLS brand was predominantly positive with 182 press articles in the year.

## CLS GROUP HOLDINGS AG

### 2004 HIGHLIGHTS

68% increase in volume  – new record daily volume and value settled in fourth quarter

Nearly 300 Members and third party participants live

TowerGroup research predicts continued rise in CLS volume and highlights benefits received by third parties for the first time

New Service Platform implemented successfully - it has already demonstrated increased reliability, processing efficiency and improved ability to handle externalities

Out of Region Operations and CLS IT capability set up

Technology upgrade - new version of the CLS Bank core system successfully implemented

Four new currencies launched

TOTAL P.12

# EXHIBIT 8



Payment Systems
in Denmark

Danmarks Nationalbank

# PAYMENT SYSTEMS IN DENMARK

Text may be copied from this publication provided that Danmarks Nationalbank is specifically stated as the source. Changes to or misrepresentation of the content are not permitted.

Payment Systems in Denmark is available at Danmarks Nationalbank's website: www.nationalbanken.dk under Publications.

To order Payment Systems in Denmark, please contact:

Danmarks Nationalbank,
Information Desk,
Havnegade 5,
DK-1093 Copenhagen K
Telephone: +45 33 63 70 00 (direct) or +45 33 63 63 63
Office hours: Monday-Friday 9.00 a.m.-4.00 p.m.
E-mail: info@nationalbanken.dk
www.nationalbanken.dk

This publication is based on information available up to June 2005.

Explanation of symbols:
- Magnitude nil
0 Less than one half of unit employed
• Category not applicable
… Data not available
Details may not add due to rounding.

Scanprint A/S
ISBN 87-87251-50-7
ISBN 87-87251-51-5 (Online)

# Contents

FORWORD ........................................................................ 7

1.    THE ROLE OF CENTRAL BANKS IN PAYMENT SYSTEMS
1.1   Serious events within the payments infrastructure ..................... 9
1.2   Central banks as system operators .................................. 13
1.3   The role of central banks as settlement banks ........................ 14
1.4   The roles of central banks and private banks ......................... 15
1.5   The central banks' oversight function ............................... 16

2.    PAYMENT SYSTEMS IN A HISTORICAL PERSPECTIVE
2.1   From barter economy to monetary economy ........................... 20
2.2   Banks and credit-based payment in the middle ages .................. 23
2.3   Payment systems with clearing and central banks ..................... 27
2.4   Payments in Denmark 1700-1850 ................................... 31
2.5   Bank-based payment systems in 19th century Denmark ............. 35

3.    PAYMENT AND SCURITIES SETTLEMENT
3.1   Settlement outside the payments infrastructure ....................... 43
3.2   Real-Time gross settlement systems ................................ 44
3.3   Net settlement systems ............................................. 48
3.4   Hybrid systems .................................................... 50
3.5   Securities settlement systems ...................................... 52

4.    RISK IN PAYMENT AND SECURITIES SETTLEMENT
4.1   Risks of settlement outside the payments infrastructure ............ 64
4.2   Risk in payment systems .......................................... 64
4.3   Risk in securities settlement ....................................... 69

5.    DANMARKS NATIONALBANK'S ROLE IN THE DANISH PAYMENTS
      INFRASTRUCTURE
5.1   Banknote and coins ............................................... 74
5.2   Danmarks Nationalbank's role as settlement bank ..................... 74
5.3   Danmarks Nationalbank provides krone liquidity ...................... 76
5.4   Danmarks Nationalbank offers intraday credit in euro .............. 78
5.5   Pledging of collateral to Danmarks Nationalbank ..................... 79
5.6   Settlement procedure at Danmarks Nationalbank ..................... 86

4

6.      PAYMENT AND SETTLEMENT SYSTEMS IN DENMARK
6.1     Kronos ........................................................................  96
6.2     The Sumclearing .........................................................  104
6.3     VP settlement .............................................................  111
6.4     FUTOP settlement  ......................................................  119

7.      RETAIL PAYMENTS IN DENMARK
7.1     Means of payment and payment instruments ............  125
7.2     Infrastructure for payment cards  ..............................  132
7.3     The Dankort .............................................................  135
7.4     New payment instruments .........................................  139
7.5     Use of payment cards in EU member states................  144

8.      INTERNATIONAL PAYMENT AND SETTLEMET SYSTEMS
8.1     Target ......................................................................  149
8.2     Target2 ....................................................................  151
8.3     EURO1 .....................................................................  153
8.4     STEP1 ......................................................................  157
8.5     STEP2 ......................................................................  159
8.6     The vision of SEPA – The Single Euro Payment Area  .................  161
8.7     CLS ..........................................................................  164

9.      THE LEGAL FRAMEWORK FOR THE PAYMENTS INFRASTRUCTURE
9.1     Contractual and legal basis of the systems  .................  173
9.2     The settlement finality directive  ................................  176
9.3     The financial collateral directive  ...............................  179
9.4     The Hauge convention on the PRIMA principle  ..........  180
9.5     Protection of the payments infrastructure in Danish law...........  181
9.6     Other legislation on payment systems  ......................  184
9.7     EU legislation on electronic retail payments  .............  185

10.     OVERSIGHT
10.1    Central banks as overseers  .......................................  190
10.2    Oversight by Danmarks Nationalbank  .......................  195
10.3    International standards for payment systems .............  195
10.4    International requirements for securities settlement systems ...  198
10.5    Assessment of Danish payment and settlement systems  ...........  202
10.6    Oversight of the risk of major operational disruptions  ............  206
Annex 10.A: BIS' Core Principles for systemically important
            payment systems  ..............................................  212
Annex 10.B: BIS/IOSCO recommendations for securities
            settlement systems...........................................  214

5

Annex 10.C: Memorandum of understanding between Danmarks Nationalbank and the Danish financial supervisory authority concerning payment systems and clearingcentres ................................................................. 217

Appendix A: Definition of gridlock and gridlock resolution in Kronos ................................................................................. 221
Appendix B: Liquidity management by the RTGS system participants ........................................................................ 227
Appendix C: Effect of queue facilities for Kronos participants ............ 235
Appendix D: Simulation of systemic risk in the sumclearing ............... 245

GLOSSARY ................................................................................. 253

INDEX ........................................................................................ 261

# Foreword

One of the objectives of Danmarks Nationalbank is to contribute to the efficiency and stability of payment and settlement systems. These systems are necessary for the efficiency of the Danish financial sector.

Danmarks Nationalbank has several roles in relation to payment systems. It operates a payment system for settlement of large-value time-critical payments between financial institutions and it is furthermore the settlement bank for payment systems and the cash leg of securities transactions in Denmark. In addition, Danmarks Nationalbank conducts the oversight of payment and securities settlement systems in Denmark. These tasks are performed by most central banks worldwide.

Danmarks Nationalbank considers it important that the Danish payments infrastructure is described in full detail and that this description is available to the general public. That is why Danmarks Nationalbank has issued this publication on payment systems.

The publication focuses on the technical infrastructure of payment systems, while the use of banknotes and coins for payments is only touched lightly upon. The systems described are primarily payment systems for settlement of large-value payments between financial  institutions, as well as securities and foreign-exchange settlement systems. Finally, retail payment systems used in connection with e.g. settlement of Dankort payments are described.

Whenever possible, it has been sought to write the chapters as stand-alone chapters. Chapter 1 presents the roles of central banks in payment systems. Chapter 2 reviews the historical background to payment systems, including the background to the involvement of central banks. This Chapter is aimed primarily at readers with an interest in history. Chapters 3 and 4 describe the general principles and risks in various types of payment and securities settlement systems. Chapters 5-7 review the Danish payments infrastructure and the role of Danmarks National-bank therein. Chapter 8 describes international payment and settlement systems of importance to the Danish financial institutions. Chapter 9 reviews the legal framework for payment systems, while Chapter 10 describes the role of Danmarks Nationalbank in the oversight of payment and settlement systems. Appendices A-D present a mathematical treatment of particular concepts/topics related to payment systems. At the end of the publication there is a glossary of payment system terms and an index.

8

Danmarks Nationalbank would like to thank colleagues in Denmark and elsewhere for useful contributions and suggestions in connection with the preparation of the publication.

If you have any queries or comments, please contact Danmarks Nationalbank, Payment Systems, at bfk@nationalbanken.dk.

The publication closed for contributions in June 2005.

# 1. The Role of Central Banks in Payment Systems

Payment settlement is the transfer of money from a remitter to a recipient. An example is payment using banknotes and coins. However, most payments are settled electronically nowadays via payment systems.

Over time, payment settlement has developed from the first primitive forms of means of payments into sophisticated, IT-based systems with a number of facilities to support the settlement procedure. Well-functioning payment systems are essential to the daily flow of payments between financial institutions and the corporate sector and households. The establishment of secure and efficient payment systems is therefore an important prerequisite for financial stability and for economic growth.

Central banks often operate payment systems for settlement of large-value payments between financial institutions, since they provide secure assets, i.e. central-bank money, for settlement of payments. This eliminates a number of risks for participants. In most countries central banks therefore function as settlement banks for payment systems that are important to the payments infrastructure. These systems are known as systemically important payment systems (SIPS). In addition, central banks oversee systemically important payment and settlement systems to ensure that they are as secure and efficient as possible.

This Chapter outlines various episodes illustrating the role of central banks in payment systems, followed by a description of central banks in their capacity as system operators. Then the function of central banks in relation to settlement of payments is explained, and the division of work between central banks and private banks is accounted for. Finally, the Chapter describes the central banks' role as overseer of systemically important payment and settlement systems.

## 1.1 SERIOUS EVENTS WITHIN THE PAYMENTS INFRASTRUCTURE

Today, the traditional role of a central bank as the lender of last resort[1] is effected via the payments infrastructure, which is therefore critical in relation to solving problems within the financial sector. After the terrorist

---

[1] "Lender of last resort" refers to the possibility that the central bank can extend credit, e.g. to a solvent bank that experiences a liquidity crisis.

148

## LITERATURE

Allen, Helen, 2003. Innovations in retail payments: e-payments, Bank of England *Quarterly Bulletin*, Winter 2003.

ECB, 2004. *Payment and securities settlement systems in the European Union – Addendum incorporating 2002 figures*, Blue Book, April 2004.

Danish Bankers Association, 2001. The Open Infrastructure of Banks (in Danish only), *Finansanalyse*, no. 13, 2001.

Hansen, K.E. and S.A. Svendsen, 1968, *Danish Monetary History*, vol. 1, 1700-1914 (in Danish only), Danmarks Nationalbank.

The Danish Ministry of Industry, 1982. *Report on Payment Cards* (in Danish only).

The Danish Competition Authority, 2002. *Competition Conditions in the Payment-Card Market 2002* (in Danish only).

The Danish Competition Authority, 2005. *The Danish Competition Authority's Analysis of the Dankort Fee* (in Danish only).

Sundorph, S. and J.J.K. Gregersen, 1990. *The History of the Danish Postal Giro System 1920-1990* (in Danish only).

Thorndal, J., 1994. Prepaid Cards, Danmarks Nationalbank, *Monetary Review*, August 1994.

Thygesen, C. and M. Kruse, 1998. Electronic Money, Danmarks Nationalbank, *Monetary Review*, 4th Quarter 1998.

www.finansraadet.dk.

www.dankort.dk.

www.oes.dk.

www.oem.dk.

www.pbs.dk.

www.videnskabsministeriet.dk.

# 8. International Payment and Settlement Systems

The introduction of the euro in January 1999 was one of the key pre-requisites to the creation of a homogeneous market in which money can be transferred quickly and inexpensively within the euro area. To support this market, it was necessary to set up European payment systems. Chapter 6 describes the Danish payment and settlement systems in detail, while this chapter focuses on a number of important European systems with Danish participation. Three of the systems, Target, the future Target2 and EURO1, are large-value euro payment systems, while the remaining two, STEP1 and STEP2, are retail payment systems.

The chapter concludes with a description of the international foreign-exchange settlement system CLS, which clears and settles foreign-exchange transactions in 15 currencies.

## 8.1 TARGET

In connection with the introduction of Economic and Monetary Union in January 1999, the European Central Bank (ECB) and the central banks of the then 15 EU member states launched a trans-European euro payment system called Target[1]. The objective of Target was to provide a fast and secure system for cross-border payments in euro, and thus to facilitate the ECB's monetary-policy transactions.

In technical terms, Target is a decentralised payment system comprising the 15 national RTGS systems plus the ECB's system. These 16 RTGS systems communicate via a shared module, the interlinking module, whereby participants can transmit payments in euro to each other via SWIFT, cf. Chapter 6, Box 6.2.

To become a direct participant in Target, the participant must hold an account in euro with its national central bank. In addition, all participating central banks hold accounts with each other. All cross-border payments in euro take place via these accounts, cf. Box 8.1. Danish participants send and receive their payments in euro via Danmarks National-bank's RTGS system, Kronos, cf. Chapter 6, section 6.1. Indirect participa-

---

[1]  Trans-European Automated Real-Time Gross Settlement Express Transfer System.

150

---

TARGET AND TARGET2                                                    Box 8.1

Target is a decentralised payment system comprising a total of 16 RTGS systems com-
municating via a shared module, the Interlinking module. Communication is SWIFT-
based. The direct participants hold accounts in euro with their national central banks,
and the participating central banks all hold accounts with each other. Via the central
banks' accounts, national participants' cross-border payments are received and for-
warded. In addition, the central banks can settle their own payments on the same
terms as the other participants. Ancillary systems settling e.g. securities transactions in
euro are not directly linked to Target; they are primarily national.

---

STRUCTURES OF TARGET AND TARGET2



Target2 comprises a single shared RTGS system on a shared SWIFT-based platform. All
direct participants hold accounts on the platform, from which payments are sent and
received. Since Target2 is a shared system, there is no technical difference between
national and cross-border payments, and so there is no need for special central-bank
accounts for forwarding cross-border payments. For settlement of their own pay-
ments, central banks connect to Target2 in the same way as the direct participants.
The ancillary systems are also linked directly to the single shared platform. From a
technical point of view, the establishment of Target2 will thus make it considerably
easier to participate in e.g. securities settlement systems in other member states.

---

tion in Target is possible via a direct participant that acts as settlement
bank.

## 8.1.1 Target settlement cycle

Between 7.00 a.m. and 5.00 p.m. on all days that Target is open, customer
payments can be submitted to Danmarks Nationalbank for immediate
settlement. Interbank payments can be submitted until 6.00 p.m. Via

SWIFT, participants submit a payment instruction identifying the final recipient and its central bank. When Danmarks Nationalbank receives the SWIFT message, a check for adequate cover is first performed. If there is adequate cover for the payment, Danmarks Nationalbank debits the euro current account of the payment transmitter and credits the account of the recipient's national central bank. A SWIFT message is sent to the recipient's central bank, which then credits the recipient's account and forwards a message to the recipient via the national RTGS system. The payment then follows the description in Chapter 6 on Kronos.

## 8.2 TARGET2

Ever since the establishment of Target, various models for a new version of the system have been discussed. It has, however, proved to be difficult for the participating central banks to reach agreement on a concrete model since they have very different views on the extent to which tomorrow's Target should be centralised.

At a meeting in October 2002, the ECB's Governing Council[1] took a strategic decision on the elements of the next-generation Target, known as Target2. The decision primarily entails the establishment of a single shared platform (a common RTGS system) for all participants. However, the national central banks still handle customer relations with national participants.

The background to this decision was, *inter alia*, that users perceive the services offered under the current decentralised structure as very heterogeneous across national borders. In addition, the cost-effectiveness of the system as such is low, and finally it is doubtful whether the current system will be able to meet the future challenges, including new member states' adoption of the euro.

In July 2003 the central banks of Germany, Italy and France offered to jointly develop a new system as the single shared platform for Target2. In December 2004 the Governing Council of the ECB accepted the offer from these three central banks to develop and operate Target2, which is expected to be implemented in the second half of 2007.

