## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

## MEMORANDUM OF ALICE CORPORATION

The Court requested briefs explaining the substance of Alice's patents and the proper

scope of discovery in determining whether there can be infringement under United States patent

law if the CLS System, in whole or in part, is located outside the United States. In response,

Alice Corporation Pty. Ltd. ("Alice") respectfully submits this brief. Because CLS Bank

International ("CLS Bank") and CLS Services Ltd. ("CLS Services") (collectively, "CLS") have

yet to provide a single document in discovery, Alice does so without prejudice to additional facts and theories it may develop.

## I.     INTRODUCTION

It is an infringement to make, use, offer to sell, or sell any patented invention within the United States or to import into the United States any patented invention without the authorization of the patent holder.  35 U.S.C. § 271(a).  The primary issue now facing the Court is the proper scope of discovery necessary to determine whether CLS or its Settlement Members "use" its allegedly infringing CLS System in the United States.[1]  The physical location of the computers that run the CLS System does not answer the question of where the system is used.  Rather, to answer this question, one must examine who uses the system, from what location and in what capacity they do so, and who ultimately benefits from using the system's functions.

Cases in both the Federal Circuit and the district courts have held that United States patent laws apply to systems located partially or entirely outside the United States.  For example, a court in the Eastern District of Texas[2] recently addressed this question, concluding that control of and beneficial use from a sports gambling website occurred in the United States even though the defendants (Canadian and Irish corporations) conducted 100% of the hosting, content development and financial operations for the website outside the United States.  *See Renhcol Inc. v. Don Best Sports et al.*, Case No. 2:06-CV-318, __ F. Supp. 2d __, 2008 WL 1885522, (E.D. Tex. Apr. 28, 2008).  Rejecting the defendants' invitation to focus on the location of the computer servers that ran the system, the *Renhcol* court properly concluded that the website's

---

[1]     Alice will focus in this brief on "use" of a system without prejudice to the other acts delineated in 35 U.S.C. § 271 that could constitute infringement of Alice's system or method claims.

[2]     It is worth noting that the Eastern District of Texas has more patent cases than any other district and has, in recent years, issued numerous carefully crafted decisions on patent law.

patented system was being "used" in the United States because many of the website's customers and handicappers accessed and interacted with the website from the United States. The location of the actual computer components and software was immaterial to determining whether the patented system was being used in the United States.

In this case, even without discovery, it appears that at least two candidates are "using" the CLS System in the United States: CLS Bank in New York, and CLS's Settlement Members who input foreign currency exchanges into the CLS System and receive payouts through the system daily in the United States. The actions of each must be considered.[3]

CLS Bank owns and controls the CLS System, establishes standard operating procedures and protocols governing the use and operation of the CLS System, settles all foreign currency exchanges processed by the CLS System across its books in the United States, issues irrevocable instructions to adjust the exchange accounts of CLS Settlement Members, sets prices and sells memberships.

Settlement Members of CLS in the United States input each request to settle foreign currency exchanges, receive the payouts from CLS Bank, and benefit from the foreign currency exchanges processed by the CLS System through the removal of settlement risk.

As the role of each must be explored, discovery related to CLS Bank, its CLS Settlement Members, and its agents, including CLS Services, is necessary to answer the question of where the CLS System is "used." Alice contends that the actions of either CLS Bank or the CLS Settlement Members in the United States are sufficient to constitute "use" of the CLS System in the United States. Although Alice can glean the broad contours of CLS's operations from

---

[3]     CLS contends that CLS Services in the United Kingdom is the entity that "uses" the CLS System. CLS Services acts as CLS Bank's agent pursuant to a Master Services Agreement that

publicly available information, discovery is necessary to determine exactly how CLS Bank and its Settlement Members control, manipulate and interact with the CLS System in the United States and to what degree they benefit from the system in the United States.

