**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLS BANK INTERNATIONAL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ALICE CORPORATION PTY. LTD., ) <br> ) <br> Defendant. ) <br> ) <br> ALICE CORPORATION PTY. LTD., ) <br> ) <br> Counterclaim-Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CLS BANK INTERNATIONAL, ) <br> ) <br> Counterclaim-Defendant, ) <br> ) <br> and ) <br> ) <br> CLS SERVICES LTD., ) <br> ) <br> Counterclaim-Defendant. ) | Case No. 07-CV-00974-RMC |

**CLS' MEMORANDUM ON SCOPE OF DISCOVERY CONCERNING CONTROL AND
BENEFICIAL USE, PURSUANT TO THE COURT'S MAY 7, 2008 REQUEST**

**Preliminary Statement**

Plaintiff and Counterclaim-Defendant CLS Bank International and Counterclaim-Defendant CLS Services Ltd. (collectively, "CLS") respectfully submit this memorandum pursuant to the Court's request during the discovery conference of May 7, 2008. The Court requested assistance, in this patent infringement action, on the appropriate scope of discovery regarding control and beneficial use of CLS' allegedly infringing system. More specifically, the Court requested (1) the parties' respective interpretations of the "control and beneficial use"

31648532.DOC

aspect of *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006) and any related cases, (2) a "plain English" discussion of the nature of defendant Alice Corp. Pty. Ltd.'s ("Alice") patented inventions at issue, and (3) a discussion of how to apply the control and beneficial use case law in delineating initial discovery in this case.

As discussed more fully below, CLS submits that, as a matter of law, the issue of "control and beneficial use" only arises in connection with alleged infringement of "system" claims, where some component of the accused system (corresponding to a component of the patented invention) is located in the U.S. and another is outside the U.S. – and more particularly, only when there is an allegation that "control and beneficial" use of the accused system as a whole is achieved through operation in the United States of a component corresponding to a claimed element of the patented invention.

The patented system invention here, as also discussed below, specifically encompasses a data processing system with a computer and coupled data storage device, configured to adjust two parties' accounts to effect a proposed transaction (after testing the transaction to ensure the parties have adequate value in their accounts), and to generate an instruction to another institution to irrevocably adjust related accounts there.

CLS submits that the scope of discovery on "control and beneficial use" in this case should be limited to whether control and beneficial use of the accused CLS computer (and coupled data storage device) *is achieved through operation in the U.S. of a component of the accused system corresponding to a claimed element of the patented invention.* As discussed below, the information that Alice now seeks -- relating to such matters as setting prices, adding currencies, and adding new Members -- is irrelevant both to the operation of any component of the accused system, and to the patented invention as a whole.

31648532.DOC                                                 2

I.  **THE "CONTROL AND BENEFICIAL USE" ISSUE ONLY ARISES IN LIMITED CIRCUMSTANCES**

The "control and beneficial use" issue only arises in the context of assessing whether there is patent infringement, in the U.S., of a *system* claim. See May 7, 2008 Tr. at 27. In *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006), the Federal Circuit unambiguously stated:

> "The use of a claimed *system* under section 271(a) is the place at which the *system* as a whole is put into service, i.e., the place where *control of the system* is exercised and *beneficial use of the system* obtained" (citing *Decca Ltd. V. U.S.*, 544 F. 2d 1070, 1083 ( Ct. Cl. 1976) (emphasis added).[1]

But, importantly here, it is also clear from *NTP v. RIM* that control and beneficial use, for purposes of assessing infringement in the U.S., means control and beneficial use of the system as a whole, *achieved through operation in the U.S. of a component of the accused system corresponding to a claimed element of the patented invention.*

In *NTP*, the claims specifically covered an "electronic mail system" with one or more "originating processors," as well as various "switches" and "destination processors." *Id*. at 1294-95, 1298-99. The accused apparatus was the Blackberry system, in which handheld devices (the claimed "processors") were located in the United States, and a relay (the claimed "switch") was located in Canada. The Federal Circuit first noted that "RIM's customers located within the United States *controlled the transmission* of the originated information *and also benefited from such an exchange of information*." (*Id.* At 1317.) Clearly, the transmission and exchange of information was accomplished by operation of the claimed processors -- the

---

[1] By contrast, as the Federal Circuit held, "the concept of 'use' of a patented method or process is fundamentally different from the use of a patented system or device." *NTP v. RIM,* 544 F. 2d at 1317. A patented process or method "cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id*. at 1318. The "control and beneficial use" test of *NTP* is simply irrelevant to method claims.

