**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**ALICE CORPORATION PTY. LTD.'S CROSS-MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AS TO SUBJECT MATTER ELIGIBILITY**

Defendant/Cross-Plaintiff Alice Corporation Pty. Ltd. ("Alice") respectfully submits the

attached Memorandum in opposition to CLS Bank International's and CLS Services Ltd.'s

(collectively, "CLS's") Motion for Summary Judgment That the Claims of Alice's Patents are

Invalid for Lack of Patent-Eligible Subject Matter and cross-moves for partial summary

judgment declaring that claims 1–84 of U.S. Patent No. 7,149,720 and claims 1–75 of U.S.

Patent No. 6,912,510 are directed to patent-eligible subject matter under 35 U.S.C. § 101.  The

grounds for Alice's opposition and cross-motion are set forth in the accompanying memorandum

of law.

Alice respectfully requests oral argument.

Dated:  April 3, 2009                    Respectfully submitted,

                                         WILLIAMS & CONNOLLY LLP


                                         _____/s/ David M. Krinsky_____
                                         Paul Martin Wolff (D.C. Bar No. 90217)
                                         Bruce R. Genderson (D.C. Bar No. 961367)
                                         Ryan T. Scarborough (D.C. Bar No. 466956)
                                         M. Jesse Carlson (D.C. Bar No. 490196)
                                         Stanley E. Fisher (D.C. Bar No. 498540)
                                         David M. Krinsky (D.C. Bar No. 978190)

                                         725 Twelfth Street, N.W.
                                         Washington, DC  20005
                                         Telephone: (202) 434-5000
                                         Facsimile: (202) 434-5029

                                         *Counsel for Defendant / Counterclaim Plaintiff
                                          Alice Corporation Pty. Ltd.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |
| ———————————————— | ) | |

**ALICE CORPORATION PTY. LTD.'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO CLS BANK'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PATENT-ELIGIBILITY**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF THE FACTS ........................................................................................ 5

    A.     Background ............................................................................................... 5

    B.     The Patents-in-Suit ................................................................................. 6

          1.     The '720 System Patent. ........................................................... 6

          2.     The '510 Method Patent. ........................................................... 8

          3.     The '479 Method Patent. .......................................................... 10

ARGUMENT ..................................................................................................................... 10

I.     THE '720 SYSTEM PATENT CLAIMS COMPUTER SYSTEMS THAT ARE
      ELIGIBLE FOR PATENT PROTECTION AS "MACHINES." ................................... 11

    A.     Federal Circuit Law Establishes that Computer Systems Are Patentable
          "Machines." ........................................................................................... 13

    B.     The Computer Systems Claimed in the '720 System Patent Do Not Wholly
          "Preempt" the Use of Any Fundamental Principle. ............................... 17

    C.     A Computer Programmed To Perform Specific Functions Satisfies Any
          Particularity Requirement that Might Exist. ......................................... 19

    D.     The Patent-Eligibility of Alice's Computer System Does Not Depend on the
          Eligibility of a Process that Is Performed Without the System. .......................... 22

II.    THE METHODS OF ELECTRONIC SETTLEMENT CLAIMED IN THE '510
      METHOD PATENT ARE PATENT-ELIGIBLE. ......................................................... 26

    A.     The Methods of Electronic Settlement Claimed in the '510 Method Patent Are
          "Tied to a Particular Machine." ........................................................... 26

          1.     Bilski Did Not Overrule Federal Circuit Law that Methods Implemented
          Electronically Are Patentable. ............................................................... 27

          2.     The Machine Required To Implement the Electronic Settlement Methods
          Claimed in the '510 Method Patent Is Sufficiently "Particular." .......................... 28

          3.     "Electronically" Is a Meaningful Limitation. ........................................... 30

    B.     The Methods of Electronic Settlement Claimed in the '510 Method Patent
          Transform Electronically-Stored Data. ................................................. 36

III.    SUMMARY JUDGMENT AS TO THE '479 PATENT IS INAPPROPRIATE............. 36

CONCLUSION....................................................................................................................... 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ...................................................14

*\*Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053 (Fed. Cir. 1992)...... *passim*

*\*AT&T Corp. v. Excel Commc'ns, Inc.*, 172 F.3d 1352 (Fed. Cir. 1999) ............................. *passim*

*CyberSource Corp. v. Retail Decisions, Inc.*, No. C 04-03268, 2009 WL 815448 (N.D. Cal. Mar. 27, 2009) .......................................................................................................33

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008) ..............14

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ...........................................................................10

*Diamond v. Diehr*, 450 U.S. 175 (1981) ............................................................................ *passim*

*Gottschalk v. Benson*, 409 U.S. 63 (1972) ....................................................................... *passim*

*In re Abele*, 684 F.2d 902 (C.C.P.A. 1982) ....................................................................................36

*\*In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994) (en banc) ...................................................... *passim*

*In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371 (Fed. Cir. 2008)..........................................25

*\*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008)...................................................................... *passim*

*In re Comiskey*, 2009 U.S. App. LEXIS 400 (Fed. Cir. Jan. 13, 2009) (Moore, J., dissenting from denial of reh'g en banc) ...............................................................................15

*\*In re Comiskey*, 554 F.3d 967 (Fed. Cir. 2009) ................................................................ *passim*

*\*In re Ferguson*, — F.3d —, 2009 WL 565074 (Fed. Cir. Mar. 6, 2009)....................2, 12, 15, 16

*In re Grams*, 888 F.2d 835 (Fed. Cir. 1989) .......................................................................34, 35

*In re Noll*, 545 F.2d 141 (C.C.P.A. 1976)............................................................................20, 30

*In re Nuijten*, 500 F.3d 1346 (Fed. Cir. 2007) .......................................................................13, 36

*In re Richman*, 563 F.2d 1026 (C.C.P.A. 1977) ......................................................................32

*In re Schrader*, 22 F.3d 290 (Fed. Cir. 1994) .......................................................................34, 35

*\*In re Warmerdam*, 33 F.3d 1354 (Fed. Cir. 1994)............................................................. *passim*

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001) ...............................10

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 127 S. Ct. 1746 (2007) .......................................14

*Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005) ............................14

*O'Reilly v. Morse*, 56 U.S. 62 (1853) .........................................................................................33

*Parker v. Flook*, 437 U.S. 584 (1978).............................................................................17, 19, 32

*Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931 (Fed. Cir. 1987) (en banc) ..................21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...............................................16

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)............................23

*\*State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998) ....................................................................................................................... *passim*

## OTHER AUTHORITIES

37 C.F.R. § 1.111 ...........................................................................................................................9

35 U.S.C. § 101 ................................................................................................................... *passim*

35 U.S.C. § 112 ............................................................................................................................21

35 U.S.C. § 273(a)(3) ...................................................................................................................18

35 U.S.C. § 282 ....................................................................................................................9, 10, 16

*Ex parte Cornea-Hasegan*, Appeal 2008-4742, 2009 WL 86725 (Bd. Pat. App. & Int. Jan. 13, 2009)..........................................................................................................................16

*Ex parte Praveen Seshadri*, Appeal 2008-2854, 2009 WL 524947 (Bd. Pat. App. & Int. February 27, 2009)....................................................................................................................16

*Ex parte Srinivas Gutta*, Appeal 2008-3000, 2009 WL 112393 (Bd. Pat. App. & Int. Jan 15, 2009) .................................................................................................................................16

*Ex parte Uceda-Sosa*, Appeal 2008-1632, 2008 WL 4950944 (Bd. Pat. App. & Int. Nov. 18, 2008) .................................................................................................................................16

*Ex parte Van Beek*, Appeal 2008-2033, 2009 WL 112387 (Bd. Pat. App. & Int. Jan. 16, 2009).........................................................................................................................................16

U.S. Patent No. 5,193,096..........................................................................................................13

U.S. Patent No. 5,955,322 ................................................................................................... 19

U.S. Patent No. 5,970,479 ........................................................................................... *passim*

U.S. Patent No. 6,912,510 ........................................................................................... *passim*

U.S. Patent No. 7,149,720 ........................................................................................... *passim*

## <u>INTRODUCTION</u>

In this action, Alice has alleged that CLS infringes three patents:  (1) U.S. Patent No. 7,149,720 ("the '720 patent"); (2) U.S. Patent No. 6,912,510 ("the '510 patent"); and (3) U.S. Patent No. 5,970,479 ("the '479 patent").  The '720 patent claims a system that includes a "computer, coupled to" a "data storage unit" which are "configured" to perform certain operations that, for example, can settle an exchange of foreign currency in a way that lessens what is called "settlement risk," i.e., the risk that one party to the exchange will pay but not receive the reciprocal payment from its counterparty.  The '510 and '479 patents claim novel methods of performing electronic settlement that are implemented using the computer systems described in '510 and '479 patents (and claimed in the '720 patent).

CLS seeks to invalidate every claim of the '720 and '510 patents and two asserted claims of the '479 patent.  It argues that none of these claims are directed to subject matter falling within any of the categories of patentable subject matter of 35 U.S.C. § 101, relying on *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008).  CLS is wrong as a matter of law and its motion should be denied in its entirety.  Furthermore, because there can be no dispute that the claims of the '720 system patent and '510 method patent require the use of a computer, which is a machine, Alice cross-moves for partial summary judgment that those patents are directed to patent-eligible subject matter under 35 U.S.C. § 101.

*The '720 System Patent.*  The computer system claimed in the '720 patent is unquestionably a "machine" under § 101.  The patent-eligibility of computer systems is well-established.  No court has *ever* invalidated a claim to a computer on the grounds that it is ineligible subject matter, and this Court should decline CLS's invitation to be the first.  Indeed, the Federal Circuit, post-*Bilski*, has reaffirmed that claims to a computer system configured to

perform business-related operations remain patent-eligible.  *In re Ferguson*, — F.3d —, 2009 WL 565074, at 4–5 (Fed. Cir. Mar. 6, 2009) (reaffirming eligibility of claim in *State Street Bank & Trust Co. v. Signature Financial Group, Inc.*, 149 F.3d 1368, 1372 (Fed. Cir. 1998), to "a data processing system" for managing a financial portfolio).  Alice's claims to a computer system are indistinguishable from those in *State Street Bank*.

Despite CLS's argument to the contrary, *In re Bilski* had absolutely nothing to do with a computer system.  Rather, *Bilski* addressed whether a claim to an abstract business method— which the patent holder conceded was not implemented on a computer or using any other sort of technology—was a patentable "process" under § 101.  A "process" is an entirely different category of patentable subject matter from a "machine."  Indeed, *Bilski* held that one of the two ways in which a "process" can be patentable subject matter is if it "is tied to a particular machine."  *Bilski*, 545 F.3d at 961.  In spite of the sheer illogic of it, CLS asks this Court to take this "machine" prong of a test created for process claims (a prong which was not even applied in *Bilski*), apply it to claims that expressly cover computer systems configured to perform particular tasks, and become the first court ever to determine that claims to a machine are not "particular" enough to satisfy the requirements of § 101.

Moreover, even assuming that the "machine" category of § 101 includes any "particularity" requirement—and no court, including *Bilski*, has even so much as hinted at one— the computer system Alice claimed in '720 patent is sufficiently "particular" because it is configured to perform specific tasks.  The Federal Circuit held more than a decade ago that a computer that has been configured to perform specific tasks "in effect becomes a special purpose computer"—i.e., "a specific machine"—and nothing in *Bilski* changed this analysis.  *In re Alappat*, 33 F.3d 1526, 1544–45 (Fed. Cir. 1994) (en banc).

There is no way to read the claims of the '720 patent so as not to require a computer configured to perform a particular task. This aspect of the claim construction is not in serious dispute. As a result, the claims of the patent are patent-eligible subject matter as a matter of law under *State Street* and *Alappat*, both of which survived *Bilski* in relevant part. CLS's motion should be denied, and Alice's cross-motion for partial summary judgment should be granted, as to the '720 system patent.

*The '510 Method Patent.* The methods of electronic settlement claimed in the '510 patent are patentable "processes" under § 101. Specifically, the '510 patent claims methods of settlement dependent on, among other things, "electronically adjusting" an "account" or "record." Post-*Bilski*, the Federal Circuit has reaffirmed that such processes are patentable. *In re Comiskey*, 554 F.3d 967, 979 n.14 (Fed. Cir. 2009). The method claims of the '510 patent are indistinguishable from those that the Federal Circuit has consistently held to be patent-eligible.

CLS argues that a method in which accounts are "electronically adjusted" does not satisfy the "machine or transformation" test articulated in *Bilski*. But once again CLS asks this Court to break new ground. No court has held that an electronically-performed method fails to involve a "particular" enough machine to satisfy the "machine" prong of *Bilski*, and here, the claims as properly interpreted require the use of a computer specifically configured to perform at least most of the steps of the method. Moreover, the U.S. Patent and Trademark Office ("PTO") rejected CLS's very argument during the prosecution of the '510 patent. In addition, an "electronic[] adjust[ment]" effects a physical transformation of an electronic device, and thus independently satisfies the "transformation" prong of *Bilski*.

Because any construction of "electronically" makes the '510 patent claims satisfy the "machine-or-transformation" test of *Bilski*, the Court should hold that the claims of the '510

patent are patent-eligible and grant partial summary judgment to Alice. Alternatively, if the Court does not conclude that the claims are patent-eligible as a matter of law, then determining the patent-eligibility of the '510 patent requires construction of the remaining claim terms, for which Alice respectfully requests a *Markman* hearing, as the remaining claim terms further define the claimed invention. Thus, the Court should deny CLS's motion for summary judgment in all events.

 *The '479 Method Patent.* Claims 33 and 34 of the '479 patent, like the claims of the '510 patent, cover methods of electronic settlement. These two claims, however, do not expressly recite the term "electronically." Rather, claim construction of terms in claims 33 and 34 is required to demonstrate that the methods of those claims are limited to electronic implementations of the claimed methods. Because claim construction is not at issue in this preliminary phase of the litigation, CLS has not even attempted to construe any of the claim terms, nor does it even cite the 100-plus page specification. Without construing the terms found in the '479 patent, any inquiry into patentability is premature. Moreover, the expert testimony of Paul Ginsberg has placed in issue the interpretation of these claims so that CLS's motion should be denied. Because CLS's position regarding the claim construction clearly disputes Alice's, Alice has not cross-moved for summary judgment as to the '479 patent. After a *Markman* hearing, and on the basis of the expert testimony of Mr. Ginsberg, the Court should conclude that for the same reasons that the claims of the '510 patent are patent-eligible under § 101, the claims 33 and 34 of the '479 patent are too. In the meantime, CLS's motion for summary judgment should be denied.

