UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLS BANK INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-974 (RMC) |
| | ) | |
| ALICE CORPORATION PTY. LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### REDACTED MEMORANDUM OPINION[1]

CLS Bank International ("CLS") seeks a declaration that it is not infringing patents owned by Alice Corporation Pty. Ltd. ("Alice") and that the patents are invalid and unenforceable. Alice counterclaims that CLS Bank is infringing its patents and seeks damages. A threshold issue is whether the U.S. patent laws reach the acts of CLS that Alice alleges constitute infringement. Because resolution of that issue could potentially dispose of the case, the Court ordered initial discovery limited in scope to CLS's operations. *See* Dkt. # 24. The parties have since completed that discovery.

Pending before the Court is CLS's motion for summary judgment of no infringement within the United States [Dkt. # 42] and Alice's cross motion for partial summary judgment as to extraterritoriality [Dkt. # 51].[2] For the reasons explained herein, the Court will deny CLS's motion

---

[1] The material redacted is designated "Confidential" under the Protective Order entered on May 23, 2008. *See* Dkt. # 33.

[2] The parties also filed cross motions for summary judgment on subject matter patentability. *See* Dkt. ## 43 & 54. Those motions relied heavily on the Federal Circuit's decision in *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc). Because the Supreme Court granted *certiorari* in *In re Bilski* on June 1, 2009, the Court denied those motions without prejudice to re-filing after the Supreme Court issues its ruling. *See* Minute Order dated June 16, 2009.

and will deny without prejudice as premature Alice's cross motion.

## I. FACTS

Alice is an Australian company that owns three United States patents, two of which are "method patents" with claims relating to a method or process of exchanging a financial obligation between parties, and one of which is a "system patent" with claims relating to a data processing system that implements the methods. The Court has yet to construe the claims of the patents. For purposes of these motions only, the parties have agreed to assume that the steps of the patented methods can be characterized as (1) maintaining accounts for two parties to a financial transaction, (2) receiving a financial transaction, (3) adjusting the parties' accounts to effect a financial exchange obligation, and (4) generating an irrevocable instruction to another institution to adjust its accounts to reflect the financial transaction. For purposes of these motions only, the parties have agreed to assume that the patented data processing system can be characterized as encompassing a computer system and coupled storage device configured to perform each of the foregoing steps.

CLS is an "Edge Act Corporation," organized under Section 25A of the Federal Reserve Act, as amended, 12 U.S.C. § 611, and is authorized by statute to engage in international banking activities. Relevant to this case is CLS's provision of a "continuous linked settlement" service for the settlement of payment instructions related to underlying foreign exchange transactions (the "CLS Service").

CLS provides the CLS Service to banks known as CLS Bank Settlement Members ("CLS Members"), who maintain multi-currency accounts with CLS. CLS Members consist of 60 banks, some of which are located in the United States. Through the CLS Members, the CLS Service

is provided to other third parties, including banks, worldwide. Some of the CLS Members, including U.S.-based Bank of New York Mellon, in turn, act as "third-party service providers" and offer the CLS Service to their customers. As of December 2008, there were more than 4,000 third parties using the CLS Service, some of whom are located in the United States. U.S. banks become CLS Members by completing a membership application and executing a membership agreement governed by New York law. CLS charges each CLS Member a fee for each settlement instruction. In 2007, CLS had $139,709,000 in revenues from instruction charges around the world.

The CLS Service is implemented, and the steps of the settlement process are performed, on computer hardware and software (the "CLS Core System") located entirely outside of the United States.[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] The CLS Core System settles approximately 700,000 financial transactions per day in multiple currencies, valued at over $4 trillion.



CLS Members electronically submit instructions for settlement of foreign exchange transactions on a particular date (the "settlement date").   The CLS Core System receives, authenticates and matches instructions relating to the same foreign exchange transaction, and stores

the matched ("paired") instructions until the settlement date.  On the settlement date, each CLS Member makes pay-ins to its member account to cover the settlement of all instructions it submitted for that settlement date, based on a pay-in schedule that the CLS Core System prepared and transmitted.  Concurrently, each paired instruction to be settled is placed in a "settlement queue" maintained on the CLS Core System, which tests the paired instructions in the settlement queue to determine if settlement would cause the balance of either of the corresponding member accounts to fall below certain predetermined values or to exceed certain limits (the "risk management tests"). If it passes the risk management tests, the CLS Core System simultaneously debits and credits the member accounts of two CLS Members.  CLS Members have no ability to intervene in the functioning of the CLS Core System except to the extent that they can enter their instructions.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere

Case 1:07-cv-00974-RMC   Document 79   Filed 11/06/2009   Page 6 of 16

existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving

party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671,

675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a

reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50

(citations omitted).

