## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CLS BANK INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>ALICE CORPORATION PTY. LTD.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-974 (RMC)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

CLS Bank International moves for summary judgment, contending that all patent claims asserted by Alice Corporation Pty. Ltd. in this case are invalid under 35 U.S.C. § 101 for lack of patentable subject matter.  Alice cross-moves for partial summary judgment, arguing that its asserted claims are directed to patent-eligible subject matter.  Before the Court are claims 33 and 34 of U.S. Patent No. 5,970,479, and every claim of U.S. Patent No. 6,912,510; U.S. Patent No. 7,149,720; and U.S. Patent No. 7,725,375.  For the reasons set out below, the Court finds each of the claims at issue to be directed to unpatentable subject matter and will grant summary judgment in full to CLS.

## I.  FACTS

### A.  The Patents

Alice is an Australian company that owns four United States patents; it asserts that CLS infringes these four patents.  CLS is an "Edge Act Corporation," organized under Section 25A of the Federal Reserve Act, as amended, 12 U.S.C. § 611, and authorized by statute to engage in international banking activities.  In response to Alice's charge of infringement, CLS challenges the

subject matter patentability of the asserted claims of the four patents. Alice's four patents at issue are: (1) U.S. Patent No. 7,149,720 ("'720 Patent"); (2) U.S. Patent No. 6,912,510 ("'510 Patent"); (3) U.S. Patent No. 5,970,479 ("'479 Patent"); and U.S. Patent No. 7,725,375 ("'375 Patent") (collectively the "Patents"). The relevant claims of the '479 and '510 Patents are directed to a method (i.e., process), while the claims of the '720 and '375 Patents are directed to a system or product. The Court has not construed the allegedly infringed claims.

In the early 1990's, the founder of Alice, Ian Shepherd, invented an "innovative trading platform" which entailed a "computerized system for the establishment, settlement, and administration of financial instruments, principally of basic derivatives, that would solve problems inherent in the way such trading had been done in the past." Alice Mem in Supp. of Mot. for Summ. J. & Opp'n [Dkts. ## 95, 96] 4 ("Alice Mem."). One aspect of the trading platform is "an automated method and system for eliminating counter-party risk when parties who were often unknown to each other and in different time zones wanted to exchange payments." *Id*. The "electronic settlement mechanism [] settled trades without the risk that one party would perform and the other would not." *Id*. Alice's expert, Paul Ginsberg, explains that the Patents "disclose and claim in various ways a novel computerized trading platform for exchanging obligations in which a trusted third party, running a computer system programmed in a specific way, settles parties' obligations so as to eliminate what is variously referred to as 'Herstatt,' 'counterparty,' or 'settlement' risk—the risk that only one party's obligation will be paid, leaving the other party without its principal." *Id*. 4–5 (citing Alice Mem., [Ex. 1] Ginsberg Decl. ¶¶ 23–24). "The trusted third party—a 'supervisory institution'—operates a data processing system that exchanges both parties' obligations or neither." *Id*. at 5.

Mr. Ginsberg elucidates the risk the Patents are intended to mitigate.  "When obligations arise from a trade made between two parties, e.g., a trade of stock or a trade of foreign currency, typically, there is a gap in time between when the obligation arises and when the trade is 'settled.'"  Ginsberg Decl. ¶ 21.  "In a number of financial contexts, the process of exchanging obligations, or settlement, is separate from the process of entering into a contract to perform a trade."  *Id*.  Mr. Ginsberg provides the example of two banks that wish to exchange large sums of currency would normally enter into a binding agreement to make an enumerated exchange but would postpone the actual exchange until after the price is set and the agreement confirmed, which is typically a two day period.  *Id*. ¶ 22.  After two days, the two banks would "settle" the trade by both paying their predetermined amounts to the other bank.  However, a risk exists that one bank might wire its money, but the second bank would fail to do the same; the loss possibly becoming permanent, for instance, if the second bank thereafter goes bankrupt or is shut down by regulators.  *Id*. ¶ 23.  The Patent claims at issue here seek to minimize this "settlement" risk that only one side of a trade would be fulfilled during the settlement process.  *Id*.  "Generally speaking, a trusted third party might operate a computer system that is configured in a particular way to exchange the parties' obligations, and by performing the particular electronic method using that computer system, can lessen settlement risk."  *Id*. ¶ 24.

Therefore, Mr. Ginsberg reads the asserted claims of the four Patents to be "generally directed to methods or systems that help lessen settlement risk using a computer system."  *Id*.  Very broadly speaking, the process claims are directed to methods of exchanging financial obligations between parties while the system claims relate to data processing systems to implement the steps of exchanging obligations and the computer product claims enable a computer to send a transaction to

the system to be implemented and allow a user to view the steps of exchanging obligations being performed.

### 1. '479 Patent

The '479 Patent is entitled "Methods and Apparatus Relating to the Formulation and Trading of Risk Management Contracts." *See* CLS Mem. in Supp. of Mot. for Summ. J. [Dkt. # 94] ("CLS Mem."), [Ex. 1] '479 Patent.  The application for the '479 Patent was filed on May 28, 1993, and the Patent issued on October 19, 1999.  The '479 Patent, at large, allegedly "discloses a complex computer-based system and various electronic methods for formulating risk management contracts, trading the contracts, and exchanging the resulting obligations."  Ginsberg Decl. ¶ 25.  The specification discloses:

> The invention encompasses methods and apparatus enabling the management of risk relating to specified, yet unknown, future events by enabling entities (parties) to reduce their exposure to specified risks by constructing compensatory claim contract orders on yet-to-be-identified counter-parties, being contingent on the occurrence of the specified future events.  The entities submit such orders to a 'system' which seeks to price and match the most appropriate counter-party, whereupon matched contracts are appropriately processed through to their maturity.  Therefore, the invention enables parties to manage perceived risk in respect of known, yet non-predictable, possible future events.

'479 Patent, col. 3:29–42.  The disclosure of the '479 Patent reveals an invention that, as a whole, appears to be directed to a seemingly complex trading platform which facilitates a wide array of parties to come together and enter into contracts to hedge against future risks of all sorts; the system allows parties to trade such contracts already entered into, the system manages contracts until maturity, and the system provides for the transfer or exchange of entitlements or payments once they arise.

Only claims 33 and 34 of the '479 Patent are at issue in this matter.  These two claims are directed to a "method of exchanging obligations" between parties, and in their entirety, they claim:

> 33. A method of exchanging obligations as between parties, each party holding a credit record and a debit record with an exchange institution, the credit records and debit records for exchange of predetermined obligations, the method comprising the steps of:
>
>> (a) creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions;
>>
>> (b) obtaining from each exchange institution a start-of-day balance for each shadow credit record and shadow debit record;
>>
>> © for every transaction resulting in an exchange obligation, the supervisory institution adjusting each respective party's shadow credit record or shadow debit record, allowing only these transactions that do not result in the value of the shadow debit record being less than the value of the shadow credit record at any time, each said adjustment taking place in chronological order; and
>>
>> (d) at the end-of-day, the supervisory institution instructing ones of the exchange institutions to exchange credits or debits to the credit record and debit record of the respective parties in accordance with the adjustments of the said permitted transactions, the credits and debits being irrevocable, time invariant obligations placed on the exchange institutions.
>
> 34. The method as in claim 33, wherein the end-of-day instructions represent credits and debits netted throughout the day for each party in respect of all the transactions of that day.

'479 Patent, col. 65:23–54.  Both claims recite a "shadow credit record," a "shadow debit record," and a "transaction."  *See, e.g., id.* col. 65:27, 33 (Claim 33).

The methods in claims 33 and 34 relate to just one feature of the entire invention

disclosed in the '479 Patent, *see* Ginsberg Decl. ¶ 26; a concluding step of sorts, when contracted-for

obligations become ripe and are exchanged.  *See* '479 Patent, col. 5:61–63 (noting the invention

"also encompasses apparatus and method dealing with the handling of contracts at maturity, and

specifically the transfer of entitlement").  The '479 Patent was the first of the Patents to issue and

the inventions disclosed by the '510, '720, and '375 Patents are continuations of the '479 Patent

which, with only minor differences, share a common specification.  *See* Ginsberg Decl. ¶ 25; Alice

Mem. 4.

### 2.  '510 Patent

The '510 Patent is entitled "Methods of Exchanging an Obligation."  *See* CLS Mem.,

[Ex. 2] '510 Patent.  The application for the '510 Patent was filed on May 9, 2000, and it issued on

June 28, 2005.  Each of the 75 claims of the '510 Patent is directed to a particular method of

exchanging an obligation.  For instance, claim 1 of the '510 Patent is directed to:

> 1. A method of exchanging an obligation between parties, wherein an exchange obligation is administered by a supervisory institution, and wherein at least one credit record and one debit record is maintained with an exchange institution, the method comprising:
>
> > (a) maintaining a shadow credit record and a shadow debit record for a party to be held independently by the supervisory institution from the exchange institution;
> >
> > (b) for every transaction resulting in an exchange obligation, the supervisory institution electronically adjusting said shadow credit record and/or shadow debit record, allowing only those transactions that do not result in a value of said shadow debit record being less than a value of said shadow credit record; and
> >
> > © at the end of a period of time, the supervisory institution providing an instruction to the exchange institution to credit and/or debit in accordance with said adjustments of said

> allowed transactions, wherein said instruction being an
> irrevocable, time invariant obligation placed on the exchange
> institution.

'510 Patent, col. 64:2–21. Each of the five independent claims—claims 1, 27, 61, 65, and 68—of

the '510 Patent calls for "electronically adjusting" records or accounts. *Id*. col. 64:11–12 (Claim 1);

*id*. col. 65:25–26 (Claim 27); *id*. col. 66:63–64 (Claim 61); *id*. col. 67:24–25 (Claim 65); *id*. col.

68:7 (Claim 68).

   An exchange of obligations, however defined, is the stated purpose of the methods

claimed in the '510 Patent claims and claims 33 and 34 of the '479 Patent. Alice argues that claims

33 and 34 of the '479 Patent and every claim of the '510 Patent are implemented electronically using

a computer coupled to a data storage method. *See* Ginsberg Decl. ¶¶ 28–43. CLS disputes that these

methods directly or indirectly claim the use of a computer.

### 3. '720 Patent

   The '720 Patent is entitled "Systems for Exchanging an Obligation." CLS Mem., [Ex.

3] '720 Patent. The application for the '720 Patent was filed on December 31, 2002, and it issued

on December 12, 2006. Each claim of the '720 Patent, claims 1–84, is directed to a particular data

processing system.

   As a representative example, claim 1 of the '720 Patent is directed to:

1. A data processing system to enable the exchange of an obligation
between parties, the system comprising:

> (a) data storage unit having stored therein information about
> a shadow credit record and shadow debit record for a party,
> independent from a credit record and debit record maintained
> by an exchange institution; and

> (a) [sic] computer, coupled to said data storage unit, that is

configured to (a) receive a transaction; (b) electronically adjust said shadow credit record and/or said shadow debit record in order to effect an exchange obligation arising from said transaction, allowing only those transactions that do not result in a value of said shadow debit record being less than a value of said shadow credit record; and © generate an instruction to said exchange institution at the end of a period of time to adjust said credit record and/or said debit record in accordance with the adjustment of said shadow credit record and/or said shadow debit record, wherein said instruction being an irrevocable, time invariant obligation placed on said exchange institution.

'720 Patent, col. 65:42–61. Each of the six independent claims—claims 1, 28, 60, 64, 68, and 80—of the '720 Patent recites "a data storage unit having stored therein" information about accounts or records, and a "computer, coupled to said data storage unit," that is "configured" to perform certain steps. *See id.* col. 65:42–61 (Claim 1); *id.* col. 67:1–18 (Claim 28); *id.* col. 68:33–53 (Claim 60); *id.* col. 68:62–66 & col. 69:1–11 (Claim 64); *id.* col. 69:20–42 (Claim 68); *id.* col. 70:20–37 (Claim 80).