It has been decided that migration from the existing Target to Target2 will take place in three waves, since it is deemed to be too risky both technically and operationally for all members to migrate to the new platform at the same time.

Box 8.1 compares the structures of Target and Target2.

---

[1] The Governing Council is the ECB's supreme decision-making body. It comprises the ECB's Executive Board and the central-bank governors of the euro area member states. The Governing Council lays down the common monetary policy within the euro area, and its 18 members have one vote each.

152

### 8.2.1 Participants in Target2

Both direct and indirect participation in Target2 will be possible. Direct participants will hold an RTGS account on the single shared platform, from which payments will be settled, cf. Box 8.1. Indirect participation in Target2 will take place via a direct participant. Indirect participants will be registered on the platform, but will not hold RTGS accounts themselves. Communication between the direct participants and the single shared platform will take place via the international payments network, SWIFT.

### 8.2.2 Structure of Target2

The common platform will comprise a number of modules, as seen in other RTGS systems, including Kronos. Some modules will be mandatory for the participating central banks, while others will be optional.

Target2 will offer participants a wide range of facilities for liquidity management, including prioritisation of payments, reservation of liquidity and setting of bilateral and multilateral limits vis-à-vis other participants. These limits will be debit limits, i.e. they will indicate the maximum amount a participant is willing to send to another participant (bilateral limit) or to all other participants (multilateral limits) without receiving payments first. Participants may also fix a specific time or period for execution of a given payment transaction. Furthermore, the system will apply various liquidity-saving mechanisms, which will continuously seek to settle queued payments – taking into account the reservations and limits determined. There will be a queue for each type of prioritisation.

For participants represented in several countries it will be possible to centrally manage the aggregated liquidity available in the RTGS accounts on the single shared platform that are held by units within the same group. However, this only applies to euro area accounts. This facility, known as liquidity pooling, entails that it will no longer be necessary to transfer liquidity between various participants within the same financial group during the day. At the end of the day, a levelling-out procedure will ensure that none of the group's accounts show a deficit.

The single shared platform will have an information and control module where participants can monitor liquidity in their RTGS accounts, view queued incoming and outgoing payments, and change priorities, reservations and limits, etc.

The RTGS part of the single shared platform will be operated in both Germany and Italy on a rotation basis, cf. Chart 8.1. The region not operating the system will act as the back-up region. In each of the two regions a primary and a secondary operations site will be established,

153

---

IT STRUCTURE OF TARGET2                                                                 Chart 8.1



Source: ECB.

---

and data will be transferred between the two operations sites on a con-
tinuous basis (real-time data mirroring). If both sites in a region fail, it
must be possible to resume operations in the other region within two
hours. France will operate selected modules such as a data warehouse.

All ancillary payment and settlement systems, such as the VP System
and the Sumclearing in euro, must settle the participants' positions on
the single shared platform within four years of the launch of Target2.
They will connect to the platform via a special interface offering a selec-
tion of settlement models, including real-time settlement (RTGS settle-
ment) and bilateral and multilateral net settlement, cf. Chapter 3. One
of the advantages of settling all systems on the single shared platform is
that a Target2 participant that participates in several of these ancillary
systems can settle all of its positions via one account and thus streamline
its use of liquidity.

No participants are expected to have to pay more than 80 eurocents
for a transaction, and the marginal price for the largest participants is
expected to be 25 eurocents.

## 8.3 EURO1

In addition to Target and the future Target2, the EU member states have
three other payment systems for handling large-value payments in euro.
These are the French PNS, the Finnish POPS[1] and the pan-European

---

[1]  The full names of these systems are: Paris Net Settlement (PNS) and Pankkien On-line Pikasiirrot ja
Sekit-järjestelmä (POPS).

154

| NUMBER OF PARTICIPANTS AND AVERAGE NUMBER OF DAILY TRANSACTIONS IN 2004 | | Table 8.1 |
|---|---|---|
| | Number of transactions ('000) | Direct participants |
| Target ........................................................... | 267 | 1,051 |
| EURO1 .......................................................... | 161 | 73 |
| PNS ............................................................... | 27 | 21 |
| POPS ............................................................. | 2 | 9 |

Source: ECB.

EURO1. PNS and POPS offer continuous net settlement throughout the day, while EURO1 settles all transactions at the end of the day. As Table 8.1 shows, the majority of the transactions in euro are settled via Target or EURO1.

Table 8.2 shows the number and value of the transactions, as well as the respective market shares of Target and EURO1. STEP1 transactions (cf. below) are included in EURO1 transactions. As the Table shows, the total value of all Target transactions settled is significantly higher than the total value of all EURO1 transactions settled.

EURO1 is described in more detail below.

### 8.3.1 Background to EURO1

In the 1990s, the Euro Banking Association[1] (EBA) developed EURO1 to replace the ECU clearing. EBA Clearing was established in 1998 by 52 large international banks for the purpose of owning and operating EURO1. EURO1 was handed over to EBA Clearing and launched in January 1999, with the introduction of the euro. The infrastructure of EURO1 is SWIFT-based.

### 8.3.2 Structure of EURO1

EURO1 is a multilateral net settlement system in which each participant has one net position vis-à-vis all other system participants. This position changes continuously over the day as the participant sends and receives payments via the system. The net position is settled at the end of the day. A major difference in relation to ordinary net settlement systems is, however, that payments accepted by the system during the day are final and irrevocable. When a EURO1 payment has been accepted, it lies within the limits set by the participants vis-à-vis each other, cf. below. Payments which entail that these limits are exceeded are placed in a

---

[1] EBA comprises the European Investment Bank and 18 private banks.

| PAYMENTS IN TARGET AND EURO1 | | Table 8.2 |
|---|---|---|
| | 2003 | 2004 |
| *Target* | | |
| Number of transactions, '000 ................................... | 66,608 | 69,213 |
| Value of transactions, billion euro ........................... | 420,749 | 443,993 |
| Market share by value of payments, per cent ......... | 86.9 | 87.7 |
| Market share by number of transactions, per cent . | 57.8 | 57.9 |
| *EURO1* | | |
| Number of transactions, '000 ................................... | 38,852 | 41,724 |
| Value of transactions, billion euro ........................... | 44,734 | 44,125 |
| Market share by value of payments, per cent ......... | 9.2 | 8.7 |
| Market share by number of transactions, per cent . | 33.7 | 34.9 |

Note:   EURO1 payments include STEP1 payments, cf. section 8.4. The market shares of the systems are calculated as a
          ratio of all transactions in Target, EURO1, PNS, POPS and SPI, which closed on 15 December 2004.
Source: ECB.

liquidity queue as in RTGS systems. The system continuously seeks to settle the queued payments on a FIFO basis, applying bypass, cf. Chapter 3, Box 3.1.

EURO1 payments for same-day settlement must be submitted to the system between 7.30 a.m. and 4.00 p.m. Within these hours participants can monitor changes in their net positions on an ongoing basis.

### 8.3.3 Participants in EURO1

EURO1 participants must meet the following criteria, among others:
- The participant's registered address must be in an OECD country or an EU member state.
- The participant must be a direct settlement participant in a payment system.
- The participant must have own funds of at least 1.25 billion euro.
- The participant's short-term credit rating must, as a minimum, be equivalent to P2 (Moody's) or A2 (S&P).
- The participant must have direct access to Target.
- The participant must be a member of the Euro Banking Association.
- The participant must unconditionally comply with the system's rules and related agreements.

### 8.3.4 Risk management in EURO1

As Chapter 4 describes, settlement in netting systems may involve a number of risks. Various risk management tools may be used to reduce or even eliminate these risks. In order to eliminate credit and liquidity risks, EURO1 applies two tools: a collateral pool and credit caps agreed between the participants.

156

*Collateral pool*

EURO1 has a collateral pool to which all participants have contributed an equal share. The pool is used in the event that one or several participants are unable to cover their negative net positions. If funds from the collateral pool are used for settlement, the pool must be re-established before new settlement cycles can begin. The value of the EURO1 collateral pool, which is deposited in an account with the ECB, is 1 billion euro. As a maximum, the pool will cover the situation where a single participant with the largest possible negative net position cannot meet its payment obligations. If several participants experience problems in the same settlement cycle, and the sum of these participants' negative net positions exceeds 1 billion euro, a number of supplementary measures[1] ensure that settlement can still take place.

*Multilateral debit and credit caps*

Each participant determines its own maximum exposure vis-à-vis each of the other participants, i.e. its credit caps. As a minimum, all EURO1 participants allocate each of the other participants a mandatory credit cap of 5 million euro. At its own discretion, each participant may increase the credit cap to 30 million euro per participant. A participant's multilateral credit cap is the sum of the bilateral credit caps allocated to the other participants by that participant and indicates the maximum amount that can be credited to (received by) that participant in EURO1. A participant's multilateral debit cap is the sum of the credit caps allocated to that participant by the other participants and indicates the maximum amount that can be debited to (sent by) that participant in EURO1. The multilateral debit and credit caps, respectively, of a participant may not exceed 1 billion euro.

It is currently sought to enable direct participants in EURO1 to increase their settlement capacity in the system via a "liquidity bridge". In practice this means that the participant, via Target, transfers a sum to EBA's account with the ECB before EURO1 opens. The participant's multilateral debit cap is then increased by the transferred amount.

### 8.3.5 EURO1 settlement cycle

At 4.00 p.m. SWIFT calculates the final net positions in EURO1 and advises the participants, EBA Clearing and the ECB. Via Target, participants with debit positions send a payment instruction to their national central banks to debit their current accounts and transfer the funds to EBA's

---

[1] The participants have concluded a loss sharing agreement whereby they are jointly and severally liable if the collateral pool of 1 billion euro is insufficient.

account with the ECB. The ECB credits the incoming payments to the account and advises EBA Clearing. When all payments have been received, EBA Clearing advises the ECB to pay participants with a credit position. The ECB debits EBA's account and sends payments via Target to these participants. When the central banks have credited the participants, confirmation is sent to the ECB, which forwards the message to EBA Clearing. When all confirmations have been received, EURO1 notifies all participants that settlement has taken place. EBA's account with the ECB zeroes every evening when settlement is completed.

## 8.4 STEP1

Shortly after the launch of EURO1, EBA decided to develop a retail payment system for handling retail payments in euro. This system was launched in November 2000 as STEP1. The system, which is operated by EBA Clearing, can be seen as a supplementary functionality for EURO1 since the two payment systems use the same platform. Settlement thus takes place in EURO1, but in a separate cycle called the Euro Retail Payment cycle (ERP).

All banks operating in the EU have access to STEP1. Participation is not subject to any credit rating or funds requirements, and the following two options are available: direct participation if the participant is a EURO1 participant, and indirect participation if settlement takes place via a direct EURO1 participant that acts as settlement bank.

Table 8.3 shows the number of direct participants in EURO1, STEP1 and STEP2, cf. section 8.5.

### 8.4.1 Risk management in STEP1

Since STEP1, cf. the above, can be seen as part of EURO1, the risk management tools used in EURO1 also apply to STEP1. In addition, the settle-

| DIRECT PARTICIPANTS IN EURO1, STEP1 AND STEP2 | Table 8.3 |
|---|---|
| | 2005 |
| *EURO1* | |
| Direct participants ................................................................ | 75 |
| *STEP1* | |
| Direct participants ................................................................ | 126 |
| *STEP2* | |
| Direct participants ................................................................ | 76 |
| Prefund participants ................................................................ | 8 |

Source: Euro Banking Association.

158

ment bank sets limits to the maximum single payments that can be received or sent by indirect participants. These limits are between 1 and 10 million euro per participant. The exact figure is determined by the settlement bank, which makes the necessary liquidity available for the indirect participant's net settlements. This is achieved via "capacity transfers", where part of the settlement bank's liquidity in EURO1 is reserved for the indirect STEP1 participant.

### 8.4.2 STEP1 clearing cycle

STEP1 participants have their own addresses on the EURO1 platform, from which they can receive and send payment instructions and monitor their net positions on an ongoing basis. When SWIFT registers a payment instruction with the ERP tag, it is retained while a copy is forwarded for processing in EURO1. The retained payment instruction is released when processing in EURO1 is complete. STEP1 participants can send payment instructions to the system for processing on day T from day T-5 until 2.00 p.m. on day T. Processing of payment instructions begins at 7.30 a.m. on day T. Single payments exceeding the individual limits of the remitter or recipient are rejected.

### 8.4.3 STEP1 settlement cycle

At 2.10 p.m. SWIFT notifies the STEP1 participant and the settlement bank, if any, of the potential net position. For indirect participants a negative potential net position represents the amount that the settlement bank must make available. Until 2.30 p.m. the settlement bank has the opportunity to relinquish this obligation, a request that can only be met under exceptional circumstances.

In order for transactions to be released, the settlement bank must make capacity transfers with the ERP tag to the indirect participant. The settlement bank can send one or more capacity transfers, provided that the total amount equals the indirect participant's potential net position. Subsequently the STEP1 participant's payments are released and the net position zeroes. Processing of STEP1 transactions must be completed by 4.00 p.m. when the EURO1 settlement begins. If the settlement bank does not make adequate liquidity available, the payments not covered are placed in a settlement queue with the value date T+1. The settlement queue operates on a FIFO basis, cf. Chapter 3, Box 3.3. The account between the indirect participant and the settlement bank as a consequence of the STEP1 settlement is settled outside the system.

The clearing and settlement cycles in EURO1, STEP1 and STEP2, cf. below, are shown in Chart 8.2.

159

---

CLEARING AND SETTLEMENT CYCLES IN EURO1, STEP1 AND STEP2          Chart 8.2



Note:   Euro Banking Association

---

## 8.5 STEP2

STEP2, which is owned by EBA Clearing, was implemented in April 2003. STEP2 is not a replacement for STEP1, since STEP1 processes single payments, while STEP2 processes bulk payments, i.e. batches of payment instructions for several different payment recipients. Furthermore, STEP2 uses its own clearing house rather than the EURO1 platform. STEP2 was developed in cooperation by EBA Clearing, SIA (an Italian IT company) and SWIFT.

One of the advantages of STEP2 is that all customers holding a bank account with a European bank can be reached even if the customer's bank is not a STEP2 participant. STEP2 processes payments of up to 12,500 euro[1] containing the internationally approved identifications of customer and bank, i.e. the customer's IBAN (International Bank Account Number) and the bank's BIC (Bank Identifier Code).

### 8.5.1 Participants in STEP2

The number of participants in STEP2 is shown in Table 8.3. STEP2 offers four types of participation:
- Direct settlement participant – if the participant is a EURO1 participant and can therefore settle via EURO1. These participants can send and

---

[1]   The limit will be raised to 50,000 euro as from 1 January 2006.

160

receive files with payment instructions directly to and from STEP2's central system.

- Direct non-settlement participant – if the participant is an indirect STEP1 participant and thus settles via a settlement bank in EURO1. These participants can also send and receive files with payment instructions to and from STEP2's central system.
- Indirect participant – if the participant is neither a EURO1 nor a STEP1 participant. These participants conclude settlement agreements with direct settlement participants to receive and send payments on their behalf.
- Prefund participant – if the participant does not wish to utilise one of the above three options. Every morning these participants must, via Target, transfer an amount equal to their payment instructions submitted to STEP2 to EBA's account with the ECB.

Banks that do not participate in STEP2 can receive payments from STEP2 participants through an "entry point". An entry point is a direct STEP2 participant that receives credit transactions and forwards them to the relevant recipients via the national retail payment systems. An EU member state may have several entry points.

### 8.5.2 STEP2 clearing cycle

All batches of payment instructions with a given value date, day T, can be submitted via SWIFT to STEP2 until 10.00 p.m. on day T-1. Each batch may contain many individual payment instructions for one or several recipients. The payment instructions are validated and then broken down into subfiles. Two subfiles are created for each pair of participants. One subfile includes all the credit transactions sent by participant A's customers to participant B's customers. Similarly, the other subfile includes all credit transactions sent by participant B's customers to participant A's customers. The breakdown into subfiles takes place between 10.00 p.m. on day T-1 and 7.30 a.m. on day T, cf. Chart 8.2.