## II.    ALICE'S PATENTS

In the late 1980s, Ian Shepherd, the founder of Alice, believed that substantial modernization of central bank systems was necessary to improve the settlement and clearing of cross-border securities trades.  Mr. Shepherd initially judged that such improvements could only be brought about by coordination between the central banks of different countries, not through the efforts of individual banks.  Based on this view, he encouraged the Reserve Bank of Australia and the Federal Reserve Bank of New York ("the FRBNY") to collaborate to establish an inter-central bank, real-time gross settlement system so that banks trading securities in different currencies and time zones could settle, *i.e.*, pay for, the trades through a linked central bank payment system.[4]

In 1991, in connection with his idea to develop a hybrid financial instrument that could be used by individuals or institutions to manage risk and create a viable trading market for those instruments, Mr. Shepherd realized that the parties would need a means by which individuals who were often unknown to each other could exchange payment for the contracts in a manner that did not involve a significant risk of non-performance.  Mr. Shepherd conceived an electronic settlement mechanism capable of allowing parties to exchange obligations in a risk-free manner

---

requires it to provide data processing services related to the CLS System.  CLS Services does not itself initiate or settle foreign currency exchanges.

[4]    Banks generally do not "pay" each other by the same means as individuals, or even corporations.  Typically, banks are the only entities that have accounts with a central bank and pay each other through their central bank accounts.  The central banks of different countries, however, were not linked so that an Australian bank could not use its Reserve Bank of Australia account to pay U.S. dollars to a U.S. bank.

because both sides of a trade would be settled simultaneously and irrevocably—removing the risk that one party would perform and the other abscond. Whatever happened after a given trade settled would not affect payment of trades that were already processed and would allow the anonymous parties trading the new financial instruments to be assured that the counter-party had sufficient funds to settle the trade.

Mr. Shepherd recognized that this electronic settlement mechanism had widespread application, not just to the trading of the hybrid financial instrument he envisioned. He realized that this electronic trading infrastructure could operate as a "virtual" inter-central bank payment system (as well as non-central bank forms of the same type of system) and that it did not depend on the collective action of central banks in different countries linking themselves together. Mr. Shepherd pursued a range of patents for methods and systems in both trading and settlement, including U.S. Patent Nos. 5,970,479 ("the '479 Patent"), 6,912,510 ("the '510 Patent") and 7,149,720 ("the '720 Patent") and commenced development of the software and business processes for commercializing his inventions in the early 1990s. Two of these patents (the '510 and '720 patents), which are now held by Alice (a corporation in which Mr. Shepherd has an indirect 50% interest), describe a method and system for exchanging obligations between parties and have particular application to the settlement of foreign exchange obligations. They incorporate a novel way of dealing with the exchange of obligations (including foreign currency exchanges) that is both simultaneous and risk-free—a substantial improvement over other practices.

A simplified example illustrates how use of Mr. Shepherd's invention overcomes foreign currency exchange settlement risk. Assume a bank in the United States wants to exchange $1,000,000 with a bank in Japan for an equivalent amount of Yen. Traditionally, this exchange

was fraught with risk because the exchange involved two independent payments that did not occur simultaneously.  The U.S. bank would have to send $1,000,000 to the Japanese bank's U.S. branch or agent (called a nostro agent), and the Japanese bank would send the Yen to the U.S. Bank's Japanese branch or agent.  However, the exchange could not occur simultaneously because they involved different central banks in different time zones (transfers of funds between banks are legally final and irrevocable when the funds are transferred by a country's central bank); the two payments that comprise the exchange were thus independent.  If the Japanese bank paid first in this example (as is typically the case because Japan is approximately twelve hours "ahead" of the U.S. based on time zones), it had no guarantee that the U.S. bank would have the means to honor its commitment and pay the $1,000,000.  Should the U.S. bank become insolvent before paying, the Japanese bank would lose the Yen equivalent of $1,000,000 it had paid.  This risk is commonly referred to as "Herstatt risk," named after the German bank Herstatt, which became insolvent in 1974 and, through its agents, failed to pay the U.S. dollar side of foreign currency exchanges it had agreed to pay after having received its counterparties' money.  While this risk would appear to be small, the sums involved are of such magnitude that this risk posed a serious threat to the financial industry.  In this regard, note that CLS Bank is currently settling in excess of $5 *trillion* worth of foreign exchange transactions *every day*.

The Shepherd invention eliminates the "Herstatt risk" by using a computer coupled to a data storage unit that is configured to make the exchange between the two banks simultaneous and irrevocable.  In the Shepherd invention, the key to eliminating the risk is creating a supervisory institution to execute the payments between the parties, by maintaining an account for each party (*i.e.*, bank) that is independent of the parties' own central bank accounts.