Blackberry handheld devices. The Court then confirmed this when it concluded that, when RIM's U.S. customers "send and receive messages *by manipulating the handheld devices in their possession in the United States*" (which devices were claimed components of the patented system) "the location of the use of the communication system as a whole occurs in the United States." *Id.* At 1317. The Court held that this finding was sufficient for a jury to conclude that control and beneficial use of the system was exercised by use of the handheld devices located in the United States. *Id.* This was the only factual context in which control and beneficial use were considered by the Court.

Likewise, in *Decca* (544 F.2d 1070), relied upon by the Court in *NTP v. RIM* as providing "a legal framework for analyzing this case" (see *NTP v. RIM*, 418 F. 3d at 1316), the patent claimed a radio location finding system that included three broadcasting stations as elements of the claim. *Decca,* 544 F.2d at 1074. In the accused system, owned and operated by the United States, two of the broadcasting stations were located in the United States but the third station was located in Norway. *Id.* The issue before the Court of Claims was whether the accused system was used within the United States. To decide it, the court had to determine the "location of the whole [system] for purposes of the United States Patent Law." *Id.* It looked to the location of the "master" station or stations in the United States, and noted that "the whole [accused] system must be *deemed, at least for purposes of litigating the patent* here involved, to be a unity." *Id.* Control was thus achieved through operation of U.S. components of the accused system that clearly corresponded to elements of the patented invention, and to which the foreign stations were "slaves." *Id*. at 1075.

Both *NTP* and *Decca* thus stand for the proposition that "control and beneficial use" of a system occurs by operation of a physical component of the accused system that corresponds to an element of the system claim itself. In neither case did the Court look at the

type of information Alice seeks here, such as where and how the system was marketed, how new customers or users were added, or how prices were set.

The recent decision in *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, (N.D. Cal. 2007), is instructive here, and demonstrates the inappropriateness of Alice's attempt to expand the meaning of "control and beneficial use" to inquire into CLS business activities that are not covered by Alice's patent claims. *CNET* involved patents on systems for aggregating product information and creating an electronic catalog of product information from Internet websites, in which the components of the claimed system were a computer, various servers, and a communication channel coupling the servers to the computer. *Id.* at 988-89, 991. Unlike in *NTP v. RIM*, customers in the U.S. did not actually use the system, and instead only used the results of the system (the catalog created by the system). *Id.,* at 991. The Court held that "overall control of the data collection and catalog creation," which were elements of the claimed system, was exercised from Pakistan. *Id.,* at 991-92. Importantly, the Court ruled that there was no U.S. infringement "even if, as asserted by CNET, Etilize [the accused U.S. infringer] instructs and directs Etilize-Pakistan on what product information to collect and how to collect it." *Id.* Furthermore, the Court rejected CNET's argument that there was U.S. infringement because the defendant "directs [the patented catalog's] management, sales and marketing operations from within the United States." *Id* at 992. That theory was rejected because "the patent claims do not speak to these types of activities." *Id*.

In short, the issue of control and beneficial use must focus on operation of the components of the accused system that correspond to the elements of the system claimed in the patent-in-suit, to determine whether such operation occurs in the U.S. Business activities not carried out by the claimed system are simply irrelevant.