*  *  *

In short, all claims of the '720 system patent and the '510 method patent are directed to patent-eligible subject matter under § 101. As to these two patents, the issue is ripe for decision. Alice's cross motion for partial summary judgment of validity under § 101 should be granted, and CLS's motion for summary judgment of invalidity under § 101 should be denied. As to the '479 patent, CLS's motion should be denied because having failed to construe the claims, CLS cannot show that claims 33 and 34 of that patent are not directed to eligible subject matter, and Alice has put in issue that they are patent-eligible.

## STATEMENT OF THE FACTS

### A.    Background

This case involves patents related to the development of an electronic trading system that allows parties to manage risk through the trading and settlement of novel financial instruments. In the early 1990s, Ian Shepherd, formerly head of the Melbourne, Australia office of management consultant McKinsey & Co. and the founder of Alice, had an idea for improving risk management by replacing piecemeal contracts between individuals or entities, such as insurance or hedging, with a hybrid financial instrument sharing aspects of a derivative security and insurance. '479 patent, col. 1, l. 61–col. 3, l.25. He envisioned a complex computerized system by which individuals or institutions could submit contract orders designed to reduce financial exposure to an uncertain future event to a system that would automatically and anonymously price the contracts, match counter-parties, and process the contracts through completion. '479 patent, col. 1, ll. 6–10, col. 3, l. 29–col. 5, l. 11.

To create a viable trading market for these new financial instruments, Mr. Shepherd realized that the parties would need a means by which individuals who were often unknown to each other and in different geographic locations could exchange payment for the contracts. For certain of the contracts involved, including foreign currency trades, this was the "settlement"

step. For the system to function effectively, the risk of non-performance by a counter-party needed to be eliminated. The anonymous parties trading the new financial instruments would have to be assured that the counter-party had sufficient funds to settle the trade, and that—whatever happened after a given trade was matched and settled by the system—there would be no effect on the trades that were already matched and in process. Thus, Mr. Shepherd conceived of an electronic settlement mechanism by which trades would be settled by the system irrevocably—removing the risk that one party would perform and the other would not. *See generally* '479 patent, col. 24, l. 59–col. 28, l. 10.

Mr. Shepherd has been issued several patents related to this innovation. While the computerized system and its functions are described in detail in the 100-plus page, mostly-common specification of each patent, including the three that are at issue in this litigation, each of the patents issued to Mr. Shepherd claims a different aspect of his invention. Three patents are at issue in this case and they are addressed in turn.

### B. The Patents-in-Suit

#### 1. The '720 System Patent.

The '720 patent claims a novel way of dealing with the exchange of obligations in which a trusted intermediary, running a computer system, settles the parties' obligations so as to eliminate what is referred to as "counterparty" or "settlement" risk—the risk that only one party's obligation will be paid, leaving the other party without its principal. Ex. 1, Ginsberg Decl. ¶¶ 10, 13–14. The trusted intermediary—a "supervisory institution"—operates a data processing system that exchanges both parties' obligations or neither. *Id.*

The claims of the '720 patent, as CLS acknowledges, *see* CLS Mem. at 10, are directed to a "data processing system"—a machine designed to accomplish a specific purpose through specific parts. The machine claimed is comprised of a "data storage unit," that stores

information about accounts or records, and a "computer, coupled to said data storage unit," that

is configured to perform the steps necessary to effect the exchange of an obligation.

For example, claim 68 of the '720 System Patent reads:

> 68. A **data processing system** to enable the exchange of an obligation between parties, the system comprising:
> **a data storage unit** having stored therein
> (a) information about a first account for a first party, independent from a second account maintained by a first exchange institution,
> (b) information about a third account for a second party, independent from a fourth account maintained by a second exchange institution; and
> **a computer, coupled to said data storage unit**, that is configured to
> (a) receive a transaction;
> (b) **electronically adjust** said first account and said third account in order to effect an exchange obligation arising from said transaction between said first party and said second party after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and
> (c) generate an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with the adjustment of said first account and/or said third account, wherein said instruction being an irrevocable, time invariant obligation placed on said first exchange institution and/or said second exchange institution.

'720 Patent col. 69.

The "data storage unit" is a specific component, such as a disk drive or file server,

capable of storing data. Ex. 1, Ginsberg Decl. ¶ 29. The "computer," coupled to the data storage

unit, is a computer configured, using software, to manipulate the data on the data storage unit in

order to carry out the recited functions. *Id.* ¶ 30.

Each independent claim of the '720 system patent recites the data storage unit and

computer required to run the system, and those terms are incorporated into each dependent claim.

Even without a *Markman* hearing to construe the claim terms, it is beyond dispute that Alice's

claims recite computer system hardware configured to perform a specific function, *Id.* ¶¶ 30–34,

which is sufficient to establish as a matter of law that the '720 patent satisfies the requirements

of § 101.

### 2.     The '510 Method Patent.

The '510 patent also claims a novel method for the exchange of obligations that

eliminates counterparty risk.  *Id.* ¶ 19.  Unlike the '720 system patent, which is directed to a

machine with specific components configured to carry out a task, the '510 method patent is

directed to a process by which obligations are electronically exchanged using a trusted

intermediary.  *Id.* ¶¶ 10, 13–14.  Alice's method for exchanging an obligation requires that the

accounts be adjusted "electronically."  Claim 68 of the '510 method patent exemplifies the

claims of the '510 patent for purposes relevant to this motion.  It reads:

> 68. A method of exchanging an obligation between parties, wherein an
> exchange obligation is administered by a supervisory institution, the method
> performed by the supervisory institution, comprising:
> **maintaining a first account** for a first party, independent from a second
> account maintained by a first exchange institution;
> **maintaining a third account** for a second party, independent from a
> fourth account maintained by a second exchange institution;
> **electronically adjusting** said first account and said third account in order
> to effect the exchange obligation between said first party and said second party
> after ensuring that said first party and said second party have adequate value in
> said first account and said third account, respectively; and
> providing an instruction to said first exchange institution and said second
> exchange institution to adjust said second account and said fourth account in
> accordance with the adjustment of said first account and said third account,
> wherein said instruction being an irrevocable, time invariant obligation placed on
> said first exchange institution and said second exchange institution.

'510 Patent cols. 67–68.

"Electronically adjusting" the accounts is at the core of the claims of the '510 patent.

Indeed, the exchange of obligations—the stated purpose of the method—is "effect[ed]" when the

"first account" and "third account" are "electronically adjusted."  Ex. 1, Ginsberg Decl. ¶ 21.

This step, at a minimum, requires the use of an "electronic" device capable of adjusting two

accounts that it "maintains"—i.e., a computer. *Id.* In addition, the electronic adjustment of account data maintained by the supervisory institution necessarily results in a physical, electronic change in the medium in which the data are stored, as well as a change in the currency obligation reflected by the account information, thus requiring some type of electronic data storage unit. *Id.* ¶ 22.

The term "electronically" is found in each claim of the '510 patent. The prosecution history indicates that the term "electronically" was added to overcome a rejection under § 101. In other words, the patent examiner considered and rejected the argument CLS now makes—that the '510 patent is not directed to patent-eligible subject matter. In this regard, the examiner initially rejected the claims as "lack[ing] any specific technology such as a computer." *See* CLS Ex. 4, Office Action at 3 (Sep. 3, 2003). An initial rejection is common, and is part of the process of ensuring that patents which issue are valid.[1] Alice then added the term "electronically" to the claims of the '510 patent to overcome the examiner's rejection and expedite the prosecution of the patents. *See* CLS Ex. 5, Amend. and Reply Under 37 C.F.R. § 1.111, at 22 (Oct. 31, 2003). The addition of the term "electronically" to Alice's claims satisfied the examiner's concerns—i.e., it provided "specific technology such as a computer." *Id.* Indeed, the examiner agreed with Alice that its claims were directed to a "real world" exchange of obligations and were an improvement on the state of the art. *See* CLS Ex. 5, Amend. and Reply at 22.

_____

[1] The PTO's expertise and the consideration of questions of patentability by that office are the foundation of the strong presumption that a patent issued by the PTO is valid. *See* 35 U.S.C. § 282. As discussed *infra*, that an initial claim submitted by Alice was rejected is irrelevant to the question of whether the claims that did issue are valid.

### 3.    The '479 Method Patent.

Like the '510 method patent, claims 33 and 34 of the '479 patent claim a novel method for the exchange of obligations that eliminates counterparty risk.  Ex. 1, Ginsberg Decl. ¶ 15. The disclosure and claims use terminology that a person of ordinary skill in the art would recognize as limited to an electronic implementation of this method on a computer.  *Id.* ¶ 16.  For example, the terms "shadow credit record" and "shadow debit record," read in context, refer to information that is stored on and maintained by a computer system.  *Id.* ¶ 17.

### ARGUMENT

Alice, not CLS, is entitled to summary judgment in its favor on the question of whether the '720 and '510 patents claim eligible subject matter, and CLS's motion as to all three patents should be denied.  35 U.S.C. § 101 sets forth what general categories of things may be patented: "process, machine, manufacture, or composition of matter."  This "extremely broad" language reflects the "'wide scope'" that the patent laws are given so as to encourage the development of new technologies.  *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 130–31 (2001) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980)).

Determining whether § 101 applies requires deciding whether the claimed invention is a "process," "machine," "manufacture," or "composition of matter."  *See Bilski*, 545 F.3d at 951 (quoting § 101).  If it falls within one of these categories, it is eligible subject matter unless the claim as a whole covers a "fundamental principle," a term which includes a "law[] of nature," a "natural phenomen[on]," or an "abstract idea."  *Id.* at 952 & n.5 (quotations omitted).

"[A] patent is presumed valid."  35 U.S.C. § 282.  Whether a claim is directed to statutory subject matter under § 101 is a question of law.  However, the "determination of this question may require findings of underlying facts specific to the particular subject matter and its mode of claiming."  *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1056 (Fed. Cir.

10

1992); *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009) ("[T]here may be cases in which the legal question as to patentable subject matter may turn on subsidiary factual issues . . . ."). As the Federal Circuit has explained with respect to § 101 analysis, claim construction "is an important first step in a § 101 analysis." *Bilski*, 545 F.3d at 951.

Both the '720 system patent and the '510 method patent clearly meet the standards for patent-eligibility, as interpreted by *Bilski* and the many other precedents (pre- and post-*Bilski*). The '720 patent claims computer systems that are patent-eligible "machines." CLS does not dispute that the '720 patent claims a computer system; rather, its argument, which is incorrect as a matter of law, is that such a computer system is not patent-eligible. Thus, Alice is entitled to partial summary judgment as to the computer system claims. Likewise, because there is no serious dispute that the term "electronically" in the '510 patent limits the claims to methods for performing *electronic* settlement, Alice is entitled to partial summary judgment as to these claims as well. Moreover, looking beyond the clear-cut claim terms that make it possible to hold the '720 and '510 patents to be patent-eligible at summary judgment, the claims of all three patents, when properly construed, require a computer configured to perform Alice's settlement method. Through the Expert Declaration of Paul Ginsberg, Alice has put at issue the proper construction of the remaining claim terms; therefore, CLS's motion for summary judgment should be denied as to all three patents.

I.    **THE '720 SYSTEM PATENT CLAIMS COMPUTER SYSTEMS THAT ARE ELIGIBLE FOR PATENT PROTECTION AS "MACHINES."**

The '720 system patent claims a computer system that includes a "computer" and a "data storage unit" which are "configured" to perform certain operations. Such claims to machines are within the scope of what may be patented under section 101 for four independent reasons.

11

First, no court has ***ever*** invalidated a claim directed to a computer system under § 101. Since *Bilski* was decided, the Federal Circuit has reaffirmed the eligibility of the claims it considered in *State Street Bank & Trust Co. v. Signature Financial Group*, which for purposes of this motion are indistinguishable from Alice's and are directed to a computer configured to perform the steps of a business method. *In re Ferguson*, 2009 WL 565074, at *4-5. And an examination of *Bilski* itself reveals that it did not change the law that computer systems are statutory subject matter; rather, *Bilski* addressed only process claims, not system claims such as those at issue in the '720 patent. 545 F.3d at 951. *Bilski* did not consider claims directed to computers (or any machine) at all.

Second, the premise that underlies CLS's entire argument—that the operations that Alice's claimed computer system is "configured to perform" involve the type of "fundamental principle" that the Federal Circuit and Supreme Court have exempted from patent protection—is simply mistaken. These claims do not preempt use of "fundamental principles" like the Pythagorean Theorem. Neither *Bilski* nor the remaining § 101 precedents on which CLS relies have any application when the claims do not implicate the narrow "fundamental principle" exception to subject-matter eligibility.

Third, even if the Court were to extend *Bilski* to require that claimed "machines" must be sufficiently "particular" to satisfy § 101 and apply it to Alice's computer systems, those systems are patent-eligible. Because they are configured to perform certain tasks, they are "specific machine[s]." *In re Alappat*, 33 F.3d 1526, 1544–45 (Fed. Cir. 1994) (en banc).

Fourth, and finally, CLS's attempt to characterize Alice's computer system claims as equivalent to method claims fails as a legal matter because Alice's claims expressly cover a

machine—a computer system.  It is irrelevant whether the method that machine is programmed to perform would be patent-eligible standing alone.  *Alappat*, 33 F.3d at 1540.

Each of these issues is addressed below.

### A.    Federal Circuit Law Establishes that Computer Systems Are Patentable "Machines."

A "machine" is "a concrete thing, consisting of parts, or of certain devices and combination of devices."  *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007) (quotations omitted).  The Federal Circuit has long recognized that computer systems like those claimed in Alice's '720 system patent are machines and "clearly patentable subject matter."  *In re Warmerdam*, 33 F.3d 1354, 1360 (Fed. Cir. 1994).  CLS does not point to a single case in which a court has invalidated a claim to a computer under § 101.  To the contrary, the Federal Circuit has squarely held that computer system claims like Alice's are directed to patentable subject matter.  *State Street Bank*, 149 F.3d at 1377; *Alappat*, 33 F.3d at 1545; *Warmerdam*, 33 F.3d at 1360 .