### III. ANALYSIS

"[W]hoever without authority makes, uses, offers to sell, or sells any patented

invention, *within the United States* or imports into the United States any patented invention during

the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a) (emphasis added). "The

statute makes it clear that it is not an infringement to make or use a patented product outside of the

United States." *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527 (1972). Alice asserts

infringement under two prongs of § 271(a): "uses" and "offers to sell, or sells." The threshold issue,

then, is whether the acts of CLS that Alice alleges constitute "use" and "offers to sell, or sells" occur

"within the bounds of this country." *Id.*

### A. CLS "Uses" the CLS Core System "Within the United States"

"In terms of the infringing act of 'use,' courts have interpreted the term 'use'

broadly." *NTP, Inc. v. Research In Motion Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005). "The use

of a claimed system under section 271(a) is the place at which the system as a whole is put into

service, *i.e.*, the place where control of the system is exercised and beneficial use of the system

obtained." *Id.* at 1317. In *NTP* the Federal Circuit considered whether customers of Research In

Motion Ltd. ("RIM") "use" within the United States a wireless email system when they "send and

receive messages" through the system "by manipulating the handheld devices" in the United States, but where "the RIM Relay," a claimed component that "controls the accused systems and is necessary for the other components of the system to function properly, is not located within the United States." *Id.* The court held that "the location of the Relay in Canada did not, as a matter of law, preclude infringement" because "RIM's customers located within the United States controlled the transmission of the originated information and also benefited [sic] from such an exchange of information." *Id.* Notwithstanding that the Relay controlled the system and was located outside of the United States, the court concluded that "[w]hen RIM's United States customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as a whole occurs in the United States." *Id.* "This satisfactorily establishes that the situs of the 'use' of RIM's system by RIM's United States customers for purposes of section 271(a) is the United States." *Id.*

Relying on *NTP*, Alice argues that CLS "uses" the CLS Core System within the United States in two ways: (1) CLS personnel in the United States exercise operational control over the system; and (2) CLS Members in the United States put the system into service by submitting settlement instructions. CLS counters that *NTP* is inapposite because no part of the CLS Core System is located within the United States, and, in any event, the system is not controlled from within the United States.

As a preliminary matter, CLS appears to conflate the standard for "use" of a method with the standard for "use" of a system. To determine whether a system is being "used" within the United States, "[c]ourts analyze the invention as a whole to determine where the 'claimed system as whole . . . is put into service,' and do not focus on the situs of use of each claimed element within

the claimed invention." *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356, 361 (E.D. Tex. 2008)

(quoting *NTP*, 418 F.3d at 1317). By contrast, "infringement of a method claim is precluded as a

matter of law if one or more of the claimed steps is performed outside the United States." *Id.* For

this reason, the Federal Circuit rejected a similar argument in *NTP*:

> RIM argues that the BlackBerry system is distinguishable from the
> system in [*Decca Ltd. v. United States*, 544 F.2d 1070 (Ct. Cl. 1976)]
> because the RIM Relay, which controls the accused systems and is
> necessary for the other components of the system to function
> properly, is not located in the United States. While this distinction
> recognizes technical differences between the two systems, it fails to
> appreciate the way in which the claimed NTP system is actually used
> by RIM's customers. When RIM's United States customers send and
> receive messages by manipulating the handheld devices in their
> possession in the United States, the location of the use of the system
> as a whole occurs in the United States.

*NTP*, 418 F.3d at 1317.

Likewise, CLS's argument that the CLS Core System is distinguishable from the

system in *NTP* because no component of the system is located in the United States is a distinction

without legal significance. The court in *NTP* recognized that "use" of a system's components may

"be separated from their physical location." *Id.* at 1313. In determining whether a "use" occurs

within the United States in such circumstances, *NTP* focused not on the location of the system or its

components, as CLS Bank would have this Court do, but on the location of the "users" of the system.