### 4. '375 Patent

The '375 Patent is entitled "Systems and Computer Program Products for Exchanging an Obligation." CLS Mem., [Ex. 4] '375 Patent. The application leading to the '375 Patent was filed on June 27, 2005, and it issued on May 25, 2010. Claims 1–38 and 42–47 of the '375 Patent are directed to data processing systems which enable the exchange of an obligation. As with the '720 Patent claims, the three independent system claims—claims 1, 14, and 26—of the '375 Patent each requires "a data storage unit having stored therein" information about accounts or records, and a "computer, coupled to said data storage unit," that is "configured" to perform certain steps. *See* '375 Patent, col. 65:1–30 (Claim 1); *id.* col. 66:1–29 (Claim 14); *id.* col. 66:61–65 & col. 67:1–26

(Claim 26).  The '375 Patent incorporates additional elements to the systems claimed in the '720 Patent.  For instance, independent claim 1 further recites a "first party device," *id*. col. 65:4, claim 12 adds a "second party device," *id*. col. 65:62, and claim 14 recites a "communications controller." *Id*. col. 66:3.

Independent claim 39 and claims 40 and 41, which depend from claim 39,[1] of the '375 Patent are, on the other hand, directed to computer program products containing particular program code.

Claim 39 of the '375 Patent is directed to:

> 39. A computer program product comprising a computer readable storage medium having computer readable program code embodied in the medium for use by a party to exchange an obligation between a first party and a second party, the computer program product comprising:
>
>> program code for causing a computer to send a transaction from said first party relating to an exchange obligation arising from a currency exchange transaction between said first party and said second party; and
>>
>> program code for causing a computer to allow viewing of information relating to processing, by a supervisory institution, of said exchange obligation, wherein said processing includes (1) maintaining information about a first account for the first party, independent from a second account maintained by a first exchange institution, and information about a third account for the second party, independent from

---

[1]  "[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.  A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."  35 U.S.C. § 112.  In other words, a dependent claim incorporates all of the limitations of the claim from which it "depends" and adds something new; thus, a dependent claim has a narrower scope than the claim from which it depends.  Further, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).

> a fourth account maintained by a second exchange institution;
> (2) electronically adjusting said first account and said third
> account, in order to effect an exchange obligation arising from
> said transaction between said first party and said second party,
> after ensuring that said first party and/or said second party
> have adequate value in said first account and/or said third
> account, respectively; and (3) generating an instruction to said
> first exchange institution and/or said second exchange
> institution to adjust said second account and/or said fourth
> account in accordance with the adjustment of said first
> account and/or said third account, wherein said instruction
> being an irrevocable, time invariant obligation placed on said
> first exchange institution and/or said second exchange
> institution.

*Id.* col. 68:5–35. Thus, each of the three product claims asserts a "computer readable storage medium" and "computer readable program code embodied in the medium." *Id.* col. 68:5–7 (Claim 39).

## B. Procedural History

On May 24, 2007, CLS brought suit against Alice, seeking a declaratory judgment of non-infringement, patent invalidity, and patent unenforceability under the Patent Act, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. On August 16, 2007, Alice counter claimed that CLS was infringing three of its patents: the '479, '510, and '720 Patents. By agreement of the parties, initial discovery commenced on the question of (1) the operation of CLS Bank International, and (2) CLS Bank International's relationship with the CLS system.

In March 2009, CLS moved for summary judgment on the basis that (a) any patent infringement by CLS could not be said to be occurring within the United States and (b) Alice's claims lacked patentable subject matter eligibility. Alice opposed and cross-moved on both issues. As for extraterritoriality, on October 13, 2009, the Court denied CLS's motion, finding that U.S.

patent laws reached CLS's alleged infringing acts since CLS both "uses" its CLS Core System and "offers to sell, or sells" its methods within the United States. The Court also denied without prejudice Alice's cross-motion as premature since it sought a declaration of infringement. *See* Redacted Mem. Op. & Order [Dkt. ## 79, 78]. The Court then certified CLS's immediate appeal, but the United States Court of Appeals for the Federal Circuit denied CLS's request for an interlocutory appeal. *See* Federal Circuit Order [Dkt. # 87].

On June 16, 2009, the Court denied without prejudice the cross-motions on subject matter eligibility on the grounds that the Supreme Court had granted certiorari in *In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (en banc) ("*Bilski I*"), upon which the parties had relied heavily in their briefing. The Court ordered re-filing for after the Supreme Court issued its decision. *See* Minute Entry Order 6/16/2009. After the Supreme Court issued *Bilski v. Kappos*, 130 S. Ct. 3218 (2010) ("*Bilski II*"), the parties renewed their briefs. Further, on August 5, 2010, the Court granted Alice leave to file an amended answer containing an additional counterclaim charging CLS with infringement of its '375 Patent, which had only been issued three months prior. Briefing on the question of whether Alice's claims at issue in this litigation are directed to patent eligible subject matter under the Patent Act is now ripe, after oral argument was held on January 14, 2011.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who

"after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### B. Subject Matter Eligibility under the Patent Act

Section 101 of the Patent Act delineates which inventions are patentable: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Congress created four independent categories of inventions or discoveries that are eligible for patent protection: processes, machines, manufactures, and compositions of matter. A "process" is defined in the Patent Act as a "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." *Id.* § 100(b). The Supreme Court has described a "process" as follows:

That a process may be patentable, irrespective of the particular form

of the instrumentalities used, cannot be disputed. . . . A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182–83 (1981) (quoting *Cochrane v. Deener*, 94 U.S. 780, 787–88 (1877)).

By writing § 101 in expansive terms, "Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). "Congress took this permissive approach to patent eligibility to ensure that ingenuity should receive a liberal encouragement." *Bilski II*, 130 S. Ct. at 3225 (internal quotation marks omitted); *In re Comiskey*, 554 F.3d 967, 977 (Fed. Cir. 2009) (recognizing that patentable subject matter under § 101 is "extremely broad"). In fact, the Supreme Court has "more than once cautioned that courts should not read into the patent laws limitations and conditions which the legislature has not expressed." *Bilski II*, 130 S. Ct. at 3226 (quoting *Diehr*, 450 U.S. at 182 (internal quotation marks omitted)).

The Supreme Court has enunciated three exceptions to the Patent Act's broad subject matter eligibility framework: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 130 S. Ct. at 3225 (quoting *Chakrabarty*, 447 U.S. at 309). Thus, even if an invention appears to nominally claim subject matter that would be statutorily covered by the Patent Act, it will be denied patent protection if it falls into one of the "fundamental principles" exceptions, i.e. a law of nature, natural phenomena, and/or an abstract idea, which have been expounded by the Supreme Court in

-13-

*Gottschalk v. Benson*, 409 U.S. 63 (1972), *Parker v. Flook*, 437 U.S. 584 (1978), *Diehr*, 450 U.S. 175, and most recently *Bilski II*, 130 S. Ct. 3218.  An underlying reason for these exceptions is that "[p]henomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work."  *Benson*, 409 U.S. at 67; *accord Diehr*, 450 U.S. at 185 ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.") (citation omitted).  Although the "fundamental principles" exceptions are not statutory, the Supreme Court has found them to be consistent with the requirement that a patentable invention be "new and useful."  *Bilski II*, 130 S. Ct. at 3225 (citing 35 U.S.C. § 101).  The Supreme Court recently emphasized that a lower court should be attentive to the "guideposts" of *Benson*, *Flook*, and *Diehr* when considering these exceptions to subject matter patentability.  *Id*. at 3231.

In 1972, the *Benson* Court held that a method of programming a computer to convert binary-coded decimal numerals to their equivalent pure binary numerals was not a "process" as covered by the Patent Act.  The Court found the method truly claimed an "algorithm," as it represented a general formulation for computers to solve the mathematical problem of converting one numerical representation to another, which merely constituted an algorithm from which specific applications could be developed.  *Benson*, 409 U.S. at 65.  The Court held that the *Benson* patent would preempt the use of the algorithm by others as the claim could cover known and future unknown uses of the code conversion formula in many different fields and for many different purposes, and effectively preempt its use in existing machinery, future-devised machinery, or no machinery at all.  *Id*. at 68.  The Court also found that the computer failed to limit the invention since the algorithm had no practical application except in connection with a computer; therefore a patent

-14-

on the invention served as a patent on the algorithm itself. *Id*. at 71–2.

In 1978, the *Flook* Court rejected another patent because it was directed to unpatentable subject matter, another algorithm, although the patent contained greater limitations and entailed a more specific application than the patent in *Benson*. The *Flook* patent concerned monitoring conditions during catalytic conversion processes in the petrochemical and oil-refining industries, and the claims were directed to a method of computing an alarm limit, which is the point at which catalytic conversion conditions can produce inefficiencies or danger. The Court recognized that the only novel part of the method was that it employed a new mathematical formula for calculating and/or updating the alarm limit, and that the invention really claimed the algorithm itself. *Flook*, 437 U.S. at 585–86. That the claims were limited to the petrochemical and oil-refining industries and would therefore not preempt the wholesale use of the algorithm was insufficient to render the claims patentable. *Id*. at 589–90. Likewise, the methods were not saved by the "post-solution" activity of adjusting the actual alarm limit based on the results of the algorithm since a "competent draftsman could attach some form of post-solution activity to almost any mathematical formula." *Id*. at 590.

In 1981, the Supreme Court colored the outer limits of the fundamental principles exceptions in *Diehr*, in which the Court upheld the subject matter eligibility of a claim to a process for producing cured synthetic rubber products. While the invention employed a well-known mathematical formula in one of its steps, the patent did not seek to preempt the use of the formula itself, but only preempt its use in conjunction with all the other steps in the claimed method. *Diehr*, 450 U.S. at 187. Admittedly, the mathematical formula would not be patentable on its own, "but when a process for curing rubber is devised which incorporates in it a more efficient solution of the

equation, that process is at the very least not barred at the threshold by § 101." *Id*. at 188.  The Court distinguished *Flook* by explaining:  "We were careful to note in *Flook* that the patent application did not purport to explain how the variables used in the formula were to be selected, nor did the application contain any disclosure relating to chemical processes at work or the means of setting off an alarm or adjusting the alarm limit.  All the application provided was a 'formula for computing an updated alarm limit.'"  *Id*. at 192 n.14 (internal citations omitted).

Most recently, in 2010, the Supreme Court found a business method unpatenable as directed to an abstract idea.  *See Bilski II*, 130 S. Ct. at 3231.  The *Bilski II* Court invalidated process claims generally directed to instructing buyers and sellers how to hedge risk and how to apply the methods to the energy commodities market.  *Id*.  The Court pointed out that hedging is a "fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class."  *Id*. (citation omitted).  "Allowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea."  *Id*.  The Court also found the dependent claims applying the methods of hedging risk to the energy commodities market unpatentable as vain attempts to limit an fundamental concept to a particular field of use or to add post-solution components.  *Id*.  The Court found that the patent claims "attempt to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation."  *Id*.  In fact, "these claims add even less to the underlying abstract principle than the invention in *Flook* did, for the *Flook* invention was at least directed to the narrower domain of signaling dangers in operating a catalytic converter."  *Id*.

While an abstract idea in itself is not patentable, a claim "is not unpatentable simply

because it contains a law of nature or a mathematical algorithm." *Flook*, 437 U.S. at 590. "It is now commonplace that an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Diehr*, 450 U.S. at 187 (emphasis in original); *id*. at 192 ("[W]hen a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect (e.g., transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of § 101."). It is also clear that when a court examines whether a claim is directed to an abstract idea, the court must view each claim as a whole. "In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole . . . This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diehr*, 450 U.S. at 188; *see also King Pharms., Inc. v. Eon Labs., Inc.*, 616 F.3d 1267, 1277 (Fed. Cir. 2010) (reasserting that "§ 101 patentability analysis is directed to the claim as a whole, not individual limitations" within the claim).