   By 8.30 p.m. on day T-1, prefund participants must notify STEP2 of the total sum of the transactions submitted. This sum must be transferred to EBA's account with the ECB by 7.00 a.m. on day T.

### 8.5.3 STEP2 settlement cycle

For each subfile, STEP2 generates a settlement instruction for processing in EURO1. These settlement instructions are forwarded to EURO1 at 7.30 a.m. on day T. Settlement then takes place in accordance with one of the following three models, depending on the status of the participants:

- Both parties to the STEP2 settlement are EURO1 participants. In this case the two settlement instructions become part of the individual EURO1 participant's net position in the system, cf. the section on the EURO1 settlement cycle.
- One party is not a EURO1 participant, but an indirect STEP1 participant. In this case the payment instructions are sent to STEP1 where they become part of the indirect STEP1 participant's settlement bank's net position in EURO1, cf. the section on the STEP1 settlement cycle.
- Prefund participants' payments are settled using the liquidity transferred.

Before 8.00 a.m. EURO1 and STEP1 advise STEP2 of whether the settlement instructions have been processed. When STEP2 receives these notifications, the subfiles are placed in "outboxes" by creditor address. At 8.00 a.m. STEP2 creates one file per participant containing all subfiles in the participant's outbox. These files are sent to the STEP2 participants, who can then credit their customers.

## 8.6 THE VISION OF SEPA – THE SINGLE EURO PAYMENT AREA

When Economic and Monetary Union was created and the single currency, the euro, introduced in January 1999, one of the objectives was to create a homogeneous market where liquidity could be transferred quickly and inexpensively throughout the euro area. As regards interbank payments this objective has been met as the smoothly operating payment systems Target and EURO1 have created a common euro payments infrastructure for large-value payments. These systems have increased efficiency and lowered the costs of large national and cross-border payments in euro. This is not the case for retail payments, where the service level for cross-border payments is substantially lower than for national payments.

The idea of a homogeneous retail payment market has existed since 1992 when the ECBS[1] was set up. From the outset, the ECBS has handled issues related to cross-border retail payments, and in this context it has contributed to developing common European standards such as IBAN and BIC.

With the Eurosystem's introduction of euro banknotes and coins in 2002, the foundations were laid for realising the Single Euro Payment Area, SEPA, for retail payments. The Eurosystem's vision of a homoge-

[1] The European Committee for Banking Standards, set up by the Banking Federation of the European Union, the European Association of Co-operative Banks, and the European Savings Banks Group.

162

neous European retail payment market is that the efficiency and pricing of cross-border retail payments will be comparable with the best-performing national payment system today.

Owing to the lack of progress by the banks in smoothing the differences in prices and service levels for national and cross-border retail payments, the European Parliament and the Council in December 2001 adopted a regulation on cross-border payments in euro, cf. section 9.7. The regulation[1] entails, *inter alia*, that the banks may not charge higher fees for cross-border electronic payment transactions[2] in euro than for equivalent national euro transactions. For the banks this means that the fee they may charge for cross-border transactions is lower than the actual costs of settling the transactions.

The regulation gave the European banking sector an impetus to move forward, and in May 2002 a strategy report, *Euroland: Our Single Payment Area*, was published. The objective is to create a single euro payment area where the payment services offered nationally and across borders are fully equivalent. The European Payment Council, EPC, was set up in 2002 by the European banking sector and is working to realise the SEPA vision. This work is based on the following key elements of the 2002 strategy report:

- The creation of a common euro infrastructure with Pan-European Automated Clearing Houses (PEACHes) for processing national and cross-border retail payments in euro.
- Adoption and implementation of a common set of pan-European standards, rules and conventions for retail payments so that all EU banks offer a service and automation level equivalent to the best national level today.
- Development and implementation of pan-European payment instruments (credit transfers, direct debit and payment cards).

The ECB is an observer on the EPC and most of its task forces, and the ECB has expressed clear visions as to what must be possible in SEPA by 2010.[3] The ECB's primary objective is that all euro-denominated payments become "domestic". In other words, it should be just as easy, secure, efficient and inexpensive to make payments throughout the whole euro area as it is to make national payments today.

---

[1]  The regulation was introduced on 1 July 2002 and applies to amounts of up to 12,500 euro. From January 2006 the limit is raised to 50,000 euro.

[2]  From 1 July 2002 the regulation solely applied to card payments and cash withdrawals. From 1 July 2003 credit transfers were also included.

[3]  See the speech by Gertrude Tumpel-Gugerell, member of the Executive Board of the ECB, to the EPC on 6 September 2004 at www.ecb.int.

163

As a consequence of the EU regulation, the EPC has adopted two conventions for credit transfers:

- Credeuro (2002), which ensures that a credit transfer of an amount up to 12,500 euro will maximum take three days if the customers have stated IBAN and BIC codes. The objective is that all credit transfers in Europe are settled within one banking day from 2007.
- ICP[1] (2003), which is to ensure that the principal is always transferred in full. This means that no fee may be charged to the recipient for receipt of a European transfer.

The EPC also plans to implement a direct debit standard in 2005.

### 8.6.1 SEPA – status 2005

As of 2005, the retail payment infrastructure of the euro area is still fragmented, and the SEPA vision is still not a reality. The European Parliament and the Council have adopted the regulation on cross-border payments in euro, and the ECBS and ISO[2] have developed the IBAN and BIC standards, which customers must use for cross-border transactions. Furthermore, the European Commission plans to table a proposal for a comprehensive directive for all types of payment services within the EU, cf. Chapter 9, section 9.7. The aim is for the directive to remove a number of the current barriers to the implementation of SEPA.

The EPC's current challenge lies in standardising the payment process to make it identical for national and cross-border payments, in implementing standards for pan-European payment instruments and in creating Pan-European Automated Clearing Houses, PEACHes. These PEACHes must be at least as efficient as the existing national clearing houses in order to give the banks an incentive to move all transactions, even national ones, to the PEACHes. Without national transactions no PEACH would be able to achieve a critical mass.

One of the EPC's criteria for a clearing house to qualify as a PEACH is that all financial institutions in the EU can be reached. The clearing house must thus be able to process all euro credit transfers irrespective of which European bank the recipient's account is held with. In addition, the price of national and intra-EU payments must not differ if the service is the same. At present only STEP2 has been approved by the EPC as a PEACH.

---

[1] The Interbank Convention on Payments.
[2] The International Organization for Standardization.

164

---

| THE BACKGROUND TO CLS | Box 8.2 |
|---|---|

In principle, a foreign-exchange transaction involves two opposite payments. A transaction in e.g. kroner against dollars involves a payment in kroner by one party to the other and a payment in dollars in the opposite direction. Foreign-exchange transactions have traditionally been settled as two independent payments executed via correspondent banks or via the RTGS systems for the currencies in question. Under this system, the parties to the transaction incur mutual credit risks equivalent to the amount traded. The credit risk arises because one party to the transaction may go into compulsory liquidation at a time when the purchased currency has been received, while the sold currency has not yet been delivered. Since the sums traded may be considerable, and since different time zones may extend the period of exposure, settlement of foreign-exchange transactions in the traditional manner could potentially involve systemic risks, cf. Chapter 1, Box 1.3, on the liquidation of Bankhaus Herstatt.

Under the auspices of BIS, the G10 central banks in 1996 laid down a strategy for reducing systemic risk in relation to settlement of foreign-exchange transactions.[1] It was a three-pronged strategy: 1) the individual private banks were to improve their own risk management, 2) the international banking community was to introduce new, risk-reducing settlement facilities, and 3) the central banks were to support the private initiatives under 1) and 2).

The introduction of CLS in 2002 was the international banking community's contribution to reducing settlement risk on foreign-exchange transactions. The development and implementation of CLS has taken place in an ongoing dialogue with the central banks of the currencies involved.

---

BIS (1996).

## 8.7 CLS

CLS[1] Bank International (CLS) is an international clearing and settlement system that settles foreign-exchange transactions in 15 currencies[2], including Danish kroner. CLS is a real-time system that enables simultaneous settlement globally, irrespective of time zones. CLS was established by some of the world's largest private banks as a bank owned by 71 shareholders, including five Scandinavian banks (Danske Bank and Nordea, among others). The background to the establishment of CLS is described in Box 8.2.

CLS' mission is to eliminate the principal risk on foreign-exchange transactions. Consequently, the core element of CLS is that the two eligible payment instructions relating to an FX transaction are settled simultaneously, i.e. Payment versus Payment (PvP). In CLS, the parties to a foreign-exchange transaction only supply the currency they have sold if

---

[1] Continuous Linked Settlement.
[2] US, Canadian, Australian, New Zealand, Singapore and Hong Kong dollars, euro, Japanese yen, pounds sterling, Swiss francs, Korean won, South African rands, Danish and Norwegian kroner and Swedish kronor.



SETTLEMENT OF DANISH KRONER IN CLS                                    Chart 8.3

Average daily gross pay-ins ▪▪▪▪
Average daily net pay-ins ▪▪▪▪
Average number of instructions (right-hand axis) ——

Source:  CLS Bank and own calculations.

they receive the currency they have bought. Another key element of CLS settlement is that Settlement Members pay in funds to CLS on a net basis in numerous small portions according to a Pay-In Schedule. This significantly reduces the Settlement Members' liquidity requirements

In April 2005, CLS settled approximately 95,000 foreign-exchange transactions daily, at a value of more than USD 1,000 billion. Statistics show that the global daily foreign-exchange trading volume is approximately USD 1,900 billion.[1] This figure is not directly comparable with the figures for CLS[2], but it is estimated that around one third of the global foreign-exchange trading now takes place via CLS. The remainder is still settled via the traditional channels for international payments, as described in Chapter 3.

Total daily Pay-Ins to CLS amount to around USD 25 billion. Pay-ins to CLS have been constant, although the value of the foreign-exchange transactions has increased since CLS went live in September 2002. This can be seen as an indication that netting within the system is becoming more effective as the number of transactions increases.

Since September 2003 it has been possible to settle transactions in Danish kroner via CLS. CLS settlement in Danish kroner is shown in Chart 8.3. In

[1] BIS *Triennial Central Bank Survey*, Foreign Exchange and Derivation Market Activity in April 2004.
[2] An FX Swap entails exchange of two currencies on a given day and an opposite transaction in the same two currencies on a future date. FX Swaps are e.g. included as two transactions in the CLS compilation and as one transaction in the BIS compilation.

166

April 2005 an average of 446 transactions in Danish kroner were settled daily, totalling kr. 98 billion in value. The average daily pay-ins to CLS were kr. 5.4 billion, equivalent to liquidity savings of almost 95 per cent.

### 8.7.1 CLS participants

CLS has three different types of participant, Settlement Members, User Members and Third Parties. Settlement Members participate directly in settlement and have a multi-currency account with CLS Bank There are currently 58 direct participants in CLS. Only CLS shareholders can join as Settlement Members. User Members can submit Instructions directly to CLS, for themselves and their customers, but do not hold an account with CLS and must therefore settle their foreign-exchange transactions via a sponsoring Settlement Member. There are only few User Members at present. Only CLS shareholders can join as User Members. A Third Party is an indirect participant that submits and settles foreign-exchange Instructions via a Settlement or User Member. Third Parties are typically smaller banks, brokers, funds and large non-financial corporates. The number of Third Parties has risen significantly over the last year, and 480 Third Parties currently participate in CLS. Below, the term "participants" refers to Settlement Members.

### 8.7.2 CLS settlement

CLS participants hold a single multi-currency account with CLS. The participants' balances in the various currencies are registered to this account. On the basis of Instructions submitted, CLS calculates the participants' net positions in the various currencies. Foreign-exchange payments to CLS are effected in the national RTGS systems by transferring funds to CLS' accounts with the relevant central banks. Pay-Ins to CLS' central-bank accounts are automatically credited to the participant's account with CLS.

Foreign-exchange transactions are settled by transferring the foreign exchange traded between the relevant participants' accounts with CLS. When a foreign-exchange transaction is settled, the two sides are entered to CLS' books simultaneously (PvP). A transaction can only be settled if CLS' risk measures, cf. below, are met.

Foreign-exchange Pay-Outs to participants are effected by transferring funds from CLS' central-bank accounts to the participants' central-bank accounts via the national RTGS system. At the same time the payouts are debited to the participants' accounts with CLS. Pay-outs are subject to CLS' risk measures. Where participants do not hold accounts in an RTGS system or do not have access to sufficient liquidity in a

SETTLEMENT OF A FOREIGN-EXCHANGE TRANSACTION IN CLS                    Chart 8.4



Participant A has sold EUR against JPY to participant B. The trade is settled via CLS:

1) Participant A pays in EUR to CLS in the RTGS system for EUR (Target). Participant B pays in JPY to CLS in the RTGS system for JPY.
2) CLS automatically registers the participants' pay-ins to their accounts with CLS.
3) When the trades have been settled, i.e. the amounts have been transferred between the participants' accounts with CLS, CLS notifies the RTGS systems.
4) CLS pays out EUR to participant B in the RTGS system for EUR and JPY to participant A in the RTGS system for JPY.

If participants A and B do not participate in the RTGS systems for EUR and JPY themselves, they must use nostro agents to make pay-ins to and receive pay-outs from the respective RTGS systems.

given currency, they may use a nostro agent[1] in the currency in question. Chart 8.4 illustrates settlement of foreign-exchange transactions in CLS with and without the use of nostro agents.

As described, Pay-Ins and Pay-Outs are effected in the national RTGS systems for the relevant CLS currencies. To enable this, the RTGS systems must be open simultaneously across the relevant time zones. Settlement in CLS is therefore scheduled to take place between 7.00 a.m. and noon Central European Time (CET), i.e. afternoon/evening in Asia/Pacific and night/early morning in North America.[2] The settlement flow in CLS is described in more detail in Box 8.3.

---

[1] Nostro agents are typically CLS participants who offer to send and receive payments in their "domestic currency" to and from CLS on behalf of other participants.
[2] The RTGS systems in Asia/Pacific close before noon CET. Therefore it is sought to settle and effect payments in these currencies before 10.00 a.m. CET.

168

---

**CLS SETTLEMENT CYCLE** <span style="float:right">Box 8.3</span>

The participants submit trading instructions to CLS on an ongoing basis. At 00.00 CET, CLS calculates each participant's preliminary net position for each currency and sends out an initial pay-in schedule to participants. Until 6.30 a.m. it is possible to submit trades for settlement on the same day. Immediately after 6.30 a.m. CLS sends out the final pay-in schedule to participants. A participant's total pay-in is broken down into three or five pay-ins per currency. Pay-ins must be received by CLS within fixed time limits, cf. the Chart.



At 7.00 a.m. CLS opens for settlement of foreign-exchange transactions, and as soon as CLS has received pay-ins from the participants or their nostro agents settlement commences. Foreign-exchange transactions are settled individually by simultaneously entering the two sides of a transaction (PvP) to the respective participants' accounts with CLS. CLS seeks to settle (enter) all foreign-exchange transactions by 9.00 a.m. In accordance with CLS' risk measures, settlement of trades may be concluded before all pay-ins have been received. Currency pay-outs do not take place according to a fixed schedule, but on an ongoing basis subject to CLS' risk measures. It is sought to conclude pay-outs in Asian/Pacific currencies immediately after 10.00 a.m. and in other currencies immediately after noon.

---

### 8.7.3 Risk management in CLS

By applying the PvP principle in CLS, the traditional credit risk between the parties to a foreign-exchange transaction is eliminated. However, the tight schedule for Pay-Ins to CLS and the consequential higher liquidity management requirements entail a liquidity risk for participants. The design of the CLS system attaches much importance to minimising this risk.