To take another example, suppose CitiBank ("Citi") maintains an account with the FRBNY and Mizuho Corporate Bank ("Mizuho") maintains an account with the Bank of Japan. Both central banks are referred to in Alice's patent claims as "exchange institutions."  Citi and Mizuho also have multi-currency accounts with the supervisory institution ("SI accounts").

The supervisory institution waits for a transaction to be received (*e.g.*, Citi wants to exchange $1,000,000 for an equivalent amount of Yen from Mizuho).  After ensuring that the parties have adequate value in their respective SI accounts, the supervisory institution adjusts these accounts to reflect the exchange.  It then instructs the exchange institutions (*i.e.*, the central banks) to adjust Citi's and Mizuho's central bank accounts, respectively, in accordance with the adjustment made to the SI accounts it maintains.  Most importantly, the adjustment of Citi's and Mizuho's accounts at the supervisory institution and the instruction from the supervisory institution to the FRBNY and the Bank of Japan are irrevocable and the instruction, once received, must be honored by both central banks.  In this manner, the exchange occurs simultaneously and cannot be undone by either party.  As a result, if Citi were to go bankrupt after the SI accounts were adjusted, Mizuho would still receive payment because the transaction is irrevocable.

CLS Bank was created in the late 1990s to do exactly what Mr. Shepherd's patented claims may be used to do:  eliminate Herstatt risk arising from foreign exchange transactions in the above-described (albeit simplified) manner.  By employing Mr. Shepherd's inventions, CLS Bank allows its Settlement Members to complete foreign currency exchanges without risk of one member not paying the other.  The CLS System thus ensures that either the entire desired currency exchange is completed—whereby both Settlement Members receive the currency they

are due and CLS Bank adjusts the respective balances in their multi-currency bank accounts—or

the transaction is aborted—whereby the funds are returned to each member.

## III.    "USE" OF A PATENTED SYSTEM WITHIN THE UNITED STATES.

Determining the proper scope of discovery begins with the definition of infringement.  35

U.S.C. § 271(a) defines patent infringement as, *inter alia*, "use[] . . . [of] any patented invention .

. . within the United States."  The statute states:

> Except as otherwise provided in this title, whoever without
> authority makes, <u>uses</u>, offers to sell, or sells any patented
> invention, <u>within the United States</u> or imports into the United
> States any patented invention during the term of the patent
> therefor, infringes the patent.

35 U.S.C. § 271(a) (emphases added).  The parties disagree about what it means to "use . . . any

patented invention, within the United States. . . ."  *Id.*  CLS contends that the CLS System can

only be used where the computer system is physically located, the argument rejected by the

*Renhcol* court.  Thus, CLS asserts, because all of the computer equipment and software needed

to run the CLS System is located in the U.K., neither the system nor the method can be "used" in

the United States and, thus, there can be no infringement.  Even assuming that all of the

computers are located in the U.K. (and Alice has not yet had an opportunity to test this assertion

through discovery), CLS's narrow interpretation of "use" does not withstand scrutiny.  As the

following discussion makes clear, the narrow, bright-line test proposed by CLS is contrary to

patent law.

### A.    The Federal Circuit Defines "Use" of a System Broadly.

The Federal Circuit recognizes that "use" should be broadly defined.  *See, e.g.*, *NTP, Inc.

v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) ("In terms of the infringing act

of 'use,' courts have interpreted the term 'use' broadly."); *see also RealSource, Inc. v. Best Buy

Co.*, 514 F. Supp. 2d 951, 958 (W.D. Tex. 2007) ("Courts interpret 'use' broadly, in terms of the

infringing act of 'use.'"). This broad definition means that a wide range of activity is deemed "use . . . within the United States." *Hughes Aircraft Co. v. United States*, 29 Fed. Cl. 197, 225 (1993) ("A device may be 'used' in many different ways, and all uses that rely on the teachings of a patent constitute infringement."). Thus, as a general principle, the Federal Circuit has rejected CLS's proffered definition of "use."