Further, Alice's attempted expansion of *NTP's* "control and beneficial use" inquiry to look beyond the location and operation of physical components of the accused system is not only unsupported by and inconsistent with the case law, but would undermine the bedrock principle of patent law that a patented system is defined by, and limited to, the "elements" of its patent claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *see also McCarty v. Lehigh Valley R.R. Co.,* 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim, . . . we should never know where to stop"); *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339 (1961) ("[T]he claims made in the patent are the sole measure of the grant"). It is completely irrelevant whether CLS uses, in the United States or elsewhere, equipment or systems that are not within the scope of Alice's patent claims. *Aro*, 365 U.S. at 344 ("if anything is settled in the patent law, it is that the combination patent covers only the totality of elements in the claim").

## II. THE PATENTED SYSTEM INVENTION

Alice has alleged that CLS infringes three U.S. patents. However, only Patent No. 7,149,720 ("the '720 patent"), entitled "Systems for Exchanging an Obligation," has *system* claims (*See* Countercl. ¶¶ 35, 56, Ex. C.) [2].

Claim 68, which on its face is the broadest claim of the '720 patent, reads:

> 1. **A data processing system** to enable the exchange of an obligation between parties, the system comprising:
> **a data storage unit** having stored therein (a) *information about a first account for a first party*, independent from a second account maintained by a first exchange institution, (b) *information about a third account for a second party*, independent from a fourth account maintained by a second exchange institution; and

---

[2] Patent No. 5,970,479 ("the '479 patent") is entitled "Methods and Apparatus Relating to the Formulation and Trading of Risk Management Contracts." (*See* Countercl. ¶¶ 21, 42, Ex. A.) Patent No. 6,912,510 ("the '510 patent") is entitled "Methods of Exchanging an Obligation." (*See* Countercl. ¶¶ 28, 49, Ex. B.) It is undisputed that the claims of the '479 and the '510 patents are "method" claims.

> **a computer**, **coupled to said data storage unit**, that is *configured to* (a) *receive a transaction*; (b) *electronically adjust said first account and said third account in order to effect an exchange obligation* arising from said transaction between said first party and said second party *after ensuring that said first party and/or said second party have adequate value* in said first account and/or said third account, respectively; and (c) *generate an instruction* to said first exchange institution and/or said second exchange institution *to adjust* said second account and/or said fourth account *in accordance with the adjustment of said first account and/or said third account*, wherein said instruction being an irrevocable, time invariant obligation place on said first exchange institution and/or said second exchange institution.

('720 patent at col. 69) (emphasis added).[3]

In simple, plain English, the nature of Alice's invention, as embodied in its above-quoted broadest patent claim, may be viewed as a data processing system having a computer system and coupled storage device, configured to:

(1) store account information for two parties to a transaction;

(2) receive a transaction;

(3) adjust the parties' accounts in accordance with the terms of the transaction, after testing the transaction to ensure that the parties have adequate value in their accounts; and

(4) generate an irrevocable instruction to another institution to adjust accounts maintained at that institution to reflect the transaction.[4]

---

[3]  Subsequent dependent claims of the '720 patent add narrowing limitations to the claimed invention. Claim 69, for example goes to "The data processing system of claim 68, wherein said first and/or second exchange institution is a central bank." Claim 70 narrows the invention further, claiming, "The data processing system of claim 69, wherein said exchange obligation involves currency."

[4]  Solely for purposes of this Memorandum, Alice's alleged invention is interpreted broadly. In the event that this case were to proceed beyond initial discovery on the threshold extraterritoriality issue, CLS intends, and reserves its right, to argue during formal claim construction that Alice's patent claims should be read more narrowly, and that they are invalid and unenforceable.

In its broadest iteration (i.e., claim 68) the invention of the '720 patent is thus limited by its essential elements: a computer system and coupled storage unit, configured in the particular manner described above.[5]

### III. DISCOVERY ON THE CONTROL AND BENEFICIAL USE ISSUE SHOULD BE LIMITED HERE, GIVEN THE APPROPRIATE APPLICATION OF THE LAW TO THE PRESENT FACTS.

As Alice's broadest system patent claim here is limited to a data processing system with a computer and coupled data storage unit – configured to store account information for two parties to a transaction, receive a transaction, adjust the accounts after testing the transaction to ensure adequate value, and generate an instruction to another institution to reflect the transaction – the discovery here respecting control and beneficial use, under *NTP v. RIM* and related cases, should be directed to whether control and beneficial use of such a CLS system is achieved through operation in the United States of a component corresponding to a claimed element of the patented invention.