*State Street Bank* is illustrative.  Like Alice's computer system claims, the claim in *State Street* was directed to a computer system configured to perform a business method, not to the business method itself.  Also like Alice's computer system, the *State Street* system comprised a "personal computer including a CPU" (analogous to Alice's "computer") configured to perform the steps of a business method,[2] as well as a "data disk" (analogous to Alice's "data storage

---

[2] The Federal Circuit used the term "arithmetic logic circuit" configured to perform these various steps, but it did not explain where it got this term, which does not appear in the patent at issue or elsewhere in the opinion.  *State Street*, 149 F.3d at 1371–72; *see* U.S. Patent No. 5,193,096, *construed in id.*  In context, it is clear that the term referred to the computer, configured, through software, to perform the listed tasks.  *See also Alappat*, 33 F.3d at 1539 (also using term "arithmetic logic circuit" to refer generally to a computer configured to perform a particular task).

unit"). 149 F.3d at 1371–72. The accused infringer challenged the patentability of this claim under § 101, but the Federal Circuit upheld its validity. In particular, the court observed that the claim was to a "machine" and that none of the exceptions to patentability applied. Notwithstanding its use of mathematics, the court held that the claim did not fall within the "mathematical algorithm" exception. *Id.* at 1373–75 & n.6 (citing *Diamond v. Diehr*, 450 U.S. 175, 192 (1981)) ("[A] claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer" (quoting *Diehr*, 450 U.S. at 187)). Moreover, the court held there was no "business method" exception to patentability. *Id.*

Similarly, in *Alappat*, the Federal Circuit embraced the patent-eligibility of computer systems claimed as "machines." 33 F.3d at 1545. Rejecting the argument that a computer programmed to perform particular functions is not a sufficiently specific machine to be patent-eligible under § 101—the very argument CLS makes today, *see infra* Part I.C—the Federal Circuit recognized that a computer programmed by software to perform functions "becomes a special purpose computer." *Id.* at 1545. Likewise, in *Warmerdam*, the Federal Circuit ruled that a "machine having a memory which contains data" is patent-eligible under § 101.[3] 33 F.3d at 1358, 1360.

_____

[3] Numerous courts, including the Supreme Court and Federal Circuit, have adjudicated claims to computer systems without mentioning § 101. *See, e.g.*, *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 127 S. Ct. 1746, 1750 (2007) (computer system claimed as "apparatus for digitally encoding and compressing recorded speech"); *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1304 (Fed. Cir. 2008) (per curiam) ("account processing system" comprising "remote interface," "communication network," and "data processing system" for processing loan application); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1355 n.1 (Fed. Cir. 2005) (computer configured to receive a request to purchase electronic data and send a second computer software to coordinate download from a third computer); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1368 (Fed. Cir. 2003) ("digital computer system" comprising "central processing unit," "memory unit," "long term storage device," and software for booting).

Post-*Bilski*, the decisions in *State Street*, *Alappat*, and *Warmerdam* remain binding precedent. The Federal Circuit recently explained that "[t]he claim at issue in *State Street* was . . . drawn to a patent-eligible machine implementation." *In re Ferguson*, 2009 WL 565074, at *4; *accord Bilski*, 545 F.3d at 960 n.18 ("In State Street, as is often forgotten, we addressed a claim drawn not to a process but to a machine" which remains patent eligible); *In re Comiskey*, 2009 U.S. App. LEXIS 400, at *36–37 (Fed. Cir. Jan. 13, 2009) (per curiam) (Moore, J., dissenting from denial of reh'g en banc) (*Bilski* "did nothing to change" the "long line of precedent" concerning machine claims). CLS's implication that *In re Bilski* overturned these precedents, *see* CLS Mem. at 26–29, is flawed because *Bilski* did not even address the patent eligibility of machine-based computer system claims. Instead, the Federal Circuit's holding was limited to process claims.

In *Bilski*, the Federal Circuit considered whether a claim to an abstract business method was a patentable "process" under § 101. 545 F.3d at 950. The claim recited a "method for managing the consumption [of] risk," comprising the steps of "initiating a series of [economic] transactions," "identifying market participants," and "initiating [another] series of transactions." *Id*. The claim was not a claim to a computer or other machine. *Id*. **Indeed, Bilski's method claim did not recite any particular machine (such as a computer) to be used for its implementation.** *Id*. The issue was thus whether this abstract business method was a "process" under § 101. *See id*. at 951 & n.2 ("the issue before us involves what the term 'process' in § 101 means"). The Federal Circuit held that the claim was not patentable because it did not satisfy a "machine or transformation" test. *Id*. at 966. The court focused its analysis on the "transformation" prong of the test. *Id*. at 962. The "machine" prong of its test was not at issue

15

because "[a]pplicants had admitted their claims are not limited to operation on a computer." *Id.* at 950.

Thus, the "machine-or-transformation" test articulated in *Bilski* is limited to processes and has nothing to do with machines. The mere statement that a ***process*** is patent-eligible when "tied to a particular machine"—a prong of the "machine-or-transformation" test that *Bilski* did not even apply—could not have effected a sweeping change in the law governing "machines," a completely different statutory subject under § 101. Indeed, CLS's novel theory that *Bilski* can be used to invalidate computer systems simply cannot be reconciled with either the text of the opinion itself or with the Federal Circuit's recent decisions, which have continued, since *Bilski*, to reaffirm the patentability of computer system claims like those in *State Street*. *See Ferguson*, 2009 WL 565074, at *37.[4]

---

[4] CLS cites to opinions of the PTO Board of Patent Appeals and Interferences to support its argument. CLS Mem. at 27–28 (citing cases). These decisions are non-binding and, in any event, do not support CLS's position. For example, a claim in one of the cases CLS relies upon, *Cornea-Hasegan*, recited a processor and memory (similar to Alice's system claims) and was found to be statutory by the PTO. *See Ex parte Cornea-Hasegan*, Appeal 2008-4742, 2009 WL 86725 (Bd. Pat. App. & Int. Jan. 13, 2009). Moreover, *Cornea-Hasegan*, like the other Board cases cited by CLS, was "nonprecedential." (Board decisions can also be "precedential" and "informative." Std. Op. Proc., Bd. Pat. App. & Int., at 6.) Nonprecedential decisions often conflict with one another, and should thus be given little weight. *Compare Ex parte Cornea-Hasegan*, Appeal 2008-4742, 2009 WL 86725 (Bd. Pat. App. & Int. Jan. 13, 2009), *and Ex parte Srinivas Gutta*, Appeal 2008-3000, 2009 WL 112393 (Bd. Pat. App. & Int. Jan 15, 2009), *with Ex parte Uceda-Sosa*, Appeal 2008-1632, 2008 WL 4950944 (Bd. Pat. App. & Int. Nov. 18, 2008) (reversing an examiner's § 101 rejection of a method "tied to a particular computer to represent and store information for a user application"); *Ex parte Praveen Seshadri*, Appeal 2008-2854, 2009 WL 524947 (Bd. Pat. App. & Int. February 27, 2009) (reversing an examiner's § 101 rejection of "a computer implemented notification system"); *Ex parte Van Beek*, Appeal 2008-2033, 2009 WL 112387 (Bd. Pat. App. & Int. Jan. 16, 2009) (upholding claim to a computer readable medium storing digital data).

In addition, the PTO applies a different standard for claim construction—the "broadest reasonable construction"—to patent applications than courts apply to issued patents. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). The rejection of a claim under this standard, which may not take full account of what the patent specification means for the construction of the remaining claim terms, may shed little light on the patent-eligibility of an issued claim that is, in any event, entitled to a presumption of validity. *See* 35 U.S.C. § 282.

**B.    The Computer Systems Claimed in the '720 System Patent Do Not Wholly "Preempt" the Use of Any Fundamental Principle.**

Underlying all of CLS's arguments is the premise that the method performed by Alice's computer system is a "fundamental principle"—a mathematical algorithm or other abstract concept—the use of which would be preempted if the claims are not invalidated.[5]  CLS relies principally on the Supreme Court's decisions in *Gottschalk v. Benson*, 409 U.S. 63 (1972), and *Parker v. Flook*, 437 U.S. 584 (1978).  CLS Mem. at 26–29.  But CLS has it wrong.  Alice's claims do not recite a mathematical algorithm such as the Pythagorean Theorem.  And no algorithm is preempted by these computer system claims.

A "mathematical algorithm" solves "a given type of mathematical problem."  *Flook*, 437 U.S. at 585 n.1.  A claim does not become unpatentable "simply because it uses a mathematical formula, computer program, or digital computer" as part of the claim.  *See Diamond v. Diehr*, 450 U.S. 175, 187 (1981).  Rather, in both *Benson* and *Flook*, the claims were unpatentable because they were directed to ***pure mathematical algorithms***.  *Benson*, 409 U.S. at 71–72; *Flook*, 437 U.S. at 596–97.  In *Benson*, the claims "were not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use."  409 U.S. at 64, 71–72.  The claim covered the mathematical algorithm itself—a "method for converting binary coded decimal number representations into binary number representations."  *Id.*  Likewise, in *Flook*, the claim "as a whole" also was directed to a mathematical algorithm—a "method for updating" a value comprising calculation steps.  437 U.S. at 594, 96–97.  In both cases, the claim would have foreclosed the public from ***any*** use of the principle—leading the

---

[5] CLS does not contend that Alice's claims recite a pre-existing natural phenomenon or law of nature.

Supreme Court to observe in *Benson* that "in practical effect" the claim is "a patent on the [principle] itself."  409 U.S. at 71–72.

By contrast, Alice's claims do not recite a mathematical algorithm at all.  None of the limitations of Alice's claims include a formula, an equation, a geometric proof, or anything of the sort.  The execution of a particular set of business operations to settle a foreign currency trade in a way that minimizes risk is, if anything, just a business method—and there is no business method exception to patentability.[6]  *Bilski*, 545 F.3d at 960 ("reaffirm[ing]" the conclusion that a business method exception would be "unlawful"); *State Street*, 149 F.3d at 1373–77 (same); *see also* 35 U.S.C. § 273(a)(3) (explaining that the earlier invention of a "method of doing or conducting business" is a defense to a patent infringement claim covering that method of doing business).

Nor do Alice's claims "preempt" every "use" of any method.  If they were not limited to an electronic computer implementation, the claimed settlement operations could be carried out "offline," without the aid of a computer.  Ex. 1, Ginsberg Decl. ¶ 25.  One could maintain accounts by hand, adjust them, and issue instructions to an exchange institution without any hardware.  *Id.*  Alternatively, one could carry out the method using a non-electronic computer that would not "electronically adjust" records or accounts and not infringe upon Alice's patents.  *See, e.g.*, ANTHONY HYMAN, CHARLES BABBAGE:  PIONEER OF THE COMPUTER 243 (1985) (depicting Babbage's Analytical Engine of 1858, a mechanical computer capable of performing

---

[6] Indeed, in considering Alice's '510 method patent, the PTO agreed that Alice's method claims "did not merely recite an abstract idea, but rather recited a 'real world' purpose, i.e., an exchange of obligations between parties . . . using exchange institutions."  CLS Ex. 5, Amend. and Reply at 22.

arithmetic);[7] U.S. Patent No. 5,955,322 (Sep. 21, 1999) ("DNA-Based Computer"); Ex. 1,

Ginsberg Decl. ¶ 25.  In reality, however, Alice's claims are narrower and limited to using an

electronic computer system configured in a specific way.[8]  Far from preempting the field, the

claims are thus markedly different from those in *Benson* and *Flook*.

To the extent any Supreme Court case is apposite, it is *Diamond v. Diehr*, 450 U.S. 175

(1981), which CLS does not cite in discussing Alice's system claims.  In *Diehr*, the claims used a

mathematical algorithm during the manufacture of molded rubber.  *Id.* at 177.  Rejecting an

argument that the case was like *Benson* and *Flook*, the Court observed that Diehr's claim sought

patent protection for a process that applied the algorithm.  *Id.* at 187.  That the claim

"employ[ed] a well-known mathematical equation" did not render it unpatentable, because it

employed the equation only in a particular context:  the specific process being claimed.  *Id.*  As

the Federal Circuit recognized in *Bilski*, the *Diehr* case involved patentable subject matter

because the patent "[sought] only to foreclose others from using a particular 'application' of that

fundamental principle."  *Bilski*, 545 F.3d at 953 (describing distinction in *Diehr*).  Alice's claims

to a computer system are no different.  Thus, as a threshold matter, they do not implicate the

"fundamental principle" exceptions to statutory subject matter, and they are patent-eligible.

### C.    A Computer Programmed To Perform Specific Functions Satisfies Any Particularity Requirement that Might Exist.

CLS also argues that the "particularity" requirement discussed in *Bilski* for **method**

claims should be applied to Alice's **system** claims.  In other words, CLS argues that Alice only

claims a general purpose computer, not a "particular" computer.  Even if "particularity" is

---

[7] *Available at* http://books.google.com/books?id=YCddaWqWK2cC.

[8] Because they require the use of computer hardware, they are also not directed to a "mental process."

relevant to machine claims (which no court, including the Federal Circuit, has ever held to be the case), the claims of Alice's '720 system patent easily satisfy any such requirement.

Indeed, CLS has acknowledged in prior briefs that Alice's system claims are limited to a "*particularly configured* computer and coupled data storage device."  CLS Repl. in Supp. of Mot. to Dismiss at 19 (Dkt. No. 18) (Oct. 15, 2007) (emphasis added).  Later, CLS characterized Alice's system claims as "cover[ing] an apparatus with *specifically defined elements*—broadly a 'data storage unit' 'coupled' to a 'computer' *configured to perform certain tasks*."  Updated Joint 26(f) Report, at 10, (Dkt. No. 23) (Feb. 14, 2008) (emphasis added) ("CLS's Position" re scope and timing of discovery).

The Federal Circuit has rejected the argument that a computer system is insufficiently "particular" by upholding claims to computer systems that are far less specific than Alice's.  For example, in *Warmerdam*, the Federal Circuit found that a claim to a "machine having a memory which contains data" generated by an algorithm—in other words, a machine that does nothing more than *store* data—was statutory subject matter under § 101.  33 F.3d at 1358, 1360.  Such a claim is less "particular" than Alice's claims, which require a "data storage unit" and a "computer" configured to perform particular electronic settlement operations.[9]  Likewise, in *Alappat*, the Federal Circuit expressly held that a computer programmed to perform certain functions—like the computers claimed in Alice's '720 patent are configured to do—is "a special purpose computer" and is patent-eligible.  *Alappat*, 33 F.3d at 1545; *accord In re Noll*, 545 F.2d 141, 148 (C.C.P.A. 1976) (holding that a "programmed machine is structurally different from a

---

[9] Indeed, the "machine having a memory" in *Warmerdam*, which merely "contain[ed]" particular data, is analogous to Alice's "data storage unit" component, which "ha[s] stored therein" particular data.  *See, e.g.*, '720 patent, claim 68.  Alice's data storage unit is therefore sufficient, standing alone, to limit the claim to a particular machine under *Warmerdam*, and it independently supports the patent-eligibility of Alice's system claims.

machine without that program"). And as discussed above, the computer system claimed in *State Street* is indistinguishable from Alice's claimed computer systems. *State Street*'s "personal computer including a CPU" is analogous to Alice's "data processing system"; its "data disk" is analogous to Alice's "data storage unit"; and its series of "arithmetic logic circuits" configured to perform the steps of a business method is analogous to Alice's "computer" configured to perform the electronic settlement operations. *State Street*, 149 F.3d at 1371–72; *see also supra* note 2.