*Id.* at 1317 (looking to whether RIM's U.S. customers are "users" of the system). The test articulated

by the Federal Circuit in *NTP* is whether the system is put into service from within the United States,

not whether the system is put into service from a component of the system that is physically located

within the United States. The relevant inquiry under *NTP*, therefore, is not whether the physical situs

of a component of the system is located within the United States but whether the system is being

"used" within the United States. Employing the reasoning of *NTP*, the Court concludes that a system

can be "used" within the United States even if all of the system's physical components lie entirely

outside of the United States.

CLS contends in the alternative that neither its personnel in the United States nor the

CLS Members in the United States "use" the CLS Core System.  CLS explains:

> The undisputed material facts establish that the CLS Core System . .
> . is so highly automated that it could not possibly be controlled by
> personnel in the U.S.  While there are CLS Bank personnel who
> sometimes interact with portions of the CLS Core System through
> remote connections from the U.S., they do so through indirect
> communications links, merely monitor the system, and address
> exceptions to normal automated processing.  And those CLS
> Members who submit transactions from the U.S., far from controlling
> anything, merely provide instructions respecting the amount and
> proposed timing of their transactions.

CLS's Mem. in Supp. of Mot. for Summ. J. ("CLS's Mem.") at 4.

*NTP* rejected such a strict interpretation of "use" of a system.  As the Federal Circuit

explained, "The use of a claimed system under section 271(a) is the place at which the system as a

whole is put into service, *i.e.*, the place where control of the system is exercised and beneficial use

of the system obtained." *NTP*, 418 F.3d at 1317.  The court found that RIM's U.S. customers "used"

the system within the United States because they "controlled the transmission of the originated

information and also benefited [sic] from such an exchange of information." *Id.*  In other words,

U.S. customers "used" the system by controlling the system's input and benefitting from the system's

output.  That was the case even though "the RIM Relay, which controls the accused systems and is

necessary for the other components of the system to function properly, is not located within the

United States." *Id.*; *see also Renhcol*, 548 F. Supp. 2d at 364-65 (system for exchanging sports

handicap information "used" within the United States by uploading and downloading predictions even though computer and code controlling system were located outside the United States). Were the definition of "use" as strict as CLS proclaims, then the Federal Circuit in *NTP* would have found that RIM's U.S. customers were not "using" the system within the United States simply by sending and receiving emails in the United States.

Against the backdrop of *NTP*, the Court finds that CLS Members in the United States "use" the CLS Core System within the United States by submitting settlement instructions from the United States. CLS argues that its U.S. members "merely transmit payment instructions for settlement relating to foreign exchange transactions over telecommunications networks used for many types of financial transactions" and that they "have no ability to intervene in the functioning of the CLS Core System." CLS's Mem. at 32. While that may be true, it is not determinative. In *NTP*, RIM's U.S. customers merely sent and received emails and had no ability to intervene in the functioning of the RIM Relay. Nevertheless, the Federal Circuit found that they were "using" the system within the United States. CLS's U.S. members are thus no different than RIM's U.S. customers in *NTP*; both "use" the system within the United States by controlling the system's input and benefitting from the system's output. Indeed, much like the wireless email system in *NTP* which was put into service by customers sending emails from the United States, settlement and pay-out occur only in response to the submission of transactions by CLS Members, including U.S. members.

The Court further finds that CLS's operators in New York "use" the CLS Core System within the United States ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ the system requires a human being to turn it on.  It also requires human intervention to

deal with exceptions to normal automatic operations that the system cannot do by itself.  CLS

operators in New York and London perform these functions remotely ████████████████████.

When the CLS Operators in New York do so, they are "using" the CLS Core System within the

United States.