There is no clear definition of what constitutes an abstract idea; instead, courts analogize from the standards etched out by the cases just discussed. As the Federal Circuit recently acknowledged, "the Supreme Court did not presume to provide a rigid formula or definition for abstractness." *Research Corp. Techs. v. Microsoft Corp*., 627 F.3d 859, 868 (Fed. Cir. 2010) (citing *Bilski II*, 130 S. Ct. at 3238). The Federal Circuit declined to "presume to define 'abstract' beyond the recognition that this disqualifying characteristic should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary

-17-

attention on the patentability criteria of the rest of the Patent Act." *Id.*

Ultimately, the determination of whether an asserted claim is invalid for lack of subject matter patentability under § 101 is a question of law. *See Bilski I*, 545 F.3d at 950. A patent is presumed to be valid by statute, 35 U.S.C. § 282; therefore, a patent challenger bears the burden of proving invalidity by clear and convincing evidence. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). This standard of proof applies equally at summary judgment. *See National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996). While invalidity is a question of law, "determination of this question may require findings of underlying facts specific to the particular subject matter and its mode of claiming." *Arrhythmia Research Technology, Inc. v. Corazonix Corp.*, 958 F.2d 1053, 1056 (Fed. Cir. 1992).

Whether an invention falls within a subject matter eligible for § 101 protection is also a threshold question. *See Comiskey*, 554 F.3d at 975. "It is well-established that '[t]he first door which must be opened on the difficult path to patentability is § 101.'" *Id.* at 973 (quoting *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368, 1372 n.2 (Fed. Cir. 1998)). Only after an invention has satisfied § 101, will it be analyzed under the remaining hurdles of the Patent Act, which include the requirement that an invention be novel, *see* § 102; nonobvious, *see* § 103; and fully and particularly described, *see* § 112. *See Bilski II*, 130 S. Ct. at 3225.[2]

---

[2] The Federal Circuit recently explained, in overturning a district court's finding that a method claim was abstract, that

> an invention which is not so manifestly abstract as to over-ride the statutory language of section 101 may nonetheless lack sufficient concrete disclosure to warrant a patent. In section 112, the Patent Act provides powerful tools to weed out claims that may present a vague or indefinite disclosure of the invention. Thus, a patent that presents a process sufficient to pass the coarse eligibility filter may

## III.  ANALYSIS

CLS argues that Alice's claims are not patentable because they are directed to an abstract idea—the exchange of an obligation when sufficient value is present—which is supported by its argument that the method claims fail to satisfy the machine-or-transformation test.  Thus, CLS posits that Alice's method claims in the '510 Patent and claims 33 and 34 of the '479 Patent are directed to an abstract idea, and then by the draftsman's art, this abstract idea is recast as computer system and product claims in the '720 and '375 Patents to carry out the same methods.  CLS argues this is further evidenced by the fact the Patents share essentially the same specification and disclosure.

### A.  Method Claims

CLS first attacks claims 33 and 34 of the '479 Patent and every claim of the '510 Patent—which collectively entail the only method claims at issue in this litigation—arguing these method claims fail as abstract and because they fail to meet the machine-or-transformation test.  Alice responds that the methods are not abstract, but a functional application of a method to satisfy a need, and that the claims further satisfy the machine-or-transformation test.

### 1. Statutory Category

The first question is whether the methods in claims 33 and 34 of the '479 Patent and

---

nonetheless be invalid as indefinite because the invention would 'not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim.'  *Star Scientific., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008).  That same subject matter might also be so conceptual that the written description does not enable a person of ordinary skill in the art to replicate the process.

*Research Corp.*, 627 F.3d at 869.

all claims in the '510 Patent statutorily qualify for patent protection. Congress broadly defined the categories of inventions to be afforded patent protection to ensure that "ingenuity should receive a liberal encouragement." *Chakrabarty*, 447 U.S. at 308–09. The Patent Act defines "process" as a "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The relevant claims of the '479 and '510 Patents are directed to particular methods, or steps, of exchanging obligations. Thus, the claims nominally satisfy the statutory language of § 101 and the process definition laid out in § 100(b). However, the analysis does not end here as the machine-or-transformation test helps guide a court in the decision as to whether a process is subject matter eligible under the Patent Act.

### 2. Machine-or-Transformation Test

To determine whether a process claims subject matter that is patent eligible, a court may look to the useful and important "machine-or-transformation" ("MOT") test for guidance. *See Prometheus Labs., Inc. v. Mayo Collaborative Servs. & Mayo Clinic Rochester*, No. 2008-1403, 2010 U.S. App. LEXIS 25956, *19–20 (Fed. Cir. Dec. 17, 2010). Under the MOT test, an invention is a process if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954. Further, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope to impart patent-eligibility" and "the involvement of the machine or transformation in the claimed process must not merely be insignificant extra-solution activity." *Id.* at 961–62. The MOT test is neither the exclusive nor the dispositive standard to determine whether an invention qualifies as a process under § 101, yet it remains a "useful and important clue, an investigative tool" in the analysis. *Bilski II*, 130 S. Ct. at 3227. Therefore, this Court analyzes the claims under the MOT

analysis to inform its ultimate finding.

The Court first finds the relevant claims of the '479 and '510 Patents do not involve any "transformation" under the MOT test.  Alice argues that the electronic transformation of data caused by the methods' electronic adjustment of accounts satisfies the transformation prong of the test.  *See* Alice Mem. 33.  The Federal Circuit recently grappled with its "measured approach" to allowing the manipulation of electronic signals or data or even "abstract constructs," such as legal obligations, to qualify as transformations under the Patent Act.  *Bilski I*, 545 F.3d at 962.  The Federal Circuit pointed to only one example where "the electronic transformation of the data itself into a visual depiction" was sufficient to meet the test.  *Id.* at 963 (citing *In re Abele*, 684 F.2d 902, 908–09 (C.C.P.A. 1982)).  It was not the mere manipulation of data itself that led the U.S. Court of Customs and Patent Appeals (the predecessor to the U.S. Court of Appeals for the Federal Circuit) to find the method was transformative, but that the process involved the conversion of X-ray data into a visual depiction which represented specific physical objects, i.e., bones.  *See Bilski I*, 545 F.3d at 962–63.[3]  Taken to the extreme, Alice's argument would convert almost any use of a computer,

---

[3] Alice cites to *Arrhythmia Research Technology, Inc. v. Corazonix Corp.*, 958 F.2d 1053 (Fed. Cir. 1992), as further support that the method claims before the Court involve a transformation under the MOT test.  In *Arrhythmia* the Federal Circuit found the conversion, application, determination, and comparison of electrocardiograph signals to be "physical process steps that transform one physical, electrical signal into another" and, accordingly that the process satisfied the second step of the *Freeman-Walter-Abele* test—which requires that an algorithm be applied to physical elements or process steps to be patent eligible.  *Id.* at 1059.  This analysis is inapposite.  First, the Federal Circuit's analysis was not related to the MOT test.  Second, the Circuit has since found the *Freeman-Walter-Abele* test to be an inadequate indicator of subject matter patentability and has warned that portions of prior decisions relying solely on this test should no longer be relied upon.  *Bilski I*, 545 F.3d at 959 n.17.  The *Bilski I* Court clarified that "the proper inquiry under § 101 is not whether the process claim recites sufficient "physical steps," but rather whether the claim meets the machine-or-transformation test."  *Id.* at 961 (referring to the 'physical steps' test developed in *In re Comiskey*, 499 F.3d 1365 (Fed. Cir. 2007)).

or other electronic device with memory, to a transformation under the MOT test simply because data would necessarily have to be manipulated, and on a microscopic level, a hard drive, for instance, would be "transformed" by the process of "mangnetizing or demagnetizing part of a hard disk drive platter corresponding to a bit of data." *See* Alice Mem. 33.

Further, for a transformation to satisfy the MOT test, the "transformation must be central to the purpose of the claimed process." *Bilski I*, 545 F.3d at 962. Assuming the asserted process claims in the Patents are implemented by computer, the claims are nonetheless directed to "a method of exchanging obligations," not to the manipulation of an electronic hard drive or memory, and any such electronic transformation is at most incidental to the exchange of obligations, not to mention it would also constitute insignificant extra-solution activity. Further, the exchange of "obligations" itself involves no particular article being transformed since obligations are a mere abstraction. "Purported transformations or manipulations simply of public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances." *Bilski I*, 545 F.3d at 963.[4] The method claims before the Court, that is, every claim of the '510 Patent and claims 33 and 34 of the '479 Patent, fail to transform any article under the

_____

[4] Similarly, a district court found a method directed towards discovering credit card fraud did not meet the transformation prong of the MOT test, despite the manipulation of credit information, because no article or physical object was transformed. The credit card number and the card itself were found to represent merely "a common underlying abstraction–a credit card account, which is a series of rights and obligations" existing between the account holder and card issuer. *Cybersource Corp. v. Retail Decisions, Inc.*, 620 F. Supp. 2d 1068, 1074 (N.D. Cal. 2009). Although the credit card information manifests in a physical credit card, the district court noted: "Options like those described in the *Bilski* patent do not simply float in the ether. A piece of paper upon which the terms of an option are written is, like a credit card, a physical object. Yet this connection to a physical medium does not create patent eligibility, because an option ultimately represents the abstraction of a legal obligation or business risk." *Id*.

machine-or-transformation test.

The closer question is whether Alice's process claims are tied to a particular machine or apparatus under the MOT test. A "machine" is a "a concrete thing, consisting of parts, or of certain devices and combination of devices." *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007) (quoting *Burr v. Duryee*, 68 U.S. (1 Wall.) 531, 570 (1863)). The Court first looks to the '510 Patent claims, each of which recites "electronically adjusting" records and/or accounts as a step within the claim.[5] The Court has yet to construe the terms of these claims, but CLS concedes for purposes of these motions that the recitation of "electronically adjusting" by each of the '510 Patent claims means that the claims require the use of a computer. CLS Opp'n & Reply in Supp. of Mot. for Summ. J. [Dkt. ## 97, 98] ("CLS Reply") at 11 n.6.

The Court will also presume, for purposes of these motions, that claims 33 and 34 of the '479 Patent are directed to computer implementation, a position CLS contests. To be sure, claims 33 and 34 of the '479 Patent contain no unambiguous reference to a machine or apparatus. Alice posits that a person of ordinary skill in the relevant art reading these claims in light of the specification and other claims of the '479 Patent would understand the term "transaction" to require the use of electronic data processing systems, *see* Alice Reply in Supp. of Mot. for Summ. J. [Dkt. # 99] ("Alice Reply") 23, and the terms "shadow credit record" and "shadow debit record" to require electronic storage of data files in a data storage unit. *Id*. (citing Ginsberg Decl. ¶ 32); *see also* '479 Patent, col. 65:27, 33 (Claim 33). At a minimum, Alice argues that claims 33 and 34 are directed to implementation by a computer system including a processor and memory. *See* Alice Mem. 31;

---

[5] *See* '510 Patent, col. 64:11–12 (Claim 1); *id*. col. 65:25–26 (Claim 27); *id*. col. 66:63–64 (Claim 61); *id*. col. 67:24–25 (Claim 65); *id*. col. 68:7 (Claim 68) (collectively, the five independent claims of the '510 Patent).

*see also* Ginsberg Decl. ¶ 43 (noting that the process claims "expressly recite methods of performing a particular transaction electronically, which requires (explicitly or implicitly) the use of a computer system").

Whether a claim is valid under § 101 is a matter of claim construction, *see State Street*, 149 F.3d at 1370, and for purposes of these motions, CLS has agreed to assume a construction of terms favorable to Alice.[6] The specification for the '479 Patent reveals that the invention entails systems and methods to be realized through the use of a computer with specific programming. *See, e.g.*, '479 Patent, col. 4:24–42; *see also* Ginsberg ¶ 29 ("The entire patent is directed to computer systems and the software applications, e.g., 'CONTRACT APPS,' needed to perform the methods described in the patent."). However, claims 33 and 34 are independent of the broader, more intricate trading platform system revealed in the specification and claimed by the '479 Patent. However, because the relevant terms of claims 33 and 34 of the '479 Patent have yet to be construed, because CLS has agreed to a broad construction of terms favorable to Alice, and because the specification reveals a computer-based invention, the Court can reasonably assume for present purposes that the terms "shadow" credit and/or debit record and "transaction" in the '479 Patent recite electronic implementation and a computer or an analogous electronic device.