Settlement of foreign-exchange Instructions in CLS does not involve central-bank money since pay-ins by participants are held in CLS' ac-

Settlement of foreign-exchange Instructions in CLS does not involve central-bank money since pay-ins by participants are held in CLS' accounts with the central banks during settlement. It is therefore essential that CLS cannot incur losses in connection with settlement. Consequently, CLS settlement is subject to very tight risk management and the risk of losses to CLS is very small. CLS thereby complies with international recommendations that settlement assets should entail little or no risk to participants.

The concentration of global foreign-exchange settlement in CLS has led to a concentration of operational risk. With the establishment of CLS a link has also been created between the RTGS systems used for pay-ins and pay-outs to/from CLS. This means that operational problems experienced by CLS may have wide-ranging consequences, and problems within one national RTGS system may affect other countries' RTGS systems[1]. For this reason the structure of CLS settlement emphasises operational stability.

The various elements of CLS risk management are outlined below.

*The participants' liquidity risk*

To minimise the participants' liquidity risk, the CLS system seeks to reduce the liquidity required and to facilitate liquidity management. A key element of the system is that foreign-exchange transactions are settled gross, i.e. individually, while Pay-Ins to CLS are netted. This reduces the liquidity requirement in CLS considerably.[2] In addition, the individual participant's Pay-Ins to CLS in a given currency are split into several smaller, time-lagged Pay-Ins. Finally, liquidity management is supported via a number of online facilities, issue of initial Pay-In Schedules, etc.

In the event that participants have inappropriately large negative positions and must thus make large pay-ins, they can undertake In/Out swaps to reduce their positions, cf. Box 8.4.

*CLS' credit and liquidity risk*

Settlement of Instructions in CLS is subject to tight risk management in order to limit the credit and liquidity risk incurred by CLS in the event of delayed payment or non-payment by one or more participants, and to ensure that settlement can take place even if one or more participants

---

[1]  If participants in one country are unable to effect their Pay-Ins to CLS due to operational problems, CLS may not be able to effect pay-outs in other currencies on time. Consequently, problems within one national RTGS system may mean that other national RTGS systems must stay open for longer.

[2]  A CLS member has submitted two foreign-exchange transactions: purchase of USD 100 million against sale of EUR, and purchase of CHF against sale of USD 100 million. The two USD positions eliminate each other so that the member in question pays only EUR to CLS and receives only CHF from CLS.

170

---

| IN/OUT SWAP AND LIQUIDITY CONTINGENCY PLANNING IN CLS | Box 8.4 |

**In/out swap**

If the preliminary pay-in schedule indicates that the net positions of some participants are inappropriately large, the participants in question may conclude in/out swaps to reduce their net positions. In an in/out swap, two participants conclude two opposite foreign-exchange transactions for settlement on the same day, one of which is settled in CLS and the other outside CLS. For instance, if a participant has an excessive negative position in USD, a foreign-exchange transaction to buy USD and sell DKK is concluded with another participant, who has an excessive negative position in DKK. In this way the negative positions in, respectively, USD and DKK are reduced in the CLS settlement. To keep the foreign-exchange portfolio of the participants unchanged, a foreign-exchange transaction in the opposite direction is concluded for settlement outside CLS. Using an in/out swap thus reintroduces a (small) part of the settlement risk on foreign-exchange transactions.

**Liquidity contingency planning**

To ensure that settlement can always be completed before the national RTGS systems close, CLS has for each currency concluded agreements with at least 2-3 liquidity providers who can provide extra liquidity at short notice if one or more participants or nostro agents do not meet their payment obligations. These liquidity providers take over the relevant participant's pay-in obligation to CLS in return for receiving its pay-outs.

---

do not meet their pay-in obligations. CLS operates with three risk measures that must be met before an Instruction can be settled and pay-outs made. CLS' risk measures are:

- A participant's net balance across currencies must always be positive or zero.
- A participant's short position limit in a given currency may not exceed CLS' limit for that currency.
- The sum of a participant's short position limits may not exceed a limit stipulated by CLS which reflects the participant's credit standing.

The risk management tests entail that settlement of Instructions can begin, irrespective of the currency paid in, and that settlement can be concluded even if some pay-ins have not yet been received.

To protect CLS against market risk on exchange-rate fluctuations in the event that a member does not meet its payment obligations, CLS operates with market volatility haircuts, which are deducted from positive and added to negative positions in the respective currencies.

In addition, liquidity contingency planning by CLS ensures that settlement can be concluded even if the participant with the largest negative net position does not meet its payment obligations, cf. Box 8.4.

If a participant does not meet its obligations, and the exchange rates fluctuate more than the haircuts provide for, CLS may incur a loss. To hedge this risk, a loss distribution agreement has been concluded with participants, whereby the loss is covered by the counterparties of the participant in question.

*Operational risk*

The structure of the CLS system attaches great importance to limiting operational risk by ensuring a high degree of operational stability. Should losses, nevertheless, arise as a consequence of operational errors, they are covered jointly by the participants.

Initially, CLS has been established with primary and secondary operating and data centres in the south of England. To comply with recommendations from the US authorities[1], cf. Chapter 10, section 10.6, CLS has established a parallel operating and data centre in New York.

Operational stability is also ensured via extensive uniform security requirements of participants and of the RTGS systems of the participating currencies, and via comprehensive procedures for the handling of operational aspects by the parties involved.

---

[1]  The Federal Reserve supervises CLS and is overall responsible for CLS oversight. Oversight takes place in cooperation with the other central banks whose currencies are settled via CLS.

172

## LITERATURE

BIS, 1996. Settlement Risk in Foreign Exchange Transactions, March 1996.

CLS website, www.cls-services.com.

CLS Bank International, Regulator's Summery, International Rules and Member Handbook.

Euro Banking Association's website, www.abe.org.

# EXHIBIT 9

Mamanga Forum :: Ver tema - Tema: Alqaeda - Terrorismo - Atentados.          Page 1 of 3

Case 1:07-cv-00974-RMC-JMF     Document 16-11     Filed 10/04/2007     Page 2 of 3

# Bank of England, London FX, CLS bank plan financial outage terror drill Sept. 26

By Reuters - Wall Street & Technology
July 27, 2006

*London FX forum plans CLS payments outage exercise*

LONDON, July 26 - A Bank of England-backed seminar will examine how the $2 trillion a day foreign exchange market would cope with a sustained outage of global currency payments system, CLS, caused by terror attacks or other disasters.

Payments systems are the plumbing which keeps money flowing around the globe. Blockages can have wide-reaching implications for **financial market** stability, a concern highlighted by the September 11, 2001 attacks in the United States.

The September 26 seminar is hosted by **the Joint Standing Committee (JSC)** -- a forum for forex industry experts, regulators and central banks.

"This session is in addition to the annual exercise where the industry simulates different types of stress or catastrophes," **Jonathan Butterfield**, Executive Vice President of Marketing and Communication for CLS, told Reuters.

"Ever since 9/11 it is obvious in the major financial centres that individual institutional resilience is one thing but that is not the point unless you have infrastructures and other participants able to continue," Butterfield said.

"You could be the most resilient entity but nothing else is going to work. Everybody clearly understands this is a group activity, not an individual activity, practicing for a disaster."

**CLS Bank** was launched in 2002 to eliminate the risk that one counterparty to a transaction does not receive the currency it is owed.

## DISASTER EXERCISE.

CLS, one of the six critical infrastructures specified by the Federal Reserve, settled a record $5.35 trillion in currency transactions on June 21. It counts both sides of a transaction.

"The FX industry is quite strong. It is well aware of the major disruptive forces in the industry, and has operated well through all of them," said Phil Weisberg, Chief Executive Officer of currency trading platform FXall.

"There are always going to be terror risks. The best plan is to have well thought-through contingency plans, and to have good people in all these companies to think about these type of contingencies," said Weisberg, who is a member of the JSC.

In November the BoE, and Britain's Treasury and Financial Services Authority held a disaster exercise involving 50 financial services firms including banks, insurers and fund managers.

On July 7 2005 when four suicide bombers made a coordinated attack on London's transport system, the three institutions implemented one plan, kicking off a secret Internet chatroom to help keep financial markets open.

That day the JSC members had a conference call, followed by a joint call with their New York counterpart.

"It was suggested that members might consider upgraded mobile phones with their business continuity staff. Blackberries had apparently worked well, as had instant messaging software," said the JSC minutes of a July meeting held after the attacks.

## INDUSTRY STANDARD

CLS had a technical problem in March 2003 delayed settlement of the yen and Australian dollar, its first serious problem. Around 20,000 settlement instructions

Mamanga Forum :: Ver tema - Tema: Alqaeda - Terrorismo - Atentados.          Page 2 of

Case 1:07-cv-00974-RMC-JMF          Document 16-11          Filed 10/04/2007          Page 3 of 3

had to be resubmitted the following day.

"It caused a lot of **chaos**," a head of FX trading at a U.S. bank said.

"A lot of people have got more used to the fact the CLS does a lot of netting for them, picking up more of the volume of the trades. A lot of big banks will struggle to move back to a non-CLS environment."

Butterfield added CLS operates multiple data centres, triple network connections and runs hardware and software operations from either sides of the Atlantic.

"For us to go down completely requires quite significant failures at multiple levels simultaneously... (The exercise) represents a good test for the industry to work through all the issues that sort of situation presents in a condensed format."

Fuente: http://falseflagnews.com/home

# EXHIBIT 10



# Danmarks Nationalbank

# Monetary Review
# 4th Quarter



Case 1:07-cv-00974-RMC-JMF    Document 16-12    Filed 10/04/2007    Page 3 of 24



# Danmarks Nationalbank

# Monetary Review 4th Quarter

# 2006

## MONETARY REVIEW 4th QUARTER 2006

The small picture on the front cover shows the "Bankers" clock, which was designed by Arne Jacobsen for the Danmarks Nationalbank building.

Text may be copied from this publication provided that Danmarks Nationalbank is specifically stated as the source. Changes to or misrepresentation of the content are not permitted.

The Monetary Review is available on Danmarks Nationalbank's website: www.nationalbanken.dk under publications.

Managing Editor: Jens Thomsen
Editor: Anders Møller Christensen

This edition closed for contributions on 24 November, 2006.

The Monetary Review can be ordered from:
  Danmarks Nationalbank,
  Information Desk,
  Havnegade 5,
  DK-1093 Copenhagen K.
Telephone +45 33 63 70 00 (direct) or +45 33 63 63 63.
Inquiries: Monday-Friday 9.00 a.m.-4 p.m.
E-mail: info@nationalbanken.dk

Datagraf Auning A/S
ISSN 0011-6149
(Online) ISSN 1398-3865

Monetary Review – 4th Quarter 2006

# Contents

Recent Economic and Monetary Trends ............................................   1

The Cyclicality of Domestic Prices ........................................   21
*Bo William Hansen* and *Dan Knudsen*, Economics
This article views the IMI index in relation to cyclical fluctuations and to other price and wage indices, while also discussing whether IMI can be seen as an indicator of future inflation. In addition, delineation of the IMI index is discussed in the Appendix.

The USA's External Imbalance in a Financial Perspective..................   33
*Per Flink Iversen*, Economics
This article looks into the financing of the USA's current-account deficit and international investment position. Particularly Asian and OPEC economies have played an important role. In addition, the article seeks to elucidate why the USA's net capital income is still positive – despite its large external debt. The "dark matter" hypothesis has been offered as an explanation.

Slovenia: An Economic Portrait of the New
Euro Area Member State .......................................................   49
*Niels Peter Hahnemann*, Economics
On 1 January Slovenia is the first of the new EU member states to join the euro after only just over 2½ years' membership. Slovenia is the most prosperous of the former Communist states. Its economy has been stable for a prolonged period with moderate inflation and relatively modest deficits on both its government budget balance and current account of the balance of payments. The article reviews Slovenia's compliance with the convergence criteria and the structure of its economy.

The Relevance of GDP Growth Rates ..................................   59
*Christian Ølgaard*, Economics
An evaluation of a country's economic performance often focuses on GDP growth. However, this is associated with several pitfalls. This article argues that adjustment of GDP growth for demographic factors and terms of trade gives a truer measure of the country's economic performance.

Settlement of Foreign-Exchange Transactions ....................................   69
*Lone Natorp*, Market Operations and *Tina Skotte Sørensen*, Payment Systems
The article describes various foreign-exchange settlement methods, including settlement via CLS, and the related risks. BIS has launched an international survey of settlement risk in relation to foreign-exchange transactions. Some of the results of the Danish part of the survey are outlined.

Monetary Review – 4th Quarter 2006

IMF Review of the Financial Sector in Denmark ................................    87
*Gitte Wallin Pedersen*, International Relations
In 2005-06 Denmark was subject to a detailed IMF review of its financial sector, FSAP. Overall, the IMF found the systems to be resilient and well-supervised. The IMF's review should be viewed in the light of the systems' importance to economic stability.

Articles in the Monetary Review
4th Quarter 2004 – 3rd Quarter 2006 .................................................   101

Press Release ........................................................................................   109

Tables and Graphs Section

Monetary Review – 4th Quarter 2006

# Settlement of Foreign-Exchange Transactions

*Lone Natorp, Market Operations and Tina Skotte Sørensen, Payment Systems*

## SUMMARY

For the last 25 years, participants in the financial markets have focused on reducing the settlement risk on foreign-exchange transactions. In 1996, the central banks formulated a strategy in accordance with which the private banks have improved their own management of foreign-exchange settlement risk. The establishment of the international clearing and settlement system CLS[1] Bank International in 2002 has enabled settlement of foreign-exchange transactions without any mutual credit risk between the parties. As more and more foreign-exchange trading migrates to CLS, it will therefore be possible to reduce the aggregate settlement risk. Surveys show that Danish market participants generally manage settlement risk prudently, but also that some participants can reduce their settlement risk by optimising settlement procedures or by settling via CLS.

## INTRODUCTION

The daily transaction value in the international foreign-exchange markets exceeds 1,900 billion dollars.[2] When a foreign-exchange transaction has been concluded, it is settled via two opposite payments between the parties. A transaction in e.g. kroner against euro involves a payment in kroner by one party to the other and a payment in euro in the opposite direction.

Foreign-exchange transactions have traditionally been settled by remitting the agreed amounts via correspondent banks[3]. With this settlement form, the parties incur a mutual credit risk equivalent to the traded amount. In view of the very large trading volumes, this settlement risk can potentially have an impact on financial stability. The case

---

[1] Continuous Linked Settlement.
[2] According to BIS (2005), the daily value of foreign-exchange transactions concluded in April 2004 was approximately 1,900 billion dollars. The trading value is expected to increase gradually over time.
[3] A correspondent bank holds accounts for other banks and effects payments on their behalf.

Monetary Review – 4th Quarter 2006

---

FOREIGN-EXCHANGE SETTLEMENT RISK AND FINANCIAL STABILITY        Box 1

Over time there have been several examples of how settlement of foreign-exchange transactions via the traditional channels for international payments can cause financial problems to spread among participants in the foreign-exchange market.

In June 1974, the German banking supervision authority, Bundesaufsichtsamt für das Kreditwesen, withdrew Bankhaus Herstatt's banking licence with immediate effect and Herstatt suspended its payments. The suspension of payments was announced at 3.30 p.m. Central European Time, i.e. 10.30 a.m. US Eastern Time (New York). At that time, several of Herstatt's foreign-exchange counterparties had effected payments of D-marks to Herstatt via their correspondent banks in Germany in the expectation that they would receive dollars from Herstatt later in the day. However, the suspension of payments led Herstatt's correspondent bank in New York to stop all payments from Herstatt's account, which left Herstatt's counterparties with credit exposure equivalent to the principal of the D-mark payments made.