### B. The Physical Location of a System Does Not Dictate Where the System is "Used."

The Federal Circuit's test for determining where a system is "used" does not turn on whether some, or even all, of the components of that system are located outside the United States. Thus, contrary to CLS's suggestion, the location of the components of the CLS System is not dispositive. Instead, in cases where some or all of the components of a system are located outside the United States, the answer to the question of where the system is "used" turns on where the system is controlled from and where the beneficial use of that system is obtained—the effective, as opposed to physical, location of the system. *See NTP*, 418 F.3d at 1316-17 (defining "use" as "the place where control of the system is exercised and beneficial use of the system [is] obtained").

*Decca Ltd. v. United States*, 544 F.2d 1070, 1074 (Ct. Cl. 1976) (per curiam) was one of the earliest federal appellate decisions to consider whether a system with some components outside the United States was infringing a patent "within the United States." In *Decca*, the patent at issue was for a system that enabled airplanes and watercraft to pinpoint their position using radio frequencies. *Id.* at 1075-77. The allegedly infringing system was owned by the United States government, and consisted of three transmission/receiver stations, one of which was located in Norway. *Id.* at 1074. The government argued that it could not be deemed an infringer of the plaintiff's patent, given that one of the stations was outside the United States.

The *Decca* court rejected that argument, holding that the government used the system from within the United States.  The *Decca* court defined "use" broadly to include "ownership of the equipment by the United States, the control of the equipment from the United States and on the actual beneficial use of the system within the United States."  *Id.* at 1083 ("This conclusion [that 'use' occurred in the United States] does not rest on any one factor but on the *combination of circumstances* here present . . . ." (emphasis added)).  The *Decca* court noted that the system had multiple ties to the United States:  "[A]ll of the equipment in Norway was purchased by the United States, installed by the United States, continues to be owned by the United States, was operated initially by the United States and it operate[s] today for the benefit of the United States under the direction and control of the United States."  It placed particular emphasis on the location of the "master" control:  "[T]he location of the whole for purposes of the United States Patent Law is where the 'master' station or stations are, which is in the United States of America, and where all the stations are monitored, presently Washington, D.C."  *Id.* at 1074.

Hughes Aircraft Co. v. United States*, 29 Fed. Cl. 197, 242 (Ct. Cl. 1993), was the next federal appellate case to confront the issue of whether a system "was used within the territorial boundaries of the United States."  In *Hughes*, the system in question was a satellite used to perform experiments.  The satellite was launched from Kenya, controlled from the England and monitored from the United States.[5]  *Id.* at 242-43.  The *Hughes* court, however, following *Decca*, noted that the satellite could still be used within the United States, regardless of where the satellite was, "[i]f the United States government had actually originated the commands within the United States and then transmitted those commands to the satellite through its STDN system."  *Id.* at 242; *see also id.* ("[I]f an invention is an instrumentality that necessarily extends beyond

the United States with a control point in the United States, the 'use' is deemed to occur here.").
In other words, if a command to the satellite originated in the United States and went through the
STDN system, the satellite was still being used in the United States.

The most recent Federal Circuit pronouncement on this question occurred in *NTP, Inc. v.
Research in Motion, Ltd*. 418 F.3d 1282 (Fed. Cir. 2005). There, considering a system claim
under § 271(a), the Federal Circuit held that use of a system to push e-mails from servers to
hand-held e-mail devices occurred within the United States even though the messages were
routed through a relay tower located in Canada. *Id*. at 1317. Specifically, the *NTP* court held
that Blackberry users, located within the United States, were "using" the system via their receipt
and transmission of e-mails through their Blackberry handheld devices.

> When RIM's United States customers send and receive messages
> by manipulating the handheld devices in their possession in the
> United States, the location of the use of the communication system
> as a whole occurs in the United States. This satisfactorily
> establishes that the situs of the "use" of RIM's system by RIM's
> United States customers for purposes of section 271(a) is the
> United States.

*Id.* (emphasis added). In reaching this conclusion, the court announced the following test: "The
use of a claimed system under section 271(a) is the place at which the system as a whole is put
into service, *i.e.*, the place where control of the system is exercised and beneficial use of the
system obtained." *Id.* (emphasis added). Notably, the Federal Circuit's test does not depend on
the number or type of system components inside or outside the United States. Put simply, the
question of "use" is one of control and benefit, not location.