*NTP v. RIM* dealt with the issue of control and beneficial use only in terms of the operation of the Blackberry handheld devices that corresponded to the processors specifically recited in the NTP patents. *Decca*, on which the *NTP v. RIM* court relied, looked only to the role

---

[5] It should be noted that the '720 patent specification only fleetingly deals with the subject of the finally issued claims of the '720 patent, and thus offers little assistance in providing a plain English description of the nature of the patented invention. It merely describes a "method of exchanging obligations as between parties" involving "shadow" credit and debit records maintained by one institution, and states that "for every transaction resulting in an exchange obligation, the supervisory institution adjusts each respective party's shadow credit record or debit record" after a test to ensure adequate value for the transaction, which is followed by "instructing" an exchange institution to credit or debit the parties' records at that institution to reflect the "shadow" records. (*Id.*, col. 5, l. 63 – col. 6, l. 19.)

While the '720 patent specification may have a bearing on claim construction, if the case progresses that far, it provides no real assistance in framing the scope of discovery on the "control and beneficial use" issue currently before the Court.

of claimed broadcasting stations that were located in the U.S. *CNET* looked only to control of data collection and catalog creation which were elements of the claimed invention there. None of the cases looked to aspects of the accused system other than those which specifically corresponded to components of the claimed invention. Moreover, *CNET* explicitly rejected an inquiry into management, sales or marketing activities, because "the patent claims do not speak to these types of business activities." 528 F. Supp. 2d 985, at 992.

Applying these cases to the facts of the present case, there is no valid basis for extending discovery here in the manner requested by Alice. CLS has already agreed to produce to Alice documents detailing the specifications and operations of the CLS system itself. The additional documents Alice now seeks relate to other matters which simply do not correspond to Alice's patent claims.

In order to further pursue its "control and beneficial use" theory in this case, Alice thus still pursues irrelevant discovery of matters such as:

- "CLS Bank's direct or indirect involvement in, or oversight of":[6]
    - setting pricing
    - adding new currencies to the CLS Service
    - adding new Settlement Members or User Members to the CLS Service; and
- "how CLS has added and/or now adds a new Settlement Member."[7]
- how CLS is regulated by the Federal Reserve Bank.[8]

Alice has also suggested that its requests relate to CLS Bank as a "gatekeeper" or "decision maker" of the CLS System. (See, e.g., May 7, 2008 Tr., at p. 5, l. 20-21; p. 10, l. 18- p. 11, l. 7.)

---

[6] Alice's First Request for the Production of Documents, No. 2.

[7] *Id.* at No. 11.

[8] *Id.* at Nos. 14, 20.

However, none of these requests or suggestions relates to operation of any component of the accused CLS system corresponding to any element of Alice's patented system claims. CLS' involvement and/or decision-making respecting non-patented aspects of the CLS System or Service is simply irrelevant here. Moreover, such additional discovery would significantly burden CLS without resulting in the production of any information that is relevant in the current phase of discovery.

Alice conceded during the May 7, 2008 discovery conference that "the patent claim doesn't include setting pricing or including new currencies." (May 7, 2008 Tr., at p. 15, ll. 9-25.) That should effectively end the matter. Alice's attempt to expand the scope of initial discovery to matters not covered by its patents should be rejected.

## CONCLUSION

For all of the foregoing reasons, Alice's requests for the production of documents unrelated to the operation of the accused CLS system, and unrelated to Alice's patented invention, should be denied.

Dated: May 19, 2008

Respectfully submitted,

_____
David O. Bickart (Bar # 355313)
KAYE SCHOLER LLP
901 Fifteenth Street, N.W.
Washington, DC 20005-2327
(202) 682-3503

William A. Tanenbaum (WT-9960)
Steven J. Glassman (SG-1616)
Stephen J. Elliott (SE-5437)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

Counsel for CLS Bank and CLS Services U.K.