Recognizing the difficulty posed by *State Street*, CLS tries to distinguish it on the basis that the computer system claim in *State Street* was written in "means-plus-function" format and thus was to a more "particular" machine than the computer system claimed in the '720 system patent. CLS Mem. at 27 n.20. But this is a meaningless distinction. A "means-plus-function" claim makes use of a particular claim-drafting technique allowed by the patent code. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means . . . for performing a specified function . . . and such [a] claim shall be construed to cover ***the corresponding structure, material, or acts described in the specification*** and ***equivalents*** thereof." (emphasis added)). As a matter of claim construction, such a claim incorporates "structure" described in the specification into the claim even though the structure is not expressly recited in the claim. § 112, ¶ 6; *see* CLS Mem. at 27 n.20. Once incorporated, the claim is no more "particular" than a regular (non-means-plus-function) claim. Indeed, if anything, a means-plus-function claim is *less* particular because its covers not just the structure described in the specification, but "equivalents" as well. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (en banc); § 112, ¶ 6.

In *State Street*, the Federal Circuit specifically identified the structure that the means-plus-function claim incorporated from the specification. 149 F.3d at 1371–72. It included a

"personal computer including a CPU," a "data disk," and an "arithmetic logic circuit[s]"
configured to" perform the steps of the method. *Id.* A claim with those components was at issue
in the § 101 patentability analysis. Accordingly, taking account of its means-plus-function
nature, the claim in *State Street* is nearly identical to—and no more "particular" than—Alice's
claim to a "data processing system" comprising a "data storage unit" storing particular data and a
"computer, coupled to said data storage unit" "configured" to perform settlement operations.

> **D.    The Patent-Eligibility of Alice's Computer System Does Not Depend on the Eligibility of a Process that Is Performed Without the System.**

Unable to find a case involving a "computer system" or "machine" that supports
imposition of the "particular machine" requirement to the '720 system patent's claims, CLS
accuses Alice of trying to "get around" a purported lack of patentable subject matter in its
method claims by "restating them as a system." CLS Mem. at 26–28. CLS argues that the
claims to electronic settlement methods in Alice's '510 method patent are not patent-eligible,
that the computer system claims in the '720 system patent implement that method, and that the
addition of a "computer, coupled to" a "data storage unit" do not sufficiently "impose
meaningful limits on the claim[s'] scope to impart patent-eligibility." CLS Mem. at 26 (quoting
*Bilski*, 545 F.3d at 961). But as demonstrated *infra* in Part II, the claims to electronic settlement
methods in Alice's '510 method patent are unquestionably patent-eligible. As a result, the entire
premise of CLS's argument fails.

Notwithstanding that faulty premise, CLS argues that "rewriting" a (purportedly)
unpatentable method claim as a machine claim directed to a computer system "exalts form over
substance," so the system claim should be treated no differently from the unpatentable method
claim. CLS. Mem. at 25. But the legal principle that CLS invokes (that the patent-eligibility of a
"particular claim" does not depend on "the form—machine or process—in which [the] claim is

drafted," *AT&T*, 172 F.3d at 1357) assumes that the machine and process versions of the claim have the same limitations—i.e., that they differ only in how they have been drafted, not in their scope.  CLS, however, compares Alice's computer system claims to a hypothetical claim ***without any computer system limitations***.  Whether *that* hypothetical claim is patent-eligible has no bearing on whether *Alice's* claims—which explicitly recite a "data processing system" comprising a "computer" configured to perform specific tasks and "coupled to" a "data storage unit having stored therein" specific data—are patent-eligible.[10]  The difference between the claims is in substance, not form, because it is improper to simply ignore claim limitations when determining patentability.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1322 (Fed. Cir. 2006) (observing that it is improper to ignore any limitations in construing claims and stating that "[w]hen product and process limitation appear in the same claim it is generally because these limitations serve to define and distinguish the invention"); *see also Diamond v. Diehr*, 450 U.S. at 188 (in § 101 analysis, it is inappropriate to "dissect the claims" and ignore some limitations rather than considering claims "as a whole").

　　For example, in both *Alappat* and *Warmerdam*, the computer system claims were patentable even though the underlying methods were not.  Both of those cases involved methods that were mathematical algorithms and were not tied to a machine or transformative in any way (and were thus far afield from the methods claimed in the '510 method patent).  In both cases, the addition of hardware resulted in a patent-eligible claim.

---

[10] Conversely, a method claim reciting the same steps that the computer of the '720 patent is configured to perform, and also reciting that each of those steps is to be executed by a "computer" that is "coupled to" a "data storage unit" that "has stored therein" information about the accounts that are "electronically" adjusted, would be "tied to a particular machine" and would be patent-eligible.

In *Alappat*, the PTO had interpreted the claim to be a pure method claim to a fundamental principle ("a mathematical algorithm for computing pixel information" for use in a TV-like display) unlimited to any particular technological implementation. 33 F.3d at 1539–40. It thus found the claim to be unpatentable under § 101. The Federal Circuit, however, reversed, because the PTO ignored limitations (that were properly part of the claim) and erred in treating the claim as if it were a method. 33 F.3d at 1539–40. The Federal Circuit explained that "***this court's precedents do not support the Board's view that the particular apparatus claims at issue in this case may be viewed as nothing more than process claims***" for purposes of the § 101 analysis *Id.* at 1540 (emphasis added). Construed as a machine, the Federal Circuit found the claim to be patentable. *Id.*

Similarly, in *Warmerdam*, the Federal Circuit upheld the PTO's decision holding that four claims to "methods of bubble generation and placement" (mathematical methods for controlling the motion of objects and machines) were unpatentable. 33 F.3d at 1355–60. However, the Federal Circuit held that the fifth claim was patent-eligible, even though it was directed to a "machine having a memory which contains data" representing the results from performing the same bubble generation methods. *Id.* at 1358. The court found that "[c]laim 5 is for a machine, and is clearly patentable subject matter." *Id.* at 1360.

Alice's '720 system patent, like the machine claims in *Alappat* and *Warmerdam*, claims a particular computer system configured to perform certain specified functions. CLS is incorrect to treat Alice's system claims as structure-less method claims. Claim limitations that restrict a claim to a particular computer system cannot be ignored. Nor can such machine limitations be dismissed as somehow insignificant. To the contrary, Alice's claim "as a whole" is directed to a

machine. *Diehr*, 450 U.S. at 188. The Federal Circuit has explicitly rejected CLS's approach to performing a § 101 analysis of apparatus (machine) claims.[11]

*          *          *

In summary, the claims of the '720 patent are directed to computer systems, which have been consistently held to be patent-eligible both before and after *Bilski*. The claims do not preempt a fundamental principle, nor do they fail any purported "particularity" requirement. Because the Federal Circuit has expressly rejected attempts, such as CLS's, to ignore the differences between system and method claims, CLS's motion for summary judgment should be denied as to the '720 patent, and Alice's cross-motion should be granted.[12]

---

[11] The "terminal disclaimers" Alice filed with the PTO as to both the '720 and '510 patents are irrelevant to whether the patents claim eligible subject matter. CLS makes much of the terminal disclaimers in an attempt to, again, draw the impermissible inference that the validity of the '479 patent controls the inquiry as to the later patents. CLS Mem. at 8–11. However, the purpose of a terminal disclaimer is to prevent so-called "double-patenting," whereby an inventor attempts to impermissibly extend his monopoly to the same basic invention by filing a second application to something that is not, to use the term of art, "patentably distinct." Filing a terminal disclaimer, which limits the term of the second patent to the term of the first, cures the problem. *See generally In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375–76 (Fed. Cir. 2008). The terminal disclaimer does ***not*** mean that the terms of the second patent are identical for purposes of the inquiry under § 101. Rather, the second patent's claims will be impermissible, absent a terminal disclaimer, if they are merely obvious (the inquiry under § 103) over the first patent's claims. *See id.* at 1379. Whether the addition of claim limitations is obvious has no bearing on patent-eligibility—the claim as a whole, including the new limitations, must be considered on its own merits. To take but one example, in *Warmerdam*, 33 F.3d at 1358, the system claim (to a "machine having a memory" that stored the results of an algorithm) would have been obvious over the process (the unpatentable algorithm). Yet the machine that was the subject of the system claim was "clearly patentable subject matter." *Warmerdam*, 33 F.3d at 1360.

Moreover, as discussed earlier, *see supra* note 6, the PTO applies a different claim construction standard when considering patent applications from the one that courts apply when considering issued patents. This limits the relevance of an initial rejection by the PTO to the patent-eligibility of an issued claim.

[12] Oddly, CLS is arguing that its own patent applications should be rejected. After filing this suit, CLS sought patents for its system, patents that are being prosecuted by the same firm that represents CLS in this case. CLS's proposed claims generically cover, *e.g.*, a "system for facilitating the settlement of payments" comprising an "interface," a "first processor," and a "second processor" configured to perform various steps. Ex. 2, U.S. Patent App. No. 2008/0154771 (published June 26, 2008). CLS cannot have it both ways, arguing to this Court

## II.     THE METHODS OF ELECTRONIC SETTLEMENT CLAIMED IN THE '510 METHOD PATENT ARE PATENT-ELIGIBLE.

The methods of electronic settlement claimed in the '510 method patent are patentable "processes" under § 101.  The '510 patent claims methods of settlement dependent on, among other things, "electronically adjusting" an "account" or "record."  Post-*Bilski*, the Federal Circuit has reaffirmed that such processes are patentable.  *In re Comiskey*, 554 F.3d 967, 979 n.14 (Fed. Cir. 2009) (reaffirming eligibility of claim in *AT&T Corp. v. Excel Commc'ns, Inc.*, 172 F.3d 1352, 1358 (Fed. Cir. 1999)); *id.* (reaffirming eligibility of claim in *Arrhythmia Research Tech., Inc. v. Corazonix Corp.*, 958 F.2d 1053 (Fed. Cir. 1992)).  Alice's claims are patentable just like those in *AT&T* and *Arrhythmia Research.*

As those cases demonstrate, the methods of electronic settlement recited in the '510 patent claims satisfy both prongs of the "machine or transformation" test recently clarified in *Bilski.*  Under the "machine" prong, each claim of the '510 patent describes accounts that must be "electronically" adjusted.  It is impossible to electronically adjust an account without a "particular machine."  Under the "transformation" prong, each claim of the '510 patent effects a physical transformation of an electronic device.

### A.     The Methods of Electronic Settlement Claimed in the '510 Method Patent Are "Tied to a Particular Machine."

Each of Alice's asserted method claims requires that at least one "account" or "shadow record" be "electronically adjusted."  *E.g.*, '510 patent, claims 65, 68.  The claim term "electronically" limits the claimed settlement method to an implementation tied to electronic hardware (a machine) and thus brings it within the broad scope of patentable subject matter.  It is

---

that Alice's claims are not patent-eligible, while simultaneously urging the PTO to approve its own indistinguishable claims.  One can be forgiven for doubting that CLS has advised the PTO that its own now-pending claims do not recite patentable subject matter.

not possible for a human mind or a non-electronic device to "electronically adjust" anything

without the aid of an electronic machine.  Ex. 1, Ginsberg Decl. ¶ 21.  This limitation ties the

claimed methods of electronic settlement to a "machine" within the meaning of the *Bilski*

machine-or-transformation test.  The claims are thus patent-eligible.

### 1.    *Bilski* Did Not Overrule Federal Circuit Law that Methods Implemented Electronically Are Patentable.

Prior to the Federal Circuit's decision in *Bilski*, the Federal Circuit had held that claims to

methods implemented electronically were patent eligible under § 101.  *See AT&T Corp. v. Excel*

*Commc'ns, Inc.*, 172 F.3d 1352 (Fed. Cir. 1999); *Arrhythmia Research Tech., Inc. v. Corazonix*

*Corp.*, 958 F.2d 1053, 1058–59 (Fed. Cir. 1992).  As discussed above, *see supra* Part I.A, *Bilski*

itself did not limit the patent-eligibility of processes involving the use of machines.  In *Bilski*, the

"machine" prong of the "machine-or-transformation" test was not at issue because the appellants

conceded that their claims did not involve a machine.  545 F.3d at 962.  Thus, *Bilski* left

undisturbed the well-established case law holding that claims involving the use of electronics are

not directed to mental processes and are patent-eligible.  Recently, the Federal Circuit in *In re*

*Comiskey*, 554 F.3d 967 (Fed. Cir. 2009), reaffirmed that the claims at issue in *AT&T* and

*Arrhythmia* remain directed to statutory subject matter under § 101.  554 F.3d at 979 & n.14.

Because the claim term "electronically" (which is present in every claim of the '510

patent) limits the claimed settlement method to an implementation tied to electronic hardware (a

machine), the claimed methods are patent-eligible.   For example,  in *AT&T Corp. v. Excel*

*Communications, Inc.*, the claim was to a "method for use in a telecommunications system" in

which telephone calls were "routed over the facilities" of an "interexchange carrier."  172 F.3d at

1354.  The method involved two steps:  "generating a message record" for a telephone call and

"including, in said message record," a particular type of data.  *Id.*  The Federal Circuit explained

that implementation of the claimed method required the use of "switches and computers," *id.* at

1355, and thus the claims "f[e]ll comfortably within the broad scope of patentable subject matter

under § 101." *Id.* at 1361. Similarly, in *Arrhythmia Research Technology v. Corazonix Corp.*,

the Federal Circuit upheld a claim to a "method for analyzing electrocardiograph signals" that

required the use of a mathematical algorithm. 958 F.2d at 1055. This claim was patent-eligible

because it used "electronic equipment programmed to perform mathematical computation" and

was thus tied to a machine. *Id.* at 1058.[13]

> ## 2. The Machine Required To Implement the Electronic Settlement Methods Claimed in the '510 Method Patent Is Sufficiently "Particular."