### B.  CLS "Offers to Sell, or Sells" the System's Methods "Within the United States"

*NTP* also addressed an issue of first impression:  "whether a sale of a claimed method

can occur in the United States, even though the contemplated performance of that method would not

be wholly within the United States . . . ."  *NTP*, 418 F.3d at 1318.  The court concluded on the facts

of that case "that the jury could not have found that RIM infringed the asserted method claims under

the 'sells' or 'offers to sell' prongs of section 271(a)" because "RIM's performance of at least some

of the recited steps of the asserted method claims as a service for its customers cannot be considered

to be selling or offering to sell the invention covered by the asserted method claims."  *Id.* at 1320-21.

The court found that "[t]he sale or offer to sell handheld devices is not, in and of itself, enough."

*Id.* at 1321.  But the court was careful to explain that "[w]e need not and do not hold that method

claims may not be infringed under the 'sells' and 'offers to sell' prongs of section 271(a)."  *Id.* at

1320-21. Thus, the court left open whether offering to sell or selling a service that involves performance of every step of the claimed method could infringe. *See also, Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1334-35 (Fed. Cir. 2008) (recognizing that *NTP* "explicitly did not decide the question of whether a 'method claim may not be infringed under the 'sells' and 'offers to sell' prongs of section 271(a)'" and concluding that "we need not definitively answer this question").

Alice alleges that CLS "sells" and "offers to sell" every step of its claimed methods within the United States. CLS argues that, as a matter of law, no claim to a method can be infringed under the "sells" or "offers to sell" prongs of § 271(a), and, in any event, it does not "sell" or "offer to sell" the methods, and to the extent it does, the situs is outside of the United States.

The Federal Circuit in *NTP* could have held that method patents may never be infringed by sales or offers to sell, but it specifically declined to do so. *See NTP*, 418 F.3d at 1320-21 ("We need not and do not hold that method claims may not be infringed under the 'sells' and 'offers to sell' prongs of section 271(a)."). Rather, the court elected to "conclude *only* that RIM's *performance of at least some* of the recited steps of the asserted method claims as a service for its customers cannot be considered to be selling or offering to sell the invention covered by the asserted method claims." *Id.* at 1321 (emphasis added). At least one court has interpreted *NTP* to allow an infringement claim to proceed to trial where the alleged infringer performed each and every step of the method that it sold, as opposed to only some of the steps of the method as in *NTP*. *See Transamerica Life Ins. Co. v. Lincoln Nat'l Life Ins. Co.*, 597 F.Supp. 2d 897, 925 (N.D. Iowa 2009) (distinguishing *NTP* "because the alleged infringer was shown only to perform 'at least some of the recited steps of the asserted claims,' not *each and every step* of the asserted claims") (emphasis in

original).  The Court agrees with that interpretation of *NTP*.  Thus, the Court finds that one who "sells" or "offers to sell" each and every step of a patented method infringes the patent.

CLS argues that to the extent it "sells or offers to sell anything, it is only access to a Service that provides for settlement of payment instructions related to underlying foreign exchange transactions" and that "performance of the steps of a service for customers does not constitute a sale or offer to sell the method."  CLS's Mem. at 35.  The Court cannot agree.  In *Ricoh*, the Federal Circuit held that selling "instructions to perform a process" does not constitute infringement under § 271(a) because the seller does not perform the method, but it implied that selling "the performance of the process itself" may constitute infringement under § 271(a).  *Ricoh*, 550 F.3d at 1335.  The court's implication that a method could be sold for purposes of § 271(a) is supported by the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S. Ct. 2109, 2117 (2008), which held that a method could be sold for purposes of "patent exhaustion."  If a method may be sold for exhaustion purposes, then the Court sees no persuasive reason why a method could not also be sold for infringement purposes.  CLS has not convinced the Court otherwise.

The Court also disagrees with CLS's argument that the situs of its sales and offers to sell is outside of the United States because it performs each of the steps of the methods outside the United States.  The determinative factor is where the infringing act occurs. CLS seems to confuse the standard for "use" of a method with the standard for "sale" of a method.  There can be no "use" infringement of a method "if one or more of the claimed steps is performed outside the United States."  *Renhcol*, 548 F. Supp. 2d at 361.  However, notwithstanding that all of the steps of a method are performed abroad, an infringing "sale" or "offer to sell" can still occur within the United States if "all of the essential activity pertaining to the offer and sale of that activity has taken place