The single fact that Alice's method claims are implemented by computer does not mean the methods are tied to a particular machine under the MOT test. The requirement that shadow

---

[6] To have the Court consider CLS's § 101 defense before conducting a possible *Markman* hearing, *see Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), CLS agreed to assume a construction of claims favorable to Alice. *See, e.g.,* Alice Mem., [Ex 6] Tr. of Aug. 6, 2010 Status Conference at 12:22–25 (reflecting that counsel for CLS stated: "I will say even as to *Markman* our briefing will assume a broad construction favorable to Alice, so we're going to assume that in arguing whether this is really a patentable subject mater or not so that we can expedite that").

accounts and/or records be adjusted electronically, or that information be stored electronically, may not sufficiently tie the claims to a particular machine or apparatus that imposes meaningful limits on the claims' scope. *See* CLS Reply 10. At what point does a method that is to be implemented by computer become sufficiently tied to a *particular* computer, so that it satisfies the machine prong of the MOT test? This question has not been clearly answered by the Federal Circuit or the Supreme Court. *See, e.g., Bilski I*, 545 F.3d at 962 ("We leave to future cases the elaboration of the precise contours of machine implementation, as well as the answers to particular questions, such as whether or when recitation of a computer suffices to tie a process claim to a particular machine.").

The Court concludes that nominal recitation of a general-purpose computer in a method claim does not tie the claim to a particular machine or apparatus or save the claim from being found unpatentable under § 101. *See, e.g., Fuzzysharp Techs., Inc. v. 3D Labs Inc., Ltd.*, No. 07-5948, 2009 U.S. Dist. LEXIS 115493, *12 (N.D. Cal. Dec. 11, 2009) ("Courts applying *Bilski* have concluded that the mere recitation of 'computer' or reference to using a computer in a patent claim us [sic] insufficient to tie a patent claim *to a particular machine*.") (emphasis in original) (referring to *Bilski I*, 545 F.3d 943); *Cf. Benson*, 409 U.S. 63 (finding method claims to be performed on a general purpose computer to be invalid as an algorithm). On the other hand, a computer that has been specifically programmed to perform the steps of a method may no longer be considered a general purpose computer, but instead, a particular machine. *Cf. In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994) (finding that "a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software").

With evolving guidance on this issue, district courts have determined that a method

claim that is directed to a general purpose computer is not tied to a particular machine under the

MOT test.[7]  *See, e.g., Fuzzysharp*, 2009 U.S. Dist. LEXIS 115493 at *12 ("The salient question is

not whether the claims are tied to a computer.  Rather, as *Bilski* makes clear, the question is whether

the claims are tied to *a particular machine*.") (citing *Bilski I*, 545 F.3d at 961) (emphasis in original).

In *DealerTrack*, a district court found asserted claims directed to a "computer aided method" of

managing a credit application to be invalid under § 101.  *DealerTrack, Inc. v. Huber*, 657 F. Supp.

2d 1152 (C.D. Cal. 2009).  The court found the method at issue was not tied to a particular machine

because the patent failed to specify how the hardware and database recited were "specially

programmed" to implement the method, and the claimed central processor was "nothing more than

a general purpose computer that has been programmed in some unspecified manner."  *Id.* at 1156;

*see also Accenture Global Servs. GMBH v. Guidewire Software, Inc.*, 691 F. Supp. 2d 577, 597 (D.

Del. 2010) (suggesting that a method conducted by a "data processing system," which also claimed

a "claim folder," "display device," and "screen," was not tied to a particular computer per the MOT

test because the terms failed to "imply a specific computer having any particular programming – they

are descriptive of a general computer system at best").

The *Fuzzysharp* court also found certain method claims were not tied to a particular

machine.  The claims at issue related to "reducing the indivisibility related computations in 3-D

---

[7] While a few of the cases cited for this proposition were decided before the Supreme Court issued *Bilski II*, that decision did not touch upon the contours of when a method claim is tied to a particular machine or apparatus under the MOT test.  The Court's decision did, of course, dethrone the MOT test as the exclusive test for process patentability under § 101.  Thus, while some of these earlier lower-court decisions may have based their holdings entirely upon the results of their application of the MOT test, something against which the Supreme Court has now spoken, the analysis of these decisions as to when a method is tied to a particular machine or apparatus itself remains unaltered after *Bilski II*.

graphics" and the district court accepted that the claims required a device such as a computer because at least one claim recited "computer storage," and the parties agreed that certain terms required a "computer screen." *Fuzzysharp*, 2009 U.S. Dist. LEXIS 115493 at *11–12. Nonetheless the court found that the claims were not tied to a particular machine because they either contained only a "passing reference to 'computer storage'" or simply made "a general[] reference to 'a' computer." *Id*. at *12–15. The court noted that ultimately the challenged method claims employed algorithms and calculations which would require a computer, but no particular computer. *Id*. at *15.[8]

       To determine whether a machine is particular under the MOT test, courts also look

---

[8] In light of *Bilski I* and *Bilski II*, the Board of Patent Appeals and Interferences has shown a similar inclination. *See, e.g., Ex Parte Monk*, No. 2009-013250, 2010 WL 5477256, *3 (B.P.A.I. Dec. 30, 2010) (finding claims directed to a method of monitoring credit fraud not tied to a particular machine per the MOT test because the recitation of "analysis engines and a global negative file" represented "at most, the use of a general computer" since the specification disclosed that any microprocessor based system capable of monitoring ongoing credit activity and/or authorizing activity in response could form the analysis engines, and the global negative files could be stored on any general purpose computer); *Ex Parte Kuno*, No. 2009-006896, 2010 WL 5127425, *10 (B.P.A.I. Dec. 13, 2010) ("Although the preamble of claim 1 calls for a 'processor-based' method, the body of the claim recites no structure at all, let alone a particular machine to which the recited process is tied. But even if a processor were recited in the body of the claim, such a nominal structural recitation would be a tantamount to a general purpose computer and would not tie the process to a particular machine or apparatus."); *Ex Parte Myr*, No. 2009-005949, 2009 WL 3006497, *9–10 (B.P.A.I. Sept. 18, 2009) (finding method claims unpatentable, in part, because claims which used the phrase "computer-implemented" only tied the process to "any general-purpose computer" and the recitation "method executed in a computer apparatus" is "so generic as to encompass any computing system, such that anyone who performed this method in practice would fall within the scope of these claims"); *Ex Parte Nawathe*, No. 2007-3360, 2009 WL 327520, *4 (B.P.A.I. Feb. 9, 2009) (rejecting under § 101 claims reciting a computerized method of inputting and representing XML documents since the "computerized recitation purports to a general purpose processor [] as opposed to a particular computer specifically programmed for executing the steps of the claimed method"); *but see Ex Parte Kohda*, No. 2009-006262, 2010 WL 4780565, *3 (B.P.A.I. Nov. 22, 2010) (remanding to patent examiner for further findings and suggesting that under the broadest reasonable construction the claims could be read to recite a particular apparatus under the MOT test since they claimed an electronic shopping cart—which appears to collect information on customers purchases thereby targeting advertisements the customers would see).

to whether the machine or apparatus imposes meaningful limits on the process itself.  "In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010).  A machine meaningfully limits a method when the machine is "essential to the operation of the claimed methods."  *Id*.  In *SiRF Tech*., decided before *Bilski II*, the Federal Circuit held that claimed methods for teaching a GPS receiver an improved manner in which to calculate its position were tied to a particular machine.  *Id*.  The Federal Circuit underscored the fact that the machine imposed meaningful limits on the methods since the methods could not be performed without the machine itself—the GPS receiver—and there was no evidence that the calculations required by the claims could be performed entirely in the human mind.  *Id*. at 1332–33; *see also Cybersource Corp. v. Retail Decisions, Inc.*, 620 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009) (finding a method for detecting fraud in credit card transactions over the Internet directed to unpatentable subject matter as the method was not limited to a particular machine, in part, because the process could occur offline:  "To give but one example, a merchant taking an order over the telephone could use records or databases to cross-check all credit card numbers associated with that telephone number").

Similarly, in *Every Penny Counts*, a district court invalidated a method claim because it failed the MOT test.  *See Every Penny Counts, Inc. v. Bank of Am. Corp.*, No. 2:07-042, 2009 U.S. Dist. LEXIS 53626 (M.D. Fla. May 27, 2009).  The claim was directed to a system in which a consumer could have a portion of any credit or debit transaction set aside—that amount determined

either by rounding up each transaction to the nearest dollar and setting aside the difference or by adding a predetermined amount to each transaction—and then have the portion routed to either the consumer's savings account, a preferred charitable organization, or a portion to each. *Id*. at *2. The district court first found the claim, categorized as a system, to be truly directed to a process since it "has no substantial practical application except in connection with computers, cash registers, and networks, but it is not comprised of those devices." *Id*. at *7 (internal quotation marks omitted). The court then found that although the process recited implementation by a "network," "entry means" and a "computing means in said network being responsive to said data," the so-described computer failed to impose a meaningful limitation on the process because the claim was essentially "a mathematical algorithm [that] uses machines for data input and data output and to perform the required calculations." *Id*. at *7.

Granting Alice's position that "claims 33 and 34 of the '479 patent are properly limited to implementations of the claim methods using a computer, just as the '510 patent requires," *see* Alice Mem. 32 n.15, the Court nonetheless finds the method claims before the Court—claims 33 and 34 of the '479 Patent and each claim of the '510 Patent—are not tied to a particular machine under the MOT test. Assuming accounts and/or records will be electronically adjusted, which requires information to be stored electronically in a data storage unit, and that an irrevocable instruction is conducted electronically, the method claims here at best recite implementation by a general-purpose computer.[9]

_____

[9] Alice holds up *AT&T Corp. v. Excel Commc'ns.*, 172 F.3d 1352 (Fed. Cir. 1999), and, again, *Arrhythmia* to dispute the need for a claim to recite more than a processor and a memory in order to be tied to a particular machine. However, the *Arrhythmia* Court did not conduct its analysis under the MOT test, nor did the case base its finding on the interconnectedness between a method claim and electronic equipment. The Circuit instead found the process before it was valid because

The claims before the Court at most implicitly recite a computer by claiming electronic adjustment of records or accounts.[10]   This contrasts with other cases in which district courts found methods were not tied to a particular machine and were unpatentable under § 101 despite explicit recitation of hardware or computer components.  *See, e.g., Every Penny*, 2009 U.S. Dist. LEXIS 53626 at *7 (reciting "network," "entry means" and "computing means in said network being responsive to said data"); *Fuzzysharp*, 2009 U.S. Dist. LEXIS 115493 at *12 (reciting "computer" and "computer storage"); *DealerTrack*, 657 F. Supp. 2d at 1153 (reciting, *inter alia*, "computer aided method" and "remote application entry and display device"); *Accenture Global Servs.*, 691 F. Supp. 2d at 597 (suggesting, but not holding, that claims reciting "data processing system," "claim folder," "display device," and "screen" were not patentable).

---

it included physical process steps under the now defunct *Freeman-Walter-Abele* test.  *See Arrhythmia*, 958 F.2d at 1059; *see also supra* note 3.  Similarly, the Federal Circuit relied on the "useful, concrete, and tangible result" test in *AT&T* to find a process claim valid per § 101.  *See AT&T Corp.*, 172 F.3d at 1358.  The *Freeman-Walter-Abele* test and the "physical steps" tests were predecessors of sorts to, and superceded by, the "useful, concrete, and tangible result" test.  This test has also since been rejected explicitly by the Federal Circuit and the Supreme Court.  *See Bilski I*, 545 F.3d at 959–60; *id*. at 960 n.19; *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009) (reaffirming that the "useful, concrete, and tangible" result test has no continuing validity); *Bilski II*, 130 S. Ct. at 3231.