In February 1990, serious liquidity problems led to the collapse of the Drexel Burnham Lambert, DBL, group. As the liquidity problems became known to the counterparties of the subsidiary, Drexel Burnham Lambert Trading, DBLT, they became less inclined to assume credit and liquidity exposures in connection with the settlement of foreign-exchange transactions with DBLT. DBLT, on the other hand, did not wish to "pay first", fearing that the counterparty would not pay its leg of the transaction, but would rather set off the foreign exchange received against other claims. Since DBLT could prove that it was solvent, the Bank of England agreed to establish a temporary settlement facility to ensure that both parties supplied the foreign exchange they had sold.

In July 1991, Bank for Credit and Commerce International (BCCI) suspended its payments, thereby inflicting losses on British and Japanese counterparties that had purchased foreign exchange from BCCI. A UK counterparty's payment of pounds sterling to BCCI was effected as planned, while BCCI's opposite payment of dollars was delayed and later revoked by BCCI's correspondent bank in the USA when the suspension of payments became known. A Japanese counterparty incurred losses due to the time difference between Japan and the USA. The counterparty had supplied yen to BCCI during Japanese opening hours, but BCCI's accounts in New York were frozen before payment of the dollar leg of the transaction had been effected.

---

of Bankhaus Herstatt in 1974 highlighted this issue, but there are also more recent examples of how settlement problems in the foreign-exchange markets have jeopardised financial stability, cf. Box 1.

Since 2002, the international clearing and settlement system CLS Bank International has enabled settlement of foreign-exchange transactions in a manner whereby the parties do not incur a mutual credit risk. Around half of the global foreign-exchange trading is estimated to take place via CLS. The remaining transactions are settled via traditional channels.

Financial stability is an important objective for the central banks. Since the failure of Herstatt, central banks have therefore worked with super-

71

---

| THE BIS STRATEGY TO REDUCE FOREIGN-EXCHANGE SETTLEMENT RISK | Box 2 |
| --- | --- |

In March 1996, the BIS Committee on Payment and Settlement Systems, CPSS, published the report Settlement Risk in Foreign Exchange Transactions. The report outlined a method to calculate the exposure on settlement of foreign-exchange transactions. A survey of the practices of 80 international banks showed that in many cases more than three days passed from the bank supplied one currency until it knew with certainty that the other currency had been received. This meant that a bank might incur a credit risk equivalent to the aggregate value of several days' trading. Moreover, the survey showed that most of the banks either did not calculate the exposure to settlement risk correctly or did not calculate it at all. Against this background, the G10 central banks formulated a three-track strategy to reduce the banks' foreign-exchange settlement risk:

1) The individual banks should take steps to improve their own risk management by measuring and managing their exposures to foreign-exchange settlement risk on an ongoing basis and by optimising settlement procedures with a view to reducing the duration of the exposure.

2) Industry groups should take action to create one or more risk-reducing multi-currency services ensuring that the two legs of a foreign-exchange transaction are settled simultaneously in accordance with the PvP[1] principle.

3) Central banks should seek to support and facilitate private initiatives by offering clear recommendations for measuring and managing settlement exposures, by cooperating with private banks to develop new settlement facilities, and by making relevant enhancements to the national payment systems.

In the next two years, BIS/CPSS conducted further surveys with a view to following up the 1996 strategy.[2] These surveys showed that although the banks' awareness and management of settlement risk had improved substantially, more than 60 per cent of the banks in the survey still underestimated their exposure to foreign-exchange settlement risk. In the spring of 2006, CPSS launched a survey of how more than 100 financial institutions and enterprises managed their foreign-exchange settlement risk, including their use of CLS. The purpose was another follow-up on the 1996 strategy. The overall conclusions of the Danish part of the survey are presented at the end of this article. No Danish market participants took part in the previous BIS surveys.

The establishment of CLS settlement in September 2002 implemented item 2 of the BIS strategy. It had been preceded by around five years' preparatory work. Throughout the process, the central banks maintained a dialogue with the banks behind CLS with a view to monitoring the development and helping to identify issues in relation to financial stability.

---

[1] Payment versus Payment.
[2] The results were presented in BIS (1998).

---

visory authorities and private banks to reduce foreign-exchange settlement risk. The work of the central banks is coordinated in the BIS[1] Committee on Payment and Settlement Systems, CPSS. In 1996, CPSS formulated a strategy to reduce foreign-exchange settlement risk, which

---

[1] The Bank for International Settlements (BIS) serves as a banker for central banks.

has been followed up regularly. Most recently, in April 2006, BIS conducted a survey of the market participants' management of foreign-exchange settlement risk, including their use of CLS. BIS' work in this respect is described in Box 2.

The following presents a general description of various settlement methods and the related risks, as well as an account of Danish participants' foreign-exchange settlement risk, based on the above BIS survey, among other things.

## DIFFERENT SETTLEMENT METHODS AND THE ASSOCIATED RISKS

Settlement risk on a foreign-exchange transaction arises when one party to the transaction has supplied the sold currency and has not yet received the purchased currency. Settlement risk comprises various types of risk:

- Credit risk is the risk of financial loss as a consequence of a counterparty's inability to meet its obligations, so that the purchased currency is received neither at the time of settlement nor at a later time.
- Liquidity risk is the risk of incurring a loss because the purchased currency is not received at the expected time. The loss arises e.g. if alternative liquidity can only be obtained at a cost.
- Operational risk is the risk of losses due to human errors, system errors and external events such as natural disasters, acts of terrorism, etc. In connection with foreign-exchange settlement, operational risk typically results in unexpected credit and/or liquidity risk on the purchased currency.

The most frequently used settlement methods and the related risks are described below. The terminology used is taken from the BIS reports on settlement risk.

### Settlement via correspondent banks and payment systems
A foreign-exchange transaction can be settled by exchanging the traded amounts via the traditional channels for international payments. Settlement of e.g. a euro/dollar transaction involves two opposite payments in, respectively, euro and dollars that are effected independently in payment systems for the two currencies, or via the parties' correspondent banks in euro and dollars.[1]

---

[1] For a more detailed description of payments via payments systems and correspondent banks, see Chapter 3 of *Payment Systems in Denmark*, Danmarks Nationalbank 2005.

73

---

STATUS OF A TRANSACTION DURING THE SETTLEMENT PROCESS                    Chart 1



(1) *Revocable:* The payment instruction for the sold currency has not yet been submitted, or it may be revoked without the consent of the correspondent bank and/or the counterparty. In this phase there is no settlement risk.

(2) *Irrevocable:* The payment instruction for the sold currency is irrevocable, i.e. it has been settled in the relevant payment system, or consent is required from e.g. the correspondent bank and/or the counterparty if it is to be revoked. A payment instruction may be irrevocable the moment it is sent. *Since the purchased currency has not yet been received, there is a settlement risk equivalent to the full amount of the transaction.*

(3) *Uncertain:* It is uncertain whether the purchased currency has been received since final verification will not take place until later. Consequently, there is still a potential settlement risk on the purchased currency.

(4) *Settled:* Receipt of the purchased currency has been verified. There is no longer any settlement risk.

(5) *Failed:* It is known with certainty that the purchsed currency has not been received as agreed. A settlement risk still exists until the currency is received.

---

### The BIS method for calculation of settlement risk

Settlement of foreign-exchange transactions via correspondent banks and payment systems involves settlement risk since the parties must supply the sold currency without having any guarantee that they will receive the purchased currency[1]. The exposure is equivalent to the purchased amount and lasts from the time of remittance of the sold currency until the time when the purchased currency has been received. The various settlement phases are illustrated in Chart 1.

As a minimum, the total exposure to settlement risk is equivalent to the sum of the transactions where payment of the sold currency is irrevocable, and where the purchased currency has not yet been received, and the transactions where it is known with certainty that the purchased currency has not been received. In Chart 1, this is equivalent to the sum of status (2) and (5) transactions. To this should be added the potential settlement risk on transactions where receipt of the purchased currency has not yet been verified. In Chart 1, this means that a

---

[1]  In addition to the settlement risk, there may be credit risk on the correspondent bank, as well as risks related to participation in payment systems. For a more detailed description of the risks connected with settlement of payments, see Chapter 4 of *Payment Systems in Denmark*, Danmarks Nationalbank 2005.

Monetary Review – 4th Quarter 2006

proportion of the status (3) transactions should be added to the exposure. The maximum exposure is thus the sum of status (2), (5) and (3) transactions.

The duration of a market participant's exposure to settlement risk on the individual transaction depends on the currencies traded and whether the transaction is settled via direct entry in payment systems or via the correspondent bank network. It is also of significance whether the two sides of the transaction are settled in different time zones. Surveys from 1997 showed that the settlement risk on a transaction typically had a duration of 10-37 hours, depending on the currencies traded. In some cases, the duration of the settlement risk was more than three days. Consequently, a market participant's current total exposure to settlement risk could be the aggregate value of several days' trading.

### Settlement via CLS

CLS is an international clearing and settlement system that settles foreign-exchange transactions in 15 currencies at present[1]. CLS was established as a bank owned by 69 of the world's largest private banks. In CLS, the two eligible payment instructions relating to a foreign-exchange transaction are settled simultaneously, i.e. Payment versus Payment, PvP. The parties to the transaction only supply the currency they have sold if they simultaneously receive the currency they have bought. Consequently, the parties to a CLS transaction incur no mutual credit risk. CLS settlement is described in Box 3.

CLS currently has 55 direct participants (settlement members), whose foreign-exchange transactions are settled via accounts with CLS. Only CLS shareholders can join as direct participants. In addition, there are around 750 indirect participants (third parties), who submit and settle their foreign-exchange instructions via direct participants. Direct participants are typically large international banks, while the – relatively – smaller banks, brokers, funds and non-financial corporations often participate as indirect participants.[2]

Transactions in CLS are settled by transferring the traded amounts between the relevant participants' accounts with CLS. The two sides of the transaction are entered to CLS' books simultaneously, i.e. PvP. Even though transactions are thus settled individually, the participants' pay-

---

[1] US, Canadian, Australian, New Zealand, Singapore and Hong Kong dollars, euro, Japanese yen, pounds sterling, Swiss francs, Korean won, South African rands, Danish and Norwegian kroner and Swedish kronor.

[2] A number of players in the Danish foreign-exchange market settle their transactions via CLS. Nordea and Danske Bank are direct participants, while Amagerbanken, Forstædernes Bank, HSH Nordbank, ISS Finans, ISS Global, Jyske Bank, Nykredit Bank, Saxo Bank and Sydbank are indirect participants.

ments to CLS are effected on a net basis[1]. Net pay-ins are split into several smaller pay-ins, which must be received by CLS at fixed times during the settlement day. Pay-outs to participants are made on an on-going basis. Pay-ins to and pay-outs from CLS take place via the national RTGS[2] systems. A participant need not be connected to all 15 RTGS systems, but may choose to let a "nostro agent" handle its pay-ins and pay-outs. A total of 48 large banks, typically settlement members themselves, offer nostro services to CLS participants.[3] For a more detailed description of CLS settlement see the Appendix.[4]

*Settlement risk in CLS*

The establishment of CLS has changed the risk scenario for foreign-exchange settlement. The application of the PvP settlement principle has eliminated the traditional credit risk between the parties to a foreign-exchange transaction. Settlement still involves a certain degree of liquidity risk since pay-ins to CLS must observe tight deadlines. In the structure of CLS settlement, great importance has, however, been attached to limiting the participants' liquidity requirements and thus their liquidity risk. A core element is that pay-ins to CLS take place on a net basis. This reduces the liquidity requirement in CLS considerably, cf. Box 3. The liquidity requirement is reduced further by splitting the individual participants' pay-ins in a given currency into several smaller, time-lagged pay-ins. In addition, liquidity management is supported by a number of online facilities, issue of initial pay-in schedules, etc.

For indirect participants in CLS settlement, the risk scenario is slightly different. Indirect participants incur no credit risk on their trading counterparties, but instead they may incur a minor credit risk on the direct participant. This is the case if the indirect participant pays in the sold foreign exchange to the direct participant in the morning and receives the purchased foreign exchange during the day. Unlike settlement outside CLS, the settlement risk is always incurred intraday, and the exposure solely corresponds to the net amount for each of the currencies sold.[5]

---

[1] As an example, a CLS member has submitted two foreign-exchange instructions: purchase of 100 million dollars against sale of euro, and purchase of kroner against sale of 100 million dollars. The two dollar positions eliminate each other so that the member in question pays only euro and receives only kroner.

[2] Real-Time Gross Settlement. An RTGS system is a payment system in which payments are settled *individually and immediately. RTGS systems are typically owned and operated by central banks.*

[3] Most CLS participants use Danske Bank and Nordea as nostro agents for their pay-ins and pay-outs in Danish kroner. SEB, ABN Amro and Jyske Bank also offer nostro services in Danish kroner.

[4] CLS is described in more detail in Chapter 8 of *Payment Systems in Denmark*, Danmarks Nationalbank, 2005.

[5] Another option is for the indirect participant to obtain intraday credit from the direct participant so that the amount due is payable by the end of business on the same day. In that case the direct participant incurs a credit risk on the indirect participant.

Monetary Review – 4th Quarter 2006

---

**CLS BANK INTERNATIONAL**                                            Box 3

CLS was established in 2002 by some of the world's largest private banks in response to the BIS strategy's call for development of risk-reducing settlement facilities. CLS currently settles foreign-exchange transactions in 15 currencies. The Danish krone, along with the Norwegian krone and the Swedish krona, joined CLS in September 2003. New currencies are added on an ongoing basis.

In April 2006, CLS settled an average of 125,000 foreign-exchange transactions daily, for a total value of 1,350 billion dollars. This is estimated to constitute around half of the global trade in foreign exchange.[1] The distribution of CLS settlement by currencies is shown in the Chart below. As the Chart illustrates, a large share of the foreign-exchange transactions have one leg in dollars.

The participants' payments to CLS are netted. Total daily pay-ins to CLS in April 2006 averaged 42 billion dollars, compiled as the sum of all net pay-ins translated into dollars. Net pay-ins constitute between 1 and 8 per cent of the gross settlement, which is the total trading value, depending on the currency. The Chart shows the netting effect (net pay-ins as a percentage of gross settlement) for the various currencies. It is seen that the netting effect increases with the gross settlement value for the currency in question.

The largest gross daily settlement value in CLS so far was just over 2,700 billion dollars. Total net pay-ins were 51 billion dollars. This record was achieved on 20 September 2006, the date on which quarterly futures settlement took place. The record for number of transactions, just over 250,000, was set on 17 January 2006, the day after Martin Luther King Day in the USA. Transactions in dollars cannot be concluded for settlement on US public holidays. The general pattern in connection with US public holidays is that settlement is postponed until the following day, so that the settlement volume in dollars almost doubles on these days.

TRANSACTION VALUE AND NETTING EFFECT IN CLS BY CURRENCIES



Note: Averages for April 2006.

[1]  The CLS settlement figures are not directly comparable with the BIS statistics for global foreign-exchange trading.

The concentration of settlement of foreign-exchange transactions in CLS means that risk is concentrated in CLS. CLS is a complex system that in practice interlinks 15 RTGS systems and 55 participants. Operational problems in the CLS system or settlement errors could therefore have a major global impact. For example, lacking or delayed pay-ins to CLS by one participant could delay pay-outs to other participants, so that RTGS systems in other countries might have to stay open for longer.

As a provision against system failures, parallel operation of the CLS system has been established in London and New York, and a complete "out of region" back-up solution is underway. When this solution has been fully implemented as planned in 2007, CLS will comply with the US authorities' enhanced requirements[1] after the attacks on the World Trade Center in New York on 11 September 2001. In addition, further contingency planning ensures that settlement can be concluded even if the participant with the largest negative net position does not meet its payment obligations. Any losses in connection with settlement are covered by a loss sharing agreement between the direct participants, which are large, well-capitalised private banks.