In the three years since *NTP* was decided, several district courts have applied the
"control" and "beneficial use" test to define "both where and when a 'use' of a claimed system

---

[5]    The *Hughes* court held that, since the only activity occurring within the United States was

occurs." *CIVIX-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 2d 869, 884 (N.D. Ill. 2005) ("[U]nder

the Federal Circuit's holding in *NTP*, an alleged infringer uses a claimed system when the

alleged infringer exercises control over the system and obtains beneficial use of the system.");

*Realsource*, 514 F. Supp. 2d at 958 (holding that use of system occurs "when the alleged

infringer exercises control over the system and obtains beneficial use of the system" (internal

quotations omitted)).

Only a handful of cases since *NTP* that apply the "control" and "beneficial use" test have

addressed the question of *where* "use" of a system occurs when the physical system is located

outside the United States. By far the most analogous and instructive case is *Renhcol, Inc. v. Don

Best Sports*, No. 2:06-CV-318, __ F. Supp. 2d __, 2008 WL 1885522 (E.D. Tex. Apr. 28, 2008).

In *Renhcol*, the patent holder claimed a computer system that automated a market for the

production and sale of predictions—or, in plain English, the plaintiff obtained a patent for a

sports gambling website that allowed handicappers to upload their predictions for various

sporting events and consumers to purchase those predictions. The claims of the *Renhcol* patents

stated a computer programmed to receive, transmit and direct payment for the predictions.

Likewise, Alice's claimed system is comprised of a means of "receiving a transaction," verifying

availability of funds, and then responding to each transaction request by "generat[ing] an

instruction" to exchange institutions in the relevant countries. The issue in *Renhcol*, as in our

case, was whether the system was being "used" in the United States for purposes of § 271(a)

when all of the computers and servers needed to run the website were located outside the United

States. *Id.* at *2.

---

monitoring of the system, the system was not "used" within the United States.

The district court began its analysis by reciting allegations made by the defendants (ones that eerily mirror this case)—namely, that the defendants were Irish and Canadian corporations who wrote the code for the system outside the United States, hosted the code on computers and servers located outside the United States, determined outside the United States the amount of money to pay handicappers, and engaged foreign banks to process customer payments and payments to handicappers. *Id.* at *6. Again, echoing the arguments raised in our case, the *Renhcol* defendants argued that they did not infringe the patents because the system was located entirely outside of the United States. *Id.* at *2 ("Defendants claim they do not make, use, sell, or offer for sale the claimed invention within the United states [sic] and claim they do not import the claimed invention into the United States, as the computer storage medium and computer code are located in Canada and the method steps are performed in Canada and Ireland.").

The *Renhcol* court rejected that argument as to the system claim. "[T]he situs of use and the person who uses a device that allegedly infringes a claimed invention depends on <u>who controls</u> the allegedly infringing characteristics of the accused device <u>and the location of that person</u>." *Id.* at *6 (emphasis added). Applying the Federal Circuit's "use" test from the *NTP* case, the court held that the system was used "within the United States" because some of the users of the system who controlled and benefited from the system—*i.e.,* the handicappers and customers—resided in the U.S.

> [E]ven if the code is <u>wholly located in Canada,</u> handicappers and prediction consumers <u>control execution of the allegedly infringing computer storage medium's code and benefit from the code's execution</u>. The handicappers and prediction consumers control the accused information marketplace when the handicappers upload their event predictions to the accused websites and when the prediction consumers download prediction information from the accused websites. Additionally, the handicappers and prediction consumers <u>benefit from</u> the information exchanged in the marketplace. . . . Thus, the <u>location of the code</u> on the allegedly

> infringing computer storage medium or computer in Canada <u>does
> not, as a matter of law, preclude infringement</u> . . . .

*Id.* (emphases added) (footnote omitted).