CLS does not dispute that Alice's claimed electronic settlement methods require the use

of an electronic "machine." CLS Mem. at 22–23. Nor does it contend that an "electronic"

adjustment is an operation that can occur solely in a person's mind. *See* Ex. 1, Ginsberg Decl.

¶ 21 (stating that it cannot). Instead, CLS cites *Bilski* and argues that the methods of electronic

settlement recited in the '510 patent are invalid because they are not tied to a "particular" enough

machine. CLS Mem. at 22–23. CLS essentially argues that in order to be "tied to a particular

machine," a claim has to be limited to a novel configuration of hardware, not just an off-the-shelf

computer that is configured using novel software. This is the same erroneous argument that CLS

made with respect to the computer system claims in the '720 system patent. It should be rejected

for the same reasons.

Even a cursory examination of the '510 patent's 100-plus page specification—which

CLS never cites—reveals that the claimed settlement methods are implemented on a computer

---

[13] The only physical component described in these steps—the "high pass filter means"—was construed to mean a "minicomputer configured as described in the specification," i.e., a general-purpose computer configured to perform specific functions.

system configured to perform the electronic adjustment.[14]  Ex. 1, Ginsberg Decl. ¶ 22; *see also* '510 patent, fig. 2a.  This computer system includes, at a minimum, a processor and memory. Ex. 1, Ginsberg Decl. ¶¶ 23–24, 26.  Such a machine is no less "particular" than the "switches and computer" in *AT&T*, 172 F.3d at 1354–55, or the "electronic equipment programmed to perform mathematical computation" in *Arrhythmia*, 958 F.2d at 1058.  *See also* Ex. 1, Ginsberg Decl. ¶ 22–24.  Those cases remain good law post-*Bilski*.  *See Comiskey*, 554 F.3d at 979 & n.14.

The word "particular" was part of the machine test for process claims long before *Bilski* came along.  *See Benson*, 409 U.S. at 70 (process claim need be transformative or tied to a "particular" machine).  CLS has not even attempted to explain how *Bilski*'s mention of an existing test—occurring in a case that did not apply that prong of the test—caused a dramatic narrowing in how the test should be applied.  The bottom line is that "tied to a particular machine" post-*Bilski* means what it has meant all along:  it requires that a machine be used in performing the steps of the method.  *See Comiskey*, 554 F.3d at 978 (a process claim is patentable if it "is embodied in, operates on, transforms, or otherwise involves another class of statutory subject matter," such as a machine).

Moreover, the PTO found during prosecution of the '510 patent that the "electronically" limitation was sufficiently "particular."  During prosecution, the PTO examiner initially considered claims without the "electronically" limitation.  The examiner rejected the claims under § 101 and explained that they "lack any specific technology such as a computer"  *See* CLS

_____

[14] Should the Court wish to defer even this minimal exercise in claim construction until after a *Markman* hearing, Alice's motion for summary judgment should still be granted because the term "electronically" necessarily, and undisputedly, is limited to some electronic machine. Either way, CLS's motion should be denied.

Ex. 4, Office Action at 3 (Sept. 3, 2003). As a result of this rejection, Alice added the term

"electronically" to every claim of the '510 patent. The PTO examiner was satisfied that the

revised claims were patentable and allowed the patent to issue. Ex. 3, Notice of Allowance (Oct.

5, 2004). Because the PTO considered the question and rejected the very argument made by

CLS, this Court should accord the '510 patent its full presumption of validity and be especially

hesitant to overrule the decision made by the PTO examiner.[15]

In addition, as explained *supra* Part I.C, when a computer is configured to perform a

specific operation, the computer itself becomes a particular device. *See Alappat,* 33 F.3d at

1545; *In re Noll*, 545 F.2d at 148. *Bilski*, which did not even consider the "machine" prong of

the "machine-or-transformation" test, did nothing to change this long-standing doctrine. In

summary, *AT&T* and *Arrhythmia* remain good law post-*Bilski*. As a result, the methods of

electronic settlement claimed in the '510 patent satisfy the requirements of § 101.

### 3. "Electronically" Is a Meaningful Limitation.

CLS further argues that although the claims of the '510 method patent require a

"machine," the "machine" prong of *Bilski* is still not satisfied because the role of the machine in

the claims is too insignificant. CLS Mem. at 24. That is, CLS argues that the "electronically"

limitation falls into either or both of two narrow categories whereby a claim reciting a particular

---

[15] CLS asserts that the PTO applied the wrong test, a so-called "technological arts" test. CLS Br. at 23. While it is true that the "technological arts" test was one test for patent-eligibility that was applied by the PTO before *Bilski* declined to adopt it (on the grounds that its "contours . . . would be unclear," 545 F.3d at 960), the Manual of Patent Examining Procedure (8th ed. rev. 1 2003) ("MPEP") expressly provided that examiners were to follow *AT&T* and *Arrhythmia* in examining applications, *see* MPEP § 2106 (citing *AT&T* and *Arrhythmia*), and it is not as clear as CLS implies what test the examiner applied. What is clear is that to expedite the issuance of the claims, Alice agreed to add the "electronically" limitation, and this satisfied the examiner that the claims no longer "lack[ed] any specific technology such as a computer." CLS Ex. 4, Office Action, at 3 (Sep. 3, 2003).

machine is not adequately "tied" to that machine under the *Bilski* test: "electronically" might be either a "field-of-use limitation," or it might be "insignificant postsolution activity." *See Bilski*, 545 F.3d at 957. CLS is incorrect; the "electronically" limitation does not fall into either category.

### (a)    "Electronically" is not a "field-of-use" limitation.

A "field-of-use" limitation, as its name implies, is a claim limitation that restricts an *otherwise unpatentable* process to use in one particular field. The "field-of-use" doctrine applies when claiming the steps of a process would result in "the wholesale pre-emption of fundamental principles"—that is, when the claim is already ineligible subject matter. In these circumstances, merely stating that the method will be used in "a particular technological environment," without actually limiting the steps of the method to a "specific application" or tying those steps to a particular machine, will not make the claim patent-eligible. *Id.* (quoting *Diehr*, 450 U.S. at 191–92) (quotation marks omitted). This doctrine is simply inapplicable to the "electronically" limitation in the '510 patent, for two reasons.

First, as discussed above in Part I.B, Alice's claims are not directed to a fundamental principle akin to the law of gravity or the Pythagorean Theorem, even without the "electronically" limitation. The claim therefore does not implicate the "field-of-use" doctrine. *See Bilski*, 545 F.3d at 953–55 (discussing eligibility-dispositive distinction between a claim "drawn only to a fundamental principle" and a claim drawn to an "'application' of that fundamental principle").

Second, the term "electronically" is not what limits Alice's claim to a "particular technological environment" nor to a particular field in which the method would be applied. *See id.* at 957. Even without the "electronically" limitation, the claims are limited to "a particular use, a specific application"—the exchange of obligations. *Id.* The term "electronically" does not

purport to further limit the field of use; rather, it further specifies how the claim is to be performed, i.e., what particular machine it is tied to.

In contrast, an impermissible "field-of-use" limitation explains only *why* the claim is to be practiced; it does not explain *how*. For example, in *Flook*, cited by CLS at 24, the claim was to a "method for updating the value of at least one alarm limit." 437 U.S. at 596–97. Because this clearly was a claim to a mathematical algorithm, the patentee added a "field of use" limitation, which stated that the algorithm was for use "in a process comprising the catalytic chemical conversion of hydrocarbons." *See id.* at 596. However, although the limitation in *Flook* kept it from wholly preempting the claimed calculation in a literal sense, every single step of the method was performed by mathematical calculation alone, and no step required any machinery. The claim did not "purport to explain how to select . . . any of the . . . variables," nor did it "contain any disclosure relating to the chemical processes at work, the monitoring of process variables, or the means of setting off an alarm or adjusting an alarm system." *Id.* at 586. Thus, the "field-of-use" limitation did nothing to change the fact that the claim was "directed essentially to a method of calculating." *Id.* at 595 (quoting *In re Richman*, 563 F.2d 1026, 1030 (C.C.P.A. 1977)). The Court held that the claim was not patentable, expressly distinguishing the claim in that case where the algorithm was the whole claim, from claims drawn with a "mathematical algorithm as one component." *Id.* at 594.

Likewise, in *Benson*, the claims were to a mathematical algorithm for converting binary-coded decimal numbers into binary numbers. 409 U.S. at 71–72. The Court held that the claims "were not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use." 409 U.S. at 64. Merely recognizing that the algorithm would, in

practice, only be performed on a digital computer did not make the algorithm patent-eligible.[16]

*See id.* at 71–72.

Alice's method claims suffer no such infirmity. As explained in Part II.A.2, *supra*, the addition of the term "electronically," which mandates an electronic, computer implementation of the method, limits the scope of the claim to a particular machine; it does not just state its intended purpose. Ex. 1, Ginsberg Decl. ¶¶ 26–27. As *Bilski* makes clear, if method steps are limited to performance using a particular machine, the "field-of-use" doctrine does not arise. *Bilski*, 545 F.3d at 957. The "field-of-use" doctrine is simply inapplicable to Alice's claims.

> **(b)    "Electronically adjusting" is not "insignificant post-solution activity."**

CLS also argues that the adjustment of accounts constitutes "insignificant post-solution activity" that cannot make an unpatentable claim patent-eligible. CLS Mem. at 19–20. This is incorrect. The "insignificant post-solution activity" doctrine, like the "field-of-use" doctrine, describes a narrow circumstance in which adding a machine limitation to an unpatentable

---

[16] Because the process was only meaningful on digital computers—it was a fundamental principle *of computer science*—limitation to a digital computer did not even really limit the field of use.

The remaining case cited by CLS, *O'Reilly v. Morse,* likewise deals with an attempt to add a "field of use" limitation to a claim that literally covers a law of nature without any attempt to limit its application to a particular implementation. 56 U.S. 62, 112 (1853) (claim to "electro-magnetism, however developed, for marking or printing intelligible characters, signs or letters, at any distances" not patentable because field-of-use limitation insufficient to limit fundamental principle (quotations omitted)).

A recent district court opinion also exemplifies the "field-of-use" doctrine. In *CyberSource Corp. v. Retail Decisions, Inc.*, the court concluded that a method for verifying the validity of a credit card transaction—each step of which could be performed without the use of machine—did not become patent-eligible just because the preamble limited it to being performed "over the Internet" or to "the field of online credit card transactions." No. C 04-03268, 2009 WL 815448, at *6 (N.D. Cal. Mar. 27, 2009) ("[A]n unpatentable mental process for collecting data and weighing values does not become patentable by tossing in references to internet commerce.").

33

fundamental principle will fail to make the claim patentable. *Bilski*, 545 F.3d at 957. If the claim "as a whole" is to an algorithm even with the addition of an extra step that involves a machine—for example, a step after the algorithm is solved in which the result of the algorithm is recorded—the claim will remain ineligible for patent protection. *E.g.*, *In re Grams*, 888 F.2d 835, 840 (Fed. Cir. 1989) (data-gathering step performed prior to a mathematical algorithm insufficient to make algorithm patent-eligible); *In re Schrader*, 22 F.3d 290, 291 (Fed. Cir. 1994) (recordation step performed after mathematical algorithm insufficient to make algorithm patent-eligible). Like the "field-of-use" doctrine, this doctrine is inapplicable to Alice's claims, for three reasons.

First, as discussed above, Alice's methods do not claim a fundamental principle.

Second, CLS is mistaken when it asserts that "electronically adjusting" is a post-solution step. To the contrary, the stated purpose of the method is "exchanging an obligation between parties"—"electronically adjusting" is central to the "solution" itself. *E.g.*, '510 patent, claim 68 (preamble). For example, claim 68 specifically states that "electronically adjusting" is done "in order to effect the exchange obligation" between the parties. *Id.* Moreover, no step of the method describes how to solve any algorithm, nor is the purpose of the "adjust[ment]" step to store the result of any calculation. Thus, CLS's effort to describe the adjustment as a recordation step, performed "once the algorithm is solved," ignores both the stated purpose of the method and the steps taken to perform it.

Third, CLS errs in focusing on "electronically adjusting" without considering the effects of the "electronically" limitation on the method as a whole. The method as a whole is performed electronically. The same accounts or records that are electronically adjusted are also "maintain[ed]." *Id.* ("maintaining a first account . . . ; electronically adjusting *said* first

account"). An account or record that is amenable to electronic adjustment will necessarily be stored electronically. Ex. 1, Ginsberg Decl. ¶ 23. Thus, at least three of the four steps of Alice's method—including the "adjusting" step that effects the claimed exchange of obligations—must be performed electronically using a computer and memory. *Id.* ¶¶ 22–23.[17]

As a result, far from "post-solution" activity, the "electronically" limitation is at the heart of the claimed method as a whole. Alice claims an electronic method for performing the settlement, and the "maintaining" and "adjusting" steps are central to that process. Unlike a data-gathering step performed prior to a mathematical algorithm, *see Grams*, 888 F.2d at 840, or a recordation step performed after it, *see Schrader*, 22 F.3d at 291, the use of electronics is an integral part of, and a limitation on, how Alice's method is to be performed. Moreover, even if CLS is correct to characterize Alice's method as requiring the use of an algorithm as part of one of its steps, *see* CLS Mem. at 19–20, that fact does not transform the rest of the method into insignificant post-solution activity. *See Bilski*, 545 F.3d at 958 ("[I]t is irrelevant that any individual step or limitation . . . by itself would be unpatentable under § 101."); *Diehr*, 450 U.S. at 187 (a claim does not become nonstatutory "simply because it uses a mathematical formula, computer program, or digital computer"). In essence, Alice's method is tied to the use of an electronic machine, which is at the heart of the claim "as a whole." *Bilski*, 545 F.3d at 958. As such, the method is clearly patentable under the "machine" prong of the *Bilski* test.

--------

[17] Because claim construction is premature, Alice will not now advance its arguments regarding the proper interpretation of other limitations of the claims of the '510 patent. However, in the event that the Court disagrees with Alice's contention that all claims of the '510 and '720 patents are directed to eligible subject matter, Alice respectfully requests a *Markman* hearing before further consideration of summary judgment. As their lengthy specifications reveal, all three of Alice's patents are directed to computer systems and methods for using them. Even the broadest claims are properly limited to using a machine to exchange an obligation.