-13-

in the United States." *Synaptic Pharm. Corp. v. MDS Panlabs, Inc.*, 265 F. Supp. 2d 452, 463 (D.N.J. 2002). In *Synaptic*, the court rejected the argument that the "purchase of services" performed abroad could not "constitute an offer to sell or a sale . . . within the meaning of § 271(a)." *Id.* at 462-63. When the infringing act is an offer to sell or a sale, the relevant inquiry is not the place where the methods are performed but the place where the offer to sell or sale occurs. Because CLS offers to perform the methods for U.S. banks for a fee and does perform the methods for its U.S. members for a fee, CLS "offers to sell" and "sells" the CLS Core System's methods within the United States.[5] That the methods are physically performed abroad does not change the fact that the methods are sold to CLS Members in the United States and offered for sale to other banks in the United States.[6]

### C. Alice's Cross Motion for Partial Summary Judgment is Premature

The Court agrees with Alice that CLS "uses" the CLS Core System within the United States and that CLS "sells" or "offers to sell" the CLS Core System's methods within the United States. Nevertheless, the Court will deny without prejudice Alice's cross motion for partial summary

---

[5] While the Court is aware that "[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law[,]" *Microsoft Corp. v. AT & T Corp*, 550 U.S. 437, 454-55 (2007), the Court finds that the U.S. patent laws would be frustrated if a U.S. patent holder could not prohibit the sale of the patented invention to U.S. customers just because the infringer uses the invention abroad. Were it otherwise, infringers could avoid liability entirely even if they sold a patented invention exclusively to U.S. customers.

[6] The Court also rejects CLS's assertion that it cannot be held liable for "offering to sell" the system's methods in the absence of a contemplated "sale" within the United States. While there is authority to the contrary, the Court finds that an "offer to sell" within the United States is an independent infringing act and does not require a further infringing act; *i.e.* an actual sale within the United States, to be actionable. *See Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d 228, 233-34 (D. Del. 2003) ("the 'sale' contemplated by the 'offer to sell' need not take place in the United States or be intended to take place in the United States for there to be infringement because of the 'offer to sell'"); *SEB, S.A. v. Montgomery Ward & Co., Inc.*. 412 F. Supp. 2d 336, 341 n.6 (S.D.N.Y. 2006) (the "assertion that 'offers in the United States to sell accused products outside of the United States do not satisfy § 271' is inaccurate").

judgment as to extraterritoriality as premature.

To determine whether a patent claim has been infringed, a court must undertake a two-step process. The court first construes or interprets each contested claim, or phrase or word within a claim, to determine its meaning and scope; only afterward are the claims compared to the accused device(s). *See O.I. Corp. v. Teckmar Co. Inc.*, 115 F.3d 1576, 1580 (Fed. Cir. 1997) ("Determining whether a patent claim has been infringed requires a two-step analysis: 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'") (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)).

In moving for partial summary judgment as to extraterritoriality before the Court has construed its claims, Alice essentially asks the Court to reverse this process. *See* Alice's Cross Mot. for Partial Summ. J. [Dkt. # 51] at 2 (arguing that CLS "uses the invention claimed in Alice's system patent in the United States" and that "CLS is liable for infringing Alice's method patents in the United States by 'offering to sell, or selling' the performance of Alice's patented method for a fee.") But the parties have only agreed to assume for present purposes that Alice's claims are broad enough to cover the CLS Core System and its methods. Indeed, CLS asserts that "[i]f this case were to proceed beyond a decision on CLS'[s] Motion for Summary Judgment, CLS would contend, among other things, that Alice's patent claims should be more narrowly construed, and that they are invalid and unenforceable." CLS's Mem. at 8 n.4. Inasmuch as the Court has yet to construe Alice's claims, Alice is seeking relief based on a hypothetical claims construction. Accordingly, the Court will deny without prejudice Alice's cross motion for partial summary judgment as to extraterritoriality as premature.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny CLS's motion for summary judgment of no infringement within the United States [Dkt. # 42] and deny without prejudice as premature Alice's cross motion for partial summary judgment as to extraterritoriality [Dkt. # 51].   A memorializing Order accompanies this Memorandum Opinion.

Date: October 13, 2009                           _____/s/_____
                                                 ROSEMARY M. COLLYER
                                                 United States District Judge