[10] Alice posits that the "electronic adjustment step, along with the maintenance of electronic accounts, and the generation of electronic instructions, are carried out because the computer implementing the claimed method acts as an electronic third party between two counterparties in an effort to minimize the risk that one counterparty will default." Alice Mem. 36 (citing Ginsberg Decl. ¶¶ 40–45). The claims recite a "supervisory institution" as the intermediary facilitating the exchange of obligations. *See* '479 Patent, claims 33–34; '510 Patent, claims 1–75. Alice suggests at one point that the intermediary may be a person or a company, *see* Alice Mem. 4–5 (contending that the patents disclose and claim in various ways a computerized trading platform for exchanging obligations in which "a trusted third party, running a computer system programmed in a specific way," settles the obligations and that the "the trusted third party—a 'supervisory institution'—operates a data processing system"), but even if the "supervisory institution" is a company or a computer, meaning a computer controls the entire method rather than a person implementing the steps of the method by way of computer, the claims before the Court at most implicitly recite a general purpose computer.

To be sure, the specification of the '479 Patent, which the '510 Patent largely shares, reveals a seemingly intricate "trading platform" invention consisting of systems and methods, with apparent software applications to be used in implementing the invention. The '479 Patent specification speaks to methods being conducted by way of specifically programmed computing devices. *See, e.g.,* '479 Patent, col. 28:12–16 ("The invention has industrial application in the use of electrical computing devices and data communications. The apparatus and methods described allow the management of risk in an automated manner by means of programming of the computing devices."); '510 Patent, col. 31:66–67 & col. 32:1–3 (same). The specification undoubtedly provides context for reading a patent's claims, but the plain language of the claims themselves is the measure of the breadth of patent protection granted. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Alice points to unasserted claims 12 and 28 of the '479 Patent to demonstrate that if claims 33 and 34 are interpreted in context of other '479 Patent claims, it becomes clear that claims 33 and 34 also require computer implementation. *See* Ginsberg ¶¶ 30–31. The Court has accepted this proposition, however this juxtaposition reinforces the Court's conclusion that claims 33 and 34 of the '479 Patent are independent of the broader computer system revealed in the specification, and it demonstrates that the drafters of the claims of the '479 Patent knew how to explicitly recite to computer components.[11] Claim 12 discloses a detailed system which incorporates other claims,

---

[11] "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

including the computer based processing system revealed in claim 1, and additionally claims an exchange institution holding a debit and credit record, that the "data processing apparatus" be "configured" to maintain a shadow credit and debit record for each stakeholder, and the "data processing means being configured" to obtain a start-of-day balance for the shadow credit and debit records and to at the end-of-day instruct the exchange institutions to adjust their records according to the transactions performed.  *See* '479 Patent, col. 61:53–67 & col. 62:1–7.  Claim 28 of the '479 Patent, on the other hand, is directed to a method of exchanging obligations similar to claims 33 and 34, but recites additional elements, such as a "data processing apparatus"—incorporated from claim 18—and that an independent shadow credit and debit record be maintained and that "at the end-of-day, the data processing apparatus instructing ones of the exchange institutions" to effectuate the exchanges accordingly.  *Id.* col. 64:13–40.

Therefore, even assuming a reasonable construction favorable to Alice that claims 33 and 34 of the '479 Patent and each claim of the '510 Patent recites to computer implementation, the asserted claims contain no indication that the computers, or other devices required to implement the methods, are specifically programmed.  The claims make no mention of any specific hardware, let alone software or specifically programmed hardware.  Alice's expert construes the claims to require "a computer configured and programmed to carry out the processes of the claims."  Ginsberg Decl. ¶ 15.  Alice argues the term "shadow record" refers to electronic records maintained in a data storage unit by a computer programmed with application software.  Alice Reply 24.  While the specification and other claims of the '479 Patent may reveal specifically programmed computers, only claims 33 and 34 of the '479 Patent and the claims of the '510 Patent are before the Court, and according to the plain language of the terms actually employed in these claims it cannot be said that

they reasonably recite to a specifically programmed computer.

Furthermore, that the processes before the Court are conducted electronically, by way of a computer, fails to impose a meaningful limitation on the processes themselves. *See Every Penny Counts*, 2009 U.S. Dist. LEXIS 53626 at *7 (finding the computerized method required machines for data input and output, and to perform calculations, but the machines imposed no limit on the process itself). A computer may facilitate and expedite the claimed methods, however the methods before the Court could be performed without use of a computer. Alice's expert acknowledges that the methods could be performed in a non-electronic format. "In an abstract sense, it is possible to perform the business methods of maintaining accounts, and providing an instruction without a computer or other hardware." Ginsberg Decl. ¶ 40. "If someone had thought of this invention 100 years ago, they might have implemented it in a non-electronic manner using various pre-computing tools such as an abacus or handwritten ledgers." *Id*.

Looking at the methods claimed by Alice, the Court need not even engage in abstraction to contemplate how they could be implemented without the use of electronics. The method of exchanging obligations by employing an intermediary to consummate the exchange after ensuring the parties have adequate value to guarantee the exchange, perhaps by keeping an up-to-date record of the parties' abilities to honor their obligations, and then providing an irrevocable instruction to the parties—or their representative banks or other value holders—to adjust their accounts or records accordingly, does not require the use of computers. *See Ultramercial, LLC v. Hulu, LLC*, No. 09-06918, 2010 U.S. Dist. LEXIS 93453, *13 (C.D. Cal. Aug. 13, 2010) (finding a computerized method invalid, in part, because "[t]here is nothing inherently computer-specific about receiving media from a content provider, choosing a sponsor for the media, selecting an ad for

the sponsor, verifying the viewer's activity, assigning passwords, charging the sponsor for the advertisement, or any of the remaining steps"); *see also Benson*, 409 U.S. at 67 ("The mathematical procedures can be carried out in existing computers long in use, no new machinery being necessary. And, as noted, they can also be performed without a computer."); *Flook*, 437 U.S. at 586 ("Although the computations can be made by pencil and paper calculations, the abstract of disclosure makes it clear that the formula is primarily useful for computerized calculations producing automatic adjustments in alarm settings."). Claims 33 and 34 of the '479 Patent and the claims of the '510 Patent are not meaningfully limited by a computer since a computer is not essential to the operation of the methods. *See SiRF Tech.*, 601 F.3d at 1333.

Even if computer implementation is not inherently necessary for the methods claimed, a computerized approach would indubitably expedite the exchanges. However, it is also true that simply because method claims call for computerized implementation to be usefully or pragmatically applied "does not mean, however, that the patent claims are limited to use on a computer, or, more importantly, that they are *tied* to one." *Ultramercial*, 2010 U.S. Dist. LEXIS 93453 at *13 (emphasis in original). "That the disclosed invention is only used on computers or computer networks cannot alone satisfy the machine test without rendering the test completely toothless." *Id*. It is a truism that the "particular methods claimed in these patents only work, as intended, when carried out using a computer," Ginsberg ¶ 41, but that alone does not mean that a computer meaningfully limits the processes. For the foregoing reasons, the Court finds that claims 33 and 34 of the '479 Patent and claims 1–75 of the '510 Patent fail to satisfy the machine-or-implementation test.[12] However, even

---

[12] The Court notes that there will likely soon be further guidance from the Federal Circuit on the extent of interconnectedness required between a machine and a process for the process to satisfy the MOT test as several cases this Court finds persuasive—*Every Penny*, *DealerTrack*, *Fuzzysharp*,

if these claims were to satisfy the MOT test, the Court would still move next to analyze the claims under the abstract idea exception.

### 3. Abstract Idea Exception to Patentability

CLS asserts that Alice's methods, claims 33 and 34 of the '479 Patent and claims 1–75 of the '510 Patent, attempt to patent the abstract idea of "'exchanging an obligation between parties' after ensuring that there is 'adequate value' in independent accounts maintained for the parties." CLS Mem. 24. CLS analogizes the method claims to a "two-sided 'escrow' arrangement for financial transactions" and likens Alice's supposed escrow-type invention to the hedging claims that were invalidated by the Supreme Court in *Bilski II*. *Id*. at 25. Alice defends the methods as "more than a mere statement of a concept," and insists they constitute "a particular solution to a real world problem in need of solving—eliminating counterparty risk with a complicated computer system programmed to perform the settlement." Alice Mem. 34. Alice argues against abstractness in that the "performance of the method can be observed and verified; settlements are completed electronically, with accounts being electronically debited and credited." *Id*. (citing Ginsberg Decl. ¶¶ 44–45).

The claims before the Supreme Court in *Bilski II*, which the Court found to encapsulate the concept of hedging, were directed to the steps of initiating a series of transactions between a commodity provider and consumers at a fixed rate which corresponded to consumers' risk positions, identifying market participants for the commodity who had a counter-risk position, and then initiating a series of transactions at a fixed price between the commodity provider and those

---

and *Ultramercial*—are all currently before the Circuit.  The outstanding motions, however, have been pending too long to await further guidance.

market participants having a counter-risk position. *See Bilski II*, 130 S. Ct. at 3223–24. The Supreme Court found the invention claimed a fundamental economic practice. *Id.* at 3231. Similarly, a district court found a business method directed to allowing Internet users to view copyrighted material free of charge in exchange for viewing certain advertisements to be an unpatentable abstract idea. *See Ultramercial*, 2010 U.S. Dist. LEXIS 93453 at *17. The district court found the method abstract because at its core sat "the basic idea that one can use advertisement as an exchange or currency." *Id.*

CLS argues that Alice's method claims are directed to unpatentable processes for exchanging an obligation based on a mathematical algorithm, as well as the abstract idea of transformation or manipulation of legal obligations or business risks. CLS Reply 23. The Court need not consider whether the methods, at heart, claim nothing more than an algorithm because the Court agrees that the methods are directed to an abstract idea of employing an intermediary to facilitate simultaneous exchange of obligations in order to minimize risk. This is a basic business or financial concept much like those struck down in *Bilski II* or *Ultramercial*. At the heart of these claims is the fundamental idea of employing a neutral intermediary to ensure that parties to an exchange can honor a proposed transaction, to consummate the exchange simultaneously to minimize the risk that one party does not gain the fruits of the exchange, and then irrevocably to direct the parties, or their value holders, to adjust their accounts or records to reflect the concluded transaction. Using an intermediary, which may independently maintain records or accounts on the parties to ensure each party has sufficient value or worth to complete a proposed exchange, as a way to guarantee that a transaction is ultimately honored by all parties, thereby minimizing risk, remains a fundamental, abstract concept.

To demonstrate, independent claim 27 of the '510 Patent requires the supervisory institution to maintain an account for a first party which is independent of an account held by an exchange institution, to facilitate an exchange of obligations if the first party's account value (however defined) does not drop below zero, and to conduct a transaction with the exchange institution that is irrevocable at the end of a period to reflect the exchange of obligations made. *See* '510 Patent, claim 27. Essentially, this claim is directed to the abstract and fundamental concept of using an intermediary to guarantee an exchange. Similar to the invention in *Flook*, which was found merely to provide a formula for computing an alarm limit, *see Diehr*, 450 U.S. at 192 n.14, the invention here simply provides the formula, or manner, in which to use an electronic intermediary to exchange obligations as a way to hedge against the risk of loss. Independent claim 33 of the '479 Patent and independent claims 1, 61, 65, and 68 of the '510 Patent, each is directed as a whole to this same abstract concept.