Overall, settlement of foreign-exchange transactions via CLS reduces the settlement risk *considerably compared* with traditional settlement methods. This is confirmed by a survey of the settlement risk of large US CLS participants two years after the introduction of CLS.[2] The aggregate settlement risk in the foreign-exchange market can thus be reduced by increasing the proportion of transactions settled via CLS. CLS is continuously working to introduce new currencies and products in CLS settlement. In future, this will enable CLS participants to settle a larger share of their foreign-exchange transactions via CLS. In addition, an influx of new participants is essential to the further growth of CLS settlement. Primarily the number of indirect participants is expected to rise.

## FOREIGN-EXCHANGE SETTLEMENT BY DANISH MARKET PARTICIPANTS

In the spring of 2006, BIS launched a survey of settlement risk on foreign-exchange transactions. The purpose is to establish the extent to which the objectives of the BIS strategy have been met, and whether further measures are required in order to reduce settlement risk. Approximately 100 financial institutions and enterprises from around 20 countries participate in the BIS survey. The participants have been selected with a view to covering at least 80 per cent of the foreign-exchange trading in the country in question. In addition, importance has been attached to the inclusion of different types of market participant, including both CLS participants and market participants without CLS access. For the purpose of the survey, the participants have supplied data for foreign-exchange transactions settled in April 2006 and answered questions about how they manage settlement risk in practice. The survey is based on the BIS definitions, cf. above. BIS expects to publish a report on the findings of the survey in 2007.

---

[1]  Cf. Board of Governors of the Federal Reserve System et al. (2003).
[2]  The Payments Risk Committee (2005).

78                      Monetary Review – 4th Quarter 2006



SETTLEMENT METHODS USED BY DANISH PARTICIPANTS                    Chart 3

Source: Stated by Danish participants in the survey in April 2006. Foreign-exchange transactions settled by foreign
branches of Danish banks are included.

Danmarks Nationalbank is responsible for the Danish part of the survey, comprising seven Danish market participants. Two of these do not currently have access to CLS settlement. Some of the results of the Danish part of the survey are outlined below. First, different settlement methods used by Danish participants are described. This is followed by a review of the participants' foreign-exchange settlement within and outside CLS, respectively. For settlement outside CLS, the exposure to settlement risk is calculated, as well as its duration and the concentration of settlement risk on the Danish participants' counterparties. Finally, the Danish participants' management of settlement risk in practice is described.

**Settlement methods used in Denmark**

Chart 3 shows the distribution by settlement methods for the seven Danish participants in the BIS survey. The five participants that have direct or indirect access to CLS settle an average of approximately 80 per cent of their transactions via CLS. The remaining transactions are settled via the traditional channels for international payments, or alternatively via own accounts[1] and bilateral netting[2]. Indirect participants in CLS, who do not

---

[1]  Foreign-exchange transactions between a bank and its customers can be settled via "own accounts" if the customer holds accounts with the bank in both the currencies traded. The settlement risk can be reduced if the bank offers a PvP service, so that accounts are debited and credited simultaneously. Settlement on own accounts can therefore take place with or without settlement risk.

[2]  Two parties set off their mutual claims so that only the net sums are exchanged.

Monetary Review – 4th Quarter 2006

79



CLS SETTLEMENT IN KRONER                                                        Chart 4

trade on behalf of customers, have the option to settle via CLS only. This is the case for one of the Danish participants in the survey, cf. Chart 3.

The two participants in the survey that do not have access to CLS mainly settle foreign-exchange transactions in the traditional manner via correspondent banks and/or payment systems. Consequently, these participants are exposed to settlement risk equivalent to the full amount of the purchased currency.

**Danish participants' use of CLS**

The BIS survey shows that CLS is now the most common method for settlement of foreign-exchange transactions among the large market participants in Denmark. This means that the credit risk on foreign-exchange settlement has been reduced significantly, which also benefits financial stability in Denmark.

Chart 4 shows CLS settlement in kroner on the basis of CLS data. It is seen that net pay-ins are very small relative to the aggregate value of the transactions settled, which illustrates the liquidity savings from net pay-ins, cf. above. On certain days – Danish or US public holidays – very few transactions in kroner are settled, if any. The reason is that the other leg in krone transactions is virtually always in dollars.

The tight deadlines for pay-ins for CLS settlement require strict liquidity management by the participants. For the Danish CLS participants, the largest single pay-ins on a daily basis are typically kr. 1-2 billion, but pay-ins exceeding kr. 10 billion are seen a few times a year. No Danish CLS

80           Monetary Review – 4th Quarter 2006

participant has indicated that the tight deadlines and the size of the individual pay-ins are problematic.

The BIS survey shows that on average approximately 20 per cent of the Danish CLS participants' foreign-exchange transactions are still settled in the traditional manner or via other settlement methods that involve some risk. The primary reason is that not all transactions can be settled via CLS. According to the participants, this applies to transactions in currencies or with counterparties that are not part of CLS, or transaction types, e.g. intraday transactions, that cannot be settled via CLS.

## Danish participants' settlement via correspondent banks and payment systems

Foreign-exchange transactions settled via traditional channels for international payments involve settlement risk on the full transaction amount, cf. above. It is important that the Danish market participants are aware of the size and duration of their exposures when settling outside CLS, and know how to reduce and manage such settlement risk.

### Size of the settlement risk

Chart 5 shows the total average daily exposures to settlement risk for the Danish participants in the BIS survey, except the one participant that



DANISH PARTICIPANTS' TOTAL EXPOSURE ON TRADITIONAL SETTLEMENT
– DAILY AVERAGES IN APRIL 2006           Chart 5

Source: Stated by Danish participants in the survey in April 2006. Foreign-exchange transactions settled by foreign branches of Danish banks are included.

always settles via CLS. The Chart shows that, after dollars, euro and kroner are the most frequently traded and settled currencies. On average, the Danish participants' aggregate daily exposure to settlement risk is approximately 34 billion dollars for all currencies taken as one. The exposures of the individual participants vary considerably in size.

In order to show whether these large exposures to settlement risk constitute a serious risk, the exposure of each participant can be compared to its equity capital. For participants with access to CLS, the exposure is lower than the equity capital in some cases, but slightly higher in other cases. For one of the participants without access to CLS, the exposure is several times the equity capital. This means that delayed payments from or failure of just a few counterparties could have serious implications, and consequently this participant must be extra prudent in its management of settlement risk.

*Duration of the settlement risk*

The exposure to settlement risk lasts from the time when payment of the sold currency becomes irrevocable to the time when final receipt of the purchased currency is verified, cf. Chart 1. Table 1 shows the exposures in hours of Danish participants in the BIS survey to settlement risk. The duration is calculated using the BIS definition and is shown for selected currencies. The longest and shortest exposures of the Danish participants are shown and averages calculated.

It is seen that the duration of the participants' exposures to settlement risk varies considerably. The BIS survey shows that the variation is attributable to major differences in the settlement practices of the participants. One participant has thus reduced the duration of the exposure to settlement risk, so that only intraday risk is incurred for the most fre-

| DANISH PARTICIPANTS' EXPOSURE, TRADITIONAL SETTLEMENT | | | | Table 1 |
|---|---|---|---|---|
| | Hours | | | |
| Purchase/sale of foreign exchange | Max. exposure | Min. exposure | Average exposure | Time difference[1] |
| Dollars/euro .................................................... | 42 | 22 | 29 | 6 |
| Euro/dollars .................................................... | 39 | 6 | 20½ | -6 |
| Dollars/yen ..................................................... | 68 | 37 | 45½ | 14 |
| Euro/yen ......................................................... | 68 | 16½ | 36 | 8 |
| Dollars/kroner ................................................ | 42½ | 22½ | 30 | 6 |
| Kroner/dollars ................................................ | 39 | 5 | 19¾ | -6 |
| Euro/kroner .................................................... | 42½ | 9 | 27¾ | 0 |
| Kroner/euro .................................................... | 42 | 8 | 26 | 0 |

*Source: Stated in the BIS survey from April 2006 by Danish participants settling in the traditional manner in that period.*
[1]  The difference between the time zones of the purchased and sold currencies.

quently traded currencies[1]. In contrast, one of the participants without access to CLS settlement is exposed to settlement risk for a far longer time than the other Danish participants.

For the individual participant, the duration of the exposure varies, depending on the currencies traded. This is a result of time differences, since the longest exposures are typically seen when the sold currency is from a more easterly time zone than the purchased currency[2]. The longest average exposures of the Danish participants relate to purchases of dollars, euro or kroner against yen, but the dollar/euro and dollar/kroner exposures are also long.

*Concentration of the settlement risk*

If the purchased currency is received from a small number of counterparties, the settlement risk is concentrated. This implies greater dependency on the individual counterparty meeting its obligations than if the settlement risk is distributed on a larger number of counterparties. The Danish participants in the BIS survey that have access to CLS spread their settlement risk on many counterparties, while the two participants that do not have access to CLS spread their settlement risk on a smaller number of counterparties.

*Danish participants' management of settlement risk*

The size and duration of the exposure to settlement risk may be considerable when transactions are settled outside CLS. However, market participants can actively limit their settlement risk by reducing the duration of the exposures. This can be done by postponing payment of the sold currency and/or by checking for receipt of the purchased currency at an earlier time.

The BIS survey shows that a few Danish participants have made considerable progress in their efforts to reduce the duration of the exposure. Among other things, they can enter payments directly to several of the relevant payment systems during the actual settlement day. Moreover, they check for receipt of the purchased currency regularly throughout the settlement day. One of the participants employs staff that check for certain currencies until 6 p.m. or later (Danish time) on the settlement day.

As Table 1 shows, however, several participants should be able to reduce the duration of their exposures substantially. For participants that settle solely via correspondent banks, the duration of the exposures can

---

[1]  Cf. Table 1, the column showing the minimum exposures for euro/dollars, kroner/dollars, euro/kroner and kroner/euro.
[2]  I.e. the currency pairs for which a positive time difference is stated in Table 1.

be reduced if agreements are concluded to postpone the deadline for remittance/withdrawal of amounts supplied. If settlement takes place via correspondent banks, receipt of the purchased currency cannot be verified until it has been confirmed by the correspondent bank, e.g. via a statement of account. The duration of the exposure may be reduced via an agreement with the correspondent bank to forward confirmation as soon as possible.

At present, it is not possible to eliminate settlement risk completely, and consequently market participants must be able to manage the existing settlement risk prudently. The Danish participants in the BIS survey have stated that they set limits to the exposure vis-à-vis the individual counterparties at any given time, depending on the credit ratings of the counterparties. In addition, the participants calculate their exposures to settlement risk on an ongoing basis. In other words, the participants manage their settlement risk in the same way as other types of credit risk.

## CONCLUSION

Danmarks Nationalbank supports the BIS strategy to reduce the settlement risk on foreign-exchange transactions and participates in the work to implement this strategy. The most recent BIS survey shows that the Danish participants generally manage settlement risk prudently. There is, however, scope for further reduction of settlement risk. This particularly applies to market participants whose exposure to settlement risk is very large in relation to their equity capital. Even though the individual market participant can reduce the duration of the exposure, CLS is the only settlement method that ensures settlement of foreign-exchange transactions without credit risk on the counterparty. Indirect participation in CLS significantly limits the credit risk.

Monetary Review – 4th Quarter 2006

# Appendix: Structure of CLS Settlement

CLS settlement participants hold multi-currency accounts with CLS, in which their balances in the various CLS currencies are registered. On the basis of the trading instructions submitted, CLS calculates the participants' net positions in each currency. Pay-ins to CLS take place in the national RTGS systems by transfer of the relevant amounts from the participants to the CLS account at the central bank and are automatically credited to the participants' accounts with CLS.

Foreign-exchange transactions are settled by transferring the amounts between the relevant participants' accounts with CLS. The two eligible payment instructions are settled simultaneously (PvP). Settlement of a transaction takes place subject to a number of risk measures, including that a participant's overall balance for all currencies must not be negative. This ensures that CLS does not incur a credit risk on the participants.[1]

In connection with pay-outs, CLS transfers funds from its own central bank account to the participants' central bank accounts via the national RTGS systems. At the same time, the pay-outs are debited to the participants' accounts with CLS. Pay-out are subject to CLS risk measures. If a participant does not have an account in an RTGS system, or does not have access to sufficient liquidity in a given currency, a nostro agent[2] in the relevant currency may be used.

The participants' pay-ins to and pay-outs from CLS are effected in the national RTGS systems for the currencies in question, as described above. To allow this, the RTGS systems must be open at the same time across the relevant time zones. Settlement in CLS has therefore been scheduled to take place between 7.00 a.m. and noon Central European Time (CET), i.e. afternoon/evening in Asia/Pacific and night/early morning in North America.[3] The CLS settlement cycle is outlined in Box 4.

---

[1] For a more detailed description of CLS risk management, see Danmarks Nationalbank (2005).
[2] Nostro agents are typically CLS participants who offer to send and receive payments in their "domestic currency" to and from CLS on behalf of other participants.
[3] The RTGS systems in Asia/Pacific close before noon CET. Therefore it is sought to settle and effect payments in these currencies before 10.00 a.m. CET.

| CLS SETTLEMENT CYCLE | Box 4 |
|---|---|

The participants submit trading instructions to CLS on an ongoing basis. At 00.00 CET, CLS calculates each participant's preliminary net position for each currency and sends out an initial pay-in schedule to participants. Until 6.30 a.m. it is possible to submit trades for settlement on the same day. Immediately after 6.30 a.m. CLS sends out the final pay-in schedule to participants. A participant's total pay-in is broken down into three or five pay-ins per currency. Pay-ins must be received by CLS within fixed time limits, cf. the Chart.



At 7.00 a.m. CLS opens for settlement of foreign-exchange transactions, and as soon as CLS has received pay-ins from the participants or their nostro agents settlement commences. Foreign-exchange transactions are settled individually by simultaneously entering the two sides of a transaction (PvP) to the respective participants' accounts with CLS. CLS seeks to settle and enter all foreign-exchange transactions by 9.00 a.m. In accordance with CLS' risk measures, settlement of trades may be concluded before all pay-ins have been received. Currency pay-outs do not take place according to a fixed schedule, but on an ongoing basis subject to CLS' risk measures. It is sought to conclude pay-outs in Asian/Pacific currencies immediately after 10.00 a.m. and in other currencies immediately after noon.

## LITERATURE

BIS, 1996. *Settlement Risk in Foreign Exchange Transactions,* Report prepared by the Committee on Payment and Settlement Systems, Bank for International Settlements, March 1996.

BIS, 1998. *Reducing Foreign Exchange Settlement Risk: A Progress Report,* Report prepared by the Committee on Payment and Settlement Systems, Bank for International Settlements, July 1998.

BIS, 2000. *Supervisory Guidance for Managing Settlement Risk in Foreign Exchange Transactions,* Basel Committee on Banking Supervision, Bank for International Settlements, September 2000.

BIS, 2005. *Triennial Central Bank Survey. Foreign Exchange and Derivatives Market Activity in 2004.*

Board of Governors of the Federal Reserve System et al., 2003. *Interagency Paper on Sound Practices to Strengthen the Resilience of the U.S. Financial System,* April 2003.

CLS Bank International, *Regulator's Summary, International Rules* and *Member Handbook.*

CLS home page: www.cls-services.com

Danmarks Nationalbank, 2005. *Payment Systems in Denmark.*

Norges Bank, 2000: *Settlement risk in foreign exchange transactions.* Economic Bulletin, Q4 2000.

The Payments Risk Committee, 2005. *Foreign Exchange Settlement Risk, Report by the FX Settlement Risk Task Force,* February 2005.

# EXHIBIT 11

## Rob Sokohl

| | |
|---|---|
| **From:** | Rob Sokohl |
| **Sent:** | Monday, March 13, 2006 11:15 AM |
| **To:** | 'wtanenbaum@kayescholer.com' |
| **Cc:** | 'ian.shepherd@alicecorp.com' |
| **Subject:** | License Agreement |
| **Attachments:** | Draft CLS License Agreement 13.03.06.doc¤ |

Bill,

Attached is a draft license agreement between Alice and CLS. Alice's board has the expectation that this agreement provides the appropriate framework for its discussions with CLS in April. I ask that you forward the document to CLS.