In reaching its conclusion that the system was "used" in the United States, the *Renhcol*
court expressly distinguished the principal case championed by the defendants in that case,
*epicRealm Licensing, LLC v. Autoflex Leasing, Inc.*, 492 F. Supp. 2d 608 (E.D. Tex. 2007).  In
*epicRealm*, the patent in question claimed a method of managing and responding to requests
originating from internet users to access web pages by intercepting requests for dynamic (as
opposed to static) web pages and redirecting them to a page server for processing, thereby
freeing up the web server to process other requests.  *Id.* at 620.  This method of managing
requests to make the web pages operate more smoothly occurred behind the scenes, unbeknownst
to the internet users who were simply visiting the web pages.  *Id.* at 615.  That is, the internet-
user had no control over or, for that matter, interest in, how the system worked.  *Id.*
Consequently, the *epicRealm* court held that the internet users were not "using" the system from
within the United States.  *Id.*

The *Renhcol* court summed up the *epicRealm* holding this way:  "It was immaterial that
the website visitors indirectly benefited from the aspects of the webserver that allegedly
infringed the claimed invention, as the webserver owner and not the visitors exercised control
over aspects of the webserver that allegedly infringed the claimed invention."  *Renhcol*, 2008
WL 1885522, at *6 (citing *epicRealm*, 492 F. Supp. 2d at 615).  The court went on to explain,
"As the patent claimed a method of managing and responding to requests—<u>and not [as] a method</u>

of sending a request and receiving a response—only the webserver owner exercised control of the method of managing requests."[6] *Renhcol*, 2008 WL 1885522, at *6 (emphasis added).

The *Renhcol* and *epicRealm* cases demonstrate the application of the Federal Circuit's "control" and "beneficial use" test to systems located outside the United States but used within the United States. These two cases are consistent, both highlighting the importance of identifying who is using the system consistent with the system claims. *Renhcol* teaches that if users directly interact with the system, using it for the same purpose as set forth in the system claims, and directly benefit from their use of that system, then the system is being "used" where the user(s) is located and not where the physical components are present. If, however, somebody only indirectly interacts with the "system" from the United States, and only indirect or incidental benefit is derived therefrom, then *epicRealm* teaches that this is insufficient to qualify as an infringing use.

### C.    The Discovery Necessary to Show Use of Alice's System by CLS Bank

To determine whether the CLS System is used by CLS Bank in the United States, Alice has sought discovery well within the bounds of Alice's patents and the case law described above. Alice's patented system settles foreign currency exchanges input by the settlement members and then directs payment to the settlement members. CLS Bank's interaction with that system in the United States, the "control" and "beneficial use" described most recently by *NTP*, is the focus of Alice's requests for production.

---

[6]    *See also CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 991 (N.D. Cal. 2007) (finding system to aggregate product information and create a product catalog was "used" in Pakistan and rejecting plaintiff's argument that customers who downloaded the catalog in the United States "used" the system under § 271(a) because "[t]he data collection and catalog creation occur statically, prior to and independent of the customer's download [of the catalog]. They do not occur dynamically, in response to and only as a result of a customer downloading or using the catalog. . . . Here, customers use the result of the system—the product catalog—not the system itself.").

Alice has sought discovery related to the design and development of the CLS System and information related to ownership of the system prior to 2002 (the date that the system became operational). Such information is relevant to determining the question of use. As the court in *Decca* found, it was relevant that "all of the equipment in Norway was purchased by the United States, installed by the United States, continues to be owned by the United States, was operated initially by the United States and it operate[s] today for the benefit of the United States under the direction and control of the United States." *Decca Ltd. v. United States*, 544 F.2d 1070, 1074 (Ct. Cl. 1976). Thus, Alice must explore who purchased the equipment used by the CLS System, who directed the design of the system, who operates the system, and how CLS benefits from the operation of the system. CLS's attempt to limit Alice's requests to the current operation of the system are out of step with the considerations the court found relevant in *Decca*.

Alice has also sought discovery regarding the control of the system. The court in *Hughes Aircraft Co. v. United States*, 29 Fed. Cl. 197, 242 (Ct. Cl. 1993) focused on a distinction between monitoring the system from the United States and initiating commands that were executed outside the United States. Alice thus requires discovery to determine the types of commands that can be initiated in the United States and executed by the CLS System. Nor should discovery regarding the control be limited by technicalities. It should be of no moment how the commands are sent, but rather the level of control CLS Bank exerts over the CLS System, including but not limited to the control exercised by the IBM Command Center and CLS Business Operations Center in the United States.

Regarding "beneficial use," as outlined in *NTP*, the Settlement Members pay for each trade executed by the CLS System, and each of those trades must be finalized on the books of CLS Bank. Who determines the pricing and who acts as the gatekeeper to accessing the system

(such as by determining how new Settlement Members are added) are key considerations in determining where the beneficial use of the CLS System flows.  The scope of discovery should encompass these considerations.