**B.  The Methods of Electronic Settlement Claimed in the '510 Method Patent Transform Electronically-Stored Data.**

The electronic settlement methods claimed in the '510 Method Patent also satisfy the "transformation" prong of the "machine or transformation" test.  This is the only issue that *Bilski* actually addressed, and it is an independent ground for finding Alice's method claims to be patent-eligible as a matter of law.

A process that converts "one physical, electrical signal into another" involves "physical process steps" that are patentable.  *Arrhythmia*, 958 F.2d at 1059.  Indeed, the transformation of data representing a physical object renders a claim patentable, even if the physical object itself is untouched.  *In re Abele*, 684 F.2d 902, 908–09 (C.C.P.A. 1982) (upholding claim to process for transforming X-ray attenuation data), *cited in Bilski*, 545 F.3d at 962–63 ("electronic transformation of the data itself" sufficient to satisfy transformation prong).

Alice's claims effect an electronic transformation of data by "electronically adjusting" an "account" or "record."  Ex. 1, Ginsberg Decl. ¶ 22.  Unlike the claims in *Bilski*, this case involves more than a transformation of an abstract legal obligation.  Rather, an electronic device must change its state—on a disk, or in a memory, the "electronic adjustment" results in a physical transformation, such as magnetizing or demagnetizing part of a hard disk drive platter corresponding to a bit of data.  *Id*.  As a result, Alice's method claims are patentable under the transformation prong.  *See Arrhythmia*, 958 F.2d at 1059

**III.  SUMMARY JUDGMENT AS TO THE '479 PATENT IS INAPPROPRIATE.**

As discussed above, the first step in an analysis of subject-matter eligibility is to construe the claims to determine what they cover.  *See In re Nuijten*, 500 F.3d 1346, 1352 (Fed. Cir. 2007).  This step is essentially obviated as to the '510 and '720 patents because there is no dispute that the claim terms "electronically," "data processing system," "data storage unit," and

"computer" all require or constitute electronic hardware, i.e., a machine.[18]  By contrast, the claims in the '479 patent do not expressly use this terminology, although the claims, when construed in light of the specification, also require that the claimed method be performed using a computer. Ex. 1, Ginsberg Decl. ¶¶ 15–18.  Mr. Ginsberg's declaration puts in issue the facts asserted by CLS to warrant summary judgment, and thus its motion should be denied.  Because a proper analysis requires the Court to interpret the meaning of the claim terms, with reference to the specification and from the perspective of a person of ordinary skill in the art, and because CLS will be able to dispute Alice's interpretation of the relevant claim terms other than the clear "computer," "data storage unit," and "electronically" terms found only in the '720 system patent and the '510 method patent (and discussed above), Alice has not cross-moved for partial summary judgment as to the '479 patent.  Such a claim construction will reveal that certain claim terms in the '479 patent—which are common to all three patents—would be understood by a person of ordinary skill in the art to limit the claims to a computer or the use of a computer.  *Id.*

Alice respectfully submits that claim construction on the '479 patent (as well as the '720 and '510 patents, should the Court deny Alice's motion as to those patents) should be performed after expert discovery and a *Markman* hearing, in conjunction with claim construction for purposes of an infringement analysis.  Because CLS has not even attempted to perform such a claim construction, and it is CLS's burden to show invalidity, CLS's motion for summary judgment should be denied.  At a minimum, CLS's motion for summary judgment should be denied without prejudice to refiling after the *Markman* phase of the litigation.

---

[18] If the Court finds that the '720 system patent and '510 method patent are not patentable, then Alice concedes that the '479 patent would not survive.

## CONCLUSION

For the foregoing reasons, CLS's Motion for Summary Judgment That the Claims of Alice's Patents Are Invalid for Lack of Patentable Subject Matter should be denied, and Alice's cross-motion for summary judgment should be granted.

Dated:  April 3, 2009                     Respectfully submitted,

WILLIAMS & CONNOLLY LLP


_____/s/ David M. Krinsky_____
Paul Martin Wolff (D.C. Bar No. 90217)
Bruce R. Genderson (D.C. Bar No. 961367)
Ryan T. Scarborough (D.C. Bar No. 466956)
M. Jesse Carlson (D.C. Bar No. 490196)
Stanley E. Fisher (D.C. Bar No. 498540)
David M. Krinsky (D.C. Bar No. 978190)

725 Twelfth Street, N.W.
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Counsel for Defendant / Counterclaim Plaintiff
 Alice Corporation Pty. Ltd.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-00974-RMC |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CLS SERVICES LTD., | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

**ALICE'S RESPONSE TO CLS'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE, AND COUNTER-STATEMENT OF
MATERIAL FACTS AS TO SUBJECT MATTER ELIGIBILITY**

Pursuant to Local Civil Rule 7(h), Alice Corporation Pty. Ltd. ("Alice") respectfully

responds to CLS's Statement of Material Facts ("SMF") in support of its motion for summary

judgment that the claims of Alice's patents are invalid for lack of patentable subject matter, and

submits the following Counter-Statement of Material Facts ("C-SMF") regarding Alice's motion

for Partial Summary Judgment As To Subject Matter Eligibility.

## ALICE'S RESPONSE TO CLS'S STATEMENT OF MATERIAL FACTS

1.      Alice Corporation Pty. Ltd. (Alice) claims [sic] of patent infringement in this litigation are based on three U.S. patents (*See* Docket No. 1 Complaint ("Complaint"), counts 1-3' Docket No. 6 Answer and Countercl., Countercl. Counts 1-6).

Alice's Response:

        Not disputed.

2.      Patent No. 5,970,479 ("the '479 patent") is entitled "Methods and Apparatus Relating to the Formulation and Trading of Risk Management Contracts."  (*See* Answer and Countercl., Countercl. ¶¶ 21, 42; Ex. 1, '479 patent.)

Alice's Response:

        Not disputed.

3.      The application that led to the '479 patent was filed on May 28, 1993, and the patent issued on October 19, 1999.  (*See* Ex. 1, '479 patent.)

Alice's Response:

        Not disputed.

4.      In this litigation, Alice is only asserting claims 33 and 34 of the '479 patent, which are the only claims of that patent directed to the exchange of an obligation.  (Docket No. 27 Alice Mem. 4-5; Ex. 1, '479 patent, claims 33-34.)

Alice's Response:

        Alice does not dispute that claims 33 and 34 recite a "method for exchanging obligations as between parties," but objects to any characterization regarding other claims of the '479 patent because such other claims are not being asserted in this litigation and are thus not at issue.  Alice notes that claim 12 of the '479 patent is a system claim directed, *inter alia*, to a system for

2

exchanging obligations between parties, and hence claims 33 and 34 are not the "only" claims of that patent directed to the exchange of an obligation.

5.     Patent No. 6,912,510 ("the '510 patent") is entitled "Methods of Exchanging an Obligation."  (*See* Answer and Countercl. ¶¶ 28, 49; Ex. 2, '510 patent.)

Alice's Response:

Not disputed.

6.     The application that led to the '510 patent was filed on May 9, 2000, and the patent issued on June 28, 2005.  (*See* Ex. 2, '510 patent.)

Alice's Response:

Not disputed.

7.     Patent No. 7,149,720 ("the '720 patent") is entitled "Systems for Exchanging an Obligation."  (*See* Answer and Countercl., Countercl. ¶¶ 35, 56; Ex. 3, '720 patent.)

Alice's Response:

Not disputed.

8.     The application that led to the '720 patent was filed on December 31, 2002, and the patent issued on December 12, 2006.  (*See* Ex. 3, '720 patent.)

Alice's Response:

Not disputed.

9.     Claims 33 and 34 of the '479 patent, and claims 1-75 of the '510 patent, claim purported methods for exchanging an obligation between parties to a transaction.  (*See* Ex. 10, Hughes Decl. ¶¶ 27-30; Ex. 1, '479 patent, claims 33, 34; Ex. 2, '510 patent, claims 1-84.)

Alice's Response:

Alice does not dispute that Claims 33 and 34 of the '479 patent and Claims 1-75 of the '510 Patent recite a "method of exchanging" an "obligation," but disputes CLS's characterization of the claims in SMF ¶ 9.

10.     Claims 1-84 of the '720 patent claim "data processing" systems for exchanging an obligation.  (*See* Ex. 10, Hughes Decl. ¶¶ 27-30; Ex. 3, '720 patent, claim 1-84.)

Alice's Response:

Alice does not dispute that Claims 1-84 of the '720 Patent recite a "data processing system to enable," *inter alia*, the "exchange of an obligation," "the exchange of a payment obligation," or "a purchase between buyer and seller," *see* CLS Ex. 3, '720 patent, claims 1-84,[1] but disputes CLS's characterization of the claims in SMF ¶ 10.

11.     In a memorandum to the Court dated May 19, 2008, (the "Alice Mem."), Alice summarized the inventions claimed in its patents as follows:

> Mr. Shepherd conceived an electronic settlement mechanism capable of allowing parties to exchange obligations in a risk-free manner because both sides of a trade would be settled simultaneously and irrevocably—removing the risk that one party would perform and the other abscond.

Alice's Response:

Alice does not dispute that the above is an accurate quotation of an excerpt from a Memorandum dated May 19, 2008 that Alice submitted to the Court in response to the Court's request for a plain-English description of how Alice's patents functioned.  The Memorandum was submitted for the limited purpose of aiding the court in determining the scope of discovery

---

[1]     "CLS Ex." refers to the exhibits attached to the Declaration of Abigail Langsam submitted in support of CLS's Motion for Summary Judgment of No Infringement Within the United States.

4

in the initial phase of the litigation and without prejudice to any other position Alice would take

in the litigation, including, specifically, claim construction.

12.     In the Alice Mem., Alice summarized the '479, '510 and '720 patents as follows:

Mr. Shepherd pursued a range of patents for methods and systems in both trading and
settlement, including U.S. Patent Nos. 5,970,479 ("the '479 Patent"), 6,912,510 ("the
'510 Patent") and 7,149,720 ("the '720 Patent") and commenced development of the
software and business processes for commercializing his inventions in the early 1990s.
Two of these patents (the '510 and '720 patents), which are now held by Alice (a
corporation in which Mr. Shepherd has an indirect 50% interest), describe a method and
system for exchanging obligations between parties . . .

Alice's Response:

See Alice's Response to SMF ¶ 11.

13.     In the Alice Mem., Alice summarized the inventions claimed in its patents as

follows:

A simplified example illustrates how use of Mr. Shepherd's invention overcomes foreign
currency exchange settlement risk.  Assume a bank in the United States wants to
exchange $1,000,000 with a bank in Japan for an equivalent amount of Yen.
Traditionally, this exchange was fraught with risk because the exchange involved two
independent payments that did not occur simultaneously.  The U.S. bank would have to
send $1,000,000 to the Japanese bank's U.S. branch or agent (called a nostro agent), and
the Japanese bank would send the Yen to the U.S. bank's Japanese branch or agent.
However, the exchange could not occur simultaneously because they involved different
central banks in different time zones (transfers of funds between banks are legally final
and irrevocable when the funds are transferred by a country's central bank); the two
payments that comprise the exchange were thus independent.  If the Japanese bank paid
first in this example (as is typically the case because Japan is approximately twelve hours
"ahead" of the U.S. based on time zones), it had no guarantee that the U.S. bank would
have the means to honor its commitment and pay the $1,000,000.  Should the U.S. bank
become insolvent before paying, the Japanese bank would lose the Yen equivalent of
$1,000,000 it had paid.  This risk is commonly referred to as "Herstatt risk," named after
the German bank Herstatt, which became insolvent in 1974 and, through its agents, failed
to pay the U.S. dollar side of foreign currency exchanges it had agreed to pay after having
received its counterparties' money.

(Alice Memo., at 5-6.)

Alice's Response:

See Alice's Response to SMF ¶ 11.

14.    In the Alice Mem., Alice stated the following with respect to the invention

claimed in the '479, '510 and '720 patents:

> In the Shepherd invention, the key to eliminating the risk is creating a supervisory
> institution to execute the payments between the parties, by maintaining an account for
> each party (*i.e.*, bank) that is independent of the parties' own central bank accounts.

(Alice Mem., at 6.)

Alice's Response:

See Alice's Response to SMF ¶ 11.

15.    In the Alice Mem., Alice summarized the inventions claimed in its patents using

the following example:

> [S]uppose CitiBank ("Citi") maintains an account with the FRBNY and Mizuho
> Corporate Bank ("Mizuho") maintains an account with the Bank of Japan.  Both central
> banks are referred to in Alice's patent claims as "exchange institutions."  Citi and Mizuho
> also have multi-currency accounts with the supervisory institution ("SI accounts").

> The supervisory institution waits for a transaction to be received (*i.e.*, Citi wants to
> exchange $1,000,000 for an equivalent amount of Yen from Mizuho).  After ensuring that
> the parties have adequate value in the respective SI accounts, the supervisory institution
> adjusts these accounts to reflect the exchange.  It then instructs the exchange institutions
> (*i.e.*, the central banks) to adjust Citi's and Mizuho's central bank accounts, respectively,
> in accordance with the adjustment made to the SI accounts it maintains.  Most
> importantly, the adjustment of Citi's and Mizuho's accounts at the supervisory institution
> and the instruction from the supervisory institution to the FRBNY and the Bank of Japan
> are irrevocable and the instruction, once received, must be honored by both central banks.
> In this manner, the exchange occurs simultaneously and cannot be undone by either
> party.  As a result, if Citi were to go bankrupt after the SI accounts were adjusted,
> Mizuho would still receive payment because the transaction is irrevocable.

(Alice Mem. at 7.)

Alice's Response:

See Alice's Response to SMF ¶ 11.

16.    All of the Alice patent claims at issue in this litigation require that "accounts" or

"shadow records" are maintained by an entity or system separate from accounts or records

maintained by another entity.  (*See* Ex. 1, '479 patent, claim 33; Ex. 2, '510 patent, claims 1, 27, 61, 65, 68; Ex. 3, '720 patent, claims 1, 28, 60, 68, 80.)

Alice's Response:

Alice disputes this paragraph because Alice's system claims do not require that any method steps be performed, only that a "computer" be "configured" to perform certain specified operations.  *E.g.*, '720 patent, claim 68.  As to the method claims, to the extent CLS refers to their recited limitations, Alice disputes that all of the patent claims at issue in this litigation require that "accounts" or "shadow records" be "maintain[ed]."  The asserted claims of the '479 patent do not contain a "maintaining" limitation.  *E.g.*, *id.*; '479 patent, claim 33.  Moreover, to the extent CLS is attempting to put at issue whether claims not reciting "maintaining" limitation nonetheless require accounts or records to be maintained, Alice objects to this paragraph on the grounds that it attempts to elicit Alice's construction of the claims, which is premature at this phase of the litigation.