Alice argues that the claimed methods "require the use of a computer and data storage unit programmed to perform a particular financial transaction, implement a concept in a tangible way with tangible, real world results – money is exchanged in the absence of counterparty risk." Alice Mem. 34. There may be no dispute that the methods claimed engender a practical result, but this fact alone does not rescue the claims from the realm of abstraction. Some abstract ideas, such as fundamental business concepts, although not patentable standing alone will nonetheless produce useful results when basically applied. *Cf. Bilski I*, 545 F.3d at 965 ("[T]he claimed process here as a whole is directed to the mental and mathematical process of identifying transactions that would hedge risk. The fact that the claim requires the identified transactions actually to be made does no more to alter the character of the claim as a whole."); *see also Diehr*, 450 U.S. at 192 n.14 (noting

that the claims in *Flook* "did more than present a mathematical formula" but presented steps to calculate an updated alarm limit and replace the outdated alarm limit for which there were a "broad range of potential uses" in the petrochemical and oil refinery industries); *Ultramercial*, 2010 U.S. Dist. LEXIS 93453 at *19 (stating that despite the Supreme Court coming to different conclusions on subject matter eligibility in *Diehr* and *Bilski II*: "In both [cases], the claimed invention discloses a real-world application of a mathematical formula. In both, a well-known or basic principle is linked to its practical use."). It would seem logical that the concept and application of hedging in the energy markets before the Supreme Court in *Bilski II* would produce practical and real world results; however the Court did not focus on this point, but instead held the claims were "broad examples" of a concept and the patent would ultimately preempt the use of the concept itself. *Bilski II*, 130 S. Ct. at 3231. The fact that a claim produces practical results may inform the abstract analysis, but it is not dispositive of subject matter eligibility.[13]

---

[13] Alice does not argue that the identification of tangible, real-world applications is sufficient to satisfy the subject matter eligibility question. Yet, it is important to note that the "useful, concrete, and tangible result" test has been clearly disavowed by both the Federal Circuit and the Supreme Court. *See supra* note 9. An administrative patent judge, writing before the test was invalidated, noted that: "The decisions by the Court of Appeals for the Federal Circuit in *State Street Bank & Trust Co. v. Signature Financial Groups Inc.* [149 F.3d 1368 (1998)] and *AT&T Corp. v. Excel Communications, Inc.* [172 F.3d 1352 (1999)] have made it easier for the public to obtain patents covering computer implemented business-related inventions. In those decisions, the Court of Appeals for the Federal Circuit held that computer implemented business method-related inventions are deemed 'statutory' subject matter (subject matter that can be patented) under 35 U.S.C. § 101 if they have a 'practical application,' i.e., produce a 'useful, concrete and tangible result' . . . . This holding has had a profound effect on the growth of new patents and patent applications covering computer implemented business method inventions. The number of new applications of these types filed in Class 705 (designated as business and management data processing class) increased from 1370 in Fiscal Year 1998 to 2600 in Fiscal Year 1999 and to 7800 in Fiscal Year 2000. The number of patents issued from these types of applications increased from a total of 447 prior to 1986 to a total of 2,850 as of the end of Fiscal Year 1999." Chung K. Pak, Patenting E-Commerce Inventions: Perspective From an Administrative Patent Judge, 85 J. Pat. & Trademark Off. Soc'y 447, 448–49 (2003) (internal citations omitted).

A district court should instead focus on the extent to which the application of an abstract idea is specific and/or limited to determine whether an invention is patent eligible. Recently, the Federal Circuit reversed a district court's finding that a method for "rendering a halftone image of a digital image by comparing, pixel by pixel, the digital image against a blue noise mask" was unpatentable as directed to an abstract algorithm. *See Research Corp.*, 627 F.3d at 868. The Circuit found the invention was not abstract, in part, because it presented "functional and palpable applications in the field of computer technology" and addressed "a need in the art for a method of and apparatus for the halftone rendering of gray scale images in which a digital data processor is utilized in a simple and precise manner to accomplish the halftone rendering." *Id*. at 868–69. "Indeed, this court notes that inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Id*. at 869.

An analysis of the preemptive power of a claim is inextricably linked with the question of whether the application of an abstract idea is specific or limited. "Pre-emption of all uses of a fundamental principle in all fields and pre-emption of all uses of the principle in only one field both indicate that the claim is not limited to a particular application of the principle." *Bilski I*, 545 F.3d at 957; *see also Accenture*, 691 F. Supp. 2d at 595 ("While it is not permissible to pre-empt the use of an intangible principle, an application of the principle may be patentable; the scope of the exclusion of others to practice or utilize the fundamental principle imparted by the claims must be examined.").[14] The abstract idea claimed by Alice's methods in claims 33 and 34 of the '479 Patent

---

[14] *See also Bilski I*, 545 F.3d at 953 ("Patents, by definition, grant the power to exclude others from practicing that which the patent claims. *Diehr* can be understood to suggest that whether a claim is drawn only to a fundamental principle is essentially an inquiry into the scope of that

and each claim of the '510 Patent effectively preempt the use of an electronic intermediary to guarantee exchanges across an incredible swath of the economic sector. The *Cybersource* court found the claims before it "broadly preempt the fundamental mental process of fraud detection using associations between credit card numbers." *Cybersource*, 620 F. Supp. 2d at 1077. Taking note of the fact that credit card transactions over the Internet have "become a staple of modern business," the court found the methods would "preempt the use of fundamental mental processes across an extraordinarily large and important segment of the commercial system." *Id*. The same is true here.

The processes claimed by Alice employ a supervisory institution to serve as an intermediary to exchange obligations, which may monitor the credit/debit accounts/records at the parties' exchange institution, and when sufficient value is present, the supervisory institution conducts the exchange of obligations and instructs the parties, or their value holding exchange institutions, to adjust their accounts/records accordingly. The methods broadly claim the idea of exchanging "obligations" by way of an intermediary. Although each claim should be considered independently and as a whole, by looking to the dependent claims of '510 Patent one understands the reach of the methods claimed. The dependent claims recite potential "obligations" as those that arise from any transaction linked to a "share price," a "weather event," a "market event," or a "currency exchange transaction,"[15] and explain that the exchange of obligations may represent the transfer of or transaction in "shares in financial or physical assets," "a wager," "a commodity," or

---

exclusion; i.e., whether the effect of allowing the claim would be to allow the patentee to pre-empt substantially all uses of that fundamental principle. If so, the claim is not drawn to patent-eligible subject matter.").

[15] *See* '510 Patent, col. 64:22 (Claim 2); *id*. col. 64:25 (Claim 3); *id*. col. 64:27 (Claim 4); *id*. col. 64:61 (Claim 18) (respectively).

"money for goods, services, promises, credits or warrants."[16]   If patentable, these claims could preempt the use of an electronic intermediary, using a shadow credit and/or debit records, as a manner in which to exchange an infinite array of tangible and intangible representations of value.

The remaining dependent claims in the '510 Patent as a whole also speak to the type of entity that might be an "exchange institution"— i.e. a credit card company, a debit card company, a bank, or a guarantor,[17] or they set forth basic realities of exchanging financial obligations, such as the fact that various institutions might exist in different time zones or be domiciled in legally and/or geographically different countries.  *See* '510 Patent, col. 64:62–63 (Claim 19); *id*. col. 65:56–57 (Claim 37).   Rather than limit the invention reflected in the '510 Patent, the dependent claims illustrate how broadly the invention might sweep its monopoly across commerce.   These dependent claims are, inter alia, broad examples of what tangible and intangible items might be exchanged and the financial and institutional value holders to be governed by the '510 Patent.   The claims simply recite how an electronic intermediary can be used to effectuate an almost infinite array of exchanges in the modern financial world.   Unlike the concrete and palpable blue noise mask and pixel-by-pixel comparison method which resulted in a higher quality halftone digital image all while using less processor power and memory space which was before the Federal Circuit in *Research Corp*., *see* 627 F.3d at 865, Alice's method claims are hardly limited to "specific applications" of an fundamental concept.  *Id*. at 869.

It is clear that "limiting an abstract idea to one field of use or adding token

---

[16] *See* '510 Patent, col. 64:29–30 (Claim 5); *id*. col. 64:32 (Claim 6); *id*. col. 64:34 (Claim 7); *id*. col. 64:36–37 (Claim 8) (respectively).

[17] *See* '510 Patent, col. 64:47 (Claim 12); *id*. col. 64:49 (Claim 13); *id*. col. 64:51 (Claim 14); *id*. col. 64:55 (Claim 16) (respectively).

postsolution components" does not make an abstract idea patentable. *Bilski II*, 130 S. Ct. at 3231; *see also Diehr*, 450 U.S. at 191 (holding that the limitation against patenting an abstract idea cannot be circumvented by "attempting to limit the use of the formula to a particular technological environment," or by adding "insignificant postsolution activity" to transform a principle into a process). Limiting the use of the unpatentable Pythagorean theorem by claiming it could be usefully applied to surveying techniques would not make the invention patentable, *see Bilski I*, 545 F.3d at 957 (citing to *Flook*, 437 U.S. at 590), no more than limiting the concept of hedging to the energy and commodities markets. *See Bilski II*, 130 S. Ct. at 3231; *see also Cybersource*, 620 F. Supp. 2d at 1077. The method claims before the Court are not limited to any particular industry, but are supposedly limited by the use of a computer. As financial transactions, and the maintenance of accounts and/or records on a party's value or wealth, are increasingly likely to be monopolized by electronic and computer implementation and storage, the fact these claims are implemented electronically fails to limit the methods. *See Benson*, 409 U.S. at 71–72 (explaining that the practical effect of granting patent protection would be patenting an abstract idea since the algorithm before that court "ha[d] no substantial practical application except in connection with a digital computer"); *see also Ultramercial*, 2010 U.S. Dist. LEXIS 93453 at *18. The method claims before the Court are not limited by electronic implementation, and in looking at the method claims as a whole they would serve to patent the fundamental and abstract concept itself. *See Benson*, 409 U.S. at 71–2.

Similar to *Bilski II*, in which the Supreme Court invalidated the dependent claims which purported to limit hedging to be "broad examples of how hedging can be used in commodities and energy markets," *Bilski II*, 130 S. Ct. at 3231, the dependent claims of the '510 Patent and claim 34 of the '479 Patent, each when considered as a whole, constitute broad examples of potential

parties, institutions, obligations, and circumstances under which the exchange of obligations—each dependent claim is no more than an attempt to limit the abstract concept to a field of use or to limit the invention by adding token postsolution components.

Also, that the methods entail an irrevocable instruction, assumed to be electronic in nature, to require that exchange institutions adjust their accounts or records according to the exchange conducted by the supervisory institution is subsumed within the abstract idea itself, if not insignificant postsolution activity. *See Flook*, 437 U.S. at 590 ("The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance."); *Bilski I*, 545 F.3d at 966 (noting that abstract hedging claims required "performing the post-solution step of consummating those transactions"). In claiming the abstract idea of using an intermediary to guarantee the exchange of obligations to minimize risk, the final action that the parties, or their account holders, be met with an irrevocable instruction to adjust their account or record to reflect the consummated transaction is no more an inherent and necessary step in the abstract idea, if not an obvious post-solution step.

The Court finds claims 33 and 34 of the '479 Patent and claims 1–75 of the '510 Patent invalid are not directed to patentable subject matter.[18]  The Court gives Alice the broadest reasonable construction of claim terms for purposes of its conclusion, for a court can bypass construction if construing the claims is not a material issue in resolving the motion. *See National Presto Indus.*, 76 F.3d at 1189.  We now move to the remaining system and product claims at issue.

---

[18] While the Court presumes that claims 33 and 34 of the '479 Patent are implemented electronically, a finding that the claims require no computer implementation at all, a point CLS argues, would only bolster the Court's finding that the claims are abstract.

### B.  Computer System & Product Claims

The claims of the '720 and '375 Patents represent system and product claims.  CLS contends that Alice simply recasts its abstract method claims in a physical embodiment in an attempt to employ the draftsman's art to save these claims from falling within the fundamental principles exceptions.  Alice counters that these claims clearly fall within the category of inventions protected by the Patent Act and that there is no controlling precedent of courts finding a machine, a physical object made of parts, to be unpatentable as abstract.

### 1. Statutory Category

The claims of the '720 and '375 Patents are directed to either a machine or a manufacture under § 101.  A "machine" is a "a concrete thing, consisting of parts, or of certain devices and combination of devices." *Nuijten*, 500 F.3d at 1355 (quoting *Burr*, 68 U.S. at 570).  A machine "includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." *Id*. (quoting *Corning v. Burden*, 56 U.S. 252, 267 (1854)).  A manufacture, on the other hand, is one or more articles prepared "for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery." *Id*. at 1356 (quoting *Chakrabarty*, 447 U.S. at 308).  Machine and method claims differ:  "A machine is a thing.  A process [or method] is an act, or a mode of acting.  The one is visible to the eye -- an object of perpetual observation.  The other is a conception of the mind, seen only by its effects when being executed or performed." *Expanded Metal Co. v. Bradford*, 214 U.S. 366, 384 (1909) (citation omitted).