Thank you.

Kind regards,

Rob

3/13/2006

DRAFT LICENSE AGREEMENT

BETWEEN

ALICE CORPORATION PTY LTD

AND

CLS GROUP HOLDINGS AG

AND

CLS BANK INTERNATIONAL

AND

CLS SERVICES LTD

MARCH 13, 2006

1

This Agreement, by and between

Alice Corporation Pty Ltd., ACN 069 586 036, an Australian company, having its principal place of business at [TBA] (**Alice**)

and

CLS Group Holdings AG, a Swiss company, having its principal place of business at [TBA] (**CLS Group**)

and

CLS Bank International, an Edge corporation organized under the laws of the United States, having its principal place of business at 39 Broadway, 29th Floor, New York, NY 10006 (**CLS Bank**)

and

CLS Services Ltd, a limited company incorporated under the laws of England and Wales, having its principal place of business at [TBA] (**CLS Services**),

is effective as of _____ (**Effective Date**)

and

Alice, CLS Group, CLS Bank and CLS Services (individually, a **Party**; collectively, the **Parties**) agree as follows:

### Section 1.    Definitions

1.1     **CLS Entity** means one or more of CLS Group, CLS Services and CLS Bank.

1.2     **CLS Settlement Member** means a person who, or company which, at the time CLS Bank performs the service of administering the exchange of a foreign exchange transaction settlement obligation in relation to that person or company:

(a)     is a shareholder of CLS Group; and

(b)     and, as a result of being a shareholder of CLS Group, is entitled to all of the following benefits:

2

(i)     to submit settlement instructions directly to CLS Bank and receive information on the status of those instructions;

(ii)    to have a multi-currency account with CLS Bank, with the ability to move funds;

(iii)   to have direct access and inputs deals on its own behalf and on behalf of customers; and

(iv)    to provide a branded CLS service to its third-party customers as part of an agreement in force with CLS Bank.

1.3     ***CLS User Member*** means a person who, or a company which, at the time CLS Bank performs the service of administering the exchange of a foreign exchange transaction settlement obligation in relation to that person or company, does not have an account with CLS Bank but:

(a)     is entitled under an agreement in force with CLS Bank to submit settlement instructions for itself and its customers; and

(b)     is sponsored by a CLS Settlement Member who acts on its behalf to authorize instructions from it for settlement through the CLS Settlement Member's account.

1.4     ***License*** means the licenses granted by Alice to CLS Bank and CLS Services under Section 2 of this Agreement.

1.5     ***Licensed Patents*** means:

(a)     the patents listed in the attached Exhibit A;

(b)     any patents that may issue from any of the pending patent applications listed in the attached Exhibit A;

(c)     any patents that may issue from any continuation or divisional that has priority based upon any of the patents or patent applications listed in the attached Exhibit A;

(d)     any patents that the patents in Exhibit A claim priority from;

(e)     any re-issues, renewals, substitutions, re-examinations and extensions of any of the patents described in (a), (b), (c), and (d) above ; and

(f)     any foreign patents corresponding to any of the patents described in (a), (b), (c), (d) or (e) above.

3

1.6    ***Licensed Service*** means the service performed by CLS Bank of administering the exchange of foreign exchange transaction settlement obligations between CLS Settlement Members.

1.7    ***Licensed System*** means the system developed by International Business Machines Corporation for CLS Group and which, at the Effective Date, CLS Services administers to allow CLS Bank to provide Licensed Services.

1.8    ***Matched foreign exchange transaction pair*** means a matched buy/sell pair of transactions with respect to the national currencies of two countries.

1.9    ***Royalty Period*** means any period of three (3) consecutive calendar months commencing on 1 January, 1 April, 1 July or 1 October, except that the first Royalty Period shall begin on the Effective Date and shall end on the last day of the next March, June, September or December, whichever occurs first, and the last Royalty Period shall end on the last day of the Term.

1.10   ***Term*** means the term of the License as set forth in Section 4 of this Agreement.


**Section 2.    The License**


2.1    <u>Grant</u>.  Alice grants to:

    (a)    CLS Bank a non-exclusive, non-transferable, royalty-bearing, non-sub-licensable license under the Licensed Patents to provide the Licensed Services during the Term; and

    (b)    CLS Services a non-exclusive, non-transferable, royalty-free, non-sub-licensable license under the Licensed Patents to use and import the Licensed System during the Term strictly as necessary to enable CLS Bank to provide the Licensed Services in exercise of the rights granted to CLS Bank under paragraph (a) above.

2.2    <u>Release</u>.  In consideration of, and effective upon, receipt of the payment required under Section 3.1, Alice releases each CLS Entity from any and all claims of infringement, including claims to treble damages for willful infringement, of the Licensed Patents based upon CLS Bank providing the Licensed Services and CLS Services making, using or importing the Licensed System, and the right to injunct the conduct of the business of CLS Bank before the Effective Date.

4

2.3    <u>Patent Marking</u>.  Wherever and whenever:

    (a)    CLS Bank provides, or offers to provide, Licensed Services to any third party (including to an existing or prospective CLS Settlement Member or CLS User Member); or

    (b)    CLS Services makes available the Licensed System; or

    (c)    any CLS Entity makes any public representation concerning the Licensed Services or the Licensed System;

    that CLS Entity must ensure that it does so in a manner that:

        (i)    makes it clear that it is a licensee of Alice; and

        (ii)    otherwise complies with the marking requirements set forth in 35 U.S.C. § 287(a) or such other marking requirements of the jurisdiction(s) in which such activity takes place.

2.4    <u>Reservation of Rights</u>.  All rights not expressly granted in this Agreement are reserved.  No additional rights whatsoever (including, without limitation, any implied licenses) are granted by implication, estoppel or otherwise.  Without limiting the generality of the foregoing, the License does not include, and Alice does not grant, any right under any patent or intellectual property other than the Licensed Patents.

2.5    <u>Publicity</u>.  Upon Alice's request, within thirty (30) days after the Effective Date, Alice and CLS Group must promptly prepare and issue a mutually acceptable press release, or other public announcement, that the Parties have entered into this Agreement for provision of Licensed Services and use of the Licensed System (including, without limitation, a statement or other quote from an appropriate executive officer of CLS Group).  Alice and CLS Group must also develop a mutually acceptable statement of their relationship under this Agreement that any Party may use in any public announcement, marketing materials or other publication without further consent or approval of the other Parties.

**Section 3.    Payments**

3.1    <u>License Fee</u>.  CLS Bank must pay to Alice **REDACTED**
                       on the Effective Date.

3.2    <u>Royalties</u>.

3.2.1  Commencing in 2007, on, or before, 7 January in each remaining calendar year during the Term, CLS Bank must pay to Alice the following licence fees (***Annual Fee***):

    (a)  for each of the years 2007 - 2011:      -
                   ; and

    (b)  for each of the years 2012 - 2016:      -

**REDACTED**

3.2.2  Subject to this clause, for the period from 1 January 2005 until the expiry of the License (specified in Section 4.1), CLS Bank must pay to Alice a royalty of       per matched foreign exchange transaction pair processed by CLS Bank. Within forty-five (45) days after the end of each Royalty Period, CLS Bank must submit to Alice, at its address for notices under Section 6.6 of this Agreement, a complete and accurate Royalty Report (in the form attached as Exhibit B, as the same may be updated from time to time by Alice), and simultaneously with such submission, CLS Bank must pay to Alice all royalties due for transactions processed during that Royalty Period. CLS Bank may credit an Annual Fee paid in respect of a calendar year against any royalties due for Royalty Periods occurring during that calendar year, so that CLS Bank need not make any payment in respect of Royalty Periods in a calendar year until the royalties due for such Royalty Periods exceed the Annual Fee paid for that calendar year. In the first Royalty Period, commencing on the Effective Date, CLS Bank's payment to Alice must be in respect of the royalty on all matched foreign exchange transaction pairs processed by CLS since 1 January 2005. Against this payment obligation, being a portion of CLS Bank's total payment obligation to Alice in 2006, CLS Bank may credit a deemed         Annual Fee in respect of both the 2005 and 2006 calendar years.

3.2.3  Within 60 days of the end of each calendar year, CLS Entity shall procure that the Royalty Reports for that calendar year are audited by a firm which audits the accounts of at least one of them and, if none has an auditor, an auditor appointed by Alice for the purpose. The report signed by such auditor shall be substantially in the form of Exhibit C and shall be delivered to Alice with all supporting documentation within 74 days of the end of the year to which the Audit Report relates.

3.2.4  During the Term and for a period of at least three (3) years thereafter, each CLS Entity must keep and maintain complete and accurate books and records of all Licensed Services provided by CLS Bank and the Licensed System used by CLS Services.

6

3.2.5   In the event that the Audit Report is qualified, or no report is provided in accordance with Clause 3.2.3, upon not less than fourteen (14) days advance written notice from Alice, each CLS Entity must make such books and records available for audit by an independent certified public accounting firm (together with independent technical personnel if, and as reasonably, required for such accountant to perform the audit) designated by Alice. Unless otherwise agreed by Alice and CLS Group, any such audit shall be conducted during regular business hours, at the principal places of business of any CLS Entity wherever situated in a manner that does not unreasonably interfere with the normal course of business of that CLS Entity.

3.2.6   If any audit conducted pursuant to Clause 3.2.5 reveals an overpayment, then CLS Bank shall receive a credit, in the amount of such overpayment, that will be applied only against future royalties payable under this Section 3.2. If any audit reveals an underpayment, then CLS Bank must pay to Alice the amount of the underpayment, together with interest as provided for in Section 3.4, within thirty (30) days after the date of the auditor's report. CLS Bank must promptly reimburse Alice, upon request, for all costs and expenses reasonably incurred by Alice to conduct an audit under Clause 3.2.5.

3.3   <u>Method of Payment</u>.  CLS Group and CLS Bank must make any and all payments to Alice under this Agreement in currency of the United States without any withholding (except as specifically provided for in Section 3.5), deduction, offset, setoff or other charge.  CLS Group or CLS Bank (as the case may be) must make such payments in immediately available funds by wire transfer to the following account with the following reference or such other account and reference as Alice may specify by notice to CLS Group in accordance with Section 6.6 of this Agreement:

Alice Corporation
Account
INFORMATION
Reference:  Patent Licensing Fee

CLS Group or CLS Bank (as the case may be) must also send notification of each wire transfer to ▓▓▓▓▓▓▓▓.

3.4   <u>Delinquent Payment</u>.  Any License Fee, Annual Fee, royalty or other amount not paid when due and otherwise in accordance with this Section 3, shall bear interest at the rate of one percent (1%) per month or the highest rate permitted by applicable usury law, whichever is less, calculated on a daily basis and compounded on the first day of each calendar month, from the date due until the date received by Alice in

7

accordance with Section 3.3. This Section 3.4 does not authorize late payments, and the payment of interest hereunder shall not be in lieu of, or prejudice, any other right or remedy that Alice may have on account of any failure to make any payment in accordance with this Section 3.

3.5    Taxes

3.5.1    Each of CLS Group and CLS Bank shall be responsible for the billing, collecting and remitting of sales, use, value added, and other comparable taxes due with respect to the exercise of the License and any other activities of CLS Group, CLS Services and CLS Bank under this Agreement (including, without limitation, the collection of revenues and any sales tax, value added tax, goods and services tax or other like tax levied on any payments due to Alice under this Agreement). Alice is not liable for any taxes (including, without limitation, any penalties or interest thereon) that CLS Group, CLS Services or CLS Bank or any one or more of them is legally obligated to pay in connection with this Agreement, the exercise of the License or any other activities of CLS Group, CLS Services or CLS Bank under this Agreement. None of CLS Group, CLS Services or CLS Bank is liable for any income taxes that Alice is legally obligated to pay with respect to any amounts paid to Alice by CLS Group or CLS Bank under this Agreement. CLS Group or CLS Bank must pay all stamp duty levied on or in connection with this Agreement.

3.5.2    CLS Group, CLS Services and CLS Bank must indemnify, defend and hold Alice harmless from any taxes (including, without limitation, sales or use taxes paid by any of CLS Group, CLS Services and CLS Bank to Alice) or claims, causes of action, costs (including, without limitation, reasonable attorneys' fees) and any other liabilities of any nature whatsoever related to any taxes referred to in Section 3.5.1.

3.5.3    If, after a determination by foreign tax authorities, any taxes are required to be withheld on royalty payments made by CLS Entity to Alice under Section 3.2, and, pursuant to any applicable tax treaty to which Australia is a signatory, Alice is able to obtain a credit for such withheld taxes, CLS Bank may deduct such taxes from the amount owed to Alice and pay them to the appropriate taxing authority; provided, however, that CLS Bank must promptly secure and deliver to Alice an official receipt for any such taxes withheld or other documents necessary to enable Alice to claim a credit for such taxes. CLS Bank must ensure that any taxes withheld are minimized to the extent possible under applicable law.

8

3.5.4 This Section 3.5 shall govern the treatment of all taxes arising as a result of, or in connection with, this Agreement notwithstanding any other section of this Agreement.

3.6    CLS Group Guarantee.

3.6.1 In consideration of Alice entering into this Agreement with, and granting licences to, CLS Bank and CLS Services, CLS Group agrees and covenants with Alice as follows:

(a)    to guarantee the due and punctual payment by CLS Bank of all monies payable by CLS Bank or CLS Services to Alice in accordance with this Agreement;

(b)    to guarantee the observance and performance by CLS Bank and CLS Services of each and all of their respective obligations under this Agreement, including the indemnity in Section 5.5; and

(c)    to indemnify and keep indemnified Alice from any loss or damage which Alice may suffer as a result of the non-payment of any monies due pursuant to the Agreement or from the failure of CLS Bank or CLS Services to perform each and all of their respective obligations under this Agreement;

3.6.2 The guarantee given under clause 3.6.1 (*Guarantee*) is a continuing guarantee and will remain in full force until the full amount for which CLS Bank and CLS Services are liable hereunder has been paid to Alice and will continue throughout any renewal or extension of this Agreement.

3.6.3 The Guarantee will be a principal obligation and will not be treated as ancillary to, or collateral with, any other obligation howsoever created to the intent that this Guarantee will be enforceable without taking any steps or proceedings against CLS Bank and CLS Services and notwithstanding any loss by Alice of any security and notwithstanding any laches acts or omissions on the part of Alice.

3.6.4 In the event of liquidation of CLS Bank or CLS Services, CLS Group will not be entitled to prove in such liquidation in competition with Alice. CLS authorises Alice to prove for all moneys owing to CLS Group by CLS Bank or CLS Services and not paid, and to retain, and to carry to, a suspense account and at the discretion of Alice to appropriate amounts received in respect thereof until Alice has received 100 cents in the dollar in respect of such moneys owing to it by CLS Bank and CLS Services. CLS Group waives in

9

favour of Alice all rights whatsoever against CLS Bank and CLS Services and any other person, estate or asset as far as is necessary to give effect to the Guarantee.

3.6.5   The liability of CLS Group under the Guarantee will extend to all amounts that Alice has been paid by CLS Bank or CLS Services but which Alice is obliged to repay on the grounds of preference or for any other reason.

3.6.6   To the extent permitted by law, the provisions of any act, regulation or proclamation now or hereafter in force providing for the postponement of payment of debts or affecting the exercise of the rights of creditors are hereby expressly excluded from and will not apply to the obligations of CLS Group to the Guarantee.

3.6.7   A demand on CLS Group may be made and will be good and sufficient although as against CLS Bank and CLS Services the indebtedness guaranteed may be barred by some act or statute.