> **D.    The Discovery Necessary to Show Use by CLS Settlement Members**

Regardless of CLS Bank's use of the system, CLS may also be held liable for the infringing actions of its Settlement Members.  Thus, discovery must encompass the use of the CLS System by the Settlement Members, as well as CLS Bank itself.

Because the Settlement Members ultimately own CLS Bank as shareholders of CLS Group and run CLS through their board membership and are members of CLS, their use of the CLS System may be attributed to CLS, thus resulting in direct liability under § 271(a).  CLS may also be held liable under 35 U.S.C. § 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  The *Renhcol* court embraced this latter theory in its decision.  This requires that Alice conduct discovery into the relationship between CLS and its Settlement Members beyond simply the names and the location of their headquarters.

Alice should be allowed discovery relating to CLS's Settlement Members so that it can prove that their actions are like the handicappers in *Renhcol* (who input predictions from the United States) and the purchasers in the United States (who buy those predictions).  Thus, Alice should be allowed discovery regarding the location from which the CLS Settlement Members input foreign currency exchanges into the CLS System (notably, Alice's patent claims a computer configured to *receive* a transaction), who signed the agreements with CLS (a key indication of where the Settlement Members' decisions related to the CLS System are made), and where the CLS Settlement Members receive the payments from the CLS System (the benefit of the trades, resulting from the generation of an instruction from the CLS System).

CLS has refused to provide discovery regarding CLS Bank's Settlement Members and the Court, at present, has limited Alice's document requests to the names of CLS' Settlement (and User) Members and the location of their headquarters. The details of where and how the Settlement Members access the CLS System, how the system is marketed, and how new Settlement Members and currencies are selected are important pieces of information regarding inducement that should be provided in order to determine whether Settlement Members are using (or being induced to use) the CLS System in the United States.

## IV.    CONCLUSION

To accept CLS's argument—focused solely on the location of the physical components of a patented system—would have far-reaching consequences for U.S. patent law. Aided by the spread of the Internet and the increased availability of low-cost global connections, cross-border transaction processing systems are becoming increasingly common. One of the most used words today in global business transactions is "outsourcing." Networked systems are dynamic and intended to be accessed and used from multiple locations, usually around the world. Indeed, that is a principal benefit of a network such as the world wide web.

Under CLS's view, a patented system accessible over a network could not be infringed so long as the computers and other equipment that are the physical embodiment of the system are moved abroad. Indeed, one could avoid infringement altogether by locating the physical pieces of equipment in a country such as India or China that has a different attitude toward ownership of intellectual property rights. To adopt CLS's theory—which has already been expressly rejected by the *Renhcol* court and runs contrary to the teachings of *Decca*, *Hughes Satellite*, and *NTP*—would create an enormous loophole in U.S. patent law. The proper focus, as dictated by the Federal Circuit in *NTP*, is not the location of the system components but instead where the

system is actually being used for its intended purpose, who is exercising control, and where the benefits from the use of that system are derived.

The question this Court must answer is whether this case is most akin to *Renhcol* or *epicRealm*. That can only be decided by providing the discovery requested by Alice. Only after the discovery has been examined, can it be determined with certainty whether CLS Bank, its Settlement Members or agents "use" the system within the United States in such a manner as to support a finding of infringement.

Respectfully submitted,

ALICE CORPORATION PTY. LTD.,

By its attorneys,

/s/ Ryan T. Scarborough
Paul M. Wolff (D.C. Bar No. 90217)
Bruce R. Genderson (D.C. Bar No. 961367)
Ryan T. Scarborough (D.C. Bar No. 466956)
M. Jesse Carlson (D.C. Bar No. 490196)
725 12th Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

Dated May 19, 2008

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of May, 2008, a true copy of the foregoing

Memorandum of Alice Corporation was served upon the following by electronic means through

ECF:

William A. Tanenbaum, Esq.
Stephen J. Glassman, Esq.
Stephen J. Elliott, Esq.
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022-3598
212-836-8000


David O. Bickart, Esq.
KAYE SCHOLER LLP
901 15th St., N.W.
Washington, DC  20005-2327
202-682-3503


/s/ M. Jesse Carlson_____