17.     All of the Alice patent claims at issue in this litigation require that information about a transaction or exchange obligation is received by the entity or system that maintains the accounts/shadow records.  (*See* Ex. 1, '479 patent, claim 33; Ex. 2, '510 patent, claims 1,27, 61, 65, 68; Ex. 3, '720 patent, claims 1, 28, 60, 68, 80.)

Alice's Response:

See Alice's Response to SMF ¶ 16.

18.     All of the Alice patent claims at issue in this litigation require the accounts/shadow records to be mathematically tested in light of the transaction and adjusted according to an algorithm.  (*See* Ex. 1, '479 patent, claim 33; Ex. 2, '510 patent, claims 1, 27, 61, 65, 68; Ex. 3, '720 patent, claims 1, 28, 60, 68, 80.)

Alice's Response:

Alice disputes this paragraph for the reasons stated in response to SMF ¶ 16. In addition, none of Alice's patent claims referenced by CLS in SMF ¶ 18 recite "mathematically test[ing]" or "algorithm" limitations, and Alice disputes the characterization of Alice's claims as involving such.

19. All of the Alice patent claims at issue in this litigation require an "instruction" to be generated or provided to adjust the accounts or records at another institution according to the adjustment of the accounts/shadow records, where the instruction is an "irrevocable, time-invariant obligation" on the other institution. (*See* Ex. 1, '479 patent, claim 33; Ex. 2, '510 patent, claims 1, 27, 61, 65, 68; Ex. 3, '720 patent, claims 1, 28, 60, 64, 68, 80.)

Alice's Response:

Alice disputes this paragraph because Alice's system claims do not require that any method steps be performed, only that a "computer" be "configured" to perform certain specified operations. *E.g.*, '720 patent, claim 68. In addition, Alice disputes that all of the method claims at issue in this litigation require an "instruction." *E.g.*, '510 patent, claim 27.

20. During prosecution of the application that led to the '510 patent, the U.S. Patent Office ("PTO") found that there was no patentable distinction between claim 33 of the '479 patent and the independent claims of the application, and rejected the independent claims under the doctrine of double patenting. (*See* Ex. 4, Office Action, dated Sept. 3, 2003 at 5-6.)

Alice's Response:

Alice objects to this proposed fact as a characterization of the document referenced. The document states that "[c]laims 62, 80, 99, 118, 119, and 124 [of the application that led to the '510 Patent] are rejected under the judicially created doctrine of double patenting over claim 33 of U.S. Patent No. 5,970,479 since the claims, if allowed, would improperly extend the 'right to

exclude' already granted in the patent." CLS Ex. 4 at 6. Alice respectfully submits that the document speaks for itself and that its legal implications are not questions of fact.

In any event, the "terminal disclaimers" Alice filed with the PTO as to both the '720 and '510 patents are irrelevant to whether the patents claim eligible subject matter. The purpose of a terminal disclaimer is to prevent so-called "double-patenting," whereby an inventor attempts to impermissibly extend his monopoly to the same basic invention by filing a second application to something that is not, to use the term of art, "patentably distinct." Filing a terminal disclaimer, which limits the term of the second patent to the term of the first, cures the problem. *See generally In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375–76 (Fed. Cir. 2008). The terminal disclaimer does not mean that the terms of the second patent are identical for purposes of the inquiry under § 101. Rather, the second patent's claims will be impermissible, absent a terminal disclaimer, if they are merely obvious (the inquiry under § 103) over the first patent's claims. *See id.* at 1379. Whether the addition of claim limitations is obvious is irrelevant to the issues now before the Court.

21.    Alice did not object to the PTO examiner's double patenting rejection, and instead executed a "terminal disclaimer" agreeing that the claims of the '510 patent would expire at the same time as those of the '479 patent. (Ex. 5, Amendment and Reply Under 37 C.F.R. § 1.111, dated October 31, 2003.)

Alice's Response:

Alice disputes this paragraph on the ground that an applicant cannot "object to" a rejection by the PTO. Alice does not dispute that it filed a terminal disclaimer.

22.    The word "electronically" was added to modify "adjusting" in each independent claim of the '510 patent during prosecution of the application that led to the patent, when the examiner rejected the original claims after finding that they were "directed to non-statutory

subject matter" under Section 101 because they "lack[ed] any specific technology." (Ex. 4,

Office Action, dated September 3, 2003 at 3).

Alice's Response:

Alice disputes this proposed fact because it misquotes the Office Action. CLS Ex. 4,

Office Action, at 3. Alice does not dispute that the term "electronically" appears in each of the

independent claims of the '510 patent as issued, and that the claim term was added in response to

a preliminary rejection of the claims submitted during the prosecution of the '510 patent.

However, Alice disputes that it agreed that the claims of the '510 patent, as originally filed, were

directed to non-statutory subject matter. CLS Ex. 5 at 22.

Alice further disputes this fact as a characterization of the document referenced in SMF ¶

22. That document, which is selectively quoted by CLS, states in full:

> Claims 62-143 are rejected under 35 U.S.C. § 101 because the claimed invention
> is directed to non-statutory subject matter. The claims lack specific technology,
> such as a computer. The Board of Patent Appeals and Interferences found in *Ex
> Parte Bowman*, 61 USPQ2d 1669, 1671 (2001) (unpublished) that without
> including technology in the claims, they are 'nothing more than an abstract idea
> which is not tied to any technological art and is not a useful art as contemplated
> by the Constitution.

CLS Ex. 4 at 3.

23.     In a subsequent interview with the patentee, the examiner stated that the

independent claims of the '510 patent were "directed to an abstract idea and were therefore

unpatentable." (Ex. 5, Amendment and Reply Under 37 C.F.R. § 1.111, dated October 31, 2003

at 22.)

Alice's Response:

Alice disputed this proposed fact. The examiner's statement regarding the patentability

of claims 62-143 of the application that led to the '510 Patent is quoted in full in response to

SMF ¶ 22. That statement was not made at the interview with the representative of the patentee

following the preliminary rejection of the draft claims of the '510 patent. At the subsequent interview with Alice's representative, the examiner "agreed with Applicant's representative . . . that the claim did not merely recite an abstract idea, but rather recited a 'real world' purpose, i.e. an exchange of obligations between parties (e.g., an exchange of money between parties) using exchange institutions (e.g., banks)." CLS Ex. 5 at 22. Further, during the interview, the authority cited by the examiner in the initial rejection—*Ex Parte Bowman*—was discussed. *Id.* Alice "pointed out that this case is a non-published, non-precedential opinion of the Board of Appeals and Inferences and therefore should not form the basis of a rejection. Instead, the examiner should be guided by the Federal Circuit's decisions in *State Street* and *AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352 (Fed. Cir. 1999)." *Id.* at 22, n.1.

24.    The examiner allowed the independent claims of the '510 patent after the patentee agreed to add the word "electronically," because he believed that the use of this term would bring the claims within the "'technological' arts." (Ex. 5, Amendment and Reply Under 37 C.F.R. § 1.111, dated October 31, 2003, at 22.)

Alice's Response:

Alice disputes this proposed fact. As the document referenced by CLS in SMF ¶ 24 explains, Alice "strongly disagree[d] with the Examiner that the claims [did] not recite statutory subject matter since the claimed invention [did] not fall within any of the established exceptions to statutory subject matter (i.e. laws of nature, natural phenomena, and abstract ideas)." CLS Ex. 5 at 22. Alice agreed to add the term "electronically" to the claims "in order to expedite prosecution to amend the claims." *Id.* In a telephone conversation, the Examiner indicated that the amendment to add the term electronically would overcome the preliminary rejection of claims 62-143, but did not reference a particular "test" such a claim term would meet. *Id.*

25.    The '720 patent differs from the '479 and '510 patents in that each of its independent claims is expressly directed to a "data processing system" comprised of "a data storage unit" and "a computer coupled to said data storage unit."  (*See* Ex. 3, '720 patent at claims 1, 28, 60, 64, 68 and 80.)

Alice's Response:

Alice does not dispute that this is one difference between the independent claims of the '720 patent and the method claims in the '479 and '520 patents.  Alice does dispute that this is the only difference in claim language.  *Compare* '720 patent claims 1, 28, 60, 64, 68 and 80 *with, e.g.*, '510 patent claim 68.

26.    In claim 68 of the '720 patent (*see* Table 1) the "data storage unit" stores "information about a first account for a first party, independent from a second account maintained by a first exchange institution."  (*See* Ex. 3, '720 patent at claim 68.)

Alice's Response:

Alice does not dispute that Claim 68 of the '720 Patent recites a "data storage unit having stored therein (a) information about a first account for a first party, independent from a second account maintained by a first exchange institution, . . . ."

27.    The "computer, coupled to said data storage unit" is configured to carry out the method claimed in claim 68 of the '510 patent.  (*See* Ex. 3, '720 patent at claim 68.)

Alice's Response:

Alice disputes this proposed fact.  Claim 68 of the '720 patent recites a "data processing system" that consists of "[a] data storage unit" that stores information and "a computer coupled to said data storage unit" configured to perform specific operations recited in the claim.  The claimed system does not "carry out" a method, but is a machine configured to complete specific

tasks. The method recited in Claim 68 of the '510 Patent is a different invention from the system recited in Claim 68 of the '720 Patent. Each of Alice's patents claim distinct subject matter.

28.    Claim 1 of the '720 patent claims a data processing system configured to perform the method of claim 1 of the '510 patent. (*See* Ex. 3, '720 patent at claim 1; Ex. 2, '510 patent at claim 1.)

Alice's Response:

Alice disputes this proposed "fact." Claim 1 of the '720 patent recites a "data processing system" that consists of "[a] data storage unit" that stores information and "a computer coupled to said data storage unit" configured to perform specific operations recited in the claim. The claimed system does not "perform" a method, but is a machine configured to complete specific tasks. The method of Claim 1 of the '510 Patent is a different invention from the system in Claim 1 of the '720 Patent. Each of Alice's patents claim distinct statutory subject matter.

29.    The systems of claim 1, 28, 60 and 68 of the '720 patent are configured to perform the methods of claim 1, 27, 61 and 68 of the '510 patent, respectively. (*See* Ex. 3, ' 720 patent at claims 1, 28, 60 and 68; Ex. 2, '510 patent at claims 1, 27, 61 and 68.)

Alice's Response:

Alice disputes this proposed fact. The claims of the '720 patent referenced in SMF ¶ 29 generally recite a "data processing system" that consists of "[a] data storage unit" that stores information and "a computer coupled to said data storage unit" configured to perform specific operations recited in the claim. The claimed system does not "perform" a method, but is a machine configured to complete specific tasks. Moreover, the operations that the system is configured to perform differ in certain respects from the steps of the methods of the listed claims. For example, claim 68 of the '510 patent contains a "maintaining" limitation and lacks a step in which a "transaction" is "receiv[ed]." *Cf.* '720 patent, claim 68 ("(a) receive a transaction").

Also for example, claim 68 of the '720 patent lacks a reference to the "supervisory institution" recited in the preamble to claim 68 of the '510 patent.

30.    The systems of claim 64 and 80 of the '720 patent are configured to perform the method of claim 65 of the '510 patent.  (*See* Ex. 3, '720 patent at claims 64, 80; Ex. 2, '510 patent at claim 65.)

Alice's Response:

Alice disputes this proposed "fact."  The claims of the '720 patent referenced in SMF ¶ 30 generally recite a "data processing system" that consists of "[a] data storage unit" that stores information and "a computer coupled to said data storage unit" configured to perform specific operations recited in the claim.  The claimed system does not "perform" a method, but is a machine configured to complete specific tasks.  Moreover, the operations that the system is configured to perform differ in certain respects from the steps of the methods of the listed claims.  For example, claim 65 of the '510 patent contains a "maintaining" limitation.  *Cf.* '720 patent, claims 64, 80 (lacking such limitation).  Also for example, claims 64 and 80 of the '720 patent lacks a reference to the "supervisory institution" recited in the preamble to claim 68 of the '510 patent.

31.    During prosecution of the '720 patent, the claims of the '720 patent were initially rejected for double patenting over each of the claims of the '510 patent.  (Ex. 7, Office Action, dated Dec. 28, 2005 at 2.)

Alice's Response:

Alice objects to this proposed fact as a characterization of the document referenced.  That document states "Claims 26–109 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-75 of U.S. Patent No. 6,912,510."  CLS Ex. 7 at 2.  Alice respectfully submits that the document speaks for itself and

that its legal implications are not questions of fact.  *See also* Alice's Response to SMF ¶ 23

(discussing irrelevance of double-patenting to issues now before the Court).

32.    The Examiner stated, "Although the . . . claims are not identical [to those in the

'510 patent], they are not patentably distinct . . . because [the claims of the '720 patent] are the

same method for intended use as claims 1-75 of [the '510 patent]."  (Ex. 7, Office Action, dated

Dec. 28, 2005 at 2.)

Alice's Response:

Not disputed.  The document referenced is, however, selectively quoted and the quotation

is altered.

33.    The Examiner noted that "[t]he additional limitation disclose[d] by [the

application that led to the '720 patent] is 'a data processing system and a data storage unit' while

all the other limitations in [the application claims] are the same as claims 1-75 of [the '510

patent]."  (Ex. 7, Office Action, dated Dec. 28, 2005 at 2.)

Alice's Response:

Not disputed.

34.    The claims were allowed only after Alice executed a terminal disclaimer so that

the claims of the '720 patent would expire at the same time as those in the '510 patent.  *See* Ex.

5, Amendment and Reply Under 37 C.F.R. § 1.111, dated Jan. 27, 2006 at 50; Ex. 8, Terminal

Disclaimer To Obviate A Double Patenting Rejection Over A Prior Patent, dated Jan. 27, 2006.

Alice's Response:

Alice does not dispute that it executed a terminal disclaimer.  As the Examiner noted in

the preliminary rejection of claims 26-109 of the '720 Patent, "[a] timely filed terminal

disclaimer in compliance with 37 C.F.R. 1.321(c) may be used to overcome an actual or

provisional rejection based on nonstatutory double patenting ground provided that the conflicting

application or patent is shown to be commonly owned with this application."  CLS Ex. 7 at 2.
Alice does, however, dispute any inference that it could not have overcome the rejection.  Alice
respectfully submits that the document speaks for itself and that its legal implications are not
questions of fact.