Each of the 84 claims in the '720 Patent is directed to a particular "data processing system" to enable an exchange of obligations.  Every claim in the '720 Patent recites "a data storage

unit having stored therein" information about shadow accounts and/or records, and a "computer, coupled to said data storage unit," that is "configured" to perform steps of exchanging obligations similar to those laid out in the asserted method claims.[19]  As an example, independent claim 1 of the '720 Patent claims a data storage unit with stored information about a shadow credit and debit record that is independent of accounts held by an exchange institution, and which is coupled with a computer configured to receive a transaction, electronically adjust the shadow credit and/or debit record to effect the exchange of an obligation if the value of the shadow debit record does not fall below the value of the shadow credit record, and generate an irrevocable instruction to an exchange institution to adjust its record(s) accordingly.  *See* '720 Patent, col. 65:42–61.  Essentially, the independent claims of the '720 Patent claim a computer that is configured to perform methods of exchanging an obligation, such as claims 1, 28, 60, and 68, or they claim methods of facilitating a purchase between parties, such as claims 64 and 80.

Similarly claims 1–38 and 42–47 of the '375 Patent are directed to a particular "data processing system" which enables the exchange of obligations.  As with the claims in the '720 Patent, claims 1–38 and 42–47 of the '375 Patent each requires "a data storage unit having stored therein" information about accounts or records, and a "computer, coupled to said data storage unit," that is "configured" to perform certain steps of effecting an exchange obligation.[20]  In contrast to the '720 Patent claims, the '375 Patent systems additionally claim a computer configured to "receive a

---

[19] *See* '720 Patent, col. 65:42–61 (Claim 1); *id*. col. 67:1–18 (Claim 28); *id*. col. 68:33–53 (Claim 60); *id*. col. 68:62–66 & col. 69:1–11 (Claim 64); *id*. col. 69:20–42 (Claim 68); *id*. col. 70:20–37 (Claim 80) (collectively, the six independent claims of the '720 Patent).

[20] *See* '375 Patent, col. 65:1–30 (Claim 1); *id*. col. 66:1–29 (Claim 14); *id*. col. 66:61–65 & col. 67:1–26 (Claim 26) (collectively, the three independent system claims of the '375 Patent).

transaction" from a "first party device," a "second party device," and/or a "communications controller." *See, e.g.*, '375 Patent, col. 65:4 (Claim 1); *id.* col. 65:62 (Claim 12); *id.* col. 66:3 (Claim 14). The first or second party devices represent, as an example, "communications hardware products used by the stakeholders to communicate data or instructions to or from the processing units and are also referred to as stakeholder input/output devices." Ginsberg Decl. ¶ 53. "These may be personal computers [or] mini- or mainframe computers fitted with modems." *Id.* Separately, the "communications controller" effects communications between the devices and the computer system by performing communications coordination and/or by adding security processing for the instructions. *Id.* ¶ 54; *see also* '375 Patent, col. 7:46–54. Therefore, claims 1–38 and 42–47 of the '375 Patent add to the computer system claimed by the '720 Patent a mechanism by which parties independently may input the transaction(s) they wish the computer system to effectuate.

Independent claim 39 and dependent claims 40 and 41 of the '375 Patent are directed to a "computer program product" containing a particular program code. *See* '375 Patent, col. 68:5 (Claim 39); *id.* col. 68:36 (Claim 40); *id.* col. 68:38 (Claim 41). Each of these claims recites a "computer readable storage medium" having "computer readable program code embodied in the medium." *Id.* col. 65:5–7 (Claim 39). The parties appear to agree for the present that these claims represent a computer readable medium containing software that instructs a computer how to submit a transaction and allow a party to view information on the processing of the exchange of obligations by the supervisory institution, which mimics the methods claimed in the '510 Patent. *See* CLS Mem. 35; Alice Mem. 25.

The Court first determines whether these claims fall within the statutory class of inventions covered by § 101. At first glance, a computer is a concrete item made of parts that would

appear to fit clearly within the statutory protection afforded by § 101 as a machine, *see Nuijten*, 500 F.3d at 1355, so that every claim of the '720 Patent and claims 1–38 and 42–47 of the '375 Patent appear to fit within the § 101 categories.[21]   Claims 39–41 of the '375 Patent are directed to a computer program product.  The body of claim 39, from which claims 40 and 41 depend, recites "program code," which alone could be statutorily invalid as "an idea without physical embodiment," *see Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 (2007); however the preamble to claim 39 recites a computer readable storage medium containing a computer readable program.  *See* '375 Patent, col. 65:5–7.  A computer readable medium, such as a disk or hard drive, containing program code could be considered either a manufacture or a machine under § 101.[22]  *See Nuijten*, 500 F.3d at 1355–56; *cf In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995).

---

[21] However, there is the possibility that if the '720 and '375 Patents system claims are only directed to a general purpose computer lacking specific programming, the general purpose computer claimed would not be considered a machine under § 101.  *See* 35 U.S.C. § 101; *Alappat*, 33 F.3d at 1545 (holding a claim which read on a general purpose computer was a machine under § 101 because a "general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software" thereby creating a "new machine" to qualify as a statutorily patentable invention under § 101).  Although no specific software or program code is explicitly recited in the claims of the '720 Patent or claims 1–38 or 42–47 of the '375 Patent, the claims do state that a computer is "configured" to perform the functions.  Therefore, assuming a broad construction of the claims, the Court assumes for purposes of these motions that the computer systems claimed have been specifically programmed and statutorily qualify as an machine under § 101.

[22] The Board of Patent Appeals and Interferences recently found that a computer program recorded on a computer-readable medium qualified statutorily for patent protection.  "Computer programs and data structures are deemed 'functional descriptive material,' which impart functionality when employed as a computer component.  When functional descriptive material is recorded on some computer-readable medium, it becomes structurally and functionally interrelated to the medium and will be statutory in most cases since use of technology permits the function of the descriptive material to be realized."  *Ex Parte Comer*, No. 2009-006782, 2010 WL 3626532, *4 (B.P.A.I. Sept. 16, 2010).

## 2. Abstract Idea Exception to Patentability

Assuming the claims of the '720 and '375 Patents are directed to machines or manufactures under § 101, the Court must still analyze these inventions under the exceptions for fundamental principles which apply to all four categories of § 101 patent eligible inventions. *See AT&T Corp. v. Excel Commc'ns*, 172 F.3d 1352, 1357–58 (Fed. Cir. 1999); *see also Benson*, 409 U.S. at 67–8; *In re Ferguson*, 558 F.3d 1359, 1363 (Fed. Cir. 2009).[23]   The "specific question whether a machine represents nothing more than a law of nature, natural phenomenon, or abstract idea is unquestionably the correct one in light of *Bilski*." *Chamberlain Group, Inc. v. Lear Corp.*, No. 5-3449, 2010 U.S. Dist. LEXIS 124566, *80 n.13 (N.D. Ill. Nov. 24, 2010) (citing *Bilski II*, 130 S. Ct. at 3225); *see also id.* at *74–75.[24]

Alice holds up *State Street* to support its argument that its process and/or software

---

[23] For instance, in *Alappat* the Federal Circuit also analyzed the machine claim before it under the fundamental principles exception to ensure that the claim did not simply recite a mathematical algorithm or an abstract idea. *See Alappat*, 33 F.3d at 1544. The Federal Circuit found the machine claim, as a whole, was not directed to an algorithm or abstract idea, in part by employing the "useful, concrete, and tangible result" test. *See id.* That the claim qualified as a machine statutorily, *see supra* note 21, was not determinative in the Circuit's analysis, however, of whether the claim was abstract. The Court reads the case to instruct that while programming a general purpose computer may be how a "machine" is adjusted to fit within the patent eligible categories of § 101, such programming does not immunize the claim from failing under the abstract idea analysis.

[24] "Labels are not determinative in § 101 inquiries. *Benson* applies equally whether an invention is claimed as an apparatus or process, because the form of the claim is often an exercise in drafting. Moreover, that the claimed computing system maybe a 'machine' within 'the ordinary sense of the word,' . . . is irrelevant." *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 927 F. Supp. 502, 511 (D. Mass. 1996), *rev'd on other grounds*, 149 F.3d 1368. The Federal Circuit in *State Street* faulted the district court's conclusion in its abstract analysis, not that the district court actually applied the abstract analysis to the respondent's method and machine claims. The Circuit noted that "although we do not make this determination here, the judicially created exceptions, i.e., abstract ideas, laws of nature, etc., should be applicable to all categories of statutory subject matter, as our own precedent suggests." *State Street*, 149 F.3d at 1372 n.1 (citations omitted).

claims are directed to patent eligible subject matter.  In *State Street*, the Federal Circuit reviewed machine claims under the abstract analysis and ultimately found the claims were patentable because they satisfied the "useful, concrete, and tangible result."  *See State Street*, 149 F.3d at 1373.  The Federal Circuit concluded, "[t]he question of whether a claim encompasses statutory subject matter should not focus on which of the four categories of subject matter a claim is directed to–process, machine, manufacture, or composition of matter–but rather on the essential characteristics of the subject matter, in particular, its practical utility."  *Id*. at 1375.  In analyzing the *State Street* claims, the Circuit did not note any potential preemptive effects of the claims, but focused only on the results produced by the claims.   However, the "useful, concrete, and tangible result" test has been thoroughly rejected, *see Bilski II*, 130 S. Ct. at 3221, at least partly because its application proved too liberal in filtering out abstract claims.  *See id*. at 3232 n.1 (Stevens, J. concurrence); *id*. at 3259 (Breyer, J. concurrence) (noting the "useful, concrete, and tangible result" test would, if taken literally, allow claims to be patentable where the Supreme Court has held to the contrary (citing cases, including *Flook*) and that the test "preceded the granting of patents that ranged from the somewhat ridiculous to the truly absurd") (internal citations and quotation marks omitted).

In the instant matter, the Court follows the reasoning of the Supreme Court in *Bilski II*, which concentrated not on the usefulness or practicality of claims, but on whether claims are directed to a fundamental concept as demonstrated, as least in part, by their preemptive force.  *See id*. at 3231.  Just as the claims in *Bilski II* were not saved from the abstract exception because they may have nominally claimed a "process" under § 101, nor can Alice's system or product claims be saved only by the fact they may nominally recite a "computer" or "manufacture."

CLS argues that the language of Alice's system and method claims are essentially one

and the same, merely replacing the term "supervisory institution" from the '510 Patent with an unspecified "computer" in every claim of the '720 Patent and claims 1–38 and 42–47 of the '375 Patent. *See* CLS Mem. 34. Accordingly, CLS argues the system claims in the '720 and '375 Patents represent nothing more than an attempt to recast an abstract method as tangible hardware to circumvent the limitations on subject matter eligibility. *See id*. at 34. Alice acknowledges the similarity, but disputes that the various claims are identical. *See* Ginsberg Decl. ¶ 52. The similarities are immediately apparent, even if not entirely identical. As an example, system claim 68 of the '720 Patent mimics the language of method claim 68 of the '510 Patent language in that the method steps are almost identical but the "supervisory institution" recited in method claim 68 of the '510 Patent is replaced by a "data processing system," or a computer, in the system claim. *Compare* '720 Patent, col. 69:20–42, *with* '510 Patent, col. 67:38–41 & col. 68:1–19; *see also* CLS Mem. 13.