**Section 4.    Term and Termination**

4.1    <u>General</u>.  The term of the License shall commence as of the Effective Date and expire on 19 October 2016 unless, before that date, Alice gives CLS Group written notice of termination in accordance with Section 4.2 or 6.8.

4.2    <u>Early Termination by Alice</u>.  Alice may terminate this Agreement by giving CLS Group written notice of termination in the event that any of the following applies:

(a)    any of CLS Group, CLS Bank or CLS Services commits any breach of this Agreement (including, without limitation any failure to make any payment when due) and fails to cure such breach within thirty (30) days after Alice gives CLS Group, CLS Bank or CLS Services written notice of such breach;

(b)    any of CLS Group, CLS Bank or CLS Services commences, directs or controls any legal action seeking to render any of the Licensed Patents or any claim under any of the Licensed Patents invalid or unenforceable;

(c)    any of CLS Group, CLS Bank or CLS Services enters into any form of insolvency or administration including the following:

10

       (i)    stops or suspends or threatens to stop or suspend payment of all or a class of its debts; or

       (ii)   becomes insolvent, has an application or order made, proceedings commenced, a resolution passed or proposed in a notice of meeting, an application to a court made or other steps taken against or, in respect of it for its winding up, deregistration or dissolution or for it to enter an arrangement, compromise or composition with or assignment for the benefit of its creditors, a class of them or any of them; or

(d)    any of CLS Group, CLS Bank or CLS Services ceases to operate or disposes of that part of its business which includes the operation of Licensed System.

4.3    <u>Effect of Expiration or Termination</u>.  Upon expiry or termination of this Agreement for any reason, each License will terminate.  Sections 2.2, 2.4, 3.5, 3.6, 4.3, 5 and 6 of this Agreement shall survive any expiration or termination.  However, any expiration or termination shall be without prejudice to any right or remedy of any Party arising out of any breach of this Agreement, including without limitation recovery of any monies due or claimed due under this Agreement.

**Section 5.    Acknowledgment, disclaimer, insurance and indemnity**

5.1    <u>Acknowledgment</u>.  Each of CLS Group, CLS Bank and CLS Services acknowledges that:  (a) Alice is the owner of the Licensed Patents; and (b) it has the right to grant the License.

5.2    <u>Disclaimer of Warranties</u>.  ALICE DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED. FURTHER, ALICE HAS NOT MADE, AND DOES NOT MAKE, ANY REPRESENTATION OR WARRANTY: WITH REGARD TO THE SCOPE, COVERAGE, VALIDITY OR ENFORCEABILITY OF ANY OF THE LICENSED PATENTS; WITH RESPECT TO ANY LICENSED SERVICE OR LICENSED SYSTEM; OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; THAT THE LICENSED PATENTS APPLY WORLDWIDE; THAT THE LICENSED PATENTS ARE NOT BEING INFRINGED BY ANY THIRD PARTY OR THAT ANY LICENSED SERVICE OR LICENSED SYSTEM IS, OR WILL BE, FREE FROM INFRINGEMENT OF ANY PATENT OR OTHER INTELLECTUAL PROPERTY RIGHT OF ANY THIRD PARTY.

11

5.3    <u>Responsibility for Licensed Services and Licensed System</u>.  Without limiting the generality of Section 5.2, CLS Group shall be solely responsible for the quality, performance and all other aspects and characteristics of any Licensed Services and of the Licensed System. CLS Group shall conduct such tests and implement such other measures as may be required to ensure the suitability and merchantability of any Licensed Services and Licensed System and to otherwise protect against any injury, damage or loss that may arise out of any failure or malfunction of any Licensed Services and the Licensed System.

5.4    <u>DISCLAIMER AND LIMITATION OF DAMAGES</u>.  IN NO EVENT SHALL ALICE BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR INDIRECT DAMAGES ARISING OUT OF, OR RELATED TO, THE LICENSE OR THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ANY LOSS OF REVENUE, PROFIT OR USE) EVEN IF ALICE HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES.

5.5    CLS Group must:

(a)    obtain, and keep in full force and effect at all times, adequate insurance policies to insure itself and CLS Bank and CLS Services from any and all liability which may arise in connection with the exercise of the License;

(b)    note on all insurance policies maintained by it in accordance with this Agreement, the interest of Alice and procure that the insurer notifies Alice of late payment of any premiums by CLS Group;

(c)    deliver to Alice copies of all applicable insurance policies taken out pursuant to this Agreement together with Certificates of Currency;

(d)    not cause, or permit, any breach of any insurance policy required to be maintained under this Agreement; and

(e)    at all times indemnify Alice and its Related Bodies Corporate and their respective directors, officers, employees and agents against any loss including economic and consequential loss, costs (including legal costs on an indemnity basis), expenses, demands or liability, whether direct or indirect, arising out of, any claim, proceeding or demand where such loss, cost, expense, demand or liability is the direct or indirect result of:

(i)    a breach by any of CLS Group, CLS Bank or CLS Services of their respective obligations under this Agreement;

(ii)   any unlawful or negligent act or omission by, or wilful default of, any of CLS Group, CLS Bank or CLS Services; or

(iii)  the exercise by either of CLS Bank or CLS Services of their respective rights under the License.

## Section 6.   Miscellaneous

6.1   <u>No Right to Technology</u>.  Alice shall not have any obligation under this Agreement to disclose or otherwise make available to CLS Group, CLS Services or CLS Bank any software, programs, specifications, designs, technical data, know-how or other technology, whether or not the same may be required for the exercise or commercial exploitation of the License.

6.2   <u>Compliance with Laws</u>.  The Licensed Patents are of US origin for purposes of US export control laws.  CLS Group, CLS Bank and CLS Services must comply with all applicable international and national laws and regulations in the performance of all of their activities under the License and this Agreement, including the U.S. Export Administration Regulations, as well as end-user, end use and destination restrictions issued by US and other governments.

6.3   <u>Confidentiality</u>.  Each party (a recipient) agrees that it will maintain in confidence any information disclosed to it by the other (a discloser) except to the extent that such information:

(a)   was already known to the recipient as shown by the written records of the recipient;

(b)   may be required by applicable law or judicial or governmental order provided that the recipient gives to the ***discloser*** reasonable notice to enable the discloser to seek a protective order, or obtains written assurance (to the satisfaction of the discloser) that the Agreement will receive appropriate protection);or

(c)   is permitted to be disclosed by the written consent of the discloser.

Nothing in this Section 6.3 will restrain a Party from using, or disclosing, any information which has entered the public domain other than by a breach of an obligation of confidence (including an obligation in this Section 6.3) owed to the discloser.

6.4   <u>Entire Agreement, Modifications and Waiver</u>.  This Agreement constitutes the entire agreement between the Parties with respect to its subject matter

and supersedes all prior and contemporaneous agreements, whether written or oral. This Agreement shall not be modified except by a written agreement signed by an authorized representative of all Parties. Failure by a Party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that provision.

6.5    Invalid Clauses. If any term of this Agreement (other than Sections 2.2, 3.1, 3.2, 3.6,  5.2,  5.4, 5.5(e) or 6.8)  is found by a court of competent jurisdiction to be in whole or in part unenforceable, then the remainder of this Agreement shall continue in effect so long as the Agreement still expresses the intent of the Parties. If the intent of the Parties cannot be preserved, or if any one of more or of the Sections listed in the previous sentence, in whole or in part, is found to be unenforceable, this Agreement shall be null and void.

6.6    Notices.

6.6.1  Unless otherwise agreed in writing, any notices given under this Agreement (**Notice**):

   (a)    must be in writing and signed by a person duly authorised by the sender; and

   (b)    must be either delivered by hand, sent by facsimile, or sent via certified or registered mail, postage prepaid and return receipt requested.

6.6.2  A Notice will be taken to be duly given or made:

   (a)    if delivered by hand, upon receipt by the party to whom the Notice is addressed, or upon receipt by any other person then upon the premises at the relevant address who reasonably appears to be authorised to receive post or other messages on behalf of the relevant party;

   (b)    if sent by facsimile transmission, upon the transmission of the Notice to the relevant facsimile number and the receipt by the transmitting facsimile machine of an answer back code showing that the facsimile message has been received properly by the facsimile machine to which it was transmitted; or

   (c)    if sent by certified or registered mail, three (3) business days (if posted within Australia to an address in the same country) or ten (10) Business Days (if posted from one country to another) after the date upon the registration receipt provided by the relevant person or authority,

14

but if a Notice is served by hand, or received by the recipient's facsimile, on a day that is not a business day, or after 5.00pm on a business day, the notice will be considered to have been received by the recipient at 9.00 am on the next business day.

6.6.3  Any notices to CLS Group must be addressed to:



Any notices to Alice must be addressed to:



6.6.4  Each party must send a notice to the other party in accordance with these clauses of any changes in its address or facsimile number.

6.6.5  Each of CLS Group, CLS Bank and CLS Services agree that any Notice served by Alice on CLS Group under (including any notice of breach or termination under Section 4.2) will be deemed to also have been served on each of CLS Bank and CLS Services, and that Alice need not separately serve any Notice on CLS Bank or CLS Services.

6.7  <u>Jurisdiction, Governing Law and Attorneys' Fees</u>.  This Agreement shall be construed and controlled by the laws of the State of New York, USA, except to the extent US federal law is controlling on a subject matter, such as assignability.  Any dispute, controversy or claim arising under, out of or relating to this Agreement and any subsequent amendments of this Agreement, including, without limitation, its formation, validity, binding effect, interpretation, performance, breach or termination, as well as non-contractual claims, will be submitted to mediation in accordance with the WIPO Mediation Rules. The place of mediation shall be Singapore. The language to be used in the mediation will be English.

If, and to the extent that, any such dispute, controversy or claim has not been settled pursuant to the mediation within 60 days of the commencement of the mediation, it will, upon the filing of a Request for Arbitration by either party, be referred to and finally determined by arbitration in accordance with the WIPO Arbitration Rules then in force. Alternatively, if, before the expiration of the said period of 60 days, either party fails to participate or to continue to participate in the mediation, the dispute, controversy or claim will, upon the filing of a Request for Arbitration by the other party, be referred to and finally determined by arbitration in accordance with the WIPO Arbitration Rules then in force. The arbitral tribunal will consist of a sole arbitrator. The place of arbitration will be Singapore. The language to be used in the arbitral proceedings will be English.

15

The dispute, controversy or claim referred to arbitration will be decided in accordance with the law of the State of New York, USA.

6.8    <u>Assignment</u>.  None of CLS Group, CLS Bank nor CLS Services may transfer or assign the License, this Agreement or any rights, license or obligations hereunder to any third party, whether by operation of contract, law or otherwise (including, without limitation, in connection with the insolvency or bankruptcy of any of them).  Any attempted transfer or assignment in violation of this Section shall be void; and, in the event of any such assignment or attempted assignment, Alice shall have the right to immediately terminate this Agreement without prejudice to Alice's rights to pursue all other remedies available under this Agreement or at law.

6.9    <u>No Third Party Beneficiaries</u>.

(a)    This Agreement is for the benefit of, and shall be enforceable by, the Parties only;

(b)    This Agreement is not intended to confer any right or benefit on any third party; and

(c)    No action may be commenced or prosecuted against a Party by any third party (including, without limitation, Subsidiaries) claiming as a third-party beneficiary of this Agreement or the License.

6.10    <u>Counterparts and Facsimile</u>.  This Agreement may be executed in two counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement.  Notwithstanding the foregoing, the parties shall deliver original executed copies of this Agreement to each another as soon as practicable following execution thereof.

[Signature Page Follows]

16

IN WITNESS WHEREOF, the Parties have caused this Agreement to be made and executed by duly authorized officers. Each signatory certifies that (s) he has the power to bind the Party on whose behalf (s) he executes this Agreement.

CLS Group Holdings AG

By: _____

Name: _____

Title: _____

Date Signed: _____

Alice Corporation Pty Ltd

By: _____

Name: _____

Title: _____

Date Signed: _____

CLS Bank International

By: _____

Name: _____

Title: _____

Date Signed: _____

CLS Services Limited

By: _____

Name: _____

Title: _____

Date Signed: _____

17

**EXHIBIT A**

1.    List of Licensed Patents:

    1.1    Patents:

            1.1.1 U.S. 5,970,479 (claims 33 and 34)

            1.1.2 U.S. 6,912,510

    1.2    Patent Applications:

            1.2.1 U.S. - [TBA]

            1.2.2 Japan -- [TBA]

            1.2.3 Canada -- [TBA]

18

**EXHIBIT B**
**ROYALTY REPORT**

19

**EXHIBIT C**

**AUDIT REPORT**

We have conducted our audit in accordance with those elements of generally accepted international standards on auditing relevant for the purposes of forming an opinion on the Royalty Reports.  These standards require that we plan and perform the audit in order to obtain reasonable assurance as to whether the Royalty Reports are free of material misstatements.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the Royalty Reports.  An audit also includes assessing the accounting principles used, and any estimates made, by management as well as evaluating the overall presentation of the Royalty Reports.  We believe that our audit provides a reasonable basis for our opinion.

**Opinion**

In our opinion, the Royalty Reports referred to above present fairly in all material respects, the information required to be reported under the Agreement by each CLS Entity for the calendar year ending <year> and the amount of royalties payable under the Agreement referred to above.

# EXHIBIT 12



**THE ASIAN BANKER**
STRATEGIC BUSINESS INTELLIGENCE FOR THE FINANCIAL SERVICES COMMUNITY

**Getting legislation changed**
304 words
31 December 2005
The Asian Banker
English
(c) 2005 TAB INTERNATIONAL PTE LTD

( FI Business )

As a "banker's bank," CLS Bank was set up three years ago and now boasts 585 live members. In 2005 it hit two new records: 400,000 instructions in one day and a peak value of $4 trillion one day in March.

Joseph De Feo, founding CEO counts "every significant financial institution in every significant economy in the world" as members, including the majors in Australia, Hong Kong, Japan and Singapore.

Counting its close relationships with some 23 central banks as a key strength, De Feo remarks: "we are the only bank in the world that has been given the ability to have central bank accounts and access the central bank services to real-time gross settlement services to one legal entity and one central location."

Jonathan Butterfield, executive vice president of marketing and communication adds, "we get legislative change made." Such was the case when the Korean won was added in 2004: there were loopholes in the finality definition in the commercial code, giving courts the authority to call back money in a bankruptcy or administration procedure – which did not meet CLS' participation requirements.

As new currencies are brought on, Butterfield says that the job becomes more challenging. "We do a lot of testing to make sure they will work; we are going to be pushing huge numbers through it, so we bring them on in a group to try to make the most efficient way to do it."

CLS is extending its services – settling cash flow positions for non-deliverable forwards and foreign exchange option premiums, in addition to existing ones in spots, forwards, options and swaps.

The group is also preparing for the future. Rob Close will take over from De Feo upon his retirement in January 2006. – Peter Hoflich

Copyright © TAB International Pte. Ltd.

Document ASABNK0020051230e1cv00009

© 2007 Factiva, Inc. All rights reserved.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| ———————————————— | ) | |

**[PROPOSED] ORDER**

This matter is before the Court on the Motion of CLS Bank International and CLS

Services Ltd. To Dismiss the Counterclaims, or, Alternatively, for Summary Judgement.  Upon

consideration of this Opposition and the entire record herein, it is hereby

ORDERED that the Motion to Dismiss, or in the Alternative, for Summary Judgment is

DENIED in its entirety.

So ordered.

_____

Rosemary M. Collyer, J.

Copies to:

Paul Martin Wolff, Esq.
Bruce R. Genderson, Esq.
Ryan T. Scarborough, Esq.
M. Jesse Carlson, Esq.
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005

Mark F. Evens, Esq.
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, N.W.
Washington, DC 20005

David O. Bickart, Esq.
KAYE SCHOLER LLP
901 15th Street, N.W.
Suite 1100
Washington, DC 20005-2329