In any event, the "terminal disclaimers" Alice filed with the PTO as to both the '720 and
'510 patents are irrelevant to whether the patents claim eligible subject matter.  The purpose of a
terminal disclaimer is to prevent so-called "double-patenting," whereby an inventor attempts to
impermissibly extend his monopoly to the same basic invention by filing a second application to
something that is not, to use the term of art, "patentably distinct."  Filing a terminal disclaimer,
which limits the term of the second patent to the term of the first, cures the problem.  *See
generally In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375–76 (Fed. Cir. 2008).  The
terminal disclaimer does not mean that the terms of the second patent are identical for purposes
of the inquiry under § 101.  Rather, the second patent's claims will be impermissible, absent a
terminal disclaimer, if they are merely obvious (the inquiry under § 103) over the first patent's
claims.  *See id.* at 1379.  Whether the addition of claim limitations is obvious is irrelevant to the
issues now before the Court.

35.    The three Alice patents, in addition to 12 independent claims, also include 149
independent claims.  The dependent claims include the following limitations on the type of
obligation or transaction on which the invention may be used, on the nature of the exchange
institution, on the nature of the parties, on the "irrevocable, time-invariant" instruction, and on
the type of data recorded in the account or shadow record.

| | Dependent Claims | | |
|---|---|---|---|
| | '479 Patent | '510 Patent | '720 Patent |
| **Limitations on type of exchange "obligation" or "transaction"** | | | |

| | | | |
|---|---|---|---|
| "arises out of" a "share price" | | 2 | 2 |
| "arises out of" or "involves" a "weather event" | | 3, 41 | 3, 42 |
| "arises out of" or "involves" a "market event" | | 4, 42 | 4, 43 |
| "involves" the "transfer of shares in financial or physical assets" | | 5 | 5 |
| "involves" a "wager" | | 6, 43 | 6, 44 |
| "involves" the "transfer of a commodity" | | 7 | 7 |
| "arises out of" or "involves" "money for goods, services, promises, credits or warrants" | | 8, 44 | 8, 45 |
| "arises out of" or "involves" "currency" | | 18, 54, 72 | 18, 54, 70, 74 |
| "arises out of" a "collateralization payment" | | 21, 40 | 21, 41 |
| Relates to "acquir[ing] an item from" "another party" | | | 27, 59, 67, 79, 84 |
| | | | |
| **Limitations on "irrevocable, time invariant" instruction** | | | |
| "period of time" for which instruction is provided is a "part of a day"** | | 9, 53, 67 | 9, 53, 66, 77 |
| Based on "netted" transactions | 34 | 11, 52, 75 | 11, 55, 78 |
| Provided at "an end of a processing cycle" | | 64 | 63 |
| "generated at the end of a day" | | | 82 |
| | | | |
| **Limitations on algorithm or test for adjusting accounts or shadow records** | | | |
| applied to transaction in "chronological order" | | 10, 62 | 10, 61 |
| Includes "debiting and/or crediting . . . shadow record based on . . . transaction | | 39 | 40 |
| Includes obtaining a balance for shadow records from exchange institution | | 22, 48, 63, 66 | 22, 49, 62, 65, 81 |
| "adequate value" requires that the first and third accounts have "a positive balance" | | 74 | 76 |
| | | | |
| **Limitations on the "exchange institution"** | | | |
| "credit card company" | | 12, 45 | 12, 46 |
| "debit card company" | | 13, 46 | 13, 47 |
| "bank" | | 14, 55 | 14, 56 |
| "central bank" | | 15, 56, 69 | 15, 57, 69 |
| "guarantor" | | 16 | 16 |
| "party offering credit" | | 17, 47 | 17, 48 |
| exchange institutions operate in "different time zone[s]" | | 19, 25, 50, 59 | 19, 24, 51, 71 |
| exchange institutions have "different account processing cycle[s]" | | 20, 26, 51, 57, 60 | 20, 25, 52, 58 |
| "non-bank clearing house or depository" | | 23, 73 | 26, 75 |
| supervisory institution and exchange institution | | 37 | 38 |

| | | | |
|---|---|---|---|
| "legally and/or geographically domiciled in different countries" | | | |
| exchange institutions are different | | 24, 49, 58 | 23, 50 |
| "first exchange institution and . . . second exchange institution are the same" | | 70 | 72 |
| | | | |
| **Limitations on the exchange institution "account" or "record"** | | | |
| pertains to "shares in financial or physical assets" | | 28 | 29 |
| pertains to "participation rights in wagers" | | 29 | 30 |
| pertains to "goods" | | 30 | 31 |
| pertains to "services" | | 31 | 32 |
| pertains to "central bank exchange settlement account deposits" | | 32 | 33 |
| pertains to "financial instrument deposits" | | 33 | 34 |
| pertains to "credit extended to/from a party or to/from a guarantor" | | 34 | 35 |
| includes an "overdraft or line-of-credit" with an exchange institution | | 35 | 36 |
| "second account and . . . fourth account are the same account" | | 71 | 73 |
| "first account holds funds for . . . first party and . . . second party" | | | 83 |
| | | | |
| **Limitation son the "parties"** | | | |
| "first party holds one or more accounts with more than one exchange institution" | | 36 | 37 |
| one "party is a buyer" and the other "party is a seller" | | 38 | 39 |

(*See* Ex. 1, '479 patent at claim 34; Ex. 2, '510 patent at claims 2-26, 28-60, 62-64, 66-67, 69-75; Ex. 3, '720 patent at claims 2-27, 29-59, 61-63, 65-67, 69-79, 81-84.)

Alice's Response:

      Alice objects to this proposed fact because it is overbroad and irrelevant with respect to the questions now at issue, and it is unreasonably burdensome for Alice to respond point-by-point to CLS's quotation of selective limitations. Alice does not argue that any of the limitations present in any dependent claim, but not the corresponding independent claim, has any bearing on

18

the analysis of patent-eligibility under § 101.  To the extent that it is necessary to consider the

language of the dependent claims, Alice respectfully directs the Court to the patents themselves.

## ALICE'S COUNTER-STATEMENT OF MATERIAL FACTS

These statements of fact are submitted in support of Alice's opposition to CLS's motion

for summary judgment of invalidity under § 101 and in support of Alice's cross-motion.

36.    Each claim of the '720 patent includes the terms "data storage unit," "computer

coupled to said data storage unit" and "configured."  CLS Ex. 3, '720 patent, claims 1-84.

37.    Each claim of the '510 patent includes the terms "electronically adjusting" and

either the term "account" or the term "record."  CLS Ex. 2, '510 patent, claims 1-75.

38.    The electronic trading system disclosed in the '479 Patent was an improvement on

the prior art in that it replaced "contractual arrangements that are piece-meal in nature" with:

> methods and apparatus enabling the management of risk relating to specified yet
> unknown, future events by enabling entities (parties) to reduce their exposure to
> specified risks by constructing compensatory claim contract orders on yet-to-be-
> identified counterparties, contingent on the occurrence of the specified future
> events. The entities submit such orders to a 'system' which seeks to price and
> match the most appropriate counter-party, whereupon matched contracts are
> appropriately processed through to their maturity.

CLS Ex. 1, '479 Patent, col. 2, ll. 18-21, col. 3, ll. 14-45.

39.    Each claim of the '720 patent is to a "data processing system."  CLS Ex. 3, '720

patent, claims 1-84.

40.    Each independent claim of the '720 patent recites "a data storage unit having

stored therein" information about accounts or records, and a "computer, coupled to said data

storage unit" that is "configured" to carry out certain tasks.  CLS Ex. 3, '720 patent, claims 1, 28,

60, 64, 68.

41.    Claim 68 of the '720 Patent recites:

19

A data processing system to enable the exchange of an obligation between parties, the system comprising:

a data storage unit having stored therein
(a) information about a first account for a first party, independent from a second account maintained by a first exchange institution,
(b) information about a third account for a second party, independent from a fourth account maintained by a second exchange institution; and

a computer, coupled to said data storage unit, that is configured to
(a) receive a transaction;
(b) electronically adjust said first account and said third account in order to effect an exchange obligation arising from said transaction between said first party and said second party after ensuring that said first party and/or said second party have adequate value in said first account and/or said third account, respectively; and
(c) generate an instruction to said first exchange institution and/or said second exchange institution to adjust said second account and/or said fourth account in accordance with the adjustment of said first account and/or said third account, wherein said instruction being an irrevocable, time invariant obligation placed on said first exchange institution and/or said second exchange institution.

CLS Ex. 3, '720 patent, claim 68.

42.    Each claim of the '720 Patent recites computer system hardware configured to perform specific functions.  Ginsberg Decl. ¶¶ 28–30.

43.    Unlike the '720 patent, the claims of which are directed to a "data processing system" comprising a "data storage unit" coupled to a "computer" that is configured to perform certain operations, the '510 patent is directed to a methods by which obligations are electronically exchanged using a trusted intermediary.   Ginsberg Decl. ¶ 30..

44.    Each claim of the '510 patent recites the term "electronically adjusting."  CLS Ex. 2, '510 patent, claims 1-75.

45.    Claim 68 of the '510 Patent recites:

A method of exchanging an obligation between parties, wherein an exchange obligation is administered by a supervisory institution, the method performed by the supervisory institution, comprising:

maintaining a first account for a first party, independent from a second account maintained by a first exchange institution;

20

maintaining a third account for a second party, independent from a fourth account maintained by a second exchange institution;

electronically adjusting said first account and said third account in order to effect the exchange obligation between said first party and said second party after ensuring that said first party and said second party have adequate value in said first account and said third account, respectively; and

providing an instruction to said first exchange institution and said second exchange institution to adjust said second account and said fourth account in accordance with the adjustment of said first account and said third account, wherein said instruction being an irrevocable, time invariant obligation placed on said first exchange institution and said second exchange institution.

CLS Ex. 2, '510 patent, claim 68.

46.     An exchange of obligations is the stated purpose of the methods claimed in the 510 patent.  CLS Ex. 2, '510 patent, claims 1-75.

47.     The exchange of an obligation in the claims of the '510 patent is "effect[ed]" when the "first account" and "third account" are "electronically adjusted."  CLS Ex. 2, '510 patent, claim 68; Ginsberg Decl. ¶¶ 21–22.

48.     At a minimum electronically adjusting an account requires the use of an electronic device capable of adjusting two accounts that it maintains, i.e., a computer consisting of a processor and memory, and it is not possible for a non-electronic device or the human mind to "electronically" adjust account information.  Necessarily, the "accounts" and "records" recited in each claim of the '510 patent must be stored electronically, as only an account that is stored electronically can be adjusted electronically.  Ginsberg Decl. at ¶ 23.

49.     The electronic adjustment of account data necessarily results in a physical, electronic change in the medium in which the data are stored.  When the accounts are electronically adjusted, the medium in which they are stored will be physically altered and there

21

will also be, for example, a change in the magnetization of a portion of a hard disk drive necessary to effect the adjustment of the accounts. Ginsberg Decl. at ¶ 22.

50.    The claims of the '510 patent do not preempt every use of the method recited, as the method, if not limited to being performed on a computer by the claim terms recited, could be performed without the aid of a computer. For example, one could maintain accounts by hand, adjust them, and issue instructions to an exchange institution without any hardware. Ginsberg Decl. at ¶ 25.

51.    The term "electronically" was added to overcome a preliminary rejection of the draft claims of the '510 Patent over Alice's objection that the draft claims were directed to statutory subject matter. Alice agreed to add the term "electronically" in order to expedite prosecution of the patents. CLS Ex. 4 at 3; CLS Ex. 5 at 22.

52.    The addition of the term "electronically" satisfied the examiner's concerns and the examiner allowed the patent to issue. CLS Ex. 5 at 22; Alice Ex. 3, Notice of Allowance (Oct. 5, 2004).

53.    In an interview following the preliminary rejection of the draft claims of the '510 patent, the examiner "agreed with Applicant's representative . . . that the claim did not merely recite an abstract idea, but rather recited a 'real world' purpose, i.e. an exchange of obligations between parties (e.g., an exchange of money between parties) using exchange institutions (e.g., banks)." CLS Ex. 5 at 22.

54.    After filing this suit, CLS sought patents for its system. Ex. 2, U.S. Patent App. No. 2008/0154771 (published Jun. 26, 2008).

55.    Kaye Scholer LLP, which represents CLS in this case, is prosecuting CLS's patent application. Ex. 2, U.S. Patent App. No. 2008/0154771 (published Jun. 26, 2008).

56.    CLS's proposed claims generically recite  a "system for facilitating the settlement of payments" comprising an "interface," a "first processor," and a "second processor" configured to perform various steps.   Ex. 2, U.S. Patent App. No. 2008/0154771 (published Jun. 26, 2008).

57.    CLS also proposes method claims for "facilitating the settlement of payments." Claim 81 is typical and recites:

> A method for facilitating settlement of payments relating to transactions involving financial instruments among multiple participants, comprising:
>
> receiving from participants a first instruction associated with a financial instrument of a first form and a second instruction associated with the financial instrument of the first form;
>
> receiving from participants a first instruction associated with a financial instrument of a second form and a second instruction associated with the financial instrument of the second form;
>
> establishing, by a first processor, an association between the first and second instructions associated with the financial instrument of the first form;
>
> applying, by the first processor, a first set of pre-settlement rules to the first and second instructions associated with the financial instrument of the first form;
>
> establishing, by a second processor, an association between the first and second instructions associated with the financial instrument of the second form; and
>
> applying, by the second processor, a second set of presettlement rules to the first and second instructions associated with the financial instrument of the second form.

Ex. 2, U.S. Patent App. No. 2008/0154771 (published Jun. 26, 2008), claim 81.

Dated:  April 3, 2009                    Respectfully submitted,

                                         ALICE CORPORATION PTY. LTD.,


                                         By its attorneys,


                                         ___/s/ David M. Krinsky_____
                                         Bruce R. Genderson (D.C. Bar No. 961367)
                                         Ryan T. Scarborough (D.C. Bar No. 466956)
                                         M. Jesse Carlson (D.C. Bar No. 490196)
                                         Stanley E. Fisher (D.C. Bar No. 498540)
                                         David M. Krinsky (D.C. Bar No. 978190)
                                         WILLIAMS & CONNOLLY LLP
                                         725 12th Street, N.W.
                                         Washington, DC 20005
                                         Telephone: (202) 434-5000
                                         Facsimile: (202) 434-5029