The Court has found Alice's asserted method claims to be directed to an abstract concept. The system claims of the '720 Patent represent merely the incarnation of this abstract idea on a computer, without any further exposition or meaningful limitation. Although it is unsettled as to when a claim to a machine or manufacture is abstract,[25] the Court concludes that the system claims in the '720 Patent would preempt the use of the abstract concept of employing a neutral intermediary to facilitate simultaneous exchange of obligations in order to minimize risk on any computer, which

---

[25] *See, e.g., Ferguson*, 558 F.3d at 1367 (Newman, J., concurring) ("There are indeed many uncertainties remaining in this court's restructure of the legal framework of modern technology and its fruits. However, the potentially complex issues of when computers are *Bilski*-acceptable machines do not arise in the Ferguson claims. I agree that these issues require clarification, for uncertainty as to legal rights is as much a disincentive to commerce as is their deprivation. However, this case is not the appropriate vehicle for dictum of potentially large consequence.") (referring to *Bilski I*, 545 F.3d 943).

is, as a practical matter, how these processes are likely to be applied.  *Cf. Alappat*, 33 F.3d at 1544

("Indeed, [machine] claim 15 as written is not 'so abstract and sweeping' that it would 'wholly

pre-empt' the use of any apparatus employing the combination of mathematical calculations recited

therein.") (quoting *Benson*, 409 U.S. at 68–72).  Unlike the machine claim in *Alappat*, the '720

Patent claims, as written, would wholly preempt the use of the abstract concept in any computer.

Despite the fact that the '720 Patent system claims and Alice's asserted method claims are directed

to different patent eligible categories under § 101, their preemptive effect would be largely one and

the same.  As the Court finds the '720 Patent claims are directed to the same abstract concept as the

method claims, the reasoning underlying the abstract determination on the method claims applies

with equal force to the claims of the '720 Patent.  *See supra* Part III(A)(3).

The impact of the '720 Patent on common and everyday financial transactions speaks

to its preemptive effect.  Independent claims 1, 27, 60, and 68 of the '720 Patent mirror the

fundamental concepts claimed by the '510 Patent.  System claim 64, on the other hand, essentially

enables a purchase between a buyer and seller, in which the system recited maintains a shadow

account for a buyer and seller independent of those held by a bank, and the computer is configured

to receive a transaction, adjust the accounts of the buyer and seller to effectuate the purchase if the

accounts have sufficient value, and to generate an irrevocable instruction to the bank(s) to adjust

their account(s) accordingly.  *See* '720 Patent, col. 68:62–66 & col. 69:1–11.  Such a "system" is

simply an electronic intermediary that maintains its own shadow accounts to guarantee and effect

purchases between parties.  Claim 67, which depends from claim 64, further entails means "for

allowing said buyer to acquire an item from said seller, wherein the purchase relates to said item."

*Id*. col. 69:17–19.  Independent claim 80 of the '720 Patent is directed to the same basic concept of

enabling a purchase by an electronic intermediary as claim 64, except it defines the stakeholders as a "first party" and a "second party" and refers to first or second accounts. *Id*. col. 70:20–37.

Chamberlain, a district court decision following *Bilski II*, well illustrates the issue here. The *Chamberlain* invention claimed a physical transmitter that sent out an encrypted signal to control an actuator (as part of a garage door opening system), which the court held was a machine under § 101. *See Chamberlain*, 2010 U.S. Dist. LEXIS 124566 at *73, 78–79. In analyzing the exception for fundamental principles, the court found the claims before it were not an attempt to patent a mere algorithm and that no preemption concerns were raised. *Id*. at *84. When viewed in the context of the entire claim, the algorithm was directed at a "physical product that is to be used for a specific purpose" and would not "preclude the use of the mathematical algorithms that operate within the transmitter for other purposes." *Id*. at *84–85. The court also noted that the physical transmitter was not simply insignificant extra-solution activity since "the machine, to the contrary, constitutes the very heart of the invention." *Id*. at 85.

The machine claims before the *Chamberlain* court stand in stark contrast to the '720 Patent claims before this Court. Here, preemption concerns of a basic concept across an unlimited field are preeminent. The system claims are not a specific and limited application of a general business concept, but instead seek to preempt the concept itself when employed by any computer coupled with a data storage unit. The system claims are no more limited than the method claims simply because they are directed to a data processing system. The effect of allowing these claims to be patentable would be to allow Alice "to pre-empt substantially all uses of th[e] fundamental principle." *Bilski I*, 545 F.3d at 953.

Further, the dependent claims of the '720 Patent only serve to limit the invention to

a field of use and are no more than token postsolution components.  *See Bilski II*, 130 S. Ct. at 3231. The dependent claims merely demonstrate the all-encompassing nature of the steps, or methods, that the '720 Patent system claims are intended to implement.  As with the dependent claims of the '510 Patent, the dependent claims of the '720 Patent describe a plethora of possible transactions or accounts that would be covered by the system,[26] what the "exchange institution" might be,[27] or circumstances under which the exchanges might be effectuated.[28]

While not dispositive for this analysis, it is worthwhile to note that the dependent claims of the '720 Patent recite details to flesh out the steps, parties, and circumstances under which obligations are to be exchanged—mirroring the '510 Patent dependent claims—but do not further describe or limit the claimed data processing system as a machine.  Unlike the machine claims in *Chamberlain*, the steps of exchanging an obligation (and not the computer system claimed) are the

---

[26] *See, e.g.*, '720 Patent, col. 65:64–65 ("transaction linked to a share price") (Claim 2); *id.* col. 65:28 ("weather event") (Claim 3); *id.* col. 66:3 ("market event") (Claim 4); *id.* col. 66:5–6 ("transfer of shares in financial or physical assets") (Claim 5); *id.* col. 66:10 ("transfer of a commodity") (Claim 7); *id.* col. 66:13 ("money for goods, services, promises, credits or warrants") (Claim 8); *id.* col. 66:64–67 ("claim 1, further comprising means for allowing said party to acquire an item from another party, wherein the exchange obligation relates to said item") (Claim 27); *id.* col. 70:1–2 ("exchange obligation involves currency") (Claim 74).

[27] *See, e.g.*, '720 Patent, col. 66:22 ("a credit card company") (Claim 12); *id.* col. 66:24 ("a debit card company") (Claim 13); *id.* col. 66:26 ("bank") (Claim 14); *id.* col. 69:44 ("central bank") (Claim 69); *id.* col. 70:3–5 ("non-bank clearing house or depository") (Claim 75).

[28] *See, e.g.*, '720 Patent, col. 66:38–40 (where exchange institutions operate in different times zones) (Claim 19); *id.* col. 66:41–43 (where exchange institutions have different processing cycles) (Claim 20); *id.* col. 66:47–50 (where "said data storage unit has stored therein a balance for said shadow credit record and/or shadow record obtained from said exchange institution") (Claim 22); *id.* col. 70:41–42 (instruction is generated at the end of the day) (Claim 82).

true "heart" of Alice's invention.  *Cf. Chamberlain*, 2010 U.S. Dist. LEXIS 124566 at *85.[29]  The

Court looks to what, at base, is claimed by the '720 Patent claims—and that is an abstract concept.

The Court agrees with CLS that, in these circumstances, "a computer system merely 'configured'

to implement an abstract method is no more patentable than an abstract method that is simply

'electronically' implemented."  CLS Reply 31; *see also Kuno*, 2010 WL 5127425 at *10 (finding

machine and manufacture claims abstract and noting that "[i]n essence, these claims merely recite

a general purpose computing device intended to facilitate the future execution of the recited

[algorithms] similar to those in the independent method claims that we found to be ineligible under

§ 101").[30]

   The Court also applies this analysis and result to system claims 1–38 and 42–47 of

the '375 Patent.  Although these claims recite an additional component of allowing stakeholders an

ability to transmit requested transactions directly to the computer system via a "first party device,"

a "second party device," or a "communications controller,"[31] the claims simply indicate that the

stakeholders can interact with the computer system, without intermediaries, and that the computer

system itself will ultimately effect the exchange of obligations.  That the parties can directly input

---

[29] *See also* Ginsberg Decl. ¶ 52 (speaking of the '720 and '375 Patents, noting that "at a general level, the basic settlement operations could be performed without the aid of a computer if they were not so claimed").

[30] To be clear, the Court does not hold that Alice's process claims in the '720 Patent fail to recite patent eligible subject matter because they mimic the asserted method claims in the '479 and '510 Patents.  The Court finds the '720 Patent process claims when considered as a whole to be unpatentable because, similar to the method claims they mimic, they are directed to an abstract concept.

[31] *See, e.g.*, '375 Patent, col. 65:4 (Claim 1); *id*. col. 65:62 (Claim 12); *id*. col. 66:3 (Claim 14) (respectively).

desired transactions using modems, land line phones, a fax machine, or otherwise, *see* '375 Patent, col. 7:55–67 & col. 8:1–5, to reach a "communications controller" represents token "postsolution components" and fails to make the claims patentable. *See Bilski II*, 130 S. Ct. at 3231. The "fact that the claim requires the identified transactions actually to be made does no more to alter the character of the claim as a whole." *Bilski I*, 545 F.3d at 965.

The dependent claims at most attempt to limit the fundamental concept to a field of use, by defining the "obligations" that are to be exchanged, the conditions under which obligations are to be exchanged, and/or the respective parties and institutions to the transaction. At the heart of these claims is the same fundamental concept of employing a neutral intermediary to facilitate a simultaneous and irrevocable exchange of obligations in order to minimize risk. The system claims in the '375 Patent recite no more specific or limited application of the fundamental concept than the claims already addressed.

Lastly, the three program claims in the '375 Patent are also directed to the same abstract concept despite the fact they nominally recite a different category of invention under § 101 than the other claims asserted by Alice. Claim 39 recites "program code" to cause a computer to allow a party to send a transaction relating to "an exchange obligation arising from a currency exchange transaction between" a first and second party. '375 Patent, col. 68:10–12, 14. The program code also causes the computer to allow a party to view information relating to the "processing" of the obligation exchange by a supervisory institution. *Id*. col. 68:15. The processing that one can view by way of the program code constitutes the general steps of exchanging an obligation that arise in the other Patents, i.e., maintaining information about the parties' accounts, electronically adjusting the accounts to effect the exchange obligation, and generating an irrevocable

instruction to the exchange institutions. *Id.* col. 68:17–35. CLS argues that claims 39–41 of the '375 Patent do no more than mirror method claim 68 of the '510 Patent, except that the computer program allows a party, by computer, to send a transaction and view information relating to the method claims. CLS Mem. 35. It is true that independent claim 39 recites as part of the claim a process almost identical to a method claimed in the '510 Patent. *Compare* '375 Patent, col. 68:17–35, *with* '510 Patent, col. 68:1–19.

To be sure, the application of an abstract idea does not render a claim unpatentable under § 101, *see Diehr*, 450 U.S. at 187, however these claims seek to claim the fundamental concept itself, and not a limited or specific application of the concept. Claims 39–41 of the '375 Patent allow a party to use a computer to submit a preferred transaction—the first and necessarily inherent step in the fundamental concept of employing an intermediary to facilitate a simultaneous and irrevocable exchange of obligations to minimize risk—and then to observe the processing, or implementation, of the fundamental concept itself. The additional elements of programming to allow a party to submit a transaction and view the exchange does little to mitigate the preemptive effect of these claims on the fundamental concept. Moreover, dependent claim 40 does no more than attempt to limit the invention to a field of use by confining the submitted "transaction" to one that involves currency, *see* '375 Patent, col. 68:37, and claim 41 similarly attempts to limit the claim by only allowing a party to view preauthorized information relating to the processing. *Id.* col. 68:38–41. These two dependent claims represent no more than "broad examples" of how the fundamental concept can be applied and implemented. *See Bilski II*, 130 S. Ct. at 3231.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant CLS's motion for summary judgment.

The Court finds claims 33 and 34 of the '479 Patent and each claim of the '510 Patent, '720 Patent, and '375 Patent to be directed to an abstract idea under the *Benson*, *Flook*, *Diehr*, and *Bilski* Supreme Court line of precedent.  Accordingly, these claims are invalid as being directed to patent-ineligible subject matter under § 101 of the Patent Act.  A memorializing Order accompanies this Memorandum Opinion.


Date: March 9, 2011                                   _____/s/_____
                                                      ROSEMARY M. COLLYER
                                                      United